FILED
JUN 23 11 05 AM '04
U.S. DISTRICT COURT
NEW HAVEN, CONN.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SUJATA NICHANI, | : | CIVIL NO. 302CV1384 (JBA) |
| Plaintiff | : | |
| v. | : | |
| OTIS ELEVATOR COMPANY and UNITED TECHNOLOGIES CORPORATION | : | |
| Defendants | : | MARCH 22, 2004 |

**THIRD AMENDED COMPLAINT**

Plaintiff, Sujata (Sue) Nichani, brings this action, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq., 29 U.S.C. § 206 et seq., 42 U.S.C. 1981 Connecticut General Statutes § 46a-51 et seq., and Conn. Gen. Stat. § 31-51q, seeking back pay, front pay, compensatory and punitive damages, attorney fees and costs.

## I. JURISDICTION

1. This Court has jurisdiction over the federal claims herein pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(4), 42 U.S.C. § 2000e-5 (f)(3), and 42 U.S.C. § 1981. Jurisdiction as to Counts Seven, Eight, Nine, Ten, Eleven, Twelve and Thirteen and Fourteen lies pursuant to 28 U.S.C. § 1367.

2. Plaintiff filed timely charges of discrimination on the basis of race, color, sex, national origin and ancestry, and charges of violations of the Equal Pay Act of 1964, with the United States Equal Employment Opportunity

Commission and the Connecticut Commission on Human Rights and Opportunities. She received a Dismissal and Notice of Rights from the Equal Employment Opportunity Commission, dated May 10, 2002, a copy of which is attached hereto as Exhibit A. By Notice dated May 21, 2002, the Connecticut Commission on Human Rights and Opportunities released jurisdiction of plaintiff's state law claims pursuant to Public Act No. 01-95. A copy of this release is attached hereto as Exhibit B. This action is filed within 90 days of her receipt of Exhibits A and B. Plaintiff thereafter filed second charges of discrimination with the CCHRO and EEOC dated April 26, 2002, CCHRO number 0210475 and EEOC number 16aa201211. The Equal Employment Opportunity Commission issued a Dismissal and Notice of Rights, dated December 9, 2002, a copy of which is attached hereto as Exhibit C. By Notice dated December 18, 2002, the Connecticut Commission on Human Rights and Opportunities released jurisdiction pursuant to Public Act No. 01-95. A copy of this release is attached hereto as Exhibit D. Thereafter, Plaintiff filed her third charge of discrimination with the CCHRO and EEOC on September 16, 2003, which was assigned Case Number 0410094 and EEOC Case Number 16A-2004-00030. The Connecticut Commission on Human Rights and Opportunities released its jurisdiction over CCHRO case number 0410094 by release dated January 20, 2004. A copy of this release is attached hereto as Exhibit E. The Equal Employment Opportunity Commission released its jurisdiction over its Charge number 16A-2004-00030 by Notice of Right to Sue dated January 15, 2004. A copy of this release is

attached hereto as Exhibit F. This complaint is filed within 90 days of her receipt of exhibits E and F.

3. Venue lies in this District pursuant to 28 U.S.C. §1391(b)(1), (2).

## II. PARTIES

4. Plaintiff Sujata (Sue) Nichani is a resident of the State of Connecticut and a woman of Asian Indian ancestry.

5. Defendant Otis Elevator Company ("Otis") is a New Jersey corporation, with its corporate headquarters in Farmington, Connecticut. Defendant Otis is a wholly owned subsidiary of Defendant United Technologies Corporation ("UTC").

6. Defendant UTC is a Delaware corporation with a business address at One Financial Plaza, Hartford, Connecticut. UTC and Otis constitute an integrated enterprise, with common management and ownership or financial control, centralized control of labor relations, and a functional interrelation of operations. Otis is a mere instrumentality and/or alter ego of UTC. The personnel decisions alleged herein, including those involving Plaintiff, were made by Otis and/or UTC employees. Plaintiff's benefits were provided through Otis and/or UTC benefits plans, including UTC stock and medical and health plans. Human resource and labor relations decisions are regularly made by Otis and UTC personnel, and employees of Otis and UTC regularly and routinely transfer between the two entities. Also, the two entities share common management with regard to policies and procedures.

7. At all times relevant to this complaint, the defendants were Plaintiff's "employer," as defined in 42 U.S.C. § 2000e(f) and C.G.S. § 46a-51(9), and an "employer," as defined in 42 U.S.C. § 2000e(b) and C.G.S. § 46a-51(10).

