

**NATIONAL ECONOMIC RESEARCH ASSOCIATES**
ONE MAIN STREET, CAMBRIDGE, MASSACHUSETTS 02142
TEL: 617.621.0444 FAX: 617.621.0336

*Consulting Economists*

My name is Christopher Erath, and I am a Senior Vice President at National Economic Research Associates (NERA) in Cambridge, Massachusetts. NERA is a consulting firm specializing in microeconomic analysis. I received a Ph. D. in economics from the University of Wisconsin where my fields of interest included labor economics, econometrics, and industrial organization. My curriculum vitae is attached.

I have been asked to review the report by Sheldon Wishnick purporting to estimate the "lost income and employee benefits" of Sujata Nichani as a result of her separation from Otis Elevator ("Otis") in March of 2003. After reviewing Mr. Wishnick's report and documents concerning compensation at Otis and information concerning Ms. Nichani's job search, I conclude that Mr. Wishnick dramatically overstates Ms. Nichani's loss due to erroneous assumptions concerning her likely compensation had she remained at Otis, duration of Otis employment, and earnings following her departure from Otis.

Ms. Nichani joined Otis in 1990 as a Field Engineer and held various positions prior to becoming a Senior Manager, Environmental Health and Safety, in 1999. She held this position at the time of her termination in March 2003. Since leaving Otis, Ms. Nichani received two informal job offers from Thyssen Krupp in May 2003, which she declined, and began new work with an unspecified new firm in March 2004. At the time of this writing little information is available concerning her new position and consequently it may become necessary to update this report should more information become available concerning her current compensation.

Mr. Wishnick estimates Ms. Nichani's economic loss by making a series of assumptions, namely that:

1. She would have been paid the salary and bonus received by Brad Russell in 2001.

2. Her compensation would have increased at five percent per year thereafter.

-2-

3. Ms. Nichani will not work until September 2005 and will at that point receive a position paying $93,713 per year with no other cash or stock compensation.

4. Stock options Ms. Nichani held when she left Otis should be valued using the Black-Scholes methodology and Ms. Nichani would have received 7,000-9,000 stock options in each year from 2002 onward.

5. Alternatively, the stock options should be valued based on a statement made by Mr. Stephen Page projecting what the price of UTX stock would be in 2007 if it continued to grow as it had in the past.

6. Losses should be augmented by 22.8 percent to account for fringe benefits.

7. Losses should be calculated through 2028 because worklife expectancy tables show "an anticipated retirement age of 61.5."

In the remainder of this report I discuss each of these assumptions and explain why they lead to an exaggerated value for Ms. Nichani's loss. I also discuss the impact of correcting the erroneous assumptions and ultimately find a total loss that falls between $301,196 and $427,926.

1. Assumption 1 – Salary and Bonus at Otis

Even though Ms. Nichani remained employed by Otis into March 2003, Mr. Wishnick begins calculating her loss as of May 1, 2001. He does so because on that date Ms. Nichani was replaced in her position by Mr. Bradford Russell, who had previously held a (higher level) executive position at Otis World Headquarters and was moved into the position so that he could gain more line experience in the elevator business.[1] Mr. Russell's compensation as an executive exceeded that paid to Ms. Nichani as a Senior Manager (or her predecessor, who also was a Senior Manager) but it is my understanding that his compensation was "red-circled," or left unchanged when he moved. Mr. Russell remained in the new position for only one week before resigning.

---

[1] See Page deposition, page 39.


Consulting Economists

Mr. Wishnick assumes that beginning on May 1, 2001 Ms. Nichani should have been paid precisely as Mr. Russell was. Mr. Russell's compensation was not determined based on his move to Ms. Nichani's job; rather, he maintained the compensation he had received in his prior executive-level position. Moreover, his compensation was red-circled, meaning that he maintained his executive compensation but would not have been eligible for pay increases until his compensation was in line with the level of his new position. Red-circling is a common practice when companies move an employee into a lower level position, possibly to allow that employee to obtain additional experience, but do not wish the employee's pay to decrease as a result. Mr. Russell also had far more environmental health and safety experience than did Ms. Nichani. The Vice Chairman and CFO of United Technologies, Stephen Page, testified that he did not believe that Ms. Nichani was qualified for an executive position in 2001.

These facts are inconsistent with Mr. Wishnick's assumption that Ms. Nichani would have received compensation identical to Mr. Russell in 2001. Mr. Page's testimony is clear that Mr. Russell was allowed to maintain his compensation level when he moved to Ms. Nichani's position and that the position itself was not upgraded to an executive level position, which it was not under Ms. Nichani or her male predecessor. That this position was not viewed as an executive-level position is also apparent from the red-circling of Mr. Russell, as there would have been no need to red-circle his compensation if the new position was an executive level position.

Given this evidence I see no basis to support Mr. Wishnick's assumption that Ms. Nichani would have received a 30 percent salary increase on May 1, 2001 or that she would have received incentive compensation available only to executives. Mr. Wishnick provides no justification for this assumption and seems to have been instructed by Ms. Nichani's counsel to proceed in this manner. Likewise, I see no reason to assume that Ms. Nichani would have received incentive compensation available only to executives. Her position was not eligible for incentive compensation and I know of no information to suggest that Senior Manager positions have become eligible for executive incentive compensation. Consequently, I modify Mr. Wishnick's calculation


n/e/r/a
Consulting Economists

by assuming that Ms. Nichani would have been paid as she actually was through her separation from Otis in 2003.[2]

I do note, however, that even if executive level incentive compensation were relevant for Ms. Nichani, Mr. Wishnick would still overstate potential losses because he assumes that in each year such compensation would be determined by multiplying salary by 25 percent and then by 1.693. This latter figure is the average of bonus multipliers which were used in 1999-2001. I obtained the actual figures for 2002 and 2003 and note that they are 1.55 and 1.22. Use of these figures would reduce the incentive compensation Mr. Wishnick projects for 2002 and 2003, and their inclusion in the average would decrease it to 1.57 from Mr. Wishnick's 1.693 and therefore reduce claimed incentive compensation losses.

One other factor is relevant to salary losses. In her position Ms. Nichani received a "position allowance" equal to 15 percent of her salary. I have reviewed the offer letter Ms. Nichani received when she obtained her job in 1999, and that letter states that she would receive the position allowance for three years and that its continuation would be reviewed after three years. The position allowance was still in effect at the time she left Otis, but there is no guarantee that it would have continued had she remained with Otis. Moreover, Ms. Nichani was terminated because of her failure to enforce company safety guidelines, and this failure became apparent in the course of an investigation into a fatal accident. I have been advised that senior employees had their incentive compensation reduced as a result of this investigation, and had Ms. Nichani not been terminated she could have had her compensation reduced. Given that her position allowance was not permanent, one possibility would be that it would have been eliminated in March 2003. As it is impossible to know what action would have been taken against Ms. Nichani had she not been terminated, I provide alternate versions of the calculation, one assuming she would have kept the position allowance and one assuming it would have been eliminated.

Assumption 2 – Salary increases at five percent per year

As discussed above, Mr. Wishnick assumes that Ms. Nichani's compensation would grow at five percent per year. The only justification provided is that this rate is "considerably below the

---

[2] Note that there can be no possibility of an allegation that Ms. Nichani's merit increase in 2002 was

**n/e/r/a**
Consulting Economists

earning growth" Ms. Nichani had in recent years.[3] Review of Ms. Nichani's annual pay changes in her Senior Manager position shows she received increases of four, five, and zero percent, figures which do not support Mr. Wishnick's claims. Moreover, it is a well-known result in labor economics that percentage salary increases slow with experience, and assumptions of large increases extending for 20 years into the future is inconsistent with this empirical fact.

To project salary for 2003 and beyond, I obtained from Otis information showing the salary increase budget for 2003 and 2004, which was 3.5 percent in both years. In past years Ms. Nichani had received merit increases slightly above the budgeted levels, but as her salary of $117,950 was well above the midpoint of the salary range for her position and not far away from the maximum permissible salary for her salary grade, I project increases for her at the budgeted amount of 3.5 percent. I note that 3.5 percent exceeds the rate at which the midpoint of permissible salaries for her salary range increased from 1998-2000 (2.7 percent).

Finally, even if one were to accept that Ms. Nichani should have received Mr. Russell's salary, it is inconsistent with the red-circling of his compensation to assume that she would have received five percent increases per year in each year thereafter.

Assumption 3 – Ms. Nichani would not work until September 2005

This assumption is now demonstrably untrue, as Ms. Nichani began work in a new position in March 2004. Mr. Wishnick again had no basis for this assumption and included it in his report because plaintiff's counsel told him to. It is also the case that Mr. Wishnick disregarded Ms. Nichani's testimony that she declined two offers from Thyssen Krupp in May 2003, two months after leaving Otis, and instead calculates losses using no offset whatsoever until September 2005. Even if he was unaware of Ms. Nichani's new job, I see no basis for Mr. Wishnick to disregard this information that she could have been employed. Consequently, I modify Mr. Wishnick's calculation by including the compensation she could have earned by accepting the Thyssen Krupp position beginning in June 2003 and then including the position she has actually obtained beginning in March 2004. Her current position pays $90,000 per year and I use the same figure for

---

affected by her allegations in this case as there were no merit increases in that year.

[3] Mr. Wishnick was unable at deposition to explain over what period he had reviewed Ms. Nichani's increases.


n/e/r/a
Consulting Economists

- 6 -

the Thyssen Krupp position because Ms. Nichani testified at deposition that she was told the salary for the position offered her was $85,000-$90,000. I use the same salary increase rate, 3.5 percent per year, as I do for Otis employment.

No further information is available concerning what other compensation would have existed at Thyssen Krupp or does exist in Ms. Nichani's new job. I have been advised by counsel for Otis that Ms. Nichani's current position includes a profit sharing plan, but as no details are available I am unable to include this plan in my calculation. I also do not know if either the Thyssen Krupp job or the new job include incentive compensation such as bonuses or stock options. Consequently, my modification of Mr. Wishnick's calculation should be viewed as an upper bound on economic losses as no such elements of compensation are included.[4]

Assumption 4 – Ms. Nichani would have received 7,000-9,000 stock options a year and these options should be valued using the Black-Scholes formula

Mr. Wishnick arrives at his first alternative for stock option damages by (1) using the Black-Scholes formula to value the options Ms. Nichani received prior to her departure and deducting from this value the amounts she received by exercising her options and (2) assuming she would have received either 7,000 or 9,000 options in each year from 2002 onward and valuing these hypothetical options using Black-Scholes. This methodology rests upon his assumptions concerning the number of options Ms. Nichani would have received and that Black-Scholes is a proper way to value the type of stock options Ms. Nichani received.

There is no issue with Mr. Wishnick's choice of the number of stock options prior to 2002, as he relies on the actual numbers Ms. Nichani received. However, in 2002 he assumes she would have received 7,000 options and then 9,000 in subsequent years. He presented no justification for these figures; again, he used them because he was instructed to do so by plaintiff's counsel. These figures are completely at odds with available information concerning stock option grants even for executives. Mr. Russell, for instance, received grants of 3,000 and 3,100 options in 2000 and 2001, his final two years with the company. I also obtained information showing the magnitude of option grants given to people in grade L3, the grade Mr. Russell held before resigning. In 2002 the


n/e/r/a
Consulting Economists

average grant for an L3 was 2,984 and in 2003 3,210. No L3 received a grant as large even as 6,000 options, let alone the 7,000 or 9,000 Mr. Wishnick uses.

As discussed above, the evidence does not support Mr. Wishnick's assumption that Ms. Nichani would have assumed an executive (L3) position. I obtained information showing typical stock option grants to non-executives and found that typical grants were less than 250 options and did not occur annually. I compared the actual average grant size to Ms. Nichani's in 1998, 1999, and 2000 and found that she received 1.96 times the average. Consequently, I assume that she would have received 1.96 times the actual average non-executive grant in each year where a grant existed. I also assume that future grants would occur every 18 months, as has been recent practice.

Another relevant concern with stock options is the recent trend away from them. The Financial Accounting Standards Board (FASB) is currently contemplating requiring companies to value stock options and include the value as a charge against earnings. Because there is no accepted method to accurately value employee stock options (discussed further below), companies have begun to move away from stock options or at least to modify the terms of any grant. For instance, recent weeks have seen announcements that Microsoft will cease granting stock options altogether while IBM announced that it will continue granting options but that any options will be granted at a price 10 percent above the market price.[5] I am unaware of a planned change to the stock option program at UTC, but Mr. Wishnick's assumption of the certainty of the continuation of an option program is inconsistent with this trend.

Mr. Wishnick's second major assumption is that stock options can be reliably valued using the Black-Scholes formula, a formula designed to value options which have an extremely short lifetime of weeks or months. This formula requires the user to input items such as the stock's volatility, expected dividend yield, and a risk-free interest rate. Each of these items may be predicted with some certainty for short periods of time such as weeks or months, but is impossible to predict over the ten year lifetime associated with employee stock options such as those granted to Ms. Nichani. Black-Scholes was created to value exchange-traded options which are of

---

[4] Should information concerning additional compensation become available, I will modify my report if warranted.

[5] Consequently, the options will have no value unless the stock appreciates at least 10 percent.


Consulting Economists

extremely short lifetime and are freely transferable and its derivation depends on the assumption that option holders can hedge their risk by taking a short position in the same stock. Each of these assumptions is inconsistent with the actual situation at United Technologies, where the options have long lifetimes, are non-transferable, and short-selling of company stock is prohibited. For such reasons and others such as diversification it is commonly known that Black-Scholes overvalues employee stock options.[6] FASB, in fact, has already recommended one modification to Black-Scholes because research has shown that employee stock options are typically exercised well before expiration, which is to replace the actual lifetime of stock options with the expected lifetime. When UTC values options as required by FASB, they use the expected lifetime, not the listed 10 year lifetime as Mr. Wishnick does.[7] Because Black-Scholes does not provide an accurate value for employee stock options even with expected lifetime included, I see no reason to use it in this case.

The value of Ms. Nichani's past options as of today is known and can be determined by simply taking today's stock price, deducting the grant price, and multiplying by the number of options. In the case of options Ms. Nichani actually exercised, this calculation is modified to deduct the price at which she sold the options rather than the grant price. Possible future appreciation can then be accounted for by assuming a three percent annual increase in the stock price. While it is certainly possible that UTC stock will increase at a more rapid rate, it is far from certain, and if a greater rate of appreciation were used a greater discount rate would also be required to account for the riskiness of the potential appreciation, and this greater discount rate would eliminate any additional value from an assumed higher rate of appreciation.

Mr. Wishnick has offered no defense of his choice of the Black-Scholes methodology other than to note that it is widely used and makes no reference to the commonly held position that it overstates the value of employee options or at a minimum to FASB's recommendation to use the expected lifetime. He also does not attempt to explain his opinion that, contrary to research in the field, Black-Scholes can give a reliable value when its basic assumptions are violated. Together, his use of the Black-Scholes formula and assumed grants of numbers of stock options far exceeding

---

[6] For instance, see Kevin Murphy and Brian Hall, "Stock Options for Undiversified Executives," available at http://www.nber.org/~confer/2000/si2000/murphy.pdf.

[7] Use of the shorter expected lifetime would lead to a lesser Black-Scholes value.


n/e/r/a
Consulting Economists

those given Senior Managers (or L3 executives) cause him to overstate Ms. Nichani's stock option loss by a factor of more than 60.

Finally, Mr. Wishnick makes no allowance for the possibility that Ms. Nichani might receive stock options in her new position or any other one she might hold between now and 2028, instead making the most extreme assumption possible that no options will ever be received by Ms. Nichani.

### Assumption 5 – Alternately, options should be valued based on an executive forecast

In this alternative Mr. Wishnick uses the same assumption regarding the number of stock options Ms. Nichani would have received as above. Consequently, the same infirmities affect this second alternative. In this alternative, however, Mr. Wishnick sets Black-Scholes aside and values the options using what he calls the "Executive Forecast Valuation." This valuation is not based on any research or option pricing formula but rather upon a single chart presented at a meeting by a Mr. Page. The chart simply shows what the UTC stock price would be in 2007 if it continued to grow at its historical rate. There is no evidence to suggest that it was meant to be a forecast of likely stock price in 2007 and basic economic theory teaches that if such appreciation could be known in advance the stock price would quickly move toward the certain 2007 value as at today's price investors would be guaranteed a return far beyond what risk-free investments typically yield. Such a methodology has no support in the valuation literature and is rank speculation.

### Assumption 6 – 22.8 percent of salary should be added to account for fringe benefits

Mr. Wishnick adds 22.8 percent of salary to his projection of salary at Otis and, once he assumes Ms. Nichani will become reemployed, her new job. He does not indicate for which benefits he is attempting to account, but from his deposition testimony it would appear that he is including insurance benefits such as medical and dental as well as savings and retirement programs and possibly paid time off such as vacation and holidays. If he is including paid time off, this is simply wrong, as such benefits are already included in base salary (Otis employees do not receive an additional check for taking vacation, for example) and represents double counting. I am also unaware of any evidence to suggest that Ms. Nichani has sustained any loss of insurance benefits. She continued to be covered by Otis' insurance plans through 2003 and has insurance coverage in


n/e/r/a
Consulting Economists

her new job and presumably would have had such coverage had she accepted the Thyssen Krupp position shortly after she lost her Otis job. In any event, Ms. Nichani has produced no evidence of medical/dental costs she incurred for which she would have been reimbursed had she remained at Otis.[8]

The fallacy of Mr. Wishnick's approach of valuing benefits by a percentage of salary is best seen by examining the years 2001-2003 when Ms. Nichani was still at Otis. Even though nothing would have changed about the health or dental insurance Ms. Nichani would have received had she been placed into an L3 executive position as Mr. Wishnick assumes, Mr. Wishnick still finds a benefits loss in excess of $30,000 because salary in such an L3 position would have increased and he values all benefits as a percentage of salary. Similarly, even after he assumes Ms. Nichani will become reemployed with full benefits, he applies the same approach and therefore continues to find a loss even though under both scenarios she has medical and dental coverage. Again, this is simply speculation and has no support.[9]

The only benefit addressed by Mr. Wishnick which is related to salary and could conceivably be measured by a percentage of salary is retirement and savings plans. The 401-(k) plan at Otis, for example, contains a matching provision which is a straight percentage of salary. However, it is not possible to calculate Ms. Nichani's economic loss from such plans given that no information exists on what plans of this ilk were available at Thyssen Krupp or are available at her new job. I modify Mr. Wishnick's calculation to include a loss of the 401-(k) matching contribution but only for the period of time prior to when she could have begun with Thyssen Krupp, and will modify this element if warranted if more information should become available.

---

[8] Other insurance benefits such as life and disability insurance also represent double counting because Mr. Wishnick has assumed away any possibility of Ms. Nichani's death or disability, and insurance against eventualities which by assumption cannot occur has no value.

[9] Moreover, Mr. Wishnick's source here, a survey by the U.S. Chamber of Commerce, calculates the cost of benefits to employers across the entire economy and all workers. Even if it were assumed that the cost of insurance to employers has some connection to the value of insurance to employees, the quantity of interest in a calculation of economic loss, workers in the economy in general have far lower compensation than Ms. Nichani and therefore the percentage of their salary represented by insurance benefits will be far greater than hers.

n/e/r/a
Consulting Economists

Assumption 7 – Losses should be calculated through 2028

Mr. Wishnick obtains the terminal year of 2028 by reference to worklife tables, which are tables showing for a person of a given age the number of years they will remain in the workforce. Such tables do not and cannot provide the answer to the question of relevance to a calculation of economic loss, namely how long Ms. Nichani would have remained at Otis had she not lost her job in March of 2003. Because worklife tables only consider the number of years a person will remain in the workforce, they do not measure (a) time spent with a single employer (b) consecutive years of work (c) years of full-time work or (d) time actually working because the government definition of "in the labor force" includes those unemployed who are looking for work. Despite these facts, Mr. Wishnick uses the tables to yield an estimate of how many consecutive years Ms. Nichani would have remained at Otis working full-time.[10]

Despite assuming that Ms. Nichani would become reemployed in 2005, Mr. Wishnick does not consider the possibility that at any point between 2005 and 2028 her compensation in subsequent employment might catch up to or surpass what she might have earned at Otis or even that the gap would narrow in any way. In fact, he assumes that the gap would continue to grow larger in each year through 2028. This has no foundation in fact and is inconsistent with basic theory in labor economics, which states that people are paid according to their productivity and would suggest that if Ms. Nichani's labor was worth a certain amount to Otis there is no reason to assume it would be worth significantly less to another employer and remain at that low level for more than 20 years.

As a means of testing the accuracy of an assumption of continued employment with Otis through age 61.5, I examined data from the U.S. Census Bureau collected as part of the January 2002 Current Population Survey. These data show the amount of time each respondent has been with their current employer. I examined data for people between 60 and 65 (when Mr. Wishnick says Ms. Nichani would have retired after 38 years with Otis) who had more than a college education. I found that less than 15 percent of those working at such ages had been with their

---

[10] At his deposition Mr. Wishnick testified he was not claiming Ms. Nichani would have remained with Otis through 2028 but that she would have remained employed at Otis or a similar company through 2028. Because Ms. Nichani is contesting her termination from Otis, however, the relevant question for purposes of economic loss is how long she would have remained with Otis had she not been terminated in 2003.


n/e/r/a
Consulting Economists

employer for more than 30 years and that typical service with the employer was 10-14 years. Such a duration of employment suggests that a job change is typical while an individual is in her forties. I examined similar data for people in managerial occupations and found similar results suggesting that 30+ years of service with a single employer is quite infrequent and that a job change typically occurs in the forties.

For these reasons I see no ground for extending the period of loss through 2028 as Mr. Wishnick does. While it is speculative to project an exact duration of economic loss, I provide calculations of loss with a future component of five years (through 2009) as a basis for evaluating any future loss Ms. Nichani may sustain. I note that such a duration would be consistent either with a job change for Ms. Nichani in her forties as suggested by the Census data or with the possibility of her actual earnings catching up to what she would have earned at Otis, as suggested by basic labor economics.

In conclusion, I have modified Mr. Wishnick's calculation as follows:

1. Assume Ms. Nichani would have remained in a Senior Manager position and that her compensation would have grown at the rates suggested by Otis' salary guidelines.

2. Allow for the possibility that her position allowance could have been affected by the investigation that actually led to her termination.

3. Use both the earnings she could have received from Thyssen Krupp and those from her actual job as an offset to what she would have earned at Otis.

4. Value stock options using actual stock appreciation and data on actual share grants instead of the unreliable as to employee stock options Black-Scholes methodology and unsubstantiated share grant sizes.


n/e/r/a
Consulting Economists

-13-

5. Disregard benefit losses from insurance plans given the lack of evidence that Ms. Nichani has sustained any loss and limit savings plan losses to the period prior to reemployment.

6. Extend future losses for a period of five years.

With these modifications, I find a loss of either $301,196 or $427,926 depending on whether it is assumed that Ms. Nichani's position allowance would have continued beyond the investigation which led to her termination.

## Modified Wishnick Calculation of Economic Loss to Sujata Nichani
### Assumes Position Allowance Ceases as of 2003

|  |  | Otis Compensation (1) | Otis 401-(k) (2) | Post-Otis Earnings (3) | Present Value of Difference (4) |
|---|---|---|---|---|---|
| 2003 | 37 | $ 121,046 | $ 836 | $ 92,062 | $ 29,820 |
| 2004 | 38 | 125,283 | - | 93,150 | 32,133 |
| 2005 | 39 | 129,668 | - | 96,410 | 31,632 |
| 2006 | 40 | 134,206 | - | 99,785 | 31,138 |
| 2007 | 41 | 138,903 | - | 103,277 | 30,652 |
| 2008 | 42 | 143,765 | - | 106,892 | 30,174 |
| 2009 | 43 | 148,797 | - | 110,633 | 29,704 |
| Total |  |  |  |  | $ 215,253 |
| Stock Option Loss |  |  |  |  | $ 85,943 |
| Grand Total |  |  |  |  | $ 301,196 |

## Modified Wishnick Calculation of Economic Loss to Sujata Nichani
### Assumes Position Allowance Continues

|  | Age | Otis Compensation (1) | Otis 401-(k) (2) | Post-Otis Earnings (3) | Present Value of Difference (4) |
|---|---|---|---|---|---|
| 2003 | 37 | $ 139,203 | $ 961 | $ 92,062 | $ 48,102 |
| 2004 | 38 | 144,075 | - | 93,150 | 50,925 |
| 2005 | 39 | 149,118 | - | 96,410 | 50,131 |
| 2006 | 40 | 154,337 | - | 99,785 | 49,349 |
| 2007 | 41 | 159,739 | - | 103,277 | 48,579 |
| 2008 | 42 | 165,330 | - | 106,892 | 47,821 |
| 2009 | 43 | 171,116 | - | 110,633 | 47,075 |
| Total |  |  |  |  | $ 341,983 |
| Stock Option Loss |  |  |  |  | $ 85,943 |
| Grand Total |  |  |  |  | $ 427,926 |