## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SUJATA NICHANI | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:02CV1384 (MRK) |
| v. | : | |
| | : | |
| UNITED TECHNOLOGIES CORP., and | : | |
| OTIS ELEVATOR COMPANY | : | |
| | : | |
| Defendants. | : | FEBRUARY 28, 2005 |

## DEFENDANTS' LOCAL RULE 56(a)1 STATEMENT

1. Otis Elevator Co. ("Otis") hired Plaintiff in October 1990 as a Regional Field Engineer.  (NICH0232, Defendants' Exhibit ("Ex.") 10.)

2. At her hire, she was an at-will employee with an annual salary of $52,000 and at a Grade 48.  (Deposition Transcript of Sujata Nichani ("Nichani Tr.") at 150-51, Ex. 39; NICH0232, Ex. 10, NICH0234, Ex. 11.)

3. By 1994, Nichani served as a Maintenance Supervisor, Grade 48; a Location Manager position that Otis was considering Nichani for was normally a Grade 47. (OTIS0039, Ex. 7, NICH0176, Ex. 6.)

4. Nichani was moved to the Location Manager position in Winston-Salem, North Carolina. (OTIS 0039, Ex. 7.)

5. Otis "red-circled" Nichani as a Grade 48, so that she could retain that same labor grade and compensation.  (NICH0176, Ex. 6; OTIS 0039, Ex. 7.)

6. Otis continued to promote Nichani within the organization. In May 1996, Otis promoted Nichani to a Grade 49 Location Manager position, and increased her salary from $69,200 to $76,120.  (NICH169, Ex. 5.)

7. In April 1997, Otis promoted Nichani to a Grade 50 position as Manager, Regional Field Operations in Otis' South West Region, in Dallas, Texas and increased her salary by 18 percent to $90,000. (NICH0166, Ex. 4.)

8. In 1998, she received a salary increase of 5 percent, to $94,500 and maintained her same Grade 50. (NICH0163-64, Exs. 2-3)

9. From her hire in 1990 until April of 1999, Nichani did not work in a safety-related position nor did she oversee the safety operations. (Nichani Tr. at 26-27, Ex. 39.)

10. Nichani had no safety or environmental background or education; rather she had an engineering background, with a Bachelor's of Science degree in Industrial Engineering and a Masters' Degree in the same field.  (NICH0180, Ex. 8; Nichani Tr. at 26, Ex. 39.)

11. Nichani acknowledged that safety is a part of each employee's responsibility at Otis, and that she thus had some responsibility for safety in her prior positions. (Nichani Tr. at 133-34, Ex. 39.)

12. In February 1999, Otis promoted Nichani to Senior Manager, Environmental Health & Safety (EH&S) for the North American Area (NAA) and raised her labor grade from 50 to 51 as well as her salary from $94,500 to $108,000. (NICH0210-11, Ex. 9; OTIS 0072, Ex. 30.)

13. Nichani replaced Patrick Dowson, a male, who held the Senior Manager, EH&S position.  Dowson, in turn, was promoted to Director of EH&S for South Europe

-2-

Area and the United Kingdom, a Grade L3 executive-level position. (OTIS 8878, Ex. 58.)

14. Prior to his promotion, Dowson was a Grade 51 with a salary of $103,070. (OTIS 09254, Ex. 59.)

15. In addition to a salary increase for her new position, Nichani also received: a "position allowance" of $16,200 annually, to account for her new position; a one-time payment of $9000 for her relocation; and, reimbursement of all moving costs and closing costs on a new home. (NICH0210, Ex. 59.)

16. For the calendar year of 1999, Nichani's compensation totaled approximately $158,500. (NICH752, Ex. 19.)

17. The terms of the promotion were outlined in a letter to Nichani on February 12, 1999. (NICH210-11, Ex. 9.)

18. Nothing in the letter guaranteed her a promotion within one year nor guaranteed her employment for a fixed term; indeed, the letter – time and again – contemplated Nichani being in the position for at least three years and had various options for her compensation should that be the case. (NICH210-11, Ex. 9)

19. At her deposition, Nichani claimed that – at the time of her promotion to Senior Manager, EH&S for NAA, then-Otis NAA president Bill Miller told her she would be promoted within a year to an executive position if she did a good job. (Nichani Tr. at 144, Ex. 39.)

20. Nichani admitted that she knew Miller did not have the authority to promote her by himself and that such a promotion would require additional approvals. (Nichani Tr. at 357-58, Ex. 39.)

21. As Senior Manager, Nichani was responsible for overseeing the environmental, health and safety function for the entire North America Area, which encompasses about 15 percent of Otis' worldwide employee population. (OTIS 0131, Ex. 32; Deposition Transcript of Ari Bousbib ("Bousbib Tr.") at 37, Ex. 35; Nichani Tr. at 42-43, 150-51, Ex. 39.)

22. Among Nichani's responsibilities was the requirement to report conditions or practices that are unsafe and ensure prompt resolution of potential hazards. (OTIS 0131, Ex. 32.)

23. Nichani understood that her responsibilities included oversight of the safety process and policy implementation throughout North America and ensuring that the proper training and tools were available. (Nichani Tr. at 42-43, Ex. 39.)

24. Nichani also acknowledged that she had the responsibility for developing and communicating to the "field" any safety practices and policies of UTC and Otis with the responsibility for implementing those as well.  (Nichani Tr. at 42-43, Ex. 39.)

25.  Nichani also admitted that she had responsibility for seeing that a specific process, called a Job Hazard Analysis (JHA), was used throughout North America Area.  (Nichani Tr. at 499, Ex. 39.)

26. Nichani was keenly aware that if she did not discharge those responsibilities she could lose her job. (Nichani Tr. at 42-43, Ex. 39.)

27. Nichani's job description also stated that she continued to be an at-will employee. (OTIS 0131, Ex. 32; OTIS09828-42, Ex. 33.)

28. A Job Hazard Analysis (also known as a "JHA") is performed to determine what risk a certain process or procedure might place on an employee's safety and to determine ways to reduce or eliminate that risk, before proceeding with the work. (Nichani Tr. at 49, Ex. 39; Deposition Transcript of Ray Moncini ("Moncini Tr.") at 68-69, Ex. 38.)

29. For the first 18 months in her new position, Nichani's performance was fully competent. (OTIS0121-0123, Ex. 31.)

30. Her boss, Ray Moncini, President of Otis NAA, instructed Nichani to work more closely with each region to ensure that they were complying with various safety rules and to ensure that their safety practices conformed with Nichani's instructions. (OTIS0121-0123, Ex. 31.)

31. In 2000 – while Nichani headed up safety in NAA -- accident rates increased when compared with 1999 rates (NICH1043, Ex. 21); however, as Nichani's supervisor, Ray Moncini did not overly criticize her on that incident rate in her 2000 review.  (OTIS0121-0123, Ex. 31.)

32. Indeed, Ms. Nichani recalls no friction between her and Moncini during this time period. (Nichani Tr. at 77, Ex. 39.)

33. Otis President, Stephen Page, hired Danny Reese as Vice President, EH&S, to oversee the entire EH&S area for Otis worldwide.  (NICH0688-89, Ex. 13.)

34. Page moved Patrick Dowson (Nichani's predecessor) back from his European assignment to one overseeing the EH&S function at Otis World Headquarters. (NICH688-89, Ex. 13.)

35. As such, Dowson replaced Bradford Russell, who then held the position of Director, EH&S at Otis World Headquarters and a Grade L3. (OTIS6968-76, Ex. 53.)

36. To accommodate this change, Otis President Page decided to move Russell to North America Area ("NAA") to oversee the EH&S function there. Although Russell was a safety professional with nearly 20 years experience in the EH&S field, Page moved Russell to NAA to allow him to broaden his experience in the elevator business (Deposition Transcript of Stephen Page ("Page Tr.") at 39, Ex. 40.)

37. In moving from Otis World Headquarters to NAA, Russell retained his L3 designation to account for his 20 years experience, his skills and the fact, that he had already been an L3 for 10 years. (Page Tr. at 44-45, 51, Ex. 40.)

38. Nichani was not considered for promotion to an executive position, because she lacked the experience and overall qualifications for a Director-level position in the safety area. (Page Tr. at 44-45, 55, Ex. 40.)

39. Moncini did not make the decision to move Russell into the position; rather the decision was left solely to Page's discretion.  (Page Tr. at 39, Ex. 40; Moncini Tr. at 152, 205, Ex. 38.)

40. Russell's move was a "lateral" one, in that his executive level, his labor grade, and his annual salary of $154,000 did not change when he accepted the new position. (Page Tr. at 55, Ex. 40.)

41. Otis accomplishes changes of executives through a recommendation package or "rec-pack" for short.  (Bousbib Tr. at 45, Ex. 35; 30(b)(6) Deposition Transcript of Ellen McGroary ("30(b)(6) McGroary Tr.") at 22-23, Ex. 37.)

42. In Russell's rec-pack, it was noted that Russell was particularly well-qualified for this new position in NAA "by virtue of his past experience and education." (OTIS06968-76, Ex. 53.)

43. Russell's experience and education were key factors in the decision to keep him at a L3 level with the same salary and to re-classify the position for him as its incumbent commensurate with his skills and qualifications as well as Otis' expectations of a high level of performance from him.  (Bousbib Tr. at 68, Ex. 35.)

44. When Mr. Russell resigned less a week into the position, the position returned to its original Grade 51 classification.  (Page Tr. at 82-83, Ex. 40; 30(b)(6) McGroary Tr. at 25, Ex. 37; Deposition Transcript of Ellen McGroary ("McGroary Tr.") at 98-99, Ex. 37.)

45.  Nichani admits that she did not have the same level of safety experience as Russell. (Nichani Tr. at 129, Ex. 39.)

46. Page directed Moncini to find an appropriate position for her within Otis to accommodate the more senior-level changes.  (Moncini Tr. at 205, 301-302, Ex. 38.)

47. Nichani had previously stated that she had had interest in returning to a line-management position, where she had been before her promotion to the senior safety manager position in NAA. (Nichani Tr. at 510, Ex. 39.)

48. Moncini looked for positions for Nichani that had a much broader subject matter than just the EH&S function and expected that as such the position he found for her would equal or exceed Nichani's current salary or grade level. (Moncini Tr. at 301-03, 309, Ex. 38.)

49. Nichani acknowledges that Moncini assisted her in a search for a new position. (Nichani Tr. at 133-34, Ex. 39.)

50. Page decided not to wait until Moncini had located a new position for Nichani because he wanted all of the other more-senior-level changes to be revealed in one central announcement. (Page Tr. at 51, Ex. 40.)

51. In early May 2001, Russell was placed into the position of Director, EH&S for NAA; Nichani left her position as Senior Manager and an announcement went out to that effect. (NICH0690, Ex. 14.)

52. Nichani's employment was not terminated; rather, she was expected to assist Russell in the transition while Otis continued to search for an appropriate position for her. (Moncini Tr. at 282, Ex. 38; Nichani Tr. at 228, Ex. 39.)

53. In Otis' announcement of the employee moves, NAA President Ray Moncini noted Nichani's leadership and stated that she would assume a "senior NAA line management position in the near future." (OTIS08529, Ex. 56.)

54. The announcement praised the "positive performance trend" that had emerged under Nichani's leadership and said it was appropriate to "thank Sue Nichani for her capable leadership." (OTIS508529, Ex. 56.)

55. The announcement asked Otis employees to join Moncini in "congratulating Sue on her many contributions to our ever improving EH&S performance." (OTIS 08529, Ex. 56.)

56. Defendants also sent similar announcements on the same day regarding Danny Reese and Pat Dowson.  (NICH0688-89, Ex. 13.)

57.  Moncini believed that this announcement put Nichani's move in a favorable light with the possibility that people might even assume she was being promoted. (Moncini Tr. at 371, Ex. 38.)

58. Nichani had an opportunity to review a draft of the announcement before it went out and did not request that any changes be made. (Nichani Tr. at 375-76, Ex. 39.)

59. Ms. Nichani admits that the announcement does not state that she was being removed from her position because she did something wrong. (Nichani Tr. at 376, Ex. 39.)

60. Within a week or so of Russell's acceptance of the new position, on or about May 14, 2001, Russell unexpectedly decided to resign his employment with Otis. (OTIS 8531, Ex. 57.)

61. Because Nichani had not yet located a new position within Otis and because he viewed Nichani as a solid employee, Moncini immediately offered Nichani her position back with the same grade level and salary that she had before. (Moncini Tr. at 280-81, Ex. 38.)

62. Nichani accepted that position without reservation and Moncini believed she seemed pleased with the opportunity.  (Moncini Tr. at 282-83, Ex. 38; Page Tr. at 81-82, Ex. 40.)

63. Moncini was pleased to have her back because he believed that she was a good employee. (Moncini Tr. at 282-83, Ex. 38; Page Tr. at 81-82, Ex. 40.)

64. A new announcement relaying Nichani's return to her former position was prepared and given to Nichani for her review and approval, which she gave. (NICH0692, Ex. 15.)

65. On May 23, 2001, Nichani sent an e-mail to the Vice President of Human Resources for NAA, Ellen McGroary, asking, "Why is this job a senior manager level job when I am in it, a director level job when Brad Russell is in it and a senior manager level job when I go back in it?" (NICH0696, Ex. 17.)

66. McGroary researched the question by speaking with additional human resources and compensation personnel. (McGroary Tr. at 94-95, Ex. 37.)

67. McGroary responded to Ms. Nichani, in an e-mail, stating "The answer to your question is that Brad brought the Director title with him from WHQ (and previously from UTC). With his departure, we reverted back to the old title. The Director title is only used for UTC executive-graded positions." (OTIS5827, Ex. 50.)

68. At this point, McGroary did not believe that Nichani was making a claim based on her gender. (McGroary Tr. at 93, Ex. 37.)

69. On June 6, 2001, despite the fact that Nichani's office was less than a hundred feet from McGroary's, Nichani sent McGroary still another e-mail. (McGroary Tr. at 171, Ex. 37; NICH0696, Ex. 17.) Nichani asked, "Are you saying that the level of a position, and ultimately the compensation, is based on the individual in

the position and not based on the duties and responsibilities of the position itself?"

(NICH0696, Ex. 17.)

70. McGroary again researched the issue to ensure its correctness. She concluded that

Russell had been "red-circled" into Nichani's former position because he had

already been at a L3 Executive-level with a higher rate of pay. Specifically, later

that day, McGroary responded:

> Typically a job is graded based on several criteria: scope of responsibilities size of budget size of operations, # of direct reports, domestic v. international responsibilities, impact of decisions, skill/education/competencies/prior experience required, who the position reports to (what level in the organization[),] etc., etc.
>
> In this case, the job wasn't re-graded. Brad was being moved into the position and he was "red-circled" in the process. This happens occasionally when we move individuals to a lower graded job. Within NAA, this often occurs at the Branch level. For example, an individual might be a Grade 50 but for certain reasons (developmental, business circumstances, etc.) we move them to what is a Grade 49 job. Rather than re-grade the position, we "red-circle" the individual moving into the position. When that individual moves on, the job is backfilled at a Grade 49.

(NICH0694-96, Ex. 17.)

71. She viewed it as a red-circling situation "[b]ecause when we completed the rec.

pack, his rate did not change, his salary did not change, and some of the verbiage

reflects the fact that he was being moved into that position as an executive."

(McGroary Tr. at 316, Ex. 37.)

72. The next day, she sent yet another e-mail stating:

> I have carefully evaluated your response and I still do not understand why this discrepancy exists….My skill, education, competencies and prior experience as it relates to our business exceed Brad Russell's….So why am I "Fully Competent" as stated in ALL of my performance appraisals and he was "learning" his

-11-

> job, yet I am at a lower level and at lower compensation than he is?
> Why would Otis not pay us the same to do the same work?

(NICH0694-96, Ex. 17.)

73. McGroary knew that Nichani's response was inaccurate; Nichani did not even have the same skill, education, competencies or prior experience as Russell. (McGroary Tr. at 116-118, 145-57, 316-17, Ex. 37; Nichani Tr. at 129-30, 379-81, Ex. 39.)

74. McGroary responded that it would be better to set up a meeting between the two of them. (McGroary Tr. at 116-118, 145-57, 316-17, Ex. 37; Nichani Tr. at 129-30, 379-81, Ex. 39.)

75. A meeting between the two was not held due to some scheduling issues and Nichani never followed up again with McGroary.  (Nichani Tr. at 383-84, Ex. 39.)

76. McGroary believed that the issue had been resolved: "I thought if Sue wanted to pursue it, she would have pursued it back through me." (McGroary Tr. at 171-72, Ex. 37.)

77. Nichani never spoke with her boss – Otis NAA President Ray Moncini – regarding this issue and he was unaware of her concerns. (Moncini Tr. at 260-61, Ex. 38.)

78. Instead, over two months later, in late August 2001 Nichani filed a charge of discrimination against United Technologies Corp. with the Connecticut Commission on Human Rights and Opportunities. (NICH0147, Ex. 1.)

79. Nichani did not receive a merit increase in 2002 because Otis deferred all merit increases company-wide for at least 12 months.  (OTIS05611-12, Ex. 49.)

80. Similarly, although Nichani received an incentive bonus in 2001, she should not have received such a bonus in that year because she was already receiving a "position allowance" as part of her overall compensation package. She was not asked to reimburse Otis for that payment. However, when discovered, Nichani did not receive an incentive compensation payment for 2002. (Moncini Tr. at 333-34, 340, 352, Ex. 38.)

81. During late 2001 and 2002, Nichani and the safety area were criticized for their performance. (OTIS0185, Ex. 44.)

82. Although Ms. Nichani had received some stock options through a non-executive recognition stock option plan in the past, she did not receive any in 2002. (Third Amended Complaint, ¶38-40.)

83. The terms of the plan specifically provide that decisions are made on an annual basis and that "Participation in the Program for any particular year does not ensure that you will receive additional Program awards in the future." (OTIS09828-42, Ex. 33.)

84. There was not a non-executive stock option program in 2003 and thus Ms. Nichani did not to receive stock options in that year either. (Moncini Tr. at 347-48, Ex. 38; Page Tr. at 94-95, Ex. 40.)

85. Ms. Nichani received over $146,000 in compensation for 2001. (NICH0752, Ex. 19.)

86. As head of safety for NAA, Nichani sat on an Otis-wide safety committee called the World-wide Job Site Safety Standards (WWJSSS) committee. (Nichani Tr. at 300, Ex. 39.)

87. Because the safety of its employees is Otis' top priority, this committee was charged with developing safety rules and procedures for areas to follow in the workplace. (OTIS08361-08365, Ex. 55.)

88. Nichani understood that, as head of safety for Otis NAA, it was her responsibility to understand these rules and implement them. (Nichani Tr. at 42-43, Ex. 39.)

89. In 2000, in response to an accident, Otis World Headquarters revised its WWJSSS rules regarding the use of wire rope clips. The WWJSSS committee revised its rules to have workers eliminate all field-applied clips because the Committee believed that it might be possible to improperly "torque" (or tighten) the clips to the rope. (OTIS 0714, Ex. 46.)

90. Wire rope clips are mechanisms that keep together two ends of a rope, either to make a loop or to prevent it from slipping (much like a rope knot would do). There are various types of wire rope clips, either called "U-Bolts" (which are also known as "Crosby Clamps") or Double Saddle rope clips. The term "fist grip" is also used interchangeably with the term "rope clip". (OTIS Safety Handbook, 2000 ed., OTIS 07517,07610-17, Ex. 57)

91. The WWJSSS Committee revised the rules in a two-step process. First, by December 31, 2000, all wire rope clips (in any form) were to be eliminated in all standard work processes (SWP) that Otis used in installing, servicing and modernizing its elevators. Instead, pre-formed slings (essentially wire ropes with the loops already made) were to be used; these would essentially be "mistake-proof" because there is no application being made in the field (i.e. no need to torque). The second part of the rule called for the elimination of the use of all U-

bolt wire rope clips as part of <u>all</u> hoisting and rigging activities (whether they were standard processes or not) in installing, servicing and modernizing its elevators. This was to be done by December 31, 2001.  If a wire rope clip <u>did</u> need to be installed in the field (instead of using a pre-formed sling), a documented Job Hazard Analysis ("JHA") and request for deviation needed to be submitted to and approved by the President of NAA.  Moreover, only one type of wire rope clip (called a "double saddle rope clips") could be used in such a process and those clips had to be installed per the manufacturer's recommendations.  However, in general, wire rope clips were not to be used absent these special circumstances and absent approval through the JHA process. (NICH1087, Ex. 24, OTIS0714-17, Ex. 46.)

92. In February 2002, Otis sent a reminder to all area safety heads, including Nichani, reiterating the safety directives outlined in the WWJSSS.  (NICH1316, Ex. 29.)

93. In June 2002, the NAA area was criticized for its continued use of wire rope clips during an assurance review of the Mexico Region. (OTIS0714-17, Ex. 46; Nichani Tr. at 310-11, Ex. 39.)

94. By July 2002, Nichani sought additional information regarding this rule, in light of the criticisms noted in Mexico review.  (OTIS0714-17, Ex. 46.)

95. EH&S Director for Otis World Headquarters Pat Dowson, told Nichani in a July 1, 2002 e-mail that the continued use of Double Saddle rope clips by NAA could only occur if there was a defined process (JHA) that was then approved by NAA President Ray Moncini.  (OTIS 0714-17, Ex. 46.)

96. Nichani understood that having a defined process and performing a job hazard

analysis was a key part of mitigating risks of accidents within the company.

> Q:     So if you saw something you didn't like, you could just
> modify it?
> A:     No.  There was a process that we went through as far as a
> risk assessment.
>
> Q:     And what was that process?
> A:     The process was to complete a JHA, job hazard analysis,
> and mitigate the risk.  The documented process with the approval
> of various managers depending on the level of activity.
>
> Q:     And would you have to go back up to World Headquarters
> to tell them that you thought this modification was appropriate
> before you could implement the modification?
> A:     No, I did not.
>
> …
>
> Q:     Who told you that you could do it on your own?
> A:     In the Worldwide Job Site Safety Standards, it was written
> that with the appropriate risk assessment signed by various
> management at the area level that a different process could be
> utilized.

(Nichani Tr. at 49-50, Ex. 39.)

97. In June 2002, the NAA area was criticized for its continued use of wire rope clips

during an assurance an assurance.  In an e-mail to a colleague complaining about

the WWJSSS, Nichani states:

> Lately, we have implemented standards that no one (including
> safety) knows how to implement - such as no more fist grips.
> That's backwards and unrealistic.

(NICH 1050, Ex. 23.) (Emphasis added.).

98. Despite being told explicitly that fist grips were to be eliminated and despite

knowing that a JHA would have to be done if they could not be eliminated,

Nichani admits that she did not utilize that process. (Nichani Tr. at 49-50, Ex. 39.)

99. One of the process owners, Scott Simmons, who was in charge of New Equipment installation, brought the issue of continued use of fist grips to Nichani's attention. (Deposition Transcript of John S. Simmons ("Simmons Tr.") at 93, Ex. 41.)  However, he was not aware of any steps that Nichani took to get clarification on the issue. (Id.)

100.    She claimed at her deposition that the JHA process was not utilized because, she claimed, she did not know that fist grips had to be eliminated – a fact directly contradicted by her August 2002 e-mail.

> Q:    With regard to the use of fist grips, did you go through this modification process and get approval at the area level?
> A:    No, I did not.
>
> Q:    Why not?
> A:    <u>Because it was not my understanding that fist grips had to be eliminated.</u>

(NICH1050, Ex. 23; Nichani Tr. at 49-50, Ex. 39.) (Emphasis added.).

101.    Even after the issues regarding NAA's continued use of wire rope clips without a JHA surfaced, Nichani ignored them; she did not raise the issues with her supervisor, NAA President Ray Moncini, as had been suggested by Otis World Headquarters. (Nichani Tr. at 51-52, Ex. 39.)

102.    In September 2002, a safety bulletin was distributed to Nichani regarding an accident in France in which wire rope clips were improperly used. (NICH1308, Ex. 28.)

103.    This bulletin, once again, reiterated that wire rope clips were to be eliminated and, if they could not be eliminated, a Job Hazard Analysis needed to be performed.  (NICH1308, Ex. 28.)

104.    There is no evidence that Nichani distributed this bulletin to anyone in NAA, including in the field.  (Deposition of Erv Lauterbach ("Lauterbach Tr.") at 75-76, Ex. 36.)

105.    Erv Lauterbach, the Vice President of the New York Region indicated that he and his staff were unaware of this requirement.  (Lauterbach Tr. at 75-76, Ex. 36.)

106.    On December 6, 2002 – nearly six months after the issue regarding NAA's continued use of wire rope clips, particularly without the completion of a JHA, had been raised with Nichani  – Nichani failed to take action to get this safety issue resolved in NAA or to see that fist grips were not used. In an e-mail, Nichani candidly conceded that "I personally am still experiencing confusion on the fist grip issue." (NICH1213, Ex. 26.)

107.    On December 23, 2002, less than three weeks after Nichani claimed that she was still experiencing "confusion" on the issue of fist grips, Otis employee Daniel McQuillan fell to his death in a construction accident in the New York City area.  Nichani and others went to the accident site immediately to investigate.  By the next day,  Nichani gave a summary report of the initial findings to NAA President Ray Moncini.  (OTIS6059, Ex. 52.)

108.    In it, Nichani noted that the car frame that the employee was riding on at the time of his death had fallen after it was "hoisted with a cable sling that was secured with fist grips."  (OTIS6059, Ex. 52.) (Emphasis added.).

109.    Nichani also prepared a summary called "An Accident", which was finalized on January 8, 2003 and distributed via e-mail. (OTIS 05209-11, Ex. 47.)

-18-

In that document, she indicates that "It is believed that the 'Fist Grip' cable clamps came loose." (OTIS 05210, Ex. 47.)

110.    On January 2, 2003, after the initial matters concerning the investigation into the fatality were assigned and addressed, Moncini asked Nichani questions regarding NAA's overall compliance with various Otis safety policies and procedures. (OTIS0609, Ex. 45.)

111.    Nichani had not talked with Moncini regarding any issue of fist grips before December 23, 2003, when McQuillan died. (Nichani Tr. at 51-52, Ex. 39.)

112.     In an e-mail on Friday, January 10, 2003, Nichani notified Moncini in detail, for the first time, of the applicable WWJSSS rules regarding the use of wire rope clips. (Moncini Tr. at 408-409, Ex. 38; NICH1087, Ex. 24.)

113.    Moncini responded on Monday, January 13, 2003 that he was "confused" by Nichani's e-mail and asked Nichani to talk with him directly. (NICH1087, Ex. 24.)

114.    Moncini explained further what he meant: "My confusion is, first of all is why the difference between standard processes and nonstandard processes. Then secondly, why haven't I seen deviation requests." (Moncini Tr. at 409, Ex. 38.)

115.    One week later, on Sunday, January 19, 2003, disturbed by the NAA's lack of compliance with WWJSSS rules, Moncini asked Danny Reese, Otis' Vice President of EH&S world-wide, to conduct a thorough review of NAA's safety practices and procedures. "I would like to impose on you and your staff to do a full management system review of NAA. What I am particularly interested in is

the discrepancies we may have in the WWJSSS versus our practices in the field."

(NICH01048-49, Ex. 22.)

116.     Moncini copied Nichani on this e-mail; she responded on January 23,

2003 and admitted that she already knew of at least <u>three</u> areas that NAA was out

of compliance with, including the continued use of wire rope clips.  (OTIS 0178,

Ex. 43.)

117.     On January 31, 2003, Moncini outlined his profound disappointment and

concern with her failure in specific terms:

> There is obviously a clear communications issue between you and
> the WHQ group on WWJSS changes…. It seems that our inability
> to use the process with regards to fist grips and other issues has put
> NAA in a very difficult position.  Although we may find that the
> WWJSS are too restrictive and need to be modified, we need to do
> this in an open fashion with WHQ and potentially with my
> involvement.  You stated that you were confused by the standard
> on the fist grips which begs the question--why didn't you ask
> Danny, Tim or Pat?  If they were unresponsive or difficult you
> could have come to me.  What I saw yesterday is that we were
> simply ignoring the direction from WHQ and this is not
> acceptable.

(OTIS 0178, Ex. 43.)

118.     Moncini also noted two other important areas of deficiency that had been

brought to his attention as a result of the McQuillan fatality: namely that NAA

had not been implementing safety training for mid-level and executives (called

MELT training) and had not filled a regional safety manager position with

sufficient speed.  (OTIS0178, Ex. 43.)

119.     In mid-March 2003, Moncini prepared a performance review for Nichani.

(NICH0816, Ex. 20.)

120.     Ultimately, it was the issues raised in the January 31, 2003 e-mail as well

as those summarized in her performance review that led to Nichani's termination

on March 21, 2003. (Moncini Tr. at 384-89, Ex. 38.)

121.     Even though Nichani was head of safety for NAA, Nichani was <u>not</u>

terminated as a sanction or discipline for the McQuillan fatality itself --  rather,

she was terminated for the issues that were discovered as a <u>result</u> of the

investigation into the fatality, principally her failure to implement WWJSSS and

safety policies. (Bousbib Tr. at 91, Ex. 35; Moncini Tr. at 384-89, Ex. 38.)

122.     Moncini's criticism of Nichani centered on her failure to take action in a

critical area of safety:

> The fact is that her job was to deploy this policy and she saw this
> deficiency and instead of proactive engagement, and asking for
> help and doing the things that she should have done to try to
> resolve these issues, what she [stated was] well, I did this and they
> never responded to me, so therefore I thought it was okay.  And,
> quite frankly, that's not good enough.

(Moncini Tr. (Day 3) at 106-07, Ex. 38.)

123.     This belief that Otis' employees should not merely "relay" information but

attempt to solve problems, was noted by Otis President Ari Bousbib at his

deposition:

> We are not interested here in people taking reports from others and
> then reporting -- passing the ball so to speak.  We are expecting
> active, engaged leadership.  So it's not reliance and just passing the
> buck and saying, well, they didn't do it.  If you're in charge, the
> buck stops there.

(Bousbib Tr. at 98, Ex. 35.)

124.    Ultimately, Moncini viewed Nichani's actions as a "dereliction" of her duties to deploy safety policies across NAA correctly.  (Moncini Tr. (Day 3) at 148, Ex. 38.)

125.    Mr. Moncini had been instructed by Otis President Ari Bousbib to take immediate actions to improve "NSAA" leadership.  (Moncini Tr. (Day 3) at 160-61, Ex. 38; OTIS 6056, Ex. 51; Bousbib Tr. at 84-85, Ex. 35.)

126.    Nichani understood too well that she was responsible for conveying all safety information from Otis World Headquarters and that she could be sanctioned or even terminated if she did not.  (Nichani Tr. at 298, 475, Ex. 39.)

127.    On March 21, 2003, Moncini met with Nichani to review her performance and terminate her employment.  (Nichani Tr. at 60-61, Ex. 39.)

128.    Although Nichani was not told in advance of the subject matter of the deposition, she expected to receive some discipline at the meeting.

> Q:    Did you know why he wanted to see you?
> A:    I suspected why he wanted to see me.
>
> Q:    What did you suspect?
> A:    I suspected that I was going to be disciplined for the accident.
>
> Q:    And what kind of discipline did you expect to receive?
> A:    I expected that it would be a warning of some sort.

(Nichani Tr. at 61, Ex. 39.)

129.    At the meeting, Moncini and Ellen McGroary, NAA Vice President of Human Resources, told Nichani that she was being terminated for the reasons outlined in the performance review. (Nichani Tr. at 65, 71, Ex. 39; NICH0216-20, Ex. 20.)

130.    After listening to Moncini explain the performance review and her failings, Nichani did not contest what he told her but merely stated "Is that all?" (Nichani Tr. at 65, 71, Ex. 39.)

131.    Nichani then met separately with McGroary but once again did not raise any issues or ask any questions. (Nichani Tr. at 69, Ex. 39.)

132.    Nichani described the meetings as "low-key conversational." (Nichani Tr. at 72, Ex. 39.)

133.    After Nichani's termination, Moncini appointed Patrick Dowson – who was Nichani's predecessor at NAA and subsequently promoted to an executive as Director, EH&S for Otis World Headquarters – to be acting director for safety for NAA until Moncini could locate a qualified replacement. Dowson still maintained his existing job and labor grade as Director of EH&S at Otis World Headquarters in addition to his temporary duties in the NAA area. (Moncini Tr. at 96-98, Ex. 38.)

134.    In early 2004, the EH&S function in the North America Area was combined with the Quality function.  Otis selected Edith DiFrancesco, a woman who was a L2 Executive, for that new position. (Moncini Tr. (Day 3) at 15-17, Ex. 38.)

135.    After the McQuillan death, Nichani and others were charged with investigating the accident.  Nichani was asked to work together with Otis' outside attorneys, Hal Engel and John McNamara, to interview numerous witnesses and prepare an internal accident report that accurately stated the facts behind the accident.  (Affidavit of John McNamara ("McNamara Aff.") at ¶¶6,7, Ex. 42.)

136.     Attorney McNamara – who was unaware that Nichani had a lawsuit pending against Otis -- told Nichani that he would be in charge of the investigation. (Id. at ¶¶6, 7, 9, Ex. 42.)

137.     Ultimately, Nichani and Regional Vice President Erv Lauterbach, prepared a draft report. (Nichani Tr. at 247-49, Ex. 39.)

138.     Nichani solicited input from various individuals, including her superiors and, was asked to make changes to the report. (Nichani Tr. at 247-49, Ex. 39.)

139.     Nichani conceded that none of the changes to the report were "false." (Nichani Tr. at 247-49, Ex. 39.)

140.     The report was then provided to outside counsel, John McNamara, who made further changes to both factual statements and to certain opinions. (Nichani Tr. at 254, Ex. 39.)

141.     McNamara – who himself interviewed all the witnesses relating to the fatality -- reviewed the draft report and found that it was inconsistent with the facts he had developed in his interviews of the witnesses.  He also found that it was inaccurate and filled with speculations, conclusions and perceptions. (McNamara Aff. at ¶7, Ex. 42.)

142.     Nichani conceded that none of the attorneys falsified anything in the final report. (Nichani Tr. at 478, 498, Ex. 39.)

143.     McNamara also states that he never asked Ms. Nichani or anyone else to submit a false report. (McNamara Aff. ¶8, Ex. 42.) He states further that he did his best to be sure that the report that was prepared for internal purposes would be factually accurate and devoid of speculation.  (Id.)

-24-

144.     Although Nichani disagreed with some of the changes that were made, she did not tell anyone about her disagreement because she was terminated before she could do so. (Nichani Tr. at 253.)

145.     At her deposition, Nichani also conceded that she had no reason to believe that her employment was terminated for raising safety concerns. (Nichani Tr. at 498, Ex. 39.)

146.     Numerous individuals received sanctions as a result of the investigation. Sanctions are issued to Otis employees were they need to be held accountable for actions in their area related to the accident.  (OTIS 6056, Ex. 51.)

147.     Nichani believes that only two individuals at Otis – Ray Moncini and Steve Page – discriminated against her because of her gender, race and national origin, and because she filed a CHRO charge in August 2001. (Nichani Tr. at 385-86, Ex. 39.)

148.     Nichani does refer to one incident when she worked in New York in the 1990s, when two co-workers allegedly called her "dot-head" or "Indian princess" in an apparent reference to her Indian national origin.  (Nichani Tr. at 121-122, Ex. 39.) However, Nichani could not remember the in an apparent reference to her Indian national origin.  (Nichani Tr. at 121-122, Ex. 39.)  However, Nichani could not remember the context of the statements because it's "been so long."(Id.)

149.     The statements in ¶ 148 are the only statements that she alleges were made about her race or national origin. (Nichani Tr. at 121, Ex. 39.)

150.     As to Moncini, Nichani relies on her allegation that he made a sexist comment he allegedly made on July 10, 2001. (Nichani Tr. at 364-66, Ex. 39.)

Nichani claims that Moncini – in a discussion regarding an unspecified OSHA investigation – stated "The inspector was a woman.  She probably didn't know what she was doing.  She was a woman." (Nichani Tr. at 364, Ex. 39.)

151.    Nichani did not recall anything more about the incident, nor did she complain to human resources about the comment. (Nichani Tr. at 364-66, Ex. 39.)

152.    When Nichani filed her CHRO complaint one month later, she did not allege anything about such comments. (NICH0147-0152, Ex. 1.)

153.    Nichani also alleges that a co-worker once sent her an e-mail regarding a "safety topic" of "Why Men Die Younger," which Nichani now claims she offended her. (NICH0740-45, Ex. 18.)

154.    Nichani claims that she once witnessed then Otis President Stephen Page ask a female executive to get a cup of coffee for NAA President William Miller during an accident review meeting. (Nichani Tr. 384-85, Ex. 39.)

155.    Nichani was never asked to get a cup of coffee and ultimately Ms. Nichani did not recall any first-hand knowledge of any other facts in support of her claim that Page discriminated against her. (Nichani Tr. at 386, Ex. 39.)

156.    Moncini testified that there was no formal progressive discipline for supervisors, such as Nichani.  (Moncini Tr. at 86, Ex. 38.)

157.    Page was aware of a general practice whereby supervisors were expected to counsel their employees, and if there was no improvement, the employees were dealt with accordingly.  (Page Tr. at 109-110, Ex. 40.

158.    Page was aware of employees who had been terminated without prior performance reviews.  (Page Tr. at 110, Ex. 40.)

159.    Nichani know of Otis employees who had been terminated without first receiving discipline, e.g., for violating an ethics policy.  (Nichani Tr. at 165, Ex. 39.)

160.    Nichani testified that she expected no discipline at all for not meeting the requirements established by Otis World Headquarters.  (Nichani Tr. at 166-67, Ex. 39.)

THE DEFENDANTS,
UNITED TECHNOLOGIES CORP. and
OTIS ELEVATOR COMPANY


By_____/s/_____
              Albert Zakarian (ct04201)
              Daniel A. Schwartz (ct15823)
              Day, Berry & Howard LLP
              CityPlace I
              Hartford, CT 06103-3499
              (860) 275-0100 (telephone)
              (860) 275-0343 (facsimile)
              azakarian@dbh.com
              daschwartz@dbh.com

              Their Attorneys

## **CERTIFICATION**

I hereby certify that the foregoing was sent via regular mail, postage prepaid, on this date, to:

Anthony Minchella, Esq.
Law Offices of Anthony R. Minchella, L.L.C.
530 Middlebury Road
Suite 212-213B
Middlebury, CT 06762

Jeffrey J. Tinley, Esq.
Robert Nastri, Esq.
Tinley, Nastri, Renehan & Dost, LLP
60 North Main Street
2nd Floor
Waterbury, CT 06702

/s/
Daniel A. Schwartz
