**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SUJATA NICHANI, | : | CIVIL NO. 302CV1384 (MRK) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| OTIS ELEVATOR COMPANY and | : | |
| UNITED TECHNOLOGIES | : | |
| CORPORATION, | : | |
| | : | |
| Defendants. | : | MAY 25, 2005 |

**PLAINTIFF'S LOCAL RULE 56(a)2 STATEMENT**

1. Otis Elevator Co. ("Otis") hired Plaintiff in October 1990 as a Regional Field Engineer. (NICHO232, Defendants' Exhibit ("Ex.") 10.)

   **RESPONSE:**     Denied.  Plaintiff worked as a maintenance supervisor first and was subsequently transferred to Winston Salem, North Carolina as a Location Manager. OTIS00039, NICH000176, Defendant's Exs. 6 and 7.

2. At her hire, she was an at-will employee with an annual salary of $52,000 and at a Grade 48. (Deposition Transcript of Sujata Nichani ("Nichani Tr.") at 150-51, Ex. 39; NICH0232, Ex. 10, NICH0234, Ex. 11.)

   **RESPONSE:**     Denied.  Plaintiff testified that in a "general sense" she understood the employment relationship to be "at will" but also that she could not be terminated for an illegal reason or without being given an opportunity to improve if the Defendants did not like her performance.  Plaintiff benefited from Defendants' progressive discipline policy that required employees, including the Plaintiff, to be disciplined according to a specified protocol.  Nichani Tr. at 151 (Defs.' Ex. 39). Transcript of Raymond Moncini at 149 (Moncini Tr. at ___.) Transcript of Stephen Page at 109-110 (Page Tr. at _____.)

   Plaintiff admits that her starting annual salary was $52,000.

3. By 1994, Nichani served as a Maintenance Supervisor, Grade 48; a Location Manager position that Otis was considering Nichani for was normally a Grade 47. (OT1S0039, Ex. 7, NICHO176, Ex. 6.)

**RESPONSE:** Admitted that by 1994 Nichani served as a maintenance supervisor, but deny that the position was normally a Grade 47. Defendants' Exhibit 7 raises a genuine issue of material fact as to whether the position was a Grade 47. Defendants' Exhibit 7 appears identical to Exhibit 6, except for handwritten alterations to the document, even though the signature of the Regional General Manager has not changed, nor has the date changed. Moreover, Defendants' Exhibit 6 (without the red circle notation but with the Grade altered) does not have the signature of the Vice President and Area Manager.

4. Nichani was moved to the Location Manager position in Winston-Salem, North Carolina. (OTIS 0039, Ex. 7.)

**RESPONSE:** Admitted.

5. Otis "red-circled" Nichani as a Grade 48, so that she could retain that same labor grade and compensation. (NICH000176, Ex. 6; OTIS 0039, Ex. 7.).

**RESPONSE:** Denied. The personnel paperwork that was signed by both required individuals, does not indicate that the Defendants red-circled the Plaintiff. Defendants' Exhibit 7 raises a genuine issue of material fact as to whether the position was a Grade 47 and whether Nichani was red circled. Defendants' Exhibit 7 appears identical to Exhibit 6, except for handwritten alterations to the document, even though the signature of the Regional General Manager has not changed, nor has the date changed. Moreover, Exhibit 6 (without the red circle notation but with the Grade altered) does not have the signature of the Vice President and Area Manager.

6. Otis continued to promote Nichani within the organization. In May 1996, Otis promoted Nichani to a Grade 49 Location Manager position, and increased her salary from $69,200 to $76,120. (NICH169, Ex. 5.)

**RESPONSE:** Admitted.

7. In April 1997, Otis promoted Nichani to a Grade 50 position as Manager, Regional Field Operations in Otis' South West Region, in Dallas, Texas and increased her

salary by 18 percent to $90,000. (NICHO166, Ex. 4.)

**RESPONSE:**          Admitted that Exhibit 3 supports this statement.

8.  In 1998, she received a salary increase of 5 percent, to $94,500 and maintained her same Grade 50. (NICHO163-64, Exs. 2-3.)

**RESPONSE:**          Admitted.

9.  From her hire in 1990 until April of 1999, Nichani did not work in a safety-related position nor did she oversee the safety operations. (Nichani Tr. at 26-27, Ex. 39.)

**RESPONSE:**          Denied.  First, the specific citation Defendants rely on does not support this statement.  Safety was a core responsibility which Plaintiff directly oversaw in every position that she held.  Affidavit of Sujata Nichani at 21 (Pl.s' Ex. I, Nichani Aff. at ____.)  Additionally, Defendants rated Plaintiff on safety-related topics in her performance appraisals in her previous positions.  Pl.s' Ex. D, OTIS00054 ("DIRECTING"); Pl.'s Ex. C, OTIS00056 (reverse page "no lost time accidents in her district"); Pl.'s Ex. E, OTIS00059 ¶6 "Environmental and Safety Standards, Sue appointed to Regional EH&S Steering Committee and will help lead Region into the next level of safety").  And as a Field Operations Manager in 1997 and 1998, she "became a key member of [the] Regional Safety Committee and led . . . training of location managers in EH&S policy."  Pl.'s Ex. F, OTIS00062.  Finally, Defendants statement number 11 directly contradicts this statement, by alleging that "Nichani acknowledged that safety is a part of each employee's responsibility at Otis, and that she thus had some responsibility for safety in her prior positions."

10. Nichani had no safety or environmental background or education; rather she had an engineering background, with a Bachelor's of Science degree in Industrial Engineering and a Masters' Degree in the same field. (NICHO18O, Ex. 8; Nichani Tr. at 26, Ex. 39.)

3

**RESPONSE:** Admit that Nichani has a Bachelor's of Science and Master's Degree in Industrial Engineering. Denied, that she categorically had no safety or environmental background or education, for the reasons in response to Para. 9, and because this Statement is not limited in time.

11. Nichani acknowledged that safety is a part of each employee's responsibility at Otis, and that she thus had some responsibility for safety in her prior positions. (Nichani Tr. at 133-34, Ex. 39.)

**RESPONSE:** Admitted.

12. In February 1999, Otis promoted Nichani to Senior Manager, Environmental Health & Safety (EH&S) for the North American Area (NAA) and raised her labor grade from 50 to 51 as well as her salary from $94,500 to $108,000. (NICHO21O-1 1, Ex. 9; OTIS 0072, Ex. 30.)

**RESPONSE:** Admitted.

13. Nichani replaced Patrick Dowson, a male, who held the Senior Manager, EH&S position. Dowson, in turn, was promoted to Director of EH&S for South Europe Area and the United Kingdom, a Grade L3 executive-level position. (OTIS 8878, Ex. 58.)

**RESPONSE:** Admitted.

14. Prior to his promotion, Dowson was a Grade 51 with a salary of $103,070. (OTIS 09254, Ex. 59.)

**RESPONSE:** Admitted.

15. In addition to a salary increase for her new position, Nichani also received: a "position allowance" of $16,200 annually, to account for her new position; a onetime payment of $9,000 for her relocation; and, reimbursement of all moving costs and closing costs on a new home. (NICHO21O, Ex. 59.)

**RESPONSE:** Admitted.

16. For the calendar year of 1999, Nichani's compensation totaled approximately $158,500. (NICH752, Ex. 19.)

**RESPONSE:** Admitted.

4

17. The terms of the promotion were outlined in a letter to Nichani on February 12, 1999. (NICH21O-11, Ex. 9.)

**RESPONSE:**        Admitted that Ex.9 contains some terms of the promotion, but denied to the extent other terms of the promotion were stated to the Plaintiff verbally. Nichani Tr. at 144..

18. Nothing in the letter guaranteed her a promotion within one year nor guaranteed her employment for a fixed term; indeed, the letter — time and again — contemplated Nichani being in the position for at least three years and had various options for her compensation should that be the case. (NICH21O-11, Defs.' Ex. 9)

**RESPONSE:**  Admitted that nothing in the letter guaranteed employment for a fixed term.  However, denied as to whether the letter "time and again" contemplates that she would be in the position for three years.  The letter merely states that a position allowance will continue for the first three years she is in the position, but that it will end if she is promoted to an executive position. (NICH21O, Defs.' Ex. 9)

19. At her deposition, Nichani claimed that — at the time of her promotion to Senior Manager, EH&S for NAA, then-Otis NAA president Bill Miller told her she would be promoted within a year to an executive position if she did a good job. (Nichani Tr. at 144, Ex. 39.)

**RESPONSE:**  Admitted.

20. Nichani admitted that she knew Miller did not have the authority to promote her by himself and that such a promotion would require additional approvals. (Nichani Tr. at 357-58, Ex. 39.)

**RESPONSE:**        Denied.  Nichani testified at these pages of her transcript that her understanding was that Miller could promote her:

| | |
|---|---|
| **Question:** | And did he have the power to promote you if you did a good job? |
| **Answer:** | Yes, he did. |
| **Question**: | Was that your understanding? |
| **Answer:** | What was my understanding. |

**Question**:          That Bill Miller had the power to promote you
if you did a good job?

**Answer:**          Yes.

**Question:**          Would he need approval from anyone?

**Answer:**          He probably would.

**Question**:          And to promote you from what grade level to
what grade level?

**Answer**:          What do you mean?  To get approval?

**Question:**          Right.

**Answer**:          From a grade level 51 to a level three.

**Question:**          So that would be the lowest level executive?

**Answer**:          Yes.

**Question:**          And in order for Mr. Miller to promote you, who would have to
approve?

**Answer**:          I would guess that UTC would.

**Question:**          Did you know that at the time you were talking with Mr. Miller?

**Answer**:          I don't know if I knew it then or not.  I would have guessed that.


21. As Senior Manager, Nichani was responsible for overseeing the environmental,
    health and safety function for the entire North America Area, which encompasses
    about 15 percent of Otis' worldwide employee population. (OTIS 0131, Ex. 32;
    Deposition Transcript of Ari Bousbib ("Bousbib Tr.") at 37, Ex. 35; Nichani Tr. at 42-
    43, 150-5 1, Ex. 39.)

**RESPONSE:**  Admitted.


22. Among Nichani's responsibilities was the requirement to report conditions or
    practices that are unsafe and ensure prompt resolution of potential hazards. (OTIS
    0131, Defs.' Ex. 32.)

**RESPONSE:**  Admitted, with the qualification that the evidence relied on in this
paragraph of Ex. 32, is contained in a bullet point list of the Exhibit that is titled "All
Employees Shall."

23. Nichani understood that her responsibilities included oversight of the safety process and policy implementation throughout North America and ensuring that the proper training and tools were available. (Nichani Tr. at 42-43, Ex. 39.)

**RESPONSE:** Admitted.

24. Nichani also acknowledged that she had the responsibility for developing and communicating to the "field" any safety practices and policies of UTC and Otis with the responsibility for implementing those as well. (Nichani Tr. at 42-43, Ex. 39.)

**RESPONSE:** Admitted.

25. Nichani also admitted that she had responsibility for seeing that a specific process, called a Job Hazard Analysis (JHA), was used throughout North America Area. (Nichani Tr. at 499, Ex. 39.)

**RESPONSE:** Denied as stated. Nichani did not admit here that she had the responsibility for seeing that a JHA was used throughout North America Area, but that her "responsibility was to insure that the field and line management understood the situations under which they would need to perform a JHA, and [she] did that." Nichani Tr. at 499. It would be impossible for one individual to ensure that, because of the numerous situations in which a JHA was required to be used and the fact that thousands of these situations could occur simultaneously throughout NAA on a daily basis, that a JHA was used throughout NAA. Pl.s' Ex. I, Nichani Aff. at ¶ 28 This is why line management also has the responsibility to implement process such as a JHA. Lauterbach Tr. at 50.

26. Nichani was keenly aware that if she did not discharge those responsibilities she could lose her job. (Nichani Tr. at 42-43, Ex. 39.)

**RESPONSE:** Admitted with the qualification that "those responsibilities" refer to those in Para. 21-25 as responded to.

27. Nichani's job description also stated that she continued to be an at-will employee. (OTIS 0131, Ex. 32; OT1S09828-42, Ex. 33.)

**RESPONSE:** Denied. Nichani testified that she was never given a written job description. Indeed, in connection with the Exhibit Defendants rely on here, the colloquy during Nichani's deposition was at p. 144 of her Transcript was:

   **Question:**        Let me show you Exhibit 4 [same as Defendants' Sum. Jmnt. Exhibit 32] from the last time you were here. Is that your job description?

   **Answer:**        I was never given this as a job description

28. A Job Hazard Analysis (also known as a "JHA") is performed to determine what risk a certain process or procedure might place on an employee's safety and to determine ways to reduce or eliminate that risk, before proceeding with the work. (Nichani Tr. at 49, Ex. 39; Deposition Transcript of Ray Moncini ("Moncini Tr.") at 68-69, Ex. 38.)

**RESPONSE:** Admitted.

29. For the first 18 months in her new position, Nichani's performance was fully competent. (Pl.s Ex. V, OTISO121-0123, Ex. 31.)

**RESPONSE:** Admitted.

30. Her boss, Ray Moncini, President of Otis NAA, instructed Nichani to work more closely with each region to ensure that they were complying with various safety rules and to ensure that their safety practices conformed with Nichani's instructions. (Pl.s Ex. V, OTISO121-0123, Ex. 31.)

**RESPONSE:** Denied. Moncini, in the performance review that the Defendants cite here, does not state this. (Pl.s Ex. V, OTISO121-0123, Defs.' Ex. 31.)

31. In 2000 — while Nichani headed up safety in NAA -- accident rates increased when compared with 1999 rates (NICHIO43, Ex. 21); however, as Nichani's supervisor, Ray Moncini did not overly criticize her on that incident rate in her 2000 review. (Pl.s Ex. V, OTISO121-0123,Ex. 31.)

**RESPONSE:** Admitted that accident rates increased from 1999 to 2000, however, denied that Moncini did not overly criticize Nichani in his 2002 review, because he made absolutely no mention of accident rates. (Pl.s Ex. V, OTISO121-0123, Defs.' Ex. 31.)

32. Indeed, Ms. Nichani recalls no friction between her and Moncini during this time period. (Nichani Tr. at 77, Ex. 39.)

**RESPONSE:** Denied. Nichani here testified that she did not recall any friction, she did not testify that she "recalls there was no friction." (Nichani Tr. at 77, Defs.' Ex. 39.

**Question:**      And during the time that you worked with him did the two of you have any friction.?  And I am talking about the time prior to filing your charge of discrimination?

**Answer:**  Not that I recall.

8

33. Otis President, Stephen Page, hired Danny Reese as Vice President, EH&S, to oversee the entire EH&S area for Otis worldwide. (N1CH0688-89, Ex. 13.)

**RESPONSE:**        Admitted.

34. Page moved Patrick Dowson (Nichani's predecessor) back from his European assignment to one overseeing the EH&S function at Otis World Headquarters. (NICH688-89, Ex. 13.)

**RESPONSE:** Admitted that those moves took place, but denied that the Exhibit Defendants rely on supports this statement.

35. As such, Dowson replaced Bradford Russell, who then held the position of Director, EH&S at Otis World Headquarters at a Grade L3. (OTIS6968-76, Ex. 53.)

**RESPONSE:**   Admitted.

36. To accommodate this change, Otis President Page decided to move Russell to North America Area ("NAA") to oversee the EH&S function there. Although Russell was a safety professional with nearly 20 years experience in the EH&S field, Page moved Russell to NAA to allow him to broaden his experience in the elevator business (Deposition Transcript of Stephen Page ("Page Tr.") at 39, Ex. 40.)

**RESPONSE:**  Denied.  Page did not testify that he made the decision, rather Page could not recall who made this decision.  Page Tr. at 39; Defs.' Ex. 40.  Moreover, Russell, while he had a degree in Environmental Health, had worked for only 10 years as a Health and Safety manager (not in the elevator industry) and then with UTC was a Manager and then Director of Human and Natural Resource Protection for three years, before becoming a Director in a Safety position in 1993.  So he did not have 20 years experience in a Safety position, and certainly not in the elevator industry.  OTIS09002.

37. In moving from Otis World Headquarters to NAA, Russell retained his L3 designation to account for his 20 years experience, his skills and the fact, that he had already been an L3 for 10 years. (Page Tr. at 44-45, 51, Ex. 40.)

**RESPONSE:**  Denied.  First, the pages the Defendants cite here do not support this evidence.  (Page Tr. at 44-45, 51, Defs.' Ex. 40.).  Second, the position was reclassified or regraded to an L3 position to "reflect the continued increase in focus which Otis and UTC place on the EH&S function." Pl.'s Ex. H, OTIS 08999, 09000 (Recommendation Package for Bradford Russell).

9

38. Nichani was not considered for promotion to an executive position, because she lacked the experience and overall qualifications for a Director-level position in the safety area. (Page Tr. at 44-45, 55, Ex. 40.)

**RESPONSE:** Denied. Plaintiff sought to be compensated at an L3 level because the work she was performing was equal to the work being performed by Russell, and the responsibilities outlined in Russell's Recommendation Package did not change when the Plaintiff resumed that position. (N1CH0694-96, Defs.' Ex. 17.)(NICHO696, Defs.' Ex. 17.) Moncini Tr. at 239-240; Pl.s' Ex. I, Nichani Aff. at ¶19, 20, 22.)  Plaintiff did not receive equal pay for performing equal work, indeed the same job.  Id.  This is further supported by the fact that almost every other EH&S leader for Otis was a male and was compensated as the Director Level.  For example, Axel Moeller, another Director of Safety and Environment at Otis, did not have a safety degree or any safety or operational experience but was made an L3 after being in the position for one year, and there was no requirement anywhere that safety directors have an EHS degree.  OTIS9007; Pl.s Ex. J, OTIS8973. Pl.s' Ex. I, Nichani Aff at ¶¶14, 22.  Indeed, when Nichani took the safety position, the Defendants stated that she may be promoted to an executive position sooner than 3 years, which contradicts Page's testimony that she needed 5 years experience to be promoted to an Executive position.  NICH 00210, Defs.' Ex. 9.; Page Tr. at 46.

39. Moncini did not make the decision to move Russell into the position; rather the decision was left solely to Page's discretion. (Page Tr. at 39, Ex. 40; Moncini Tr. at 152, 205, Ex. 38.)

**RESPONSE:**  Denied.  Page testified it was not his idea to move Russell, and that he did not direct Moncini to make the move. Page Tr. at 40.

| | |
|---|---|
| **Question**: | Okay.  But if it was your idea, you would know.  Was it your idea? |
| **Answer:** | No. |
| **Question:** | Did you direct Ray Moncini to make this move? |
| **Answer:** | No. |
| **Question:** | Did you suggest to Ray Moncini he should make this move? |
| **Answer:** | I supported the move. |

10

40. Russell's move was a "lateral" one, in that his executive level, his labor grade, and his annual salary of $154,000 did not change when he accepted the new position. (Page Tr. at 55, Ex. 40.)

**RESPONSE:** Admitted to the extent Page testified that <u>he considered</u> it a lateral move, and also because the Safety position was reclassified to an L3 position, and Russell was an L3 at the time he was moved.

41. Otis accomplishes changes of executives through a recommendation package or "rec-pack" for short. (Bousbib Tr. at 45, Ex. 35; 30(b)(6) Deposition Transcript of Ellen McGroary ("30(b)(6) McGroary Tr.") at 22-23, Ex. 37.)

**RESPONSE:** Admitted.

42. In Russell's rec-pack, it was noted that Russell was particularly well-qualified for this new position in NAA "by virtue of his past experience and education." (OTIS06968-76, Ex. 53.)

**RESPONSE:** Admitted, without the characterization "particularly" that is what the document says, deny that it is true, since Russell had no elevator experience.

43. Russell's experience and education were key factors in the decision to keep him at a L3 level with the same salary and to re-classify the position for him as its incumbent commensurate with his skills and qualifications as well as Otis' expectations of a high level of performance from him. (Bousbib Tr. at 68, Ex. 35.)

**RESPONSE:** Denied.  First, the transcript citation the Defendants rely on does not support the statement of fact.  Second, the position was not reclassified for "him." Rather the position was reclassified because of the increase in focus on safety. OTIS09000.  To further exemplify why this is a disputed material fact, Ellen McGroary's first explanation to Nichani was that the position was not regraded, NICH0694-96, Defs.' Ex. 17.), and she clarified that position as Otis' 30(b)(6 designee. 30(b)(6) McGroary Tr. at 25, Defs.' Ex. 37.  McGroary also testified that Russell's skill set he was bringing to the job didn't affect the grade.  McGroary Tr. September 15, 2003 at 116.

44. When Mr. Russell resigned less a week into the position, the position returned to its original Grade 51 classification. (Page Tr. at 82-83, Ex. 40; 30(b)(6) McGroary Tr. at 25, Ex. 37; Deposition Transcript of Ellen McGroary ("McGroary Tr.") at 98-99, Ex. 37.)

**RESPONSE:** Denied.  The transcript citations do not support this statement. Indeed, McGroary's 30(b)(6) deposition stated that the position never changed and that the position was not reclassified.  30(b)(6) McGroary Tr. at 25, Defs.' Ex. 37.  Russell's Recomendation Package clearly and unequivocally states that the position was

11

reclassified.  OTIS09000;  Page Tr. at 42.

45. Nichani admits that she did not have the same level of safety experience as Russell. (Nichani Tr. at 129, Ex. 39.)

**RESPONSE:** Denied.  Nichani testified that Russell's experience was different than hers, not a different "level" because his experience was in a factory setting. Additionally, Russell himself admitted that he needed to "learn the business" as part of his move to NAA.  Pl.s Ex. K, OTIS00290.  Russell, while he had a degree in Environmental Health, had worked for only 10 years as a Health and Safety manager (not in the elevator industry) and then with UTC was a Manager and then Director of Human and Natural Resource Protection for three years, before becoming a Director in a Safety position in 1993.  So he did not have 20 years experience in a Safety position, and certainly not in the elevator industry.  OTIS09002.

46. Page directed Moncini to find an appropriate position for her within Otis to accommodate the more senior-level changes. (Moncini Tr. at 205, 301-302, Ex. 38.)

**RESPONSE:** Denied that this statement is supported by the transcript citations Defendants' rely on.  (Moncini Tr. at 205, 301-302, Defs.' Ex. 38.).  Moreover, Defendants story on this is entirely inconsistent.  Moncini testified that Page directed him to make room for Russell.  Moncini Tr. 9/4/03 at 152.  Page testified that he did not direct Ray Moncini to make the move to bring Russell over, and that it was Moncini's decision to move Nichani out of her position and Page was merely aware of it.  Page Tr. at 39-40; 43.

47. Nichani had previously stated that she had had interest in returning to a line-management position, where she had been before her promotion to the senior safety manager position in NAA. (Nichani Tr. at 510, Ex. 39.)

**RESPONSE:**  Denied.  Nichani testified that she may have told MsGroary that she wanted to return to a line management position.   Nichani did not express to McGroary a desire to move to a line management position at the time of the Russell move.  McGroary Tr. at 230.

48. Moncini looked for positions for Nichani that had a much broader subject matter than just the EH&S function and expected that as such the position he found for her would equal or exceed Nichani's current salary or grade level. (Moncini Tr. at 301-03, 309, Ex. 38.)

**RESPONSE:**  Denied. Moncini targeted two branch manager positions for Nichani. Moncini Tr. at 301, Defs.' Ex. 38.  Nichani had previously been a branch manager. Moreover, those two positions were graded a level or two below Nichani's current

position. Pl.s Ex.L,  OTIS00296 and 00297.  Moncini testified that while her salary may have remained the same or gone up, he did not mention anything about her grade level during his testimony at this point of his deposition.

49. Nichani acknowledges that Moncini assisted her in a search for a new position. (Nichani Tr. at 133-34, Ex. 39.)

**RESPONSE:**  Admitted that Moncini offered Nichani two branch manager positions, but deny that additional assistance was given, other than offering the NAES position, since Moncini also said he would set up a dinner meeting for Nichani to find another position, but he did not.  Pl.s' Ex. I, Nichani Aff. at ¶¶6-7.

50. Page decided not to wait until Moncini had located a new position for Nichani because he wanted all of the other more-senior-level changes to be revealed in one central announcement. (Page Tr. at 51, Ex. 40.)

**RESPONSE:**  Admitted that Page testified he wanted one announcement to reveal the changes, but denied that Page testified he decided not to wait for Moncini to find a position for Nichani.  (Page Tr. at 51, Defs.' Ex. 40.)

51. In early May 2001, Russell was placed into the position of Director, EH&S for NAA; Nichani left her position as Senior Manager and an announcement went out to that effect. (NICHO69O, Ex. 14.)

**RESPONSE:**  Admitted.

52. Nichani's employment was not terminated; rather, she was expected to assist Russell in the transition while Otis continued to search for an appropriate position for her. (Moncini Tr. at 282, Ex. 38; Nichani Tr. at 228, Ex. 39.)

**RESPONSE:**  Admit that her employment was not terminated at this point, and that she was expected to assist Russell in the transition.  Deny that these transcript citations support the fact that Otis continued to search for an appropriate position for her. (Moncini Tr. at 282, Defs.' Ex. 38; Nichani Tr. at 228, Defs.' Ex. 39.)

53. In Otis' announcement of the employee moves, NAA President Ray Moncini noted Nichani's leadership and stated that she would assume a "senior NAA line management position in the near future." (OTIS08529, Ex. 56.)

**RESPONSE:**  Admitted that the announcement states this and speaks for itself.

54. The announcement praised the "positive performance trend" that had emerged under Nichani's leadership and said it was appropriate to "thank Sue Nichani for her capable leadership." (OTIS508529, Ex. 56.)

**RESPONSE:** Admitted that the announcement states this and speaks for itself.

55. The announcement asked Otis employees to join Moncini in "congratulating Sue on her many contributions to our ever improving EH&S performance." (OTIS 08529, Ex. 56.)

**RESPONSE:** Admitted that the announcement states this and speaks for itself.

56. Defendants also sent similar announcements on the same day regarding Danny Reese and Pat Dowson. (NICH0688-89, Ex. 13.)

**RESPONSE:** Admitted that the announcements were sent and that each speaks for itself.

57. Moncini believed that this announcement put Nichani's move in a favorable light with the possibility that people might even assume she was being promoted. (Moncini Tr. at 371, Ex. 38.)

**RESPONSE:** Admitted that Moncini held this belief deny its valid. Pl.s' Ex. I, Nichani Aff. at ¶¶10-11.

58. Nichani had an opportunity to review a draft of the announcement before it went out and did not request that any changes be made. (Nichani Tr. at 375-76, Ex. 39.)

**RESPONSE:** Admitted that Nichani was shown the announcement but deny that she testified that she did not request any changes be made. (Nichani Tr. at 375-76, Defs.' Ex. 39.) Rather Nichani testified in response to the question "Did you suggest any changes as far as the wording goes?" that "[She] believe[d] she questioned why our title were difference and our levels were different. Id. Also, when Nichani was shown the announcement, McGroary asked her if she was "okay with those [the announcements]." Nichani responded with a question: "Do I have a choice?" to which McGroary said "No." Pl.s' Ex. I, Nichani Aff. at ¶ 8. She was also told that the announcements would not go out until Thursday, when a scheduled dinner meeting was to occur with her and Moncini, so that hopefully a position would be in place for her. Yet the announcements went out anyway. Pl.s' Ex. I, Nichani Aff. at ¶ 9.

59. Ms. Nichani admits that the announcement does not state that she was being removed from her position because she did something wrong. (Nichani Tr. at 376, Ex. 39.)

**RESPONSE: Admitted.**

60. Within a week or so of Russell's acceptance of the new position, on or about May 14, 2001, Russell unexpectedly decided to resign his employment with Otis. (Pl.s Ex. M, OTIS 8531, Ex. 57.)

**RESPONSE:** Denied that it was unexpected, because both Moncini and Page knew that Russell was not pleased with the move to NAA. Pl.s Ex. M, OTIS 08531. Also, prior the move taking place, Russell had stated himself that he "didn't want the NAA job." Pl.s Ex. N, OTIS 00286.

61. Because Nichani had not yet located a new position within Otis and because he viewed Nichani as a solid employee, Moncini immediately offered Nichani her position back with the same grade level and salary that she had before. (Moncini Tr. at 280-81, Ex. 38.)

**RESPONSE:** Admit that Moncini offered her the safety position, but deny that it was because she had not yet located a new position within Otis, because Moncini's transcript at this point does not support that. Denied that Moncini's offer specifically stated it was at the same grade and salary level she had before Admit that Moncini viewed Nichani as a solid employee. (Moncini Tr. at 280-81, Defs.' Ex. 38.)

62. Nichani accepted that position without reservation and Moncini believed she seemed pleased with the opportunity. (Moncini Tr. at 282-83, Ex. 38; Page Tr. at 81-82, Ex. 40.)

**RESPONSE:** Denied that Nichani accepted the position without reservation, because she accepted it because she had no other position to move to. Pl.s' Ex. I, Nichani Aff. at ¶13. Admit that Moncini believed she seemed pleased with the opportunity.

63. Moncini was pleased to have her back because he believed that she was a good employee. (Moncini Tr. at 282-83, Ex. 38; Page Tr. at 8 1-82, Ex. 40.)

**RESPONSE:** Admitted.

64. A new announcement relaying Nichani's return to her former position was prepared and given to Nichani for her review and approval, which she gave. (NICHO692, Ex. 15.)

**RESPONSE:** Admit that an announcement was prepared, deny the rest of the statement as not supported by the evidence cited.

65. On May 23, 2001, Nichani sent an e-mail to the Vice President of Human Resources for NAA, Ellen McGroary, asking, "Why is this job a senior manager level job when I am in it, a director level job when Brad Russell is in it and a senior manager level job when I go back in it?" (NICHO696, Ex. 17.)

15

**RESPONSE:** Admitted.

66. McGroary researched the question by speaking with additional human resources and compensation personnel. (McGroary Tr. at 94-95, Ex. 37.)

**RESPONSE:** Denied. McGroary could not testify equivocally that she researched the question, but merely said she thought she spoke to the Director of Executive Compensation. (McGroary Tr. at 94-95, Defs.' Ex. 37.) Though later she testified that she did speak with only with James Defau. (McGroary Tr. at 106, Defs.' Ex. 37.)

67. McGroary responded to Ms. Nichani, in an e-mail, stating "The answer to your question is that Brad brought the Director title with him from WHQ (and previously from UTC). With his departure, we reverted back to the old title. The Director title is only used for UTC executive-graded positions." (OTIS 5 827, Ex. 50.)

**RESPONSE:** Admitted that McGroary sent Nichani an email stating this.

68. At this point, McGroary did not believe that Nichani was making a claim based on her gender. (McGroary Tr. at 93, Ex. 37.)

**RESPONSE:** Admitted that McGroary testified that she did not believe Nichani was making a claim based on gender at the time she received Nichani's email in May 2001. However, denied that such testimony is truthful since McGroary's own response to the June 5th 2001 email from Nichani identified red circling as a reason, and McGroary has been a Human Resource professional for 17 years who is familiar with the laws and regulations concerning gender discrimination. (McGroary Tr. at 92, Defs' Ex. 37.) And McGroary testified in describing Nichani's discrimination charge that she claimed "[Otis] had selected a while male [Russell] for a job, so her claims were around gender as well as race" McGroary Tr. at 80, 88, which is precisely the claims Nichani made in her emails to McGroary. (NICHO696, Defs.' Ex. 17.)

69. On June 6, 2001, despite the fact that Nichani's office was less than a hundred feet from McGroary's, Nichani sent McGroary still another e-mail. (McGroary Tr. at 171, Ex. 37; N1CH0696, Ex. 17.) Nichani asked, "Are you saying that the level of a position, and ultimately the compensation, is based on the individual in the position and not based on the duties and responsibilities of the position itself'?" (N1CH0696, Ex. 17.)

**RESPONSE:** Admitted that Nichani sent McGroary the June 6th 2001 email, however, deny the inference – intended by the statement concerning the distance between their offices – that Nichani was avoiding discussing the issue in person. Indeed, Nichani tried to set up a meeting with McGroary through her assistant but McGroary was unresponsive. Pl.s' Ex. I, Nichani Aff. at ¶16.

70. McGroary again researched the issue to ensure its correctness. She concluded that Russell had been "red-circled" into Nichani's former position because he had already been at a L3 Executive-level with a higher rate of pay. Specifically, later that day, McGroary responded:

> Typically a job is graded based on several criteria: scope of responsibilities size of budget size of operations, # of direct reports, domestic v. international responsibilities, impact of decisions, skill/education/competencies/prior experience required, who the position reports to (what level in the organization[),] etc., etc.

> In this case, the job wasn't re-graded. Brad was being moved into the position and he was "red-circled" in the process. This happens occasionally when we move individuals to a lower graded job. Within NAA, this often occurs at the Branch level. For example, an individual might be a Grade 50 but for certain reasons (developmental, business circumstances, etc.) we move them to what is a Grade 49 job. Rather than re-grade the position, we "red-circle" the individual moving into the position. When that individual moves on, the job is backfilled at a Grade 49.

(N1CH0694-96, Ex. 17.)

**RESPONSE:** Admitted that McGroary sent an email stating this, but deny any implication that the job was not regraded or reclassified, and deny that Russell was red circled. Moncini, President of Otis NAA, testified he did not believe Russell was red circled. Moncini Tr. September 19, 2003 p. 236. The recommendation package for Russell includes a box to be checked if it is a "red circle" event, which is not checked. Pl.s' Ex. H, OTIS08999. However, McGroary testified that Otis keeps track of all red-circling regardless of whether it involves a protected class or not, and that red-circling would be reflected in the paperwork associated with someone moving from one job to another so they can understand what happened. McGroary Tr. at 163.

71. She viewed it as a red-circling situation "[b]ecause when we completed the rec. pack, his rate did not change, his salary did not change, and some of the verbiage reflects the fact that he was being moved into that position as an executive." (McGroary Tr. at 316, Ex. 37.)

**RESPONSE:** Admitted that McGroary viewed it as red circling but deny that it was red circling for the reasons stated in response to number 70.

17

72. The next day, she sent yet another e-mail stating:

> I have carefully evaluated your response and I still do not understand why this discrepancy exists. . . .My skill, education, competencies and prior experience as it relates to our business exceed Brad Russell's. . . So why am I "Fully Competent" as stated in ALL of my performance appraisals and he was "learning" his job, yet I am at a lower level and at lower compensation than he is? Why would Otis not pay us the same to do the same work? (N1CH0694-96, Ex. 17.)

**RESPONSE:** Admitted that Sujata Nichani sent this email.

73.    McGroary knew that Nichani's response was inaccurate; Nichani did not even have the same skill, education, competencies or prior experience as Russell. (McGroary Tr. at 116-118, 145-57, 316-17, Ex. 37; Nichani Tr. at 129-30, 379-81, Ex. 39.)

**RESPONSE:** Denied because Nichani's field experience in the elevator industry safety was greater than Russell's, and also because there was no requirement that a safety professional possess a safety degree. OTIS8878 Defs' Ex. 58. Moncini told Nichani that he thought Russell needed to learn the elevator business (Pl.s' Ex. I, Nichani Aff. at ¶12), and Russell himself said that he needed to "learn the business" as part of his move to NAA. Pl.s Ex. K, OTIS00290. And Russell, while he held the safety position at NAA, made a freshman mistake of characterizing an accident as serious, something an experienced safety professional would not have done. McGroary Tr. at 149. Aff. Nichani.

74. McGroary responded that it would be better to set up a meeting between the two of them. (McGroary Tr. at 116-118, 145-57, 316-17, Ex. 37; Nichani Tr. at 129-30, 379-8 1, Ex. 39.)

**RESPONSE:** Denied.  First, the transcript citations Defendants rely on here do not in any way support this statement.  Second, while McGroary did suggest that they meet to discuss the issue. Ms. McGroary agreed but never made little attempt to arrange this meeting, and appeared unresponsive to Plaintiff's concerns.  Pl.s' Ex. I, Nichani Aff. at ¶16.  For example, on Monday July 2, 2001, Plaintiff e-mailed Ms. McGroary saying that she was available to meet with her on July 9, 2001. Ms. McGroary's secretary responded and asked Plaintiff whether she was available to meet with Ms. McGroary on July 12, 2001, to which Plaintiff said yes.  Ms. McGroary never made any arrangements for this meeting. Id.

75. A meeting between the two was not held due to some scheduling issues and Nichani never followed up again with McGroary. (Nichani Tr. at 383-84, Ex. 39.)

**RESPONSE:** Admitted that the meeting was never scheduled, but deny that Ms.

18

Nichani never followed up.  See response to Number 74 above.

76. McGroary believed that the issue had been resolved: "I thought if Sue wanted to pursue it, she would have pursued it back through me." (McGroary Tr. at 17 1-72, Ex. 37.)

**RESPONSE:** Admitted that was McGroary's belief.

77. Nichani never spoke with her boss — Otis NAA President Ray Moncini — regarding this issue and he was unaware of her concerns. (Moncini Tr. at 260-61, Ex. 38.)

**RESPONSE:**  Admitted, with the qualification that she did not speak with him because he was the decisionmaker it appeared, and therefore Ms. Nichani thought it proper to pursue her complaint through Human Resources and Ms. McGroary. Pl.s' Ex. I, Nichani Aff. ¶17.

78. Instead, over two months later, in late August 2001 Nichani filed a charge of discrimination against United Technologies Corp. with the Connecticut Commission on Human Rights and Opportunities. (NICHO 147, Ex. 1.)

**RESPONSE:**  Admitted that Ms. Nichani filed the charge, but denied that she did it "instead" of anything else.  She filed the charge because attempting to resolve the complaint through Human Resources was futile. Pl.s' Ex. I, Nichani Aff. at ¶18.

79. Nichani did not receive a merit increase in 2002 because Otis deferred all merit increases company-wide for at least 12 months. (OTISO561 1-12, Ex. 49.)

**RESPONSE:**  Admitted.

80. Similarly, although Nichani received an incentive bonus in 2001, she should not have received such a bonus in that year because she was already receiving a "position allowance" as part of her overall compensation package. She was not asked to reimburse Otis for that payment. However, when discovered, Nichani did not receive an incentive compensation payment for 2002. (Moncini Tr. at 333-34, 340, 352, Ex. 38.)

**RESPONSE:** Denied, because Moncini testified it was not a mistake placing her into the performance inventive plan.  Moncini Tr. at 333-334.

81. During late 2001 and 2002, Nichani and the safety area were criticized for their performance. (OTISO185, Ex. 44.)

**RESPONSE:** Denied to the extent Defendants contend this was anything more than a single email from Erv Lauterbach to Ray Moncini.  Moreover, Moncini never did a performance appraisal of Nichani during this period, and never communicated this to her.  Pl.s' Ex. I, Nichani Aff. at ¶66.

19

82. Although Ms. Nichani had received some stock options through a non-executive recognition stock option plan in the past, she did not receive any in 2002. (Third Amended Complaint, ¶38-40.)

**RESPONSE:** Admitted.

83. The terms of the plan specifically provide that decisions are made on an annual basis and that "Participation in the Program for any particular year does not ensure that you will receive additional Program awards in the future." (0TIS09828-42, Ex. 33.)

**RESPONSE:** Admitted.

84. There was not a non-executive stock option program in 2003 and thus Ms. Nichani did not to receive stock options in that year either. (Moncini Tr. at 347-48, Ex. 38; Page Tr. at 94-95, Ex. 40.)

**RESPONSE:** Denied. Page testified that the non-executive stock option plan was a "constant" from 1998 until his deposition on December 12, 2003. Page Tr. at 15-16.

85. Ms. Nichani received over $146,000 in compensation for 2001. (NICHO752, Ex. 19.)

**RESPONSE:** Admitted.

86. As head of safety for NAA, Nichani sat on an Otis-wide safety committee called the World-wide Job Site Safety Standards (WWJSSS) committee. (Nichani Tr. at 300, Ex. 39.)

**RESPONSE:** Admitted.

87. Because the safety of its employees is Otis' top priority, this committee was charged with developing safety rules and procedures for areas to follow in the workplace. (0T1S08361-08365, Ex. 55.)

**RESPONSE:** Admitted.

88. Nichani understood that, as head of safety for Otis NAA, it was her responsibility to understand these rules and implement them. (Nichani Tr. at 42-43, Ex. 39.)

**RESPONSE:** Admitted that Nichani's responsibilities included ensuring that there were processes in place that implemented the WWJSSS, and that they were implemented on a daily basis along with the oversight and supervision of line management.  Pl.s' Ex. I,

Nichani Aff. at ¶¶28, 33.

89. In 2000, in response to an accident, Otis World Headquarters revised its WWJSSS rules regarding the use of wire rope clips. The WWJSSS committee revised its rules to have workers eliminate all field-applied clips because the Committee believed that it might be possible to improperly "torque" (or tighten) the clips to the rope. (OTIS 0714, Ex. 46.)

**RESPONSE:** Admit that the WWJSSS was revised, yet deny that Otis World Headquarters did so, because the evidence relied on by Defendants is an email merely from Patrick Dowson, not notes or minutes from the WWJSSS Committee meetings.

90. Wire rope clips are mechanisms that keep together two ends of a rope, either to make a loop or to prevent it from slipping (much like a rope knot would do). There are various types of wire rope clips, either called "U-Bolts" (which are also known as "Crosby Clamps") or Double Saddle rope clips. The term "fist grip" is also used interchangeably with the term "rope clip". (OTIS Safety Handbook, 2000 ed., OTIS 07517,07610-17, Ex. 57)

**RESPONSE:**  Objection because this paragraph does not comply with Local Rule 56 (a) 2 because the Defendants do not cite to a specific paragraph of a document that is more than one page in length. Admit as to the description of the use of wire rope clips. Deny that the term fist grip is used interchangeably with "rope clip" because the document cited does not support that statement of fact.

91. The WWJSSS Committee revised the rules in a two-step process. First, by December 31, 2000, all wire rope clips (in any form) were to be eliminated in all standard work processes (SWP) that Otis used in installing, servicing and modernizing its elevators. Instead, pre-formed slings (essentially wire ropes with the loops already made) were to be used; these would essentially be "mistake-proof" because there is no application being made in the field (i.e. no need to torque). The second part of the rule called for the elimination of the use of all U-bolt wire rope clips as part of all hoisting and rigging activities (whether they were standard processes or not) in installing, servicing and modernizing its elevators. This was to be done by December 31, 2001. If a wire rope clip did need to be installed in the field (instead of using a pre-formed sling), a documented Job Hazard Analysis ("JHA") and request for deviation needed to be submitted to and approved by the President of NAA. Moreover, only one type of wire rope clip (called a "double saddle rope clips") could be used in such a process and those clips had to be installed per the manufacturer's recommendations. However, in general, wire rope clips were not to be used absent these special circumstances and absent approval through the JHA process. (NICH 1087, Ex. 24, OTISO714-17, Ex. 46.)

21

**RESPONSE:** Admitted to the extent this statement of fact derives verbatim from the applicable WWJSSS. Denied to the extent that the Defendants –without supporting evidence as required by Local Rule 56 – place their interpretation on the WWJSSS. Other people than the president of Otis, such as the managing director, or Regional Vice President, would sign off on the JHA. Reese 8/25/04 Tr. at 226.

92. In February 2002, Otis sent a reminder to all area safety heads, including Nichani, reiterating the safety directives outlined in the WWJSSS. (NICH1 316, Ex. 29.)

**RESPONSE:** Admitted that this reminder was sent, and that as the Exhibit states, it was sent by Helio Tinone of WHQ to clarify the WWJSSS for all areas.

93. In June 2002, the NAA area was criticized for its continued use of wire rope clips during an assurance review of the Mexico Region. (OTISO714-17, Ex. 46; Nichani Tr. at 310-11, Ex. 39.)

**RESPONSE:** Admitted that during an Assurance Review of Mexico, which had just recently come under NAA's leadership, U-Bolts were discovered in use not fist grips. Deny that Exhibit 46 entirely supports this statement of fact.

94. By July 2002, Nichani sought additional information regarding this rule, in light of the criticisms noted in Mexico review. (0T1S0714-17, Ex. 46.)

**RESPONSE:** Admitted.

95. EH&S Director for Otis World Headquarters Pat Dowson, told Nichani in a July 1, 2002 e-mail that the continued use of Double Saddle rope clips by NAA could only occur if there was a defined process (JHA) that was then approved by NAA President Ray Moncini. (OTIS 07 14-17, Ex. 46.)

**RESPONSE:** Denied, Downson's email does not state that Moncini had to approve the JHA. (OTIS 0714-17, Defs' Ex. 46.). Dowson recommends a process – at OTIS 0717 – that would require approval by Engineering and Moncini, and then says he will do further research. OTIS 0717, Defs'.

96. Nichani understood that having a defined process and performing a job hazard analysis was a key part of mitigating risks of accidents within the company.

> Q:      So if you saw something you didn't like, you could just modify it?
> A:      No. There was a process that we went through as far as a risk assessment.
> Q:      And what was that process?
> A:      The process was to complete a JHA, job hazard analysis, and mitigate the risk. The documented process with the approval of various managers depending on the level of activity.

22

> Q:     And would you have to go back up to World Headquarters to tell them that you thought this modification was appropriate before you could implement the modification?
> A:     No, I did not.
>
> Q:     Who told you that you could do it on your own?
> A:     In the Worldwide Job Site Safety Standards, it was written that with the appropriate risk assessment signed by various management at the area level that a different process could be utilized.

(Nichani Tr. at 49-50, Ex. 39.)

**RESPONSE:**   Admitted.

97. In June 2002, the NAA area was criticized for its continued use of wire rope clips during an assurance review. In an e-mail to a colleague complaining about the WWJSSS, Nichani states:

> Lately, we have implemented standards that no one (including safety) knows how to implement - such as no more fist grips. That's backwards and unrealistic.

(NICH 1050, Ex. 23.) (Emphasis added.).

**RESPONSE:**   Denied that in June 2002, the NAA area was criticized for its continued use of wire rope clips during an assurance review because the Exhibit Defendants cite does not support that statement of fact.  Admit that Nichani wrote the sentence referenced in NICH1050, Defs' Ex. 23.

98. Despite being told explicitly that fist grips were to be eliminated and despite knowing that a JHA would have to be done if they could not be eliminated, Nichani admits that she did not utilize that process. (Nichani Tr. at 49-50, Ex. 39.)

**RESPONSE:** Denied because the JHA was performed in the field, not by Nichani, and the policy to utilize a JHA when there was no standard work process was completely implemented in NAA.  Pl.s' Ex. I, Nichani Aff. at ¶28.

99. One of the process owners, Scott Simmons, who was in charge of New Equipment installation, brought the issue of continued use of fist grips to Nichani's attention. (Deposition Transcript of John S. Simmons ("Simmons Tr.") at 93, Ex. 41.) However, he was not aware of any steps that Nichani took to get clarification on the issue. (Id.)

**RESPONSE:** Denied because Simmons' Deposition at this point does not say he brought "the issue of continued use of fist grips to Nichani's attention." Simmons Tr. at 93, Defs' Ex. 41.)  Admit remainder.

100. She claimed at her deposition that the JHA process was not utilized because, she claimed, she did not know that fist grips had to be eliminated — a fact directly contradicted by her August 2002 e-mail.

> Q:    With regard to the use of fist grips, did you go through this modification process and get approval at the area level?
> A:    No, I did not.
>
> Q:    Why not?
> A:    <u>Because it was not my understanding that fist grips had to be eliminated</u>.

(NICH 1050, Ex. 23; Nichani Tr. at 49-50, Ex. 39.) (Emphasis added.).

**RESPONSE:**  Denied that the email (the substance of which is admitted) contradicts her testimony.  Her email of August 2002 questioned Dowson as to why he was saying something different than what the WWJSSS said, and is consistent with her testimony. (NICH 1050, Defs.' Ex. 23; Nichani Tr. at 49-50, Defs.' Ex. 39.)

101. Even after the issues regarding NAA's continued use of wire rope clips without a JHA surfaced, Nichani ignored them; she did not raise the issues with her supervisor, NAA President Ray Moncini, as had been suggested by Otis World Headquarters. (Nichani Tr. at 51-52, Ex. 39.)

**RESPONSE:**   Denied. This statement of fact is not supported by the evidence cited. The evidence cited does not support that Nichani "ignored the issues" but rather supports that Nichani "does not recall" speaking with Moncini regarding the use of fist grips in the field.

102. In September 2002, a safety bulletin was distributed to Nichani regarding an accident in France in which wire rope clips were improperly used. (NICH13O8, Ex. 28.)

**RESPONSE:**  Admitted that a safety bulletin was distributed to all Otis Area Safety leaders, however, the evidence cited does not support the statement that wire rope clips were improperly used. (NICH13O8, Defs.' Ex. 28.).  The document supports that that Otis Area was still using U-Bolt clips in September 2002 in a hoisting procedure.

103. This bulletin, once again, reiterated that wire rope clips were to be eliminated and, if they could not be eliminated, a Job Hazard Analysis needed to be performed. (NICHI3O8, Ex. 28.)

**RESPONSE:** Denied, because once again the document cited does not support the statement.

104. There is no evidence that Nichani distributed this bulletin to anyone in NAA, including in the field. (Deposition of Erv Lauterbach ("Lauterbach Tr.") at 75-76, Ex. 36.)

**RESPONSE:** Denied. This statement is not supported by competent evidence; to rely on the testimony of only the Regional Vice President of one region in the entire NAA does not support the statement that there is "no evidence."

105. Erv Lauterbach, the Vice President of the New York Region indicated that he and his staff were unaware of this requirement. (Lauterbach Tr. at 75-76, Ex. 36.)

**RESPONSE:** Admitted that Erv Lauterbauch testified to that statement.

106. On December 6, 2002 — nearly six months after the issue regarding NAA's continued use of wire rope clips, particularly without the completion of a JHA, had been raised with Nichani  ---  Nichani failed to take action to get this safety issue resolved in NAA or to see that fist grips were not used. In an e-mail, Nichani candidly conceded that "I personally am still experiencing confusion on the fist grip issue." (NICH1213, Ex. 26.)

**RESPONSE:** Denied all of the statement up to and including the sentence that concludes with "not used" because the cited evidence does not support the statement of fact. Admit that Nichani wrote the email referenced.

107. On December 23, 2002, less than three weeks after Nichani claimed that she was still experiencing "confusion" on the issue of fist grips, Otis employee Daniel McQuillan fell to his death in a construction accident in the New York City area. Nichani and others went to the accident site immediately to investigate. By the next day, Nichani gave a summary report of the initial findings to NAA President Ray Moncini. (OT1S6059, Ex. 52.)

**RESPONSE:** Admitted.

108. In it, Nichani noted that the car frame that the employee was riding on at the time of his death had fallen after it was "hoisted with a cable sling that was secured with fist grips." (0TIS6059, Ex. 52.) (Emphasis added.).

**RESPONSE:** Admitted.

109. Nichani also prepared a summary called "An Accident", which was finalized on January 8, 2003 and distributed via e-mail. (OTIS 05209-li, Ex. 47.) In that document, she indicates that "It is believed that the 'Fist Grip' cable clamps came

25

loose." (OTIS 05210, Ex. 47.)

**RESPONSE:** Admitted.

110. On January 2, 2003, after the initial matters concerning the investigation into the fatality were assigned and addressed, Moncini asked Nichani questions regarding NAA's overall compliance with various Otis safety policies and procedures. (OTISO6O9, Ex. 45.)

**RESPONSE:** Admitted.

111.     Nichani had not talked with Moncini regarding any issue of fist grips before December 23, 2003, when McQuillan died. (Nichani Tr. at 51-52, Ex. 39.)

**RESPONSE:** Admitted that prior to the McQuillan fatality Nichani had not discussed the use of fist grips in the field with Moncini, but deny that she did not discuss any issue of fist grips because the evidence Defendants cite does not support that statement. (Nichani Tr. at 51-52, Defs.' Ex. 39.)

112. In an e-mail on Friday, January 10, 2003, Nichani notified Moncini in detail, for the first time, of the applicable WWJSSS rules regarding the use of wire rope clips. (Moncini Tr. at 408-409, Ex. 38; NICH1O87, Ex. 24.)

**RESPONSE:** Admit that Nichani sent the January 10, 2003 email, and that Moncini testified that was the first time he had seen that standard.

113. Moncini responded on Monday, January 13, 2003 that he was "confused" by Nichani's e-mail and asked Nichani to talk with him directly. (NICH1O87, Ex. 24.)

**RESPONSE:** Denied. Moncini was confused "about this" meaning the WWJSS standard, not by the email. (NICH1O87, Defs.' Ex. 24.; Moncini Tr. at 409).

114. Moncini explained further what he meant: "My confusion is, first of all is why the difference between standard processes and nonstandard processes. Then secondly, why haven't I seen deviation requests." (Moncini Tr. at 409, Ex. 38.)

**RESPONSE:** Denied that the evidence cited here by the Defendants supports in any manner the statement of fact. Admit that during his deposition Moncini gave that explanation.

26

115. One week later, on Sunday, January 19, 2003, disturbed by the NAA's lack of compliance with WWJSSS rules, Moncini asked Danny Reese, Otis' Vice President of EH&S world-wide, to conduct a thorough review of NAA's safety practices and procedures. "I would like to impose on you and your staff to do a full management system review of NAA. What I am particularly interested in is the discrepancies we may have in the WWJSSS versus our practices in the field." (NICHO1O48-49, Ex. 22.)

**RESPONSE:** Admitted.

116. Moncini copied Nichani on this e-mail; she responded on January 23, 2003 and admitted that she already knew of at least <u>three</u> areas that NAA was out of compliance with, including the continued use of wire rope clips. (OTIS 0178, Ex. 43.)

**RESPONSE:** Denied because this statement is not supported by the evidence cited, specifically OTIS 0178, Defs.' Ex. 43.)

117. On January 31, 2003, Moncini outlined his profound disappointment and concern with her failure in specific terms:

> There is obviously a clear communications issue between you and the WHQ group on WWJSS changes.... It seems that our inability to use the process with regards to fist grips and other issues has put NAA in a very difficult position. Although we may find that the WWJSS are too restrictive and need to be modified, we need to do this in an open fashion with WHQ and potentially with my involvement. You stated that you were confused by the standard on the fist grips which begs the question--why didn't you ask Danny, Tim or Pat? If they were unresponsive or difficult you could have come to me. What I saw yesterday is that we were simply ignoring the direction from WHQ and this is not acceptable.

(OTIS 0178, Ex. 43.)

**RESPONSE:** Admitted that the document speaks for itself. Deny that these statements are true, as stated in Nichani's email of February 1, 2003 to Moncini. Pl.s Ex. O, OTIS04698.

118. Moncini also noted two other important areas of deficiency that had been brought to his attention as a result of the McQuillan fatality: namely that NAA had not been implementing safety training for mid-level and executives (called MELT training) and had not filled a regional safety manager position with sufficient speed. (OTISO178, Ex. 43.)

**RESPONSE:** Admitted that the document speaks for itself. Deny that these statements are true, as stated in Nichani's email of February 1, 2003 to Moncini, Pl.s Ex. O,

OTIS04698.

119.In mid-March 2003, Moncini prepared a performance review for Nichani. (NICHO816, Ex. 20.)

**RESPONSE:**  Admitted that Moncini was involved in the preparation of the performance review, as were other individuals as reflected by the document itself.

120.Ultimately, it was the issues raised in the January 31, 2003 e-mail as well as those summarized in her performance review that led to Nichani's termination on March 21, 2003. (Moncini Tr. at 384-89, Ex. 38.)

**RESPONSE:**  Denied.  Nichani's termination was motivated by her charge of discrimination and her opposition to Defendants' discriminatory practices which started with her email communications with McGroary after Nichani learned that Russell had been compensated as an L3, resulted in her initial CCHRO charge, a subsequent charge alleging retaliation based on failure to award stock options, her ongoing lawsuit; her refusal to alter the report concerning McQuillan's death, and her removal as the Business Practices Officer for NAA.  Pl.s' Ex. I, Nichani Aff. at ¶18, 27.  The issues raised in the January 31, 2003 email are pretextual as evidenced by Nichani's response to Moncini's January 31, 2003 email to Moncini. Pl.s Ex. O, OTIS04698.

121.Even though Nichani was head of safety for NAA, Nichani was not terminated as a sanction or discipline for the McQuillan fatality itself-- rather, she was terminated for the issues that were discovered as a <u>result</u> of the investigation into the fatality, principally her failure to implement WWJSSS and safety policies. (Bousbib Tr. at 91, Ex. 35; Moncini Tr. at 384-89, Ex. 38.)

**RESPONSE:**  Denied.  Danny Reese asked Pat Dowson to prepare a "Privileged and Confidential" document called "NSAA Senior Management of EH&S – Sue Nichani Sanction Consideration" for the McQuillan fatality.  Pl.s Ex. P, OTIS 05842.  This document attempts to link the McQuillan fatality to Nichani in order to justify her termination as a sanction for the fatality.  Indeed, in describing that document, Reese stated: "I'm looking for just background information, things to consider as to whether there's some reason to impose a sanction or not impose a sanction on the EH&S function in regard to this particular case."  Reese Tr. at 151.

28

122.Moncini's criticism of Nichani centered on her failure to take action in a critical area of safety:

> The fact is that her job was to deploy this policy and she saw this deficiency and instead of proactive engagement, and asking for help and doing the things that she should have done to try to resolve these issues, what she [stated was] well, I did this and they never responded to me, so therefore I thought it was okay. And, quite frankly, that's not good enough.

(Moncini Tr. (Day 3) at 106-07, Ex. 38.)

**RESPONSE:** Admitted Moncini testified to that in his deposition.

123.This belief that Otis' employees should not merely "relay" information but attempt to solve problems, was noted by Otis President An Bousbib at his deposition:

> We are not interested here in people taking reports from others and then reporting -- passing the ball so to speak. We are expecting active, engaged leadership. So it's not reliance and just passing the buck and saying, well, they didn't do it. If you're in charge, the buck stops there.

(Bousbib Tr. at 98, Ex. 35.)

**RESPONSE:** Admitted Bousbib testified to that in his deposition.

124.Ultimately, Moncini viewed Nichani's actions as a "dereliction" of her duties to deploy safety policies across NAA correctly. (Moncini Tr. (Day 3) at 148, Ex. 38.)

**RESPONSE:** Denied.  Plaintiff maintains that Moncini fabricated this "dereliction of her duties" in order to establish a pretext to terminate her for opposing discriminatory practices, Pl.s' Ex. I, Nichani Aff. at ¶¶27-56, 63-72, and for refusing to alter the report among other things.  Pl.s' Ex. I, Nichani Aff. at ¶¶57-62.


125.Mr. Moncini had been instructed by Otis President An Bousbib to take immediate actions to improve "NSAA" leadership. (Moncini Tr. (Day 3) at 160-61, Ex. 38; Pl.s Ex. GG, OTIS 6056, Ex. 51; Bousbib Tr. at 84-85, Ex. 35.)

**RESPONSE:**  Admitted that Bousbib did so instruct Moncini, but deny that Ex. 51 relied on by Defendants supports that statement.

126.Nichani understood too well that she was responsible for conveying all safety information from Otis World Headquarters and that she could be sanctioned or even terminated if she did not. (Nichani Tr. at 298, 475, Ex. 39.)

**RESPONSE:** Admitted that Nichani responded at her depositon as such, but denied to the extent that answer needs to be qualified, with for example, the responses to paragraphs 21-25 above, Pl.s' Ex. I, Nichani Aff. at ¶¶ 28, 29.


127. On March 21, 2003, Moncini met with Nichani to review her performance and terminate her employment. (Nichani Tr. at 60-61, Ex. 39.)

**RESPONSE:** Admit.

128. Although Nichani was not told in advance of the subject matter of the meeting, she expected to receive some discipline at the meeting.

> Q: Did you know why he wanted to see you?
> A: I suspected why he wanted to see me.
>
> Q: What did you suspect?
> A: I suspected that I was going to be disciplined for the accident.
>
> Q: And what kind of discipline did you expect to receive?
> A: I expected that it would be a warning of some sort.

(Nichani Tr. at 61, Ex. 39.)

**RESPONSE:** Admitted Nichani expected to receive discipline because the Defendants had been planning to retaliate against her and fabricating issues. Pl.s' Ex. I, Nichani Aff. at 27, 29, 36; 63-72.


129. At the meeting, Moncini and Ellen McGroary, NAA Vice President of Human Resources, told Nichani that she was being terminated for the reasons outlined in the performance review. (Nichani Tr. at 65, 71, Ex. 39; NICHO216-20, Ex. 20.)

**RESPONSE:** Admitted that is what McGroary stated, deny that those reasons are true. Plaintiff maintains that these reasons are pretextual and fabricated in order to establish a pretext to terminate her for opposing discriminatory practices, Pl.s' Ex. I, Nichani Aff. at ¶¶27-56, 63-72, and for refusing to alter the report among other things. Pl.s' Ex. I, Nichani Aff. at ¶¶57-62.


130. After listening to Moncini explain the performance review and her failings, Nichani did not contest what he told her but merely stated "Is that all?" (Nichani Tr. at 65, 71, Ex. 39.)

**RESPONSE:** Admitted that she did not verbally contest her termination at the time of

the event because she was shaken up by the fact that [Moncini had told [her] that he was taking [her] out of her position. Moreover, Nichani stated that she only recalled saying "Is that all?" not that that was all she said. (Nichani Tr. at 65, 71, Defs.' Ex. 39.)

131. Nichani then met separately with McGroary but once again did not raise any issues or ask any questions. (Nichani Tr. at 69, Ex. 39.)

**RESPONSE:** Admit at that time she did not raise any issues or questions.

132. Nichani described the meetings as "low-key conversational." (Nichani Tr. at 72, Ex. 39.)

**RESPONSE:** Admitted

133. After Nichani's termination, Moncini appointed Patrick Dowson — who was Nichani's predecessor at NAA and subsequently promoted to an executive as Director, EH&S for Otis World Headquarters — to be acting director for safety for NAA until Moncini could locate a qualified replacement. Dowson still maintained his existing job and labor grade as Director of EH&S at Otis World Headquarters in addition to his temporary duties in the NAA area. (Moncini Tr. at 96-98, Ex. 38.)

**RESPONSE:** Admitted that Dowson took over Nichani's job, denied the remainder because the evidence cited does not support this statement. Moncini did not testify at pp. 96-98 that Dowson was appointed until he could locate a qualified replacement. Rather, Moncini testified that he was evaluating whether or not Dowson may stay in the job, and that a determination would be made in the future as to whether Dowson would be permanent in the job. (Moncini Tr. at 96-98, Defs.' Ex. 38.)

134. In early 2004, the EH&S function in the North America Area was combined with the Quality function. Otis selected Edith DiFrancesco, a woman who was a L2 Executive, for that new position. (Moncini Tr. (Day 3) at 15-17, Ex. 38.)

**RESPONSE:** Admitted.

135. After the McQuillan death, Nichani and others were charged with investigating the accident. Nichani was asked to work together with Otis' outside attorneys, Hal Engel and John McNamara, to interview numerous witnesses and prepare an internal accident report that accurately stated the facts behind the accident. (Affidavit of John McNamara ("McNamara Aff.") at ¶116,7, Ex. 42.)

**RESPONSE:** Admitted with the qualification that the internal report was required to follow a specific protocol to determine the root cause of the accident, and that she as

safety leader investigates these accidents.  Pl.s' Ex. I, Nichani Aff. at ¶57.  After the accident investigation started she was asked to work with the attorneys.

136. Attorney McNamara — who was unaware that Nichani had a lawsuit pending against Otis -- told Nichani that he would be in charge of the investigation. (McNamara Affat ¶116, 7, 9, Ex. 42.)

**RESPONSE:**  Admitted that McNamara's affidavit states that, deny that he was qualified to perform the Tap Root or Root Cause analysis and therefore could not perform the investigation from that perspective.  Pl.s' Ex. I, Nichani Aff. at ¶¶57-58, 61.

137. Ultimately, Nichani and Regional Vice President Erv Lauterbach, prepared a draft report. (Nichani Tr. at 247-49, Ex. 39.)

**RESPONSE:**  Admitted.

138.Nichani solicited input from various individuals, including her superiors and, was asked to make changes to the report. (Nichani Tr. at 247-49, Ex. 39.)

**RESPONSE:**  Admitted.

139.Nichani conceded that none of the changes to the report were "false." (Nichani Tr. at 247-49, Ex. 39.)

**RESPONSE:**  Denied to the extent that the citation Defendants rely on here concern changes made to the report that are different from the changes that Nichani claims she refused to make.  Nichani testified that certain changes to the report were false, for example, that the cause of the accident was changed to state employee misconduct. Nichani Tr. at 470.  And she testified that the changes that were made to the final report were false.  Nichani Tr. at 470.  Pl.s' Ex. I, Nichani Aff. at ¶¶57-61**.**

140.The report was then provided to outside counsel, John McNamara, who made further changes to both factual statements and to certain opinions. (Nichani Tr. at 254, Ex. 39.)

**RESPONSE:**  Denied. The evidence cited by the Defendants here does not support this statement.

141.McNamara—who himself interviewed all the witnesses relating to the fatality -- reviewed the draft report and found that it was inconsistent with the facts he had developed in his interviews of the witnesses.  He also found that it was inaccurate and filled with speculations, conclusions and perceptions. (McNamara Aff. at ¶7, Ex. 42.)

**RESPONSE:** Admitted that McNamara has stated so much, but deny that the report was inaccurate and filled with speculations, conclusions and perceptions. Pl.s' Ex. I, Nichani Aff. at ¶¶57-61.

142. Nichani conceded that none of the attorneys falsified <u>anything</u> in the final report. (Nichani Tr. at 478, 498, Ex. 39.)

**RESPONSE:** Denied. She testified that the changes that were made to the final report were false.  Nichani Tr. at 470; Pl.s' Ex. I, Nichani Aff. at ¶¶57-61.


143. McNamara also states that he never asked Ms. Nichani or anyone else to submit a false report. (McNamara Aff. ¶8, Ex. 42.) He states further that he did his best to be sure that the report that was prepared for internal purposes would be factually accurate and devoid of speculation. (<u>Id</u>.)

**RESPONSE:** Admitted that McNamara's affidavit states that.

144. Although Nichani disagreed with some of the changes that were made, she did not tell anyone about her disagreement because she was terminated before she could do so. (Nichani Tr. at 253.)

**RESPONSE:** Denied. Nichani told Moncini she would not remove the fall protection issue from the report. Pl.s' Ex. I, Nichani Aff. at ¶61.

145. At her deposition, Nichani also conceded that she had no reason to believe that her employment was terminated for raising safety concerns. (Nichani Tr. At 498, Ex. 39.)

**RESPONSE:** Admitted.

146. Numerous individuals received sanctions as a result of the investigation. Sanctions are issued to Otis employees were they need to be held accountable for actions in their area related to the accident. (Pl.s Ex. GG, OTIS 6056, Ex. 51.)

**RESPONSE:** Admitted that numerous individuals received sanctions for the McQuillan fatality.


147. Nichani believes that only two individuals at Otis — Ray Moncini and Steve Page -- discriminated against her because of her gender, race and national origin, and because she filed a CHRO charge in August 2001. (Nichani Tr. at 385-86, Ex. 39.)

**RESPONSE:** Admitted.

148.Nichani does refer to one incident when she worked in New York in the 1990s, when two co-workers allegedly called her "dot-head" or "Indian princess" in an apparent reference to her Indian national origin. (Nichani Tr. at 121-122, Ex. 39.) However, Nichani could not remember the in an apparent reference to her Indian national origin. (Nichani Tr. at 121-122, Ex. 39.) However, Nichani could not remember the context of the statements because it's "been so long."(Id.)

**RESPONSE:** Admitted except for the statement that Nichani could not remember the context because the evidence cited does not support this statement.  Rather, Nichani's testimony on this point is:

Question:  And how did you respond?
Answer:  I don't recall.  It's been so long.

(Nichani Tr. at 122, Defs. Ex. 39.)

149.The statements in ¶ 148 are the only statements that she alleges were made about her race or national origin. (Nichani Tr. at 121, Ex. 39.)

**RESPONSE:** Admitted.

150. As to Moncini, Nichani relies on her allegation that he made a sexist comment he allegedly made on July 10, 2001. (Nichani Tr. at 364-66, Ex. 39.) Nichani claims that Moncini -- in a discussion regarding an unspecified OSHA investigation — stated "The inspector was a woman. She probably didn't know what she was doing. She was a woman." (Nichani Tr. at 364, Ex. 39.)

**RESPONSE:** Admitted that Moncini made that comment.

151.Nichani did not recall anything more about the incident, nor did she complain to human resources about the comment. (Nichani Tr. at 364-66, Ex. 39.)

**RESPONSE:** Admitted that Nichani did not report the incident to human resources, but deny that she did not recall anything more about the incident, because the evidence cited by the Defendants does not support that statement.

152.When Nichani filed her CHRO complaint one month later, she did not allege anything about such comments. (NICHO147-0 152, Ex. 1.)

**RESPONSE: Admitted**.

153. Nichani also alleges that a co-worker once sent her an e-mail regarding a "safety topic" of "Why Men Die Younger," which Nichani now claims she offended her. (NICHO74O-45, Ex. 18.)

**RESPONSE:** Admitted, except to deny that "she now claims it offended her." Nichani told the person running the meeting that it was inappropriate. Pl.s' Ex. I, Nichani Aff. at ¶24.

154. Nichani claims that she once witnessed then Otis President Stephen Page ask a female executive to get a cup of coffee for NAA President William Miller during an accident review meeting. (Nichani Tr. 3 84-85, Ex. 39.)

**RESPONSE:** Admitted.

155. Nichani was never asked to get a cup of coffee and ultimately Ms. Nichani did not recall any first-hand knowledge of any other facts in support of her claim that Page discriminated against her. (Nichani Tr. at 386, Ex. 39.)

**RESPONSE:** Denied because the evidence cited by the Defendants does not support this statement. And also Nichani testified that Page tried to get rid of another woman, Lisa Sczefzul, and failed to promote her despite her experience.
Nichani Tr. at 386.

156. Moncini testified that there was no formal progressive discipline for supervisors, such as Nichani. (Moncini Tr. at 86, Ex. 38.)

**RESPONSE:** Admit that Moncini testified to that but deny that the statement is true.

157. Page was aware of a general practice whereby supervisors were expected to counsel their employees, and if there was no improvement, the employees were dealt with accordingly. (Page Tr. at 109-1 10, Ex. 40.

**RESPONSE:** Admitted.

158. Page was aware of employees who had been terminated without prior performance reviews. (Page Tr. at 110, Ex. 40.)

**RESPONSE:** Admitted.

159. Nichani knows of Otis employees who had been terminated without first receiving

discipline, e.g., for violating an ethics policy. (Nichani Tr. at 165, Ex.39.)

**RESPONSE:** Admitted.


160. Nichani testified that she expected no discipline at all for not meeting the requirements established by Otis World Headquarters. (Nichani Tr. at 166-67, Ex. 39.)

**RESPONSE:** Admitted with the qualification and context that no Otis Area was ever in 100% compliance with the requirements established by WHQ. Nicani. Aff. at ¶32; Simmons Tr. at 67, 94, 170, 219.


## DISPUTED ISSUES OF MATERIAL FACT (AND MATERIALS UNDISPUTED ISSUES)

1.    Otis Elevator Company and United Technologies are one entity – an

integrated enterprise -- for purposes of human resources and labor relations,

because, among other things, the entities share common employee benefit

plans, UTC determines the competitiveness of the benefit plans for employee

in Otis NAA; UTC establishes compensation policies that Otis must be

consistent with; and employees transfer among the two companies.

(McGroary Tr. at 27, 28, 31, 43 ; Bousbib Tr. at 73-74.  Bousbib testified that

the vast majority of the UTC employees reside in its divisions, including Otis.

Id.

2.    The job classifications at Otis are UTC classifications.  Bousbib Tr. at 78;

NICH000184, Pl.'s Ex. A.

3.    Document from Nichani's personnel file indicates she was a UTC hire.
      Paintiff's Exhibit A to Mem. Opp. Sum. Jmnt. ("I ___", NICH000184

4.    Plaintiff was designated a female minority with executive potential to be a
      UTC Level 3 executive during the 1991 Leadership Development Plan, after
      being with Otis for less than one year, and William Miller and Moncini
      considered Nichani a high performer with high potential. Pl.'s Ex. A.,
      NICH000184; Moncini Tr. at 333; McGroary Tr. at 65.

5.    Nichani consistently received positive performance reviews up until her March
      2003 Performance Review when Moncini terminated her employment.

6.    Nichani was recognized for her outstanding performance through awards – in
      addition to consistent promotions -- including Stock Options and Bonuses.
      Pl.s Ex. Q, NICH000142-145; Pl.s Ex. R, NICH000137

7.    Otis and UTC maintain a Recognition Stock Option Plan ("RSO") which is
      designed to permit "outstanding employees whose decisions impact the
      performance of the company, and whose skilled execution of those decisions
      helps to add value for shareowners" to "personally benefit from the value
      those key employees help create." Defs.' Ex. 33 , OTIS 9829.

8.    Nichani received recognition stock options under that Plan from 1997 through
      2000 for her "outstanding performance".  From her experience and knowledge
      of Otis and UTC, the award of recognition stock options was very selective,
      and the Respondent awarded options to only extremely high performing
      individuals.  In 2001 Nichani received the maximum allowable award of stock
      options:  500 shares.  Pl.s Ex. Q, NICH000142-145. Pl.s' Ex. I, Nichani Aff. at

37

¶ 64.

9.    The  RSO pool was expanded in 2002 in NAA by 40%, yet that year, the year

      after Nichani filed her charge of discrimination, she received none, in

      retaliation for her opposition to the discriminatory practices.  Pl.s' Ex. I,

      Nichani Aff. at ¶ 64;  Pl.s Ex. S, NICH000644.

10.   Though Otis claims Nichani received the payment in error, Moncini believes

      she still met all of the qualifications for the award, namely that she was

      identified as a High Potential or Successor to UTC Executive Position

      determined by the LDR ("leadership Development Review") process.   Pl.s

      Ex. T, OTIS00142.  Moncini's February 19, 2001 letter to Nichani awarding

      her the PIP stated that the plan provided "Otis senior management with an

      additional opportunity to align [its] highest performers, critical talent and those

      with significant responsibilities."  Pl.s Ex. R, NICH000137.

11.   Danny Reese, who was hired as an L3 and headed EH&S for Otis World

      Headquarters has no safety degree, but rather has an undergraduate degree

      in psychology and a master's degree in counseling and guidance.  Reese Tr.

      At 33.  The only formal safety education he received was through a self study

      course where he studied and took exams unsupervised.  Id.

12.   Russell's Recommendation Package stated the Qualifications for the L3

      position as:

      a.  Undergraduate degree in EH&S or in a technical discipline or significant

          experience in a relevant function;

      b.  Experience in an EH&S responsible management position; and

     c.  Experience in the elevator industry.

Pl.s' Ex. H, OTIS08999-9007.

     And Nichani possessed each one of those qualifications as she had a

Bachelor's and Master's degree in Industrial Engineering, had worked for Otis

since 1990, and had been the EH&S leader for NAA since 1999 at the time

she was asked to return to the EH&S leadership position at NAA after

Russell's departure.  (NICHO18O, Defs. Ex. 8; Nichani Tr. at 26, Defs.' Ex.

39.; NICHO232, Defs' Ex. 10;

13.    Moncini, in his <u>only</u> review of Nichani's performance in the 2 ½ years prior to

the performance review that led to her termination, stated that she:

- •    Has done a fine job with the safety function in NAA. Defendants' Ex. 31, at

  Pl.s Ex. V, OTIS 00121.

- •    Has articulated our vision, particularly in fatality prevention, and has

  effectively managed the UTC and WHQ requirements. Defendants' Ex. 31, at

  Pl.s Ex. P V, OTIS 00121;

- •    Has done very well in all reviews with senior management and managing

  WHQ safety. Defendants' Ex. 31, at OTIS 00122.

- •    Is able to deal with the policy deployment from above to ensure that NAA

  complies with all corporate requirements. Defendants' Ex. 31, at OTIS 00122.

Defendants' Ex. 31.

14.    In January 2001, Nichani notified Moncini that the New York Region was a

high risk based on the FPA audits, and Moncini admitted that it would not be Nichani's

responsibility alone to reduce that risk.  Moncini Tr. June 8, 2004 at 36.

**Sexual Intent**

15.     During a safety class in Bloomington, Indiana, William Bowling started the class with a joke about a woman's vagina, which was witnessed by Wendy Cramer, another Otis employee.  Pl.s' Ex. I, Nichani Aff. at ¶¶25.

16.     During an Otis World Headquarters Meeting, an Otis manager projected an email from his laptop which included a screen that was titled "Petite Women, Tight Asses" which was witnessed by Tiz Weber, Lou DeLoreto, Maryana Simonetti, Melanie Rakita and Scott Gaskill, in addition to Nichani. Pl.s' Ex. I, Nichani Aff. at ¶¶26.

17.     During a June 26, 2001 Regional Field Operations Management meeting in Nogales, Mexico, Robert Woolf projected a safety tip on the screen entitled "Why Men Die Young" depicting disasters that happen as men are distracted by scantily clad women.  The entire group laughed hysterically, including a Regional Vice President, Lou Rinaldi.  This was witnessed by Scott Simmons, Mark Dye, Steve Martin and other Regional Field Operations Managers. Pl.s' Ex. I, Nichani Aff. at ¶¶24.  NICH000740-45. Defs' Ex. 18.

18.     William Gooding, Nichani's former superior, admitted to her that she was paid much less than men doing the same job as she was doing and therefore gave Nichani a few "good raises" to help her get closer to their pay.  Gooding also stated that he would have promoted Nichani to Lead Supervisor during her time in NY but he did not "because the guys could not handle it."  Pl.s' Ex. I, Nichani Aff. at ¶4.

**Sue's Performance**

19.     While Nichani did not have an advanced degree in Safety, this was never

40

communicated to her as a requirement for holding the lead EH&S position of NAA, or

any other director.  Pl.s' Ex. I, Nichani Aff. at ¶¶22. Moreover, when Ms. Nichani

assumed the position as leader of safety in NAA, she received no training, but merely

met with Pat Dowson over two days so he could tell her what was going on in the

department.  Nichani Tr. At 37;

20.    Accident rates are not due solely to an Area safety leader's job

performance.  Safety is also line management's direct responsibility, and line

management includes Regional Vice Presidents, Regional General Managers, Branch

Managers, General Managers, all the field supervision ranks, which would include

supervisors, and superintendents.   Lauterbach Tr. at 50-51.

21.    It is not uncommon among any Otis Areas to have years when accident

rates increased and others when they declined.  Pl.s' Ex. I, Nichani Aff. at ¶¶29.

22.    No Otis Area was ever in full compliance with WHQ policies or directives.

Simmons Tr. at 67;Pl.s' Ex. I, Nichani Aff. at ¶¶28-29.2.

23.    The accident rate increase in NAA from 1999 to 2000 occurred largely

because of the numerous reorganizations that were taking place in the regions and, as

Nichani explained to Moncini in an email dated March 7, 2001 (with attachment),

because of the high number of new and inexperienced employees hired during that

period  Pl.s' Ex. I, Nichani Aff. at ¶¶29;  Pl.s Ex. U, NICH000289-000290

24.    An increase in accident rates, especially the increase from 1999 to 2000,

can also be attributed to a corresponding increase in construction activity in certain

regions within NAA.  NICH 000291 at "Western Region" and "Greater New York Region"

paragraphs. Pl.s' Ex. I, Nichani Aff. at ¶¶29.

25.    Ever since Nichani filed her charge of discrimination, Moncini became unapproachable and most if not all of their communication was via e-mail.  Pl.s' Ex. I, Nichani Aff. at ¶¶63

26.    Nichani's communication skills, including disseminating information such as safety requirements and processes, had always been lauded. Pl.'s Ex., W, OTIS 00122; Pl.'s Ex. B, OTIS00052-53; Pl.'s Ex. D, OTIS00054-55; Pl.'s Ex. C, OTIS00056-58; Pl.'s Ex. E., OTIS00059-61; Pl.'s Ex. F, OTIS00062-63.

27.    In her 1995 Performance Review, Nichani was rated Exceptional in "Initiative and Adaptability, and the rater stated that she "is always willing to take initiative and seek solutions on her own.  She is also smart enough to run ideas by her superiors to get feedback and consultation." Pl.s' Ex. I, Nichani Aff. at ¶27.

28.    The purpose of an Assurance Review is to identify issues of non-compliance with WHQ policy and the WWJSSS.  Reese Tr. at 141.

29.    EH&S leaders, including Nichani, and the WHQ EH&S leader, rely on the data from audits  and assurance reviews to determine compliance with the World Wide Job Site Safety Standards, and these are conducted by the first-line supervisors, the branch manager, the regional branch manager, and the regional field operations manager, and this permits Otis to determine where a safety problem is coming from. Reese Tr. at 144.  Moncini Tr. at 46-47, 51, 54.

30.    Otis performs audits at various levels of the organization, in order to identify compliance levels with WHQ policies, including implementation of the WWJSSS.  An audit is: "A systematic review of all phases of a process or program to evaluate if it is appropriate and effective in managing inherent EH&S risks."  Pl.s Ex. W, OTIS9980.

42

31.    Part of the management system compliance is that the line managers are doing there auditing.  Moncini Tr. at 77-78.

32.    For the last few years, going back from September 2003, NAA's audit scores were fairly high.  Moncini Tr. at 59.

33.    Five (5) Assurance Reviews were completed for NAA and not one identified fist grips as an issue.  Pl.s' Ex. I, Nichani Aff. at  ¶41.

34.    Nichani sent an email to Tim Beck confirming that NAA had eliminated U-Bolt Clips and stating that fist grips were to be used.  Beck did not respond to that email. Pl.s' Ex. I, Nichani Aff. at ¶37.

35.    On August 17, 2001, Pat Dowson sent out Standard Work Process N-0.1.5-3 concerning Hoisting and Rigging which states that fist grips were to be used instead of U-Bolts.  Pl.s' Ex. I, Nichani Aff. at ¶38; Pl.s Ex. X, OTIS 000846-000854.

36.    Moncini claims he first believed that Otis should not be using fist grips at all.  Moncini Tr. at 401-402.

37.    Even though Moncini is on the distribution list for Standard Work Processes, and safety is Otis' number one priority, Moncini doesn't read and study them because he has too many other things to do.   Moncini Tr. at 406.

38.    Moncini strictly enforced the Otis travel policy restrictions.  Aff. Nichani; Pl.s Ex. Y, NICH000346; Pl.s Ex. Y, NICH000350-51. Moninci Tr. at 42.

39.    Nichani had taken steps to implement MELT training but was met with resistance primarliy by Moncini and Bousbib's travel policy restrictions, because such training would require at least 35-40 people to travel per class. Pl.s' Ex. I, Nichani Aff. at

---

1 These documents, called Assurance Reviews, are each numerous pages, and this is why they have not

¶¶47-48;  Pl.s Ex. Y, NICH000346.  Also, in order to comply with the travel policy, NAA instead implemented MELT on a CD ROM that could be used by the regions and with the help of their safety manager.  Id.

40.    Nichani met resistance in filling the open Safety Manager positions, and early on in her search recommended two candidates whom were rejected by Lou Rinaldo.  And there was only one open position until near February 2003, in the Midwest Region.  Pl.s' Ex. I, Nichani Aff. at ¶¶49, 50.  Nichani found very good candidates for that position, but the regional management could not agree on the candidates.    Nichani otherwise sought assistance with filling these positions, and acted properly.  Id. Nichani's email of February 1, 2003 to Moncini.  Pl.s Ex. O, OTIS04698.

41.    Nichani submitted a request for approval for one new hire and one replacement on January 12, 2001 to Moncini and McGroary, who told her to hold off until the second quarter because of the "current circumstances."  Pl.s Ex. Z, OTIS04397.

42.    As late as January 2003, Moncini relayed Bousbib's policy restrictions on hiring and travel in order to continue to "deliver year-over-year profit."  Pl.s Ex. AA NICH000348.

43.    The travel policy also restricted the regions' ability to perform safety audits, which are necessary to uncover non-compliance with WHQ policies, including WWJSSS.  Pl.s Ex. BB, OTIS 00872; Pl.s Ex. CC, NICH000347.  This travel policy impacted several safety items throughout the country.  Id.

44.    When Nichani enforced the travel policy – even though it negatively

been included herein.  They were produced by Otis, and are available if the Court would like copies.

affected safety functions – Moncini told her she was "doing exactly the right thing." Pl.s Ex. CC, NICH000347.

## Reasons for Her Termination

45.    Otis first blamed Nichani for not eliminating fist grips entirely, and then when it realized that fist grips were not eliminated entirely, blamed her for no ensuring that JHA's were completed.  Pl.s' Ex. I, Nichani Aff. at ¶¶29, 35-36.

46.    After the McQuillan fatality, it was discovered that all Otis Areas were still using fist grips, despite the WWJSSS, because the standard was confusing, and because there was no practical way to eliminate their use.  Pl.s Ex. DD, NICH001284; Simmons Tr. at 79.

47.    Helio Tinone had to send an email on Feb 1, 2002 to clarify the WWJSSS concerning wire rope clips because many Otis Areas were confused.  Pl.s Ex. EE, OTIS0001316.

48.    Also, Pat Dowson sent a reminder to all Areas of the WWJSSS wire rope clip standard, yet All Areas were still out of compliance after the McQuillan fatality. Pl.s Ex. FF, OTIS001308; Pl.s Ex. DD, NICH001284.

49.    The WWJSSS concerning wire rope clips was changed from its December 2000 iteration to its December 2001 iteration because all areas had not conformed to the requirements of the standard process and to clarify the standard for standard work processes.  Reese 8/25/04 Tr. at 220.

50.    Moncini was well aware of the WWJSSS compliance issues, and money was an issue as far as coming into complete compliance with them.  Simmons Tr. at 68; Pl.s' Ex. I, Nichani Aff. at ¶40

51.     No Otis area was ever 100% compliant with the WWJSSS, and indeed the United States (NAA) adopted more than any other Area, and other Areas were out of compliance with about 20% of the WWJSSS.  Simmons Tr. at 67, 155, 222.

52.     Nichani implemented the changes to the processes in North America how they related to the World-Wide Job Site Safety Standards when possible.  Changes of this magnitude involve millions and millions of dollars, and many of the changes could not be made by Nichani alone, they had to be made by Moncini.  Simmons Tr. at 68; Pl.s' Ex. I, Nichani Aff. at ¶¶40, 51-54.

53.     Nichani asked several times for the meeting minutes of the WWJSSS Committee for the period when the fist grip standard was changed, so that she could further clarify the issue and her understanding.  Despite numerous requests, she was never provided those minutes, nor did Defendants produce them during discovery.  Pl.s' Ex. I, Nichani Aff. at ¶39.

54.     Moncini received every single assurance review performed in NAA and did not care about anything other than the score as long as NAA was 80%+.  Moncini would occasionally sit in the briefing of the assurance reviews and argue with the UTC & WHQ auditors about how they are wrong and their policies don't apply.  Pl.s' Ex. I, Nichani Aff. at ¶¶40-41;  Simmons Tr. at 158.

55.     The main reason McQuillen died is that he fell. Had he been tied off as required, he would not have fallen. He could not tie off because there were no lifelines in the hoistway.  Pl.s' Ex. I, Nichani Aff. at ¶¶60(c), 61.

56.     The reasons for Nichani's termination, including the issues concerning false car alarms, the electrical gloves and the fist grip issue are unfounded.  Pl.s' Ex. I,

46

Nichani Aff. at ¶¶23-56; Pl.s Ex. O, Pl.s Ex. O, OTIS04698; Simmons Tr. at 30, 79, 83,

87-89, 91-93, 95-96, 98, 148, 155.

57.     Erv Lauterbach was allegedly invited to be a "rater" for Nichani's final

performance review that led to her termination, yet even though comments are

attributable directly to him, he could not recall specifically typing the comments nor

could he explain why he referred to himself in the third person, which he agreed was

odd:

> **Question:**    Do you have a specific recollection of typing that text?
> **Answer:**      It sure seems familiar, but I can't -- I can't recall typing it.  I don't
> know how else it would get there unless I typed it.
> **Question**:    Couldn't somebody else have typed it, Mr. Lauterbach, and put your
> name next to it?
> **Answer**:      I don't know how it's possible, unless I type it off line and someone
> can insert it next to my name.
> **Question**:    In the middle of that paragraph, you refer to yourself in the third
> person, correct?
> **Answer**:      That's what it says here.
> **Question**:    Do you usually speak in the third person or write in the third person
> when referring to yourself?
> **Answer**:      No.
> **Question**:    Is that odd to see text that has your name next to it indicating that
> you had written it referring to yourself in the third person?
> **Answer**:      I wouldn't normally write it that way, no, so in that sense it would be
> odd.

Pl.'s Ex. G, OTIS 00124-00125; Lauterbach Tr. at 179-180.

58.     Lauterbach and Moncini were determined by the investigation and also

noted by Ari Bousbib to be responsible for the lax safety environment in the New York

Region where the McQuillan fatality occurred.  Pl.s Ex. GG, OTIS006056, at No. 3 at

bottom of page..

59.     Also, Bill Cassidy, the foreman, was found to be directly responsible for

the lax environment, (ignoring fall protection requirements, eliminating lifelines because of the cost, failing to perform safety audits) however, Otis did not want to terminate him because he brought in money and would be snatched up by a competitor, thereby harming Otis more than anything.  Pl.s Ex. GG, OTIS006056; Pl.s Ex. HH, OTIS05999.

## The Internal Report

60.    Otis has a specific reporting process for fatal accidents called the Root Cause Analysis which requires the elimination for management failures as a cause of a fatality before blaming other factors, including employee error.  Pl.s' Ex. I, Nichani Aff. at ¶57.

61.    At the time of the McQuillan fatality, Otis was a repeat offender for fall protection violations, and faced criminal sanctions if McQuillan's death was attributed to lack of fall protection. Pl.s' Ex. I, Nichani Aff. at ¶58.

62.    As Regional Vice President for the New York Region where McQuillan died, Erv Lauterbach had safety oversight responsibilities to ensure that WHQ policies were implemented, yet he failed to perform his required audits, and the Region was extremely non-compliant with established processes, such as having lifelines installed in hoistways, and requiring employees to wear fall protection.  Pl.s' Ex. I, Nichani Aff. at ¶58; 62. Ex. B to Pl.s' Ex. I, Nichani Aff., NICH00567 "Other Issues to Be Addressed";

63.    The report which Nichani prepared followed the root cause analysis as required, and Moncini told her to change the report, in disregard for the clear process. Nichani refused to make the change, for example, she refused to take out the reference to fall protection because had McQuillan been wearing fall protection as required, he would not have died.  Pl.s' Ex. I, Nichani Aff. at ¶61.

64.    Moncini and McGroary first testified that Nichani was deficient in her job concerning environmental and workers compensation matters.   Yet no performance review was done during this time to address these issues, even though Otis' Human Resources Manual states that "All Otis supervisors are required to hold performance evaluations with each of their employees on a regular basis.  Pl.s Ex. II, OTIS08635.

65.    Page testified that the "sole reason [Russell] was transferred as an executive into the position was his experience."  Page Tr. at 55.  However, the recommendation package circulated among and approved by several Otis and UTC high level employees states unequivocally that the position was reclassified because of the emphasis on safety.  Pl.'s Ex. H, OTIS 08999, 09000.

66.    The scope of responsibilities was the same from when Russell took over Nichani's position.  Moncini Tr. September 19, 2003 pp. 239-240.  And they did not change when Nichani resumed that position.  Pl.s' Ex. I, Nichani Aff. at ¶19, 20.

67.    All Area EH&S leaders essentially have the same responsibilities or core tasks.  Reese Tr. at 131-132; Pl.s' Ex. I, Nichani Aff. at ¶20.

68.    Otis Human Resouces Policy Manual, applicable to Nichani, states that: "The content of each job is evaluated on the basis of knowledge, accountability and problem-solving.  Based upon this job evaluation, a grade and associated pay range are assigned . . . If a position's grade changes as a result of a re-evaluation, the incumbents' pay should be reviewed and adjusted accordingly."  Pl.s Ex. JJ, OTIS08611.

69.    The position held by Nichani, subsequently held by Russell, and then held again by Nichani was equal work requiring equal skill, effort and responsibility; and was

under the same or similar working conditions.  McGroary Tr. at 113-115; Moncini Tr.
September 19, 2003 pp. 239-240.  They were in the same building, covering the same
area and regions, with the same responsibilities, direct reports and staff.  Pl.s' Ex. I,
Pl.s' Ex. I, Nichani Aff. at ¶¶19.

70.     Otis keeps track of all red circling that occurs whether it affects a protected
class or not, and the red circling would be reflected in the paperwork so people
understand that it has occurred.  McGroary Tr. at 163-164.

71.     Erv Lauterbach stated that during an Assurance Review in the New York
region in early February following the McQuillan fatality, that the auditors had an agenda
to discredit Nichani and make her look as if she was not doing her job. Pl.s' Ex. I,
Nichani Aff. ¶67.

72.     On January 30, 2003, a meeting was held at WHQ at Moncini's request to
review NAA's compliance with the WWJSSS and training initiatives.  Nichani
participated by telephone conference and Erv Lauterbach was present in person.
Afterwards, Lauterbach told Nichani that he "could not believe how hostile they were
towards you, it was unbelievable."  Lauterbach also said that what he got out of the
meeting was that "[Nichani] had asked for help and clarification several times and that
[Nichani's] requests were ignored.  Pl.s' Ex. I, Nichani Aff. at ¶68.

73.     Nichani served as Otis NAA's Business Practices Officer from early
1999/2000 to near the time when she was filed, and was removed from that position
after the McQuillan fatality and while the investigation was ongoing.  This also occurred
within days of Moncini asking her to change the McQuillans report.  Pl.s' Ex. I, Nichani
Aff. at ¶ 69..

74.    From 2000 up to her termination in 2003, the Safety Numbers for NAA, under Ms. Nichani's leadership, were improving.  Moncini Tr. June 8, 2004, pp. 51-52.

75.    Plaintiff was the only woman in a high-level field operational role out of approximately 8,000 employees in North America.

76    Bill Miller, then President of North American Area, indicated that a Regional General Manager position was an option for her next assignment, and that if her performance was good at EHS, she would be promoted to Level 3 after 1 year. Pl.s' Ex. I, Nichani Aff. at ¶.3

77.    While Otis claims that Nichani's poor performance thereafter justified her termination, she was never given a performance review, nor any other indication of poor performance, between her "fully competent" review for the year ended December 2000 and her March 21, 2003 termination.  This failure to provide an annual performance review contravened Otis's express policies and practices (Pl.s Ex. II, OTIS08635) and coincided with the period during which plaintiff first challenged her compensation in relation to her male counterparts (in or about May 2001), filed charges of discrimination with the CHRO (August 23, 2001) and initiated the present action (August 2002).

78.    In early 2001, Plaintiff received a 10% bonus payment under the Performance Incentive Plan for her performance in 2000.  In 2002 she did not receive any bonus for the year 2001, the year she filed charges of discrimination with the CHRO and  EEOC.  Nor did she receive any in 2003, for her performance in 2002, the year she commenced this action in federal court.

79.    Moncini had put in place the management structure in the New York region, including hiring Erv Lauterbach, and also placing people in management

51

positions with very little field experience, so Moncini did not want to sanction those individuals as severely, but rather saw this as an opportunity to terminate Nichani. Pl.s' Ex. I, Nichani Aff. at ¶34.

80.    The positions Moncini offered Nichani in the Spring of 2001 – when Russell was coming over from WHQ – would have effectively been demotions as Nichani has previously served as a branch manager, and the operations manager position Moncini suggested she take with Otis' North American Acquisition Company would entail significantly fewer responsibilities than those Plaintiff had as Safety Manager. Pl.s' Ex. I, Nichani Aff. at ¶¶6,7; Pl.s Ex. L, OTIS00296-297

81.    When Danny Reese was hired to lead WHQ EH&S, one of his specific responsibilities was to accelerate compliance worldwide with the WWJSSS.

82.    On Thursday, April 26, 2001, Ellen McGroary, Vice President of Human Resources, entered Nichani's office to give her, in McGroary's words, a "heads up." McGroary explained that Brad Russell had been given Nichani's job and that Moncini would be offering her Branch Manager positions (entailing significantly fewer job responsibilities) in Atlanta, Georgia and San Jose, California. Pl.s' Ex. I, Pl.s' Ex. I, Nichani Aff. at ¶8; Pl.s Ex. L, OTIS00296-297.

83.    The positions would be demotions because they would entail fewer responsibilities and Nichani had held the branch manager position before. The San Jose and Atlanta positions would be lateral only to the extent that Nichani's compensation would not have changed. Pl.s' Ex. I, Pl.s' Ex. I, Nichani Aff. at ¶34McGroary Tr. at 210.

84.    On Thursday, April 26, 2001, Nichani and Moncini met . He offered Plaintiff lower level positions than the Senior Manager position she had been in since

April 1999. Those positions carried significantly fewer responsibilities, and were posted at one to two grade levels below Plaintiff's grade level. Pl.s Ex. L, OTIS00296-297. Pl.s' Ex. I, Pl.s' Ex. I, Nichani Aff. at ¶¶6-7.

85.    The company-wide announcement had stated that she was being removed from her position, taking a "senior NAA Line Management Position" (even though no position was in place), and that Brad Russell would be taking over her position.  This representation and others, implied that Plaintiff had done something wrong in connection with her job.  Indeed, Plaintiff received dozens of phone calls inquiring as to what new position she would be taking, why the change had been made, and why the announcement did not designate what her position would be.  Some people even asked Plaintiff what she did wrong. Pl.s' Ex. I, Pl.s' Ex. I, Nichani Aff. at ¶10.

86.    On Thursday, May 10, 2001, Mr. Rangnekar asked Plaintiff to speak on elevator safety for an NBC broadcast.  When Plaintiff responded that she was no longer the Senior Manager for Safety, but that Brad Russell was and should speak, Mr. Rangnekar replied that Mr. Russell was not knowledgeable enough. Pl.s' Ex. I, Pl.s' Ex. I, Nichani Aff. at ¶12

87.    On  May 14, 2001, Plaintiff still had not been reassigned, and Ray Moncini informed Plaintiff that day that Brad Russell had resigned.  Mr. Moncini said he'd love to have her back in safety (although he previously told Plaintiff safety was not right for her).  Plaintiff agreed to take her old position back.  Plaintiff then learned that Brad Russell was paid at a Level 3 salary (higher than Plaintiff),  received greater benefits, including allowances, stock options and performance payments, than Plaintiff, yet was

less qualified to perform the job responsibilities of a Safety Manager. Pl.s' Ex. I, Pl.s' Ex. I, Nichani Aff. at ¶13, 14.

88.     Over the next several weeks Plaintiff sought to have her concerns addressed. On May 23, 2001, Plaintiff inquired of Ms. McGroary why Brad Russell had received greater pay and benefits than she for doing less work. Ms. McGroary did not respond for two weeks and then offered an inadequate explanation only after Plaintiff on June 5, 2001, reminded her of the May 23, 2001 inquiry. Pl.s' Ex. I, Pl.s' Ex. I, Nichani Aff. at ¶¶14-18; Pl.s' Responses to Defs.' Facts at ¶¶65-76.

89.     When Plaintiff continued to try to communicate via e-mail with Ms. McGroary about her concerns, Ms. McGroary suggested they discuss it rather than communicate via e-mail. Plaintiff suggested to Ms. McGroary they meet in the next few days. Ms. McGroary agreed but never made any attempt to arrange this meeting, and appeared unresponsive to Plaintiff's concerns. For example, on Monday July 2, 2001, Plaintiff e-mailed Ms. McGroary saying that she was available to meet with her on July 9, 2001. Ms. McGroary's secretary responded and asked Plaintiff whether she was available to meet with Ms. McGroary on July 12, 2001, to which Plaintiff said yes. Ms. McGroary never made any arrangements for this meeting. Pl.s' Ex. I, Pl.s' Ex. I, Nichani Aff. at ¶14-16.

90.     Defendants have treated male employees more favorably than women under circumstances substantially similar as Nichani's. For example, they permitted a male Senior Labor Relations Manager (Robert McGuiness Grade 51) to retain his position instead of being replaced and displaced by a male director, Joseph Byrka. What they did was bring Byrka over as a Director and had McGuiness report directly to

54

him.  McGroary Tr. at 226-228.

91.    All of Plaintiff's counterparts throughout the world with comparable size territories were compensated at Level 3, or higher. Pl.s' Ex. I, Nichani Aff. at ¶14

92.    Of the 18 people who reported to Ray Moncini, the then Vice President & Senior Area Executive for Otis' North America Area in August of 2001, only two were paid as Senior Managers rather than the higher salary level of director:  Plaintiff and another person, Dilip Rangnekar, who were both of Indian National Origin.  Mr. Rangnekar was moved laterally to World Headquarters, and replaced by a female, who was kept at the Senior Manager level. Pl.s' Ex. I, Nichani Aff. at ¶70.

93.    Defendants also maintain a progressive discipline policy that mandated verbal warnings followed by written warnings and, if necessary termination.  During her employment, Plaintiff has utilized this policy in disciplining certain employees, and always believed and relied upon the Defendants adhering to this policy as a condition of her employment.  Prior to being terminated on March 23, 2003, Plaintiff never received any formal or informal warnings or discipline. Pl.s' Ex. I, Nichani Aff. at ¶66.

94.    Defendants published a Code of Ethics in 1990 that governs its "business decisions and actions."  In the Code of Ethics, Defendants represented, among other things, that:

a.    "[They] maintain the highest ethical, environmental and safety standards everywhere;"

b.    "[They] are committed to the highest standards of ethics and business conduct" in their relationships with employees at every organizational level;"

c.    "[They] are committed to providing safe and healthy working conditions

and an atmosphere of open communication for all [their] employees;"

  d.  No retribution will be taken against any employee for contacting . . . any level of supervision [or] the Legal Department. . . to express concerns with business policies or practices;"

  e.  Failure to comply with these Standards and associated UTC policies will result in appropriate sanctions; and

  f.  UTC policy prohibits any retribution against an individual for making [reports of violations or suspected violations of the UTC Standards of conduct.]" Complaint at ¶52; Defs.' Answer.

  95.  Defendants further represented that "these Standards of Conduct" would be "enforced equitably at all organizational levels."  Complaint at ¶; Defs.' Answer.

  96.  Defendants proceeded to demand that Plaintiff mischaracterize the causes of the fatality, when such characterization would have been false and would have required Plaintiff to conceal management failures concerning the fatality.  Plaintiff refused to agree to such characterization and stated her reasons for this refusal to Defendants.  Pl.s' Ex. I, Nichani Aff. at ¶¶58-61.

  97.  After Defendants' terminated Plaintiff's employment, they replaced her with a male, who is compensated at a director level, yet is less qualified for the position. Pl.s' Ex. I, Nichani Aff. at 71.

**THE PLAINTIFF,**

                                     **SUJATA NICHANI**

                             **By**_____

                                       **Jeffrey J. Tinley, Esq.**
                                     **Tinley, Nastri, Renehan & Dost, LLP**
                                     **60 North Main Street, 2nd Floor**
                                     **Waterbury, CT 06702**
                                     **Tel. No. 203-596-9030**
                                     **Fax No. 203-596-9036**
                                     **Federal Bar No.: CT00765**

## CERTIFICATION

THIS IS TO CERTIFY THAT a copy of the foregoing was mailed, postage prepaid, on this 25th day of May, 2005, to:

     Albert Zakarin, Esq.
     Daniel Schwartz, Esq.
     Day, Berry & Howard, LLP
     CityPlace I
     Hartford CT 06103-3499

     Sarah Poston, Esq.
     Zeldes, Needle & Cooper
     1000 Lafayette Blvd.
     PO Box 1740
     Bridgeport, CT 06601

     Anthony R. Minchella
     530 Middlebury Road
     Suite 212-213 B
     Middlebury, CT 06762

                                  _____

57

Jeffrey J. Tinley