## III. STATEMENT OF FACTS

8. Plaintiff began her employment with defendants on October 15, 1990. Up until March 21, 2003, she was employed as the Senior Manager in Safety & Environment ("EHS") for Defendant Otis at its Farmington, Connecticut headquarters, a position she held since April 1, 1999. Safety is widely touted by Defendants to be a top priority at Otis. In addition to having safety-related responsibilities as Safety Manager, she was also the Business Practices Officer for her Area.

9. From approximately October 1990 through October 1994, Plaintiff was a Maintenance Supervisor for Otis' New York location. She was then promoted to Location Manager (a Location Manager is now called a Branch Manager) and relocated to Otis' Winston-Salem, North Carolina offices. In May 1995, Plaintiff was named Location Manager for Otis' Charlotte, North Carolina location. Plaintiff was later promoted to Regional Field Operations Manager for the Southwest Region and relocated to Otis' Dallas, Texas location. In April 1999, she accepted an offer to become the Senior Manager in Safety and Environment and relocated to Connecticut.

10. Plaintiff was the only woman in a high-level field operational role out of approximately 8,000 employees in North America.

11. The Defendants utilize a system involving grades and levels for personnel, compensation and seniority purposes. Although this system has recently changed, during most of the period relevant to this complaint, the grade levels (which determine salary) went up to Grade 51. The next step beyond Grade 51 was Level 3, Level 2 and Level 1. The recent change created designations, for example, for grade levels 49-51 as Level 4, and grade levels 46-48 as Level 5.

12. During Plaintiff's interview for her position as Senior Manager in Safety and Environment, Bill Miller, then President of North American Area, indicated that a Regional General Manager position was an option for her next assignment, and that if her performance was good at EHS, she would be promoted to Level 3 after 1 year.

13. Throughout her career, except for the events alleged herein, Plaintiff has received recognition for her job performance, in the form of salary increases, positive performance appraisals, written and spoken praise, and increasingly important job responsibilities. For example, Plaintiff's Regional General Manager while she was Location Manager in Charlotte stated that Plaintiff "demonstrated outstanding leadership capabilities" and "show[ed] potential to be a Regional General Manager." By letter dated September 24, 1991, Gary Faltin described Plaintiff as having a "high degree of integrity." Plaintiff's Performance Appraisal in her current position for the period January 1, 2000 through December 1, 2000, described her performance level as "fully

competent." Plaintiff did not receive another written formal performance appraisal until March 21, 2003.

14.     Plaintiff was always a dedicated employee, and envisioned a lifelong career with Defendant United Technologies and its companies.

15.     During her career, Plaintiff was consistently faced with adverse treatment of women in her work environment based upon sex. She has witnessed comments by male superiors about the professional inadequacies of women, comments about the inability of women to perform as well as men, and overall unequal treatment of women as compared to men. For example, Plaintiff's immediate superior, Ray Moncini, President of North American Area, commented while discussing with Plaintiff an OSHA violation that "the inspector was a woman, she probably didn't know what she was doing, she was a woman." Another recent example occurred when a field operations manager explained during a field operations meeting -- using a Power Point Presentation with visual slides -- how workers get injured on the job because their attention is focused on scantily clad women, rather than on the work they are performing. This presentation was entitled "Why Men Die Young." Plaintiff was the only woman at that meeting. During a meeting at World Headquarters attended by Plaintiff, a communications manager displayed on his laptop for people including Plaintiff to see, an e-mail entitled "Petite women, tight asses."

16.     On Monday, April 2, 2001, Ray Moncini, Plaintiff's superior, asked Plaintiff to consider taking a position as operations manager with Otis' North

American Acquisition Company. He commented that a position in safety was "not the right job for [her]." An operations manager position would entail significantly fewer responsibilities than those Plaintiff had as Safety Manager. At Mr. Moncini's request, Plaintiff agreed to speak with the President of North American Elevator Services ("NAES"), Mark Boelhouwer, about the operations manager position, and did so. Interestingly, Mr. Boelhouwer stated that he did not need an operations manager and that the position was in fact not available.

17. Although Plaintiff herself had never been informed of any adverse job decision affecting her, on Tuesday, April 24, 2001, Dilip Rangenkar, Otis' Manager of Communications North American Area, informed Plaintiff that the Vice President of Otis Worldwide Communications asked him to prepare an announcement regarding Plaintiff's "new assignment." When Plaintiff responded that she had never been formally offered nor accepted any new position, he told Plaintiff that the Vice President of Worldwide Communications had said it was confirmed that she had accepted a new position.

18. On Thursday, April 26, 2001, Ellen McGroary, Vice President of Human Resources, entered Plaintiff's office to give Plaintiff, in her words, a "heads up." She explained to Plaintiff that Brad Russell, then Director of EHS Programs Worldwide, had been given Plaintiff's job and that Ray Moncini would be offering her Branch Manager positions (entailing significantly fewer job responsibilities) in Atlanta, Georgia and San Jose, California. Plaintiff had previously held Branch/Location Manager positions in North Carolina.

19. Later, on Thursday, April 26, 2001, Plaintiff met with Mr. Moncini. He offered Plaintiff lower level positions than the Senior Manager position she had been in since April 1999. Those positions carried significantly fewer responsibilities, and were posted at one to two grade levels below Plaintiff's grade level. During this meeting, Mr. Moncini stated that he did not want Plaintiff to think that he had given her job away while she was still in it. Plaintiff told him that that was the reality of the situation, and excused herself. This event, in addition to the others leading up to and subsequent to this, shocked Plaintiff, and caused her embarrassment, shame, and emotional distress.

20. On Friday, April 27, 2001, Ray Moncini asked Plaintiff to come into his office to review a draft announcement outlining the personnel changes involving Mr. Russell and Plaintiff. Ellen McGroary, who was also present, asked Plaintiff whether she was okay with the announcements. Plaintiff asked her whether she had a choice, to which Ms. McGroary responded "no."

21. On Monday, April 30, 2001, Ellen McGroary told Plaintiff that she had been thinking about how she must have felt over the weekend, and decided not to release the announcements until Plaintiff knew where she was going. The announcements were released that evening on the intranet anyway, distributed to thousands of people, including Plaintiff's colleagues, her staff, people she manages, supervises, and is expected to lead and direct as part of her job.

22. The company-wide announcement had stated that she was being removed from her position, taking a "senior NAA Line Management Position"

(even though no position was in place), and that Brad Russell would be taking over her position. This representation and others, implied that Plaintiff had done something wrong in connection with her job. Indeed, Plaintiff received dozens of phone calls inquiring as to what new position she would be taking, why the change had been made, and why the announcement did not designate what her position would be. Some people even asked Plaintiff what she did wrong.

23. On Thursday, May 10, 2001, Mr. Rangnekar asked Plaintiff to speak on elevator safety for an NBC broadcast. When Plaintiff responded that she was no longer the Senior Manager for Safety, but that Brad Russell was and should speak, Mr. Rangnekar replied that Mr. Russell was not knowledgeable enough.

24. In connection with Brad Russell's arrival, Ray Moncini told Plaintiff to be sure that Russell (her replacement) was adequately trained and that the transition go smoothly. It became clear through statements by Mr. Moncini and others, that Russell did not know enough to perform Plaintiff's position.

25. As of May 14, 2001, Plaintiff still had not been reassigned. Ray Moncini informed Plaintiff that day that Brad Russell had resigned. Mr. Moncini said he'd love to have her back in safety (although he previously told Plaintiff safety was not right for her). Plaintiff agreed to take her old position back.

26. Plaintiff then learned that Brad Russell was paid at a Level 3 salary (higher than Plaintiff), received greater benefits, including allowances, stock

options and performance payments, than Plaintiff, yet was less qualified to perform the job responsibilities of a Safety Manager.

27. Over the next several weeks Plaintiff sought to have her concerns addressed. On May 23, 2001, Plaintiff inquired of Ms. McGroary why Brad Russell had received greater pay and benefits than she for doing less work. Ms. McGroary did not respond for two weeks and then offered an inadequate explanation only after Plaintiff on June 5, 2001, reminded her of the May 23, 2001 inquiry.

28. When Plaintiff continued to try to communicate via e-mail with Ms. McGroary about her concerns, Ms. McGroary suggested they discuss it rather than communicate via e-mail. Plaintiff suggested to Ms. McGroary they meet in the next few days.

29. Ms. McGroary agreed but never made any attempt to arrange this meeting, and appeared unresponsive to Plaintiff's concerns. For example, on Monday July 2, 2001, Plaintiff e-mailed Ms. McGroary saying that she was available to meet with her on July 9, 2001. Ms. McGroary's secretary responded and asked Plaintiff whether she was available to meet with Ms. McGroary on July 12, 2001, to which Plaintiff said yes. Ms. McGroary never made any arrangements for this meeting.

30. On many occasions, Defendants have treated male employees more favorably than women under circumstances substantially similar as Plaintiff. For example, they permitted a male Senior Manager to retain his position instead

of being replaced and displaced by a male director. Also, when a male controller was assigned to Otis North America, the previous controller, a male, was moved into another position before the other controller was assigned. And, when one male was promoted in January 2000, he replaced another male but was not given the same title and compensation until he brought it to the company's attention, and he was very quickly accommodated by a level and compensation increase.

31. Despite being promised that she would be promoted to Level 3 after one year of good performance, Plaintiff was never promoted.

32. Plaintiff's counterpart in Germany, a male, was promoted to Level 3 from Grade 51 even though he had been in the position for approximately one year. All of Plaintiff's counterparts throughout the world with comparable size territories are compensated at Level 3, or higher.

33. Of the 18 people who reported to Ray Moncini, the then Vice President & Senior Area Executive for Otis' North America Area in August of 2001, only two were paid as Senior Managers rather than the higher salary level of director: Plaintiff and another person, Dilip Rangnekar, who were both of Indian National Origin. Mr. Rangnekar was moved laterally to World Headquarters, and replaced by a female, who was kept at the Senior Manager level. Since Plaintiff filed her charge with the CHRO and EEOC, that woman was promoted to the Director level, so that Plaintiff was the only person on Ray Moncini's staff that was not a director level or higher.

34. Plaintiff filed a claim with the CHRO and the EEOC on or about August 23, 2001. The Defendants responded to these claims, but they passed the Merit Assessment Review.

35. Defendants therefore knew that Plaintiff was engaged in an activity protected by both federal and state law.

36. After Plaintiff filed her charges of discrimination with the CHRO and the EEOC, she continued to perform her job at the highest level. Up until the day she was terminated, the plaintiff received no formal or informal complaints about her work. Indeed, she continued to receive formal and informal praise from other employees. The Defendants, up until the day she was terminated, never communicated to Plaintiff any dissatisfaction in her performance.

37. Defendants maintain a Recognition Stock Option Plan which is designed to permit "outstanding employees whose decisions impact the performance of the company, and whose skilled execution of those decisions helps to add value for shareowners" to "personally benefit from the value those key employees help create."

38. Plaintiff received recognition stock options for five (5) years starting in 1997. From her experience and knowledge of the Defendants, she knows that prior to 2002, the award of recognition stock options was very selective, and only extremely high performing individuals awarded options. In 2001 Plaintiff received the maximum allowable award of stock options: 500 shares.

39. The Recognition Stock Option Plan was expanded in 2002 to permit 40% additional participation than previous years; the obvious result being more employees received options under the Plan.

40. These stock options are awarded through Statement of Award certificates that are issued every year. Plaintiff received none in 2002 nor 2003. Plaintiff believes this is in retaliation for her protected activity of filing charges of discrimination, since her performance has remained at the highest level.

41. The Defendants also have a Performance Incentive Plan which identifies key employees and rewards them with a bonus up to 15% of the employee's salary.

42. In 2001, Plaintiff received a 10% bonus payment under the Performance Incentive Plan for her performance in 2000. In 2002 she did not receive any bonus for the year 2001, the year she filed charges of discrimination with the CHRO and EEOC. Nor did she receive any in 2003, for her performance in 2002, the year she commenced this action in federal court.

43. Defendants, upon information and belief, maintain and have maintained discriminatory seniority lists and systems that favor males over females, including the Grade Level compensation system and the general exclusion of females in high level field operational roles. In many occasions, as with Plaintiff, less-qualified males are selected over more qualified females, for equal work, and sometimes for less work than females are performing. These constitute discriminatory practices and/or policies.

44. In 2002, Defendants implemented a Performance Review procedure that utilized the company's intranet. This procedure requires the employee to establish goals for himself or herself, evaluate themselves against those goals, and then the applicable manager provides input along with other individuals who are permitted to "rate" the employee. This procedure is performed "on-line."

45. The final step in this performance review involves a face-to-face meeting with the employee and his or her manager, ending with the manager and the employee signing the performance review.

46. This procedure was made mandatory for 2003 performance reviews, and Ms. Nichani received written policies concerning its implementation with her staff.

47. On March 21, 2003, while Plaintiff was on vacation, she was summoned from home to Ray Moncini's office. Upon her arrival, Plaintiff was presented with a completed "Performance Feedback" form, and met with Moncini and Ellen McGroary for approximately ten (10) minutes. At the end of this meeting defendants terminated Plaintiff's employment.

48. Ms. Nichani was never permitted to participate in the Performance Feedback process, as Defendants had mandated.

49. Defendants maintain a progressive discipline policy that mandated verbal warnings followed by written warnings and, if necessary termination. During her employment, Plaintiff has utilized this policy in disciplining certain

employees, and always believed and relied upon the Defendants adhering to this policy as a condition of her employment.

50. Prior to being terminated on March 23, 2003, Plaintiff never received any formal or informal discipline.

51. Defendants published a Code of Ethics in 1990 that governs its "business decisions and actions."

52. In the Code of Ethics, Defendants represented, among other things, that:

a. "[They] maintain the highest ethical, environmental and safety standards everywhere;"

b. "[They] are committed to the highest standards of ethics and business conduct" in their relationships with employees at every organizational level;"

c. "[They] are committed to providing safe and healthy working conditions and an atmosphere of open communication for all [their] employees;"

d. No retribution will be taken against any employee for contacting . . . any level of supervision [or] the Legal Department. . . to express concerns with business policies or practices;"

e. Failure to comply with these Standards and associated UTC policies will result in appropriate sanctions; and

    f.    UTC policy prohibits any retribution against an individual for making [reports of violations or suspected violations of the UTC Standards of conduct.]"

53.    Defendants further represented that "these Standards of Conduct" would be "enforced equitably at all organizational levels."

54.    On or about December 23, 2002, a fatal accident occurred in Jersey City, New Jersey, at a construction project involving the Defendant Otis. Plaintiff, as safety manager, was involved in the Defendants' internal investigation of this fatality.

55.    Plaintiff worked extremely long hours investigating this fatality, its causes, and remedial action that Defendants should take.

56.    While the investigation was ongoing, Defendants removed Plaintiff from the position of Business Practices Officer, a position that involved overseeing ethics compliance and Defendants' adherence to the Code of Ethics.

57.    Defendant conspired to blame Plaintiff for the fatality, by making false representations and statements concerning Plaintiff's performance as safety manager.

58.    Plaintiff prepared the internal investigation report concerning the fatality, and presented it to Defendants. Defendants proceeded to demand that Plaintiff mischaracterize the causes of the fatality, when such characterization would have been false and would have required Plaintiff to conceal management failures concerning the fatality.

59. Plaintiff refused to agree to such characterization and stated her reasons for this refusal to Defendants. Defendants proceeded to alter the report despite Plaintiff's opposition and statements that such conduct would be wrong.

60. After Defendants' terminated Plaintiff's employment, they replaced her with a male, who is compensated at a director level, yet is less qualified for the position.

61. As a result of defendant's actions, plaintiff has lost income, benefits and suffered severe emotional distress.

## IV. COUNT ONE: Discrimination on the Basis of National Origin in Violation of Title VII, 42 U.S.C. § 2000e-2

1-57. Paragraphs 1 through 57 of this Complaint are hereby incorporated as paragraphs numbered 1 through 57 of Count One.

58. Plaintiff's Asian Indian ancestry and national origin was a motivating factor in defendants' decision to demote her and reduce her job responsibilities on April 26, 2001, to pay her at a lower salary grade level than her lesser qualified male counterparts, specifically Brad Russell and Pat Dowson, to provide her with less benefits, deny her a promotion and/or raise, and to terminate her on March 21, 2003.

59. In so doing, defendants acted with malice and/or reckless indifference to plaintiff's rights.

60. As a result of defendants' actions as described above, plaintiff

has suffered damages including, but not limited to, loss of income, emotional distress and humiliation.

## V. COUNT TWO: Discrimination on the Basis of Race in Violation of Title VII, 42 U.S.C. § 2000e-2

1-57. Paragraphs 1 through 57 of this Complaint are hereby incorporated as paragraphs numbered 1 through 57 of Count Two.

58. Plaintiff's Asian Indian race was a motivating factor in defendants' decision to demote her and reduce her job responsibilities on April 26, 2001, to pay her at a lower salary grade level than her lesser qualified male counterparts, specifically Brad Russell and Pat Dowson, to provide her with less benefits, and deny her a promotion and/or raise, and to terminate her on March 21, 2003.

59. In so doing, defendants acted with malice and/or reckless indifference to plaintiff's rights.

60. As a result of defendants' actions as described above, plaintiff has suffered damages including, but not limited to, loss of income, emotional distress and humiliation.

## VI. COUNT THREE: Discrimination on the Basis of Sex in Violation of Title VII, 42 U.S.C. § 2000e-2

1-57. Paragraphs 1 through 57 of this Complaint are hereby incorporated as paragraphs numbered 1 through 57 of Count Three.