**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SUJATA NICHANI | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:02CV1384 (MRK) |
| v. | : | |
| | : | |
| UNITED TECHNOLOGIES CORP. and | : | |
| OTIS ELEVATOR COMPANY | : | |
| | : | |
| Defendants. | : | FEBRUARY 28, 2005 |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

I.    PRELIMINARY STATEMENT..................................................................................1

II.   STATEMENT OF FACTS .......................................................................................3

    A.    Otis Hires Nichani in 1990..................................................................3

    B.    Nichani Promoted to Senior Manager ................................................4

    C.    Nichani's Job Responsibilities ...........................................................5

    D.    Nichani's Performance Review in December 2000..............................6

    E.    Otis Reorganizes EH&S Positions .....................................................6

    F.    Russell Resigns; Nichani Offered and Accepts Back Senior Manager
       Position................................................................................................9

    G.    Nichani Continues Her Work as Senior Manager .............................12

    H.    Otis World Headquarters' Rules on Wire Rope Clips.......................13

    I.    The Death of Daniel McQuillan .......................................................18

    J.    Moncini Terminates Nichani's Employment ....................................20

    K.    Nichani's Claims Regarding the Investigation into the McQuillan Death ..........22

    L.    Nichani's Claims Regarding the Decision Makers............................23

    M.    Procedural History ............................................................................25

III.   ARGUMENT ........................................................................................................26

    A.    Summary Judgment Standard.............................................................26

B.  Defendants Are Entitled to Summary Judgment on Plaintiff's Claims of Discrimination under Title VII, 42 U.S.C. § 1981 and State Law (Counts One, Two, Three, Four, Eight, Nine) ................................................................. 28

    1.  Plaintiff always carries the burden of proving discrimination in Title VII cases ..................................................................................... 28

    2.  Plaintiff cannot establish a prima facie case of national origin or race discrimination because her termination did not occur under circumstances giving rise to an inference of discrimination ................... 30

    3.  The plaintiff cannot establish a prima facie case of gender discrimination because her termination did not occur under circumstances giving rise to an inference of discrimination ................... 33

    4.  Defendants have offered legitimate nondiscriminatory reasons for the plaintiff's termination ...................................................................... 35

    5.  The plaintiff cannot prove pretext ............................................................ 36

C.  Plaintiff Cannot Meet Her Burden on Her Retaliation Claims (Counts Six and Ten) ................................................................................................. 37

    1.  Plaintiff cannot establish a prima facie case of retaliation because there is no causal connection between her protected activity and her termination ......................................................................................... 38

    2.  Defendants have proffered a nondiscriminatory reason that Plaintiff cannot prove was false ............................................................ 40

D.  Defendants are Entitled to Summary Judgment Because They Have Not Violated the Equal Pay Act (Count Five) .......................................................... 41

    1.  Plaintiff cannot show that the positions required "equal skill, effort, and responsibility" ...................................................................... 43

    2.  Plaintiff received less compensation because of a valid "factor other than sex" ..................................................................................... 45

    3.  Plaintiff cannot prove pretext ................................................................. 47

E.  Plaintiff Cannot Prevail on Her Defamation Claim Because Defendants' Statements Were Not False, and/or Were Protected by a Qualified Privilege (Count Seven) .............................................................................. 48

    1.  The company-wide announcement was not false, and did not cause injury ...................................................................................................... 49

    2.  The performance feedback report was a privileged managerial evaluation, and Plaintiff cannot demonstrate malice ............................... 50

F.  Plaintiff Cannot Prevail on Her Claim for Common Law Wrongful Discharge (Count Eleven) ............................................................................. 51

G.  Plaintiff's Claim Under Conn. Gen. Stat. § 31-51q Fails Because She Did Not Engage in Protected Speech (Count Twelve) ............................................ 55

H.    Plaintiff's Breach of Contract Fails Because She Was an at-will Employee (Count Thirteen) ................................................................................59

I.    Plaintiff's Negligent Misrepresentation Fails Because Defendants Never Provided False Information (Count Fourteen) ....................................................63

J.    Plaintiff's Promissory Estoppel Claim Fails Because There Was No Clear and Definite Promise (Count Fifteen)................................................................65

IV.   CONCLUSION ..........................................................................................67

**PRELIMINARY STATEMENT**

   Defendants, United Technologies Corp. and Otis Elevator Company (collectively, "the Defendants"), respectfully submit this memorandum of law in support of their Motion for Summary Judgment. ("Defendants' Motion"). In this case, the Plaintiff, Sujata Nichani, has filed the proverbial "laundry list" of claims in her Third Amended Complaint, with 15 counts ranging from race discrimination to promissory estoppel arising out of the terms and conditions, and eventual termination, of her employment with Otis. Despite over 10 days of depositions of Otis' senior executives, including Otis' President, and being provided with over 10,000 pages of documents, there is no real dispute as to the material facts in this case. Based on those facts, Defendants are entitled to summary judgment.

   Putting aside, for the moment, the number of causes of action that Nichani has filed, this case centers on two key claims: Nichani's belief that she was not promoted to an executive-level position in 2001 because of her race, national origin and gender; and her belief that her termination two years later, in March 2003, was in retaliation for complaining about not being promoted. Each of these claims is addressed separately below, in further detail.

   Nichani's first claim, that she should have been promoted to an executive position in the safety area in spring 2001, fails because she has no evidence that she was denied a promotion because of her race, national origin or gender. Moreover, her claim that she should have been paid the same as a white male executive, who took over her responsibilities for less than a week in 2001 before resigning, fails because there is no evidence that her gender, race, or national origin had anything to do with how she – or the male employee – were compensated. Indeed, the undisputed facts show that the male executive to whom she compares herself was a safety professional with over 20 years experience (with over 10 within Otis and UTC at an executive

level), when Nichani had but two years in the safety area.  In any event, any disparities in their compensation were not gender-based.

When Nichani filed a charge of discrimination with the Connecticut Commission on Human Rights and Opportunities in August 2001, raising these claims, Otis did not change her position, salary, or benefits, nor did Otis retaliate against her in any way.  Indeed, it is undisputed that Nichani continued to work in her position as a senior manager in charge of environment, health and safety for Otis' North America Area ("NAA") for the next year and half.  After the tragic death of an Otis elevator mechanic in December 2002 in the North America Area, Nichani's supervisor, Raymond Moncini, President of Otis NAA, learned that Nichani had failed to implement safety policies mandated by Otis' world headquarters.  He noted this critical failure and other deficiencies in various e-mails to her and in her performance review.  Ultimately, on March 21, 2003, he decided that these failures warranted Nichani's termination.  Although the termination was not a sanction for the mechanic's death, the issues that Nichani's boss discovered as a result of the fatality were serious.  Ms. Nichani has not shown that the reasons for termination were pretextual, and in retaliation for her filing a prior discrimination charge, or because of her gender, race or national origin.

For these reasons, explained in more detail below, this court must grant Defendants' Motion for Summary Judgment.

# I.    STATEMENT OF FACTS

## A.    Otis Hires Nichani in 1990

Otis Elevator Co. ("Otis") hired Plaintiff in October 1990 as a Regional Field Engineer.  (Defendants' Local Rule 56(a)1 Statement ("Facts") ¶ 1.)  At her hire, she was an at-will employee with an annual salary of $52,000, at a Grade 48.[1]  (Facts, ¶ 2.)

By 1994, Nichani served as a Grade 48 Maintenance Supervisor; a Location Manager position for which Otis was considering Nichani was ordinarily a Grade 47.  (Facts, ¶ 3.)  Nevertheless, Nichani was moved to the Location Manager position in Winston-Salem, North Carolina.  (Facts, ¶ 4.)  Otis "red-circled"[2] Nichani as a Grade 48, so that she could retain that same labor grade and compensation.  (Facts, ¶ 5.)  Thereafter, Otis continued to promote Nichani within the organization.  In May 1996, Otis promoted Nichani to a Grade 49 Location Manager position, and increased her salary from $69,200 to $76,120.  (Facts, ¶ 6.)  Less than a year later, in April 1997, Otis promoted Nichani to a Grade 50 position as Manager, Regional Field Operations in Otis' Southwest Region, in Dallas, Texas, and increased her salary by 18 percent

---

[1] Otis has two sets of grade levels for its salaried employees, which indicate a level within the organization as well as a salary band.  Up until 2001, salaried non-executive positions had a grade level associated with them of 41 to 51 (with the higher number reflecting a more senior labor grade).  Salaried executive-level positions were graded at Level 3 (L3) to Level 1 (L1) (with an L1 position being higher than an L3).  Starting in 2001, the salaried non-executive positions were renumbered to correspond with the executive positions by combining them.  Thus, Grade 49-51 positions became Grade L4 positions, etc.  An L3 position, as a "Director"-level position has greater responsibilities and expectations, and entitles an employee to additional benefits that are not available to L4 or non-executive employees.  (Dep. Tr. of Ellen McGroary ("McGroary Tr."), at 25-27, Ex. 37; Dep. Tr. of Raymond Moncini ("Moncini Tr.") at 92, 304-05, Ex. 38; OTIS 5541-48, Ex. 48.)

[2] "Red-circling" has various definitions and uses, but connotes keeping an employee at a higher salary or grade than the position may call for, for reasons other than gender.  See, e.g., 29 C.F.R. § 1620.26.

to $90,000. (Facts, ¶ 7.) In 1998, Otis increased Nichani's salary by 5 percent, to $94,500, and maintained her at Grade 50. (Facts, ¶ 8.)

From her hire in 1990 until April of 1999, Nichani did not work in a safety-related position nor did she oversee the safety operations.[3] (Facts, ¶ 9.) Moreover, Nichani had no safety or environmental background or education; rather, she had an engineering background, with a Bachelor's of Science degree in Industrial Engineering and a Masters' Degree in the same field. (Facts, ¶ 10.)

### B. Nichani Promoted to Senior Manager

In February 1999, Otis engineered a series of moves and promotions of personnel, in the environmental, health and safety function, including Nichani. Otis promoted Nichani to Senior Manager, Environmental Health & Safety (EH&S) for the North American Area (NAA), and raised her labor grade from 50 to 51 as well as her salary from $94,500 to $108,000. (Facts, ¶ 12.) She replaced Patrick Dowson, a male, who held the Senior Manager, EH&S position. Dowson, in turn, was promoted to Director of EH&S for the South Europe Area and the United Kingdom, a Grade L3 executive-level position. (Facts, ¶ 13.) Prior to his promotion, Dowson was a Grade 51, with a salary of $103,070. (Facts, ¶ 14.)

In addition to a salary increase for her new position, Nichani also received: a "position allowance" of $16,200 annually, to account for her new position; a one-time payment of $9000 for her relocation; and, reimbursement of all moving costs and closing costs on a new home. (Facts, ¶ 15.) Although Nichani had been with Otis for fewer than 10 years, and she had never held an EH&S position when Otis promoted her to a Senior Manager EH&S position, it

---

[3] Nichani acknowledged that safety is a part of each employee's responsibility at Otis, and that she thus had some responsibility for safety in her prior positions. (Facts, ¶ 11.)

paid her <u>more</u> in base salary than her prior male predecessor, Dowson.  For the calendar year of 1999, Nichani's compensation totaled approximately $158,500.  (Facts, ¶ 16.)

The terms of the promotion were outlined in a letter to Nichani on February 12, 1999.  (Facts, ¶ 17.)  Nothing in the letter guaranteed her a promotion within one year nor guaranteed her employment for a fixed term; indeed, the letter – time and again – contemplated Nichani being in the position for at least three years and had various options for her compensation should that be the case.[4]  (Facts, ¶ 18.)

### C.    Nichani's Job Responsibilities

As Senior Manager, Nichani was responsible for overseeing the environmental, health and safety function for the entire North America Area, which encompasses about 15 percent of Otis' worldwide employee population.  (Facts, ¶ 21.)  Among Nichani's responsibilities was the requirement to report conditions or practices that are unsafe and ensure prompt resolution of potential hazards.  (Facts, ¶ 22.)  Moreover, Nichani understood that her responsibilities included oversight of the safety process and policy implementation throughout North America and ensuring that the proper training and tools were available.  (Facts, ¶ 23.)  She also acknowledged that she had the responsibility for developing and communicating to the "field" any safety practices and policies of UTC and Otis, along  with the responsibility for implementing those as well.[5]  (Facts, ¶ 24.)  Nichani also admitted that she had responsibility for seeing that a specific

---

[4] At her deposition, Nichani claimed that – at the time of her promotion to Senior Manager, EH&S for NAA, then-Otis NAA president Bill Miller told her she would be promoted within a year to an executive position if she did a good job.  (Facts, ¶ 19.)  Nevertheless, Nichani admitted that she knew Miller did not have the authority to promote her by himself and that such a promotion would require additional approvals.  (Facts, ¶ 20.)

[5] For field employees, Nichani was the primary source of information about key safety policies and procedures.  (Dep. Tr. of Erv Lauterbach ("Lauterbach Tr.") at 77, Ex. 36.)

process, called a Job Hazard Analysis (JHA),[6] was used throughout the North America Area. (Facts, ¶ 25.)  Nichani was keenly aware that if she did not discharge those responsibilities she could lose her job.  (Facts, ¶ 26.)  Her job description also stated plainly that she continued to be an at-will employee.  (Facts, ¶ 27.)

### D.    Nichani's Performance Review in December 2000

For the first 18 months in her new position, Nichani's performance was fully competent.  (Facts, ¶ 29.)  However, her boss, Ray Moncini, President of Otis NAA, instructed Nichani to work more closely with each region to ensure that they were complying with various safety rules, and to ensure that their safety practices conformed with Nichani's instructions. (Facts, ¶ 30.)  Nevertheless, in 2000 – while Nichani headed up safety in NAA – accident rates increased when compared with 1999 rates (Facts, ¶ 31); however, as Nichani's supervisor, Ray Moncini did not overly criticize her on that incident rate in her 2000 review.  Indeed, Ms. Nichani recalls no friction between her and Moncini during this time period.  (Facts, ¶ 32.)

### E.    Otis Reorganizes EH&S Positions

In early 2001, Otis began to move some senior-level EH&S positions.  In particular, Otis President, Stephen Page, hired Danny Reese as Vice President, EH&S, to oversee the entire EH&S area for Otis worldwide.  (Facts, ¶ 33.)  Page moved Patrick Dowson (Nichani's predecessor) back from his European assignment to one overseeing the EH&S function at Otis World Headquarters.  (Facts, ¶ 34.)  As such, Dowson replaced Bradford Russell, who then held

---

[6] As explained later, a Job Hazard Analysis (also known as a "JHA") is performed to determine what risk a certain process or procedure might place on an employee's safety and to determine ways to reduce or eliminate that risk, before proceeding with the work.  (Facts, ¶ 28.)

the position of Director, EH&S at Otis World Headquarters and a Grade L3.  (Facts, ¶ 35.)  To accommodate this change, Otis President Page decided to move Russell to North America Area ("NAA") to oversee the EH&S function there.  Although Russell was a safety professional with nearly 20 years' experience in the EH&S field, Page moved Russell to NAA, which would allow him to broaden his field experience in the elevator business. (Facts, ¶ 36.)  In moving from Otis World Headquarters to NAA, Russell retained his L3 designation to account for his 20 years' experience, his skills, and the fact that he had already been an L3 for 10 years.  (Facts, ¶ 37.)  Nichani was not considered for promotion to an executive position, because she lacked the experience and overall qualifications for a Director-level position in the safety area.  (Facts, ¶ 38.)  Moncini did not make the decision to move Russell into the position; rather, the decision was left solely to Page's discretion.  (Facts, ¶ 39.)  Russell's move was a "lateral" one, in that his executive level, his labor grade, and his annual salary of $154,000 did not change when he accepted the new position at Otis NAA.  (Facts, ¶ 40.)

Otis accomplishes changes of executives through a recommendation package or "rec-pack" for short.  (Facts, ¶ 41.)  In Russell's rec-pack, it was noted that Russell was particularly well-qualified for this new position in NAA "by virtue of his past experience and education." (Facts, ¶ 42.)  Thus, his experience and education were key factors in the decision to keep him at an L3 level with the same salary and to reclassify the position for him, commensurate with his skills and qualifications, as well as Otis' expectations of a high level of performance from him. (Facts, ¶ 43.)[7]  Nichani admits that she did not have the same level of safety experience as Russell.  (Facts, ¶ 45.)

---

[7] When Mr. Russell resigned less a week into the position, the position returned to its original Grade 51 classification.  (Facts, ¶ 44.)

Because Nichani's performance in her senior manager position was good, Otis did not terminate her employment. Instead, Page directed Moncini to find an appropriate position for her within Otis to accommodate the corporate changes. (Facts, ¶ 46.) Indeed, Nichani had previously stated that she had had interest in returning to a line-management position, where she had been before her promotion to the senior safety manager position in NAA. (Facts, ¶ 47.) Moncini looked for positions for Nichani that had a much broader subject matter than just the EH&S function, and he expected that the position ultimately would equal or exceed Nichani's current salary or grade level. (Facts, ¶ 48.) Nichani acknowledges that Moncini assisted her in a search for a new position. (Facts, ¶ 49.)

However, Page decided not to wait until Moncini had located a new position for Nichani because he wanted all of the other more-senior-level changes to be revealed in one central announcement, to coincide with Reese's arrival. (Facts, ¶ 50.) Thus, in early May 2001, Russell was placed into the position of Director, EH&S for NAA; Nichani left her position as Senior Manager and an announcement went out to that effect. (Facts, ¶ 51.) Nichani's employment was not terminated; rather, she was expected to assist Russell in the transition while Otis continued to search for an appropriate position for her. (Facts, ¶ 52.)

In Otis' announcement of the personnel moves, NAA President Ray Moncini noted Nichani's leadership and stated that she would assume a "senior NAA line management position in the near future." (Facts, ¶ 53.) Indeed, the announcement praised the "positive performance trend" that had emerged under Nichani's leadership and said it was appropriate to "thank Sue Nichani for her capable leadership." (Facts, ¶ 54.) Lastly, the announcement asked Otis employees to join Moncini in "congratulating Sue on her many contributions to our ever

improving EH&S performance."[8]  (Facts, ¶ 55.)  Moncini believed that this announcement put

Nichani's move in a favorable light with the possibility that people might even assume she was

being promoted.  (Facts, ¶ 57.)[9]  Nichani had an opportunity to review a draft of the

announcement before it went out and did not request that any changes be made.  (Facts, ¶ 58.)

Ms. Nichani admits that the announcement does not state that she was being removed from her

position because she did something wrong.  (Facts, ¶ 59.)


### F.    Russell Resigns; Nichani Offered and Accepts Back Senior Manager Position

Within a week or so of Russell's acceptance of the new position, on or about May 14,

2001, Russell unexpectedly decided to resign his employment with Otis.  (Facts, ¶ 60.)  Because

Nichani had not yet located a new position within Otis and because he viewed Nichani as a solid

employee, Moncini immediately offered Nichani her position back with the same grade level and

salary that she had before.  (Facts, ¶ 61.)  Nichani accepted that position without reservation and

Moncini believed she seemed pleased with the opportunity.  (Facts, ¶ 62.)  Moncini was pleased

to have her back because he believed that she was a good employee.  (Facts, ¶ 63.)  A new

announcement relaying Nichani's return to her former position was prepared and given to

Nichani for her review and approval, which she gave.  (Facts, ¶ 64.)

Shortly afterwards, on May 23, 2001, Nichani sent an e-mail to the Vice President of

Human Resources for NAA, Ellen McGroary, asking, "Why is this job a senior manager level

job when I am in it, a director level job when Brad Russell is in it and a senior manager level job

---

[8] Defendants also sent similar announcements on the same day regarding Danny Reese and Pat Dowson.  (Facts, ¶ 56.)

[9] Indeed, Moncini was not pleased that Nichani was being reassigned and said that the only reason she was being reassigned was because Page wanted to move Russell into NAA. (Moncini Tr. at 152, 205, 283, Ex. 38.)

when I go back in it?" (Facts, ¶ 65.) McGroary researched the question by speaking with additional human resources and compensation personnel. (Facts, ¶ 66.) McGroary responded a bit later, in an e-mail, stating "The answer to your question is that Brad brought the Director title with him from WHQ (and previously from UTC). With his departure, we reverted back to the old title. The Director title is only used for UTC executive-graded positions." (Facts, ¶ 67.) At this point, McGroary did not believe that Nichani was making a discrimination claim based on gender. (Facts, ¶ 68.)

On June 6, 2001, despite the fact that Nichani's office was less than a hundred feet from McGroary's, Nichani sent McGroary still another e-mail. (Facts, ¶ 69.) In it, Nichani asked, "Are you saying that the level of a position, and ultimately the compensation, is based on the individual in the position and not based on the duties and responsibilities of the position itself?" (Id.)

McGroary again researched the issue to ensure its correctness. She concluded that Russell had been "red-circled" into Nichani's former position because he had already been at an L3 executive level with a higher rate of pay.[10] Specifically, later that day, McGroary responded:

> Typically a job is graded based on several criteria: scope of responsibilities size of budget size of operations, # of direct reports, domestic v. international responsibilities, impact of decisions, skill/education/competencies/prior

---

[10] Moncini, at his deposition, seemingly indicated that Russell or the position may not have been "red-circled," as Moncini understood that term. (Moncini Tr. at 236, Ex. 38.) However, the entire context of his answer reveals that Moncini did not <u>view</u> it as "red-circling" because he was not going to be content with a lower level of performance from Russell. (Moncini Tr. at 237, Ex. 38.) "It was my intent to -- if I have an executive level person in the job, my intent would be to in fact demand executive level performance." (Id.) Indeed, Moncini did not make the decision as to Russell's position or labor grade, or whether Russell would be red-circled or not; he was simply told by Page that Russell was coming over as an executive (L3). (Moncini Tr. at 233, Ex. 38.) Ultimately, Moncini clarified his answers further by stating that he "didn't know" whether Russell had been "red-circled." (Moncini Tr. (Day 3) at 45, Ex. 38.)

> experience required, who the position reports to (what level in the organization[),] etc., etc.
>
> In this case, the job wasn't re-graded. Brad was being moved into the position and he was "red-circled" in the process. This happens occasionally when we move individuals to a lower graded job. Within NAA, this often occurs at the Branch level. For example, an individual might be a Grade 50 but for certain reasons (developmental, business circumstances, etc.) we move them to what is a Grade 49 job. Rather than re-grade the position, we "red-circle" the individual moving into the position. When that individual moves on, the job is backfilled at a Grade 49.

(Facts, ¶ 70.)[11] Nichani was apparently still dissatisfied with the response, but did not approach

McGroary or anyone else. Instead, the next day, she sent yet another e-mail stating:

> I have carefully evaluated your response and I still do not understand why this discrepancy exists….My skill, education, competencies and prior experience as it relates to our business exceed Brad Russell's….So why am I "Fully Competent" as stated in ALL of my performance appraisals and he was "learning" his job, yet I am at a lower level and at lower compensation than he is? Why would Otis not pay us the same to do the same work?

(Facts, ¶ 72.) McGroary knew that Nichani's response was inaccurate; Nichani did not have the

same skill, education, competencies or prior experience as Russell. (Facts, ¶ 73.) Nevertheless,

McGroary responded that it would be better to set up a meeting between the two of them. (Facts,

¶ 74.) A meeting between the two was not held due to some scheduling issues and Nichani never

followed up again with McGroary. (Facts, ¶ 75.) Indeed, McGroary believed that the issue had

been resolved: "I thought if Sue wanted to pursue it, she would have pursued it back through

me." (Facts, ¶ 76.) Remarkably, Nichani never spoke with her boss – Otis NAA President Ray

Moncini – regarding this issue and he was unaware of her concerns. (Facts, ¶ 77.) Instead, over

two months later, in late August 2001 Nichani filed a charge of discrimination against United

---

[11] As McGroary explained further at her deposition, she viewed it as a red-circling situation "[b]ecause when we completed the rec. pack, his rate did not change, his salary did not change, and some of the verbiage reflects the fact that he was being moved into that position as an executive." (Facts, ¶ 71.)

Technologies Corp. with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). (Facts, ¶ 78.)[12]

### G.    Nichani Continues Her Work as Senior Manager

With her charge against UTC pending, Nichani continued working over the next year and half in her same position with the same salary and benefits as she had before.[13] Although Nichani was due for a merit increase in March 2002, she did not receive it because Otis deferred all merit increases company-wide for at least 12 months. (Facts, ¶ 79.)[14] Ms. Nichani and her safety area continued to be criticized for its performance in late 2001-2002. (Facts, ¶ 81.) During late 2001 and 2002, Nichani and the safety area were criticized for their performance. (Facts, ¶ 82.) Thus, while Ms. Nichani had received some stock options through a non-executive

---

[12] Otis presumed that Nichani brought a charge against the wrong corporate party and entered an appearance in the CHRO matter. It did not contest jurisdiction over it. Nevertheless, as a formal matter, the charge should not have been brought against the separate corporate entity of UTC.

[13] Although not material to this matter, Ms. Nichani was assigned the responsibility of being the Business Practices Officer for NAA in 2000, which required her to assist in investigations into allegations of some violations of company policy or Otis' code of ethics. (Nichani Tr. at 123-24, Ex. 39; NICH1090, Ex. 25.) However, Ms. Nichani continued in this position after she filed her charge of discrimination in August 2001, until just a few weeks before her termination on March 21, 2003. (Id.) She received no compensation for this position. (Id.) At the time she was removed from her position, there were no pending cases before her. (NICH0590-91, Ex. 12.)

[14] Similarly, although Nichani received an incentive bonus in 2001, she should not have received such a bonus in that year because she was already receiving a "position allowance" as part of her overall compensation package. She was not asked to reimburse Otis for that payment. However, when discovered, Nichani did not receive an incentive compensation payment for 2002 but still received her position allowance of nearly $17,000. (Facts, ¶ 80.)

recognition stock option plan in the past, she did not receive any in 2002.[15]  (Facts, ¶ 83.)  The

terms of the plan specifically provide that decisions are made on an annual basis and that

"participation in the Program for any particular year does not ensure that you will receive

additional Program awards in the future."[16]  There was no employee non-executive stock option

program in 2003, and thus Ms. Nichani did not to receive stock options in that year either.

(Facts, ¶ 84.)  Ms. Nichani received over $146,000 in compensation for 2001.  (Facts, ¶ 85.)

### H.    Otis World Headquarters' Rules on Wire Rope Clips

As head of safety for NAA, Nichani sat on an Otis-wide safety committee called the

World-Wide Job Site Safety Standards (WWJSSS) committee.  (Facts, ¶ 86.)  Because the safety

of its employees is Otis' top priority, this committee was charged with developing safety rules

and procedures for areas to follow in the workplace.  (Facts, ¶ 87.)  Nichani understood that, as

---

[15] As Moncini stated at his deposition, UTC and Otis encourage supervisors to put
different people in the program.  (Moncini Tr. at 347, Ex. 38.)  The programs run, on average,
about every 18 months.  (Page Tr. at 94-95, Ex. 40.)

[16] Specifically, the plan provides:

**Right of discharge reserved.**  Your participation in the Recognition Stock
Option Program does not confer the right to continue your employment for any
period of time or affect any right that the Corporation or any subsidiary or
division to terminate your employment.  Participation in the Program for any
particular year does not ensure that you will receive additional Program awards in
the future.

**Right of discharge reserved.**  Nothing in this Plan or in any Award granted
hereunder shall confer upon any Participant the right to continue in the
employment of service of the Corporation or any Business Unit for any period of
time or affect any right that the Corporation or a Business Unit may have to
terminate the employment of service of such Participant at any time for any
reason.

head of safety for Otis NAA, it was her responsibility to understand and implement these rules. (Facts, ¶ 88.)

In 2000, in response to an accident,[17] Otis World Headquarters revised its WWJSSS rules regarding the use of wire rope clips.[18]  The WWJSSS committee revised its rules to have workers eliminate all field-applied clips because the Committee believed that it might be possible to improperly "torque" (or tighten) the clips to the rope.  (Facts, ¶ 89.)[19]

The WWJSSS Committee revised the rules in a two-step process.  First, by December 31, 2000, all wire rope clips (in any form) were to be eliminated in all standard work processes (SWP) that Otis used in installing, servicing and modernizing its elevators.  Instead, pre-formed slings (essentially wire ropes with the loops already made) were to be used; these would essentially be "mistake-proof" because there are no adjustments made in the field (i.e., no need to torque).  The second part of the rule called for the elimination of the use of all U-bolt wire rope clips as part of all hoisting and rigging activities (whether they were standard processes or not) in installing, servicing and modernizing its elevators.  This was to be done by December 31, 2001.  If a wire rope clip did need to be installed in the field (instead of using a pre-formed sling), a documented Job Hazard Analysis ("JHA") and request for deviation needed to be submitted to and approved by the President of NAA.  Moreover, only one type of wire rope clips

---

[17] For example, in October 1999, an Otis employee fell to his death because a rope clip that had been used to secure a rope loosened.  It was determined that the rope clip was not installed correctly because it had not been torqued (or tightened).  (NICH01225, Ex. 27.)

[18] Wire rope clips are mechanisms that keep together two ends of a rope, either to make a loop or to prevent it from slipping (much like a rope knot would do).  There are various types of wire rope clips, either called "U-Bolts" (which are also known as "Crosby Clamps") or Double Saddle rope clips.  The term "fist grip" is also used interchangeably with the term "rope clip." (Facts, ¶ 90.)

[19] If the wire rope clips are not properly torqued, then the rope may loosen and ultimately slip, depending on how that rope is being used.

(called "double saddle rope clips") could be used in such a process, and those clips had to be installed per the manufacturer's recommendations.[20]  However, in general, wire rope clips were not to be used absent these special circumstances and absent approval through the JHA process.[21]  (Facts, ¶ 91.)

In February 2002, Otis sent a reminder to all area safety heads, including Nichani, reiterating the safety directives outlined in the WWJSSS.  (Facts, ¶ 92.)  In June 2002, NAA was criticized for its continued use of wire rope clips during an assurance review of the Mexico Region.  (Facts, ¶ 93.)  By July 2002, Nichani sought additional information regarding this rule, in light of the criticisms noted in Mexico review.  (Facts, ¶ 94.)  EH&S Director for Otis World Headquarters, Pat Dowson, told Nichani in a July 1, 2002 e-mail that the continued use of double saddle rope clips by NAA could occur only if there was a defined process (JHA) that was then approved by NAA President Ray Moncini.  (Facts, ¶ 95.)

---

[20] The rules provided:

Effective 31 December 2000, all Otis Companies must eliminate the use of wire rope clips as part of New Equipment, Modernization, and Service Repair Standard processes and substitute appropriately designed pre-formed slings, shackles, and properly engineered lifting devices.  Standard processes included in this ruling are hoisting and hanging of cars, counterweights, machines, controllers, drives, and generators.

Effective 31 December 2001, all Otis Operations must have eliminated the use of U-Bolt wire rope clips for ALL hoisting and rigging activities in repair, modernization, and new equipment.  If circumstances require a special sling to be fabricated in the field, a documented Job Hazard Analysis (JHA) and request for deviation must be reviewed and approved by the President or Managing Director.  These slings can only be fabricated using Double Saddle clips (or other approved alternative) and installed according to manufacturer's recommendations.

(Facts, ¶¶ 89-91.)

[21] The reasoning behind this change was explained to Nichani in a July 2002 e-mail from Pat Dowson to her.  (OTIS 0714, Ex. 46.)

Indeed, Nichani understood that having a defined process and performing a job hazard analysis was a key part of mitigating risks of accidents within the company.

> Q:    So if you saw something you didn't like, you could just modify it?
> A:    No.  There was a process that we went through as far as a risk assessment.
>
> Q:    And what was that process?
> A:    The process was to complete a JHA, job hazard analysis, and mitigate the risk.  The documented process with the approval of various managers depending on the level of activity.
>
> Q:    And would you have to go back up to World Headquarters to tell them that you thought this modification was appropriate before you could implement the modification?
> A:    No, I did not.
>
> …
>
> Q:    Who told you that you could do it on your own?
> A:    In the Worldwide Job Site Safety Standards, it was written that with the appropriate risk assessment signed by various management at the area level that a different process could be utilized.

(Facts, ¶ 96.)

One month later, in August 2002, Nichani admitted that <u>fist grips were to be eliminated</u>.[22]

In an e-mail to a colleague complaining about the WWJSSS, Nichani states:

> Lately, we have implemented standards that no one (including safety) knows how to implement - **<u>such as no more fist grips</u>**.  That's backwards and unrealistic.

(Facts, ¶ 97.) (Emphasis added).  Despite being told explicitly that fist grips were to be eliminated and despite knowing that a JHA would have to be done if they could not be eliminated, Nichani admits that she did not utilize that process.[23]  (Facts, ¶ 98.)  Quite

---

[22] Nichani was also told in an safety audit for the Mexico Region in June 2002 that fist grips were to be removed.  (Nichani Tr. at 310-11, Ex. 39.)

[23] Indeed, one of the process owners, Scott Simmons, who was in charge of New Equipment installation, brought the issue of continued use of fist grips to Nichani's attention. (Facts, ¶ 99.)  However, he was not aware of any steps that Nichani took to get clarification on the issue.  (<u>Id.</u>)

remarkably, she claimed at her deposition that the JHA process was not utilized, not because she

forgot or did not understand the rules, but because, she claimed, she did not know that fist grips

had to be eliminated – a fact directly contradicted by her August 2002 e-mail.

> Q:     With regard to the use of fist grips, did you go through this modification
> process and get approval at the area level?
> A:     No, I did not.
>
> Q:     Why not?
> A:     <u>Because it was not my understanding that fist grips had to be eliminated.</u>

(Facts, ¶ 100.) (Emphasis added).  Nichani's testimony reveals her critical failure to implement

the WWJSSS rules and, even now, it reveals her troubling attempts to downplay or hide her

inaction and her failure to implement the WWJSSS.

Even after the issues regarding NAA's continued use of wire rope clips without a JHA

surfaced, Nichani ignored them; she did not raise the issues with her supervisor, NAA President

Ray Moncini, as had been suggested by Otis World Headquarters.  (Facts, ¶ 101.)  Indeed, in

September 2002, a safety bulletin was distributed to Nichani regarding an accident in France in

which wire rope clips were improperly used.  (Facts, ¶ 102.)  This bulletin, once again, reiterated

that wire rope clips were to be eliminated and, if they could not be eliminated, a Job Hazard

Analysis needed to be performed.  (Facts, ¶ 103.)  (<u>Id.</u>)  However, there is no evidence that

Nichani distributed this bulletin to anyone in NAA, including anyone in the field.  (Facts, ¶ 104.)

Indeed, Erv Lauterbach, the Vice President of the New York Region, indicated that he and his

staff were unaware of this requirement.  (Facts, ¶ 105.)

On December 6, 2002 – nearly six months after the issue regarding NAA's continued use

of wire rope clips, particularly without the completion of a JHA, had been raised with Nichani –

Nichani failed to take action to get this safety issue resolved in NAA or to see that fist grips were

not used.  Indeed, in an e-mail, Nichani candidly conceded that "I personally am still experiencing confusion on the fist grip issue."  (Facts, ¶ 106.)

That confusion would prove fateful later that same month.

I.    **The Death of Daniel McQuillan**

On December 23, 2002, less than three weeks after Nichani claimed that she was still experiencing "confusion" on the issue of fist grips, Otis elevator mechanic Daniel McQuillan fell to his death in a construction accident in the New York City area.  Nichani and others went to the accident site immediately to investigate.  By the next day, Nichani gave a summary report of the initial findings to NAA President Ray Moncini.[24]  (Facts, ¶ 107.)  In it, Nichani noted that the car frame that the employee was riding on at the time of his death had fallen after it was "hoisted with a cable sling that was <u>secured with fist grips</u>."[25]  (Emphasis added.) (Facts, ¶ 108.)

---

[24] The report stated in part:

At the time of the accident, the crew (consisting of 4-5 people) were in the process of roping the elevator.  The comp ropes were attached to the bottom of the car.  The car was then hoisted up in order to run the comp cables up.  The rigging supporting the car failed, at which time Dan McQuillan was on the working platform that was built on top of the crosshead.  We believe that Dan was on the platform attempting to remove the rail bugs so the car could be hoisted up.

The car was hoisted with a cable sling that was secured with fist grips.  We have the fist grips and will test them and the sling with the help of our engineers as soon as possible.

Interviews with the mechanics this morning seemed to corroborate the fact that Dan was on the working platform removing the rail bugs to allow the carframe to be hoisted.

[25] Nichani also prepared a summary called "An Accident", which was finalized on January 8, 2003 and distributed via e-mail.  (Facts, ¶ 109.)  In that document, she indicates that "It is believed that the 'Fist Grip' cable clamps came loose."  (Facts, ¶ 109.)

On January 2, 2003, after the initial matters concerning the investigation into the fatality were assigned and addressed, Moncini asked Nichani questions regarding NAA's overall compliance with various Otis safety policies and procedures.  (Facts, ¶ 110.)  As Nichani admitted in her deposition, she had not talked with Moncini regarding any issue of fist grips before December 23, 2003, the date of McQuillan's death.  (Facts, ¶ 111.)  In an e-mail on Friday, January 10, 2003, Nichani notified Moncini in detail, for the first time, of the applicable WWJSSS rules regarding the use of wire rope clips.  (Facts, ¶ 112.)  Moncini responded on Monday, January 13, 2003 that he was "confused" by Nichani's e-mail and asked Nichani to speak with him directly.  (Facts, ¶ 113.)  At his deposition, Moncini explained further what he meant:  "My confusion is, first of all is why the difference between standard processes and nonstandard processes.  Then secondly, why haven't I seen deviation requests."  (Facts, ¶ 114.)

One week later, on Sunday, January 19, 2003, disturbed by the NAA's lack of compliance with WWJSSS rules, Moncini asked Danny Reese, Otis' Vice President of EH&S world wide, to conduct a thorough review of NAA's safety practices and procedures.  "I would like to impose on you and your staff to do a full management system review of NAA.  What I am particularly interested in is the discrepancies we may have in the WWJSSS versus our practices in the field."  (Facts, ¶ 115.)  Moncini copied Nichani on this e-mail; she responded on January 23, 2003 and admitted that she already knew of at least three areas with which NAA was out of compliance, including the continued use of wire rope clips.  (Facts, ¶ 116.)

Moncini found Nichani's response unacceptable.  One week later, on January 31, 2003, he outlined his profound disappointment and concern with her failure in specific terms:

> There is obviously a clear communications issue between you and the WHQ group on WWJSSS changes…. It seems that our inability to use the process with regards to fist grips and other issues has put NAA in a very difficult position. Although we may find that the WWJSSS are too restrictive and need to be

> modified, we need to do this in an open fashion with WHQ and potentially with
> my involvement. You stated that you were confused by the standard on the fist
> grips which begs the question--why didn't you ask Danny, Tim or Pat? If they
> were unresponsive or difficult you could have come to me. What I saw yesterday
> is that we were simply ignoring the direction from WHQ and this is not
> acceptable.

(Facts, ¶ 117.) Moncini also noted two other important areas of deficiency that had been brought

to his attention as a result of the McQuillan fatality: namely that NAA had not been

implementing safety training for mid-level and executives (called MELT training) and had not

filled a regional safety manager position with sufficient speed. (Facts, ¶ 118.)


**J.      Moncini Terminates Nichani's Employment**

Just a few weeks later, in mid-March 2003, Moncini prepared a performance review

for Nichani. (Facts, ¶ 119.) Ultimately, it was the issues raised in the January 31, 2003 e-mail as

well as those summarized in her performance review that led to Nichani's termination on March

21, 2003. (Facts, ¶ 120.) Even though Nichani was head of safety for NAA, Nichani was <u>not</u>

terminated as a sanction or discipline for the McQuillan fatality itself -- rather, she was

terminated for the issues that were discovered as a <u>result</u> of the investigation into the fatality,

principally her failure to implement WWJSSS and safety policies.[26] (Facts, ¶ 121.)

Moncini's criticism of Nichani centered on her failure to take action in a critical area

of safety:

> The fact is that her job was to deploy this policy and she saw this deficiency and
> instead of proactive engagement, and asking for help and doing the things that she
> should have done to try to resolve these issues, what she [stated was] well, I did

---

[26] Strikingly, Nichani tries to place blame on others for her failures. (Third Amended
Complaint ¶ 57.) However, she admitted at her deposition that the responsibility for ensuring job
hazard analyses were done was hers and that it was not done in this case. (Nichani Tr. at 499,
Ex. 39.)

this and they never responded to me, so therefore I thought it was okay. And, quite frankly, that's not good enough.

(Facts, ¶ 122.)[27]  Ultimately, Moncini viewed Nichani's actions as a "dereliction" of her duties to deploy safety policies across NAA effectively. (Facts, ¶ 124.)  Indeed, Mr. Moncini had been instructed by Otis President Ari Bousbib to take immediate actions to improve "NSAA"[28] leadership. (Facts, ¶ 125.)  Nichani understood too well that she was responsible for conveying all safety information from Otis World Headquarters and that she could be sanctioned or even terminated if she did not. (Facts, ¶ 126.)

On March 21, 2003, Moncini met with Nichani to review her performance and terminate her employment. (Facts, ¶ 127.)  Although Nichani was not told in advance of the subject matter of the meeting, she expected to receive some discipline at the meeting.

> Q:   Did you know why he wanted to see you?
> A:   I suspected why he wanted to see me.
>
> Q:   What did you suspect?
> A:   I suspected that I was going to be disciplined for the accident.
>
> Q:   And what kind of discipline did you expect to receive?
> A:   I expected that it would be a warning of some sort.

(Facts, ¶ 128.)

---

[27] This belief that Otis' employees should not merely "relay" information, but attempt to solve problems, was noted by Otis President Ari Bousbib at his deposition:

> We are not interested here in people taking reports from others and then reporting -- passing the ball so to speak. We are expecting active, engaged leadership. So it's not reliance and just passing the buck and saying, well, they didn't do it. If you're in charge, the buck stops there.

(Facts, ¶ 123.)

[28] In 2002 and 2003, NAA was expanded to include South America. The new area is now known as NSAA. For purposes of this motion and to prevent further confusion, Defendants simply refer to the area as NAA.

At the meeting, Moncini and Ellen McGroary, NAA Vice President of Human Resources, told Nichani that she was being terminated for the reasons outlined in the performance review. (Facts, ¶ 139.)  After listening to Moncini explain the performance review and her failings, Nichani did not contest what he told her but merely stated, "Is that all?"  (Facts, ¶ 130.)  Nichani then met separately with McGroary but once again did not raise any issues or ask any questions. (Facts, ¶ 131.)  Nichani described the meetings as "low-key conversational."  (Facts, ¶ 132.) After Nichani's termination, Moncini appointed Patrick Dowson – who was Nichani's predecessor at NAA and subsequently promoted to an executive as Director, EH&S for Otis World Headquarters – to be acting director for safety for NAA until Moncini could locate a qualified replacement.  Dowson still maintained his existing job and labor grade as Director of EH&S at Otis World Headquarters in addition to his temporary duties in the NAA area.  (Facts, ¶ 133.)  In early 2004, the EH&S function in the North America Area was combined with the Quality function.  Otis selected Edith DiFrancesco, a woman who was an L2 Executive, for that new position.  (Facts, ¶ 134.)

### K.    Nichani's Claims Regarding the Investigation into the McQuillan Death

After the McQuillan death, Nichani and others were charged with investigating the accident.  Nichani was asked to work together with Otis' outside attorneys, Hal Engel and John McNamara, to interview numerous witnesses and prepare an internal accident report that accurately stated the facts behind the accident.  (Facts, ¶ 135.)  Attorney McNamara – who was unaware that Nichani had a lawsuit pending against Otis – told Nichani that he would be in charge of the investigation.  (Facts, ¶ 136.)  Ultimately, Nichani and Regional Vice President, Erv Lauterbach, prepared a draft report.  (Facts, ¶ 137.)  Nichani solicited input from various individuals, including her superiors, and was asked to make changes to the report.  (Facts, ¶ 138.)

However, she concedes that none of the changes were "false."  (Facts, ¶ 139.)  The report then

was provided to outside counsel, John McNamara, who made further changes to both factual

statements and to certain opinions.  (Facts, ¶ 140.)  Indeed, McNamara – who himself

interviewed all the witnesses relating to the fatality – reviewed the initial draft report and found

that it was inconsistent with the facts he had developed in his interviews of the witnesses.  He

also found that it was inaccurate and filled with speculations, conclusions, and perceptions.

(Facts, ¶ 141.)  In her deposition, Nichani conceded that none of the attorneys falsified <u>anything</u>

in the final report.[29]  (Facts, ¶ 142.)  Although Nichani disagreed with some of the changes that

were made, she did not tell anyone about her disagreement.  (Facts, ¶ 144.)  At her deposition,

Nichani also conceded that she had no reason to believe that her employment was terminated for

raising safety concerns.  (Facts, ¶ 145.)  Although Nichani may have had personal disagreements

with the internal report, there is no evidence that her employment was terminated because of

those disagreements.[30]

### L.    Nichani's Claims Regarding the Decision Makers

Nichani believes that only two individuals at Otis – Otis NAA President Ray Moncini

and former Otis President Stephen Page – discriminated against her because of her gender, race

---

[29] McNamara also states that he never asked Ms. Nichani or anyone else to submit a false report.  (Facts, ¶ 143.)  He states further that he did his best to be sure that the report that was prepared for internal purposes would be factually accurate and devoid of speculation.  (Facts, ¶ 143.)

[30] Numerous individuals received sanctions as a result of the investigation.  Sanctions are issued to Otis employees where they need to be held accountable for actions in their area related to an accident.  (Facts, ¶ 146.)

and national origin, and because she filed a CHRO charge in August 2001.[31]  (Facts, ¶ 147.)  As

to Moncini, Nichani relies on her allegation that he made a sexist comment on July 10, 2001.

(Facts, ¶ 150)  Specifically, Nichani claims that Moncini – in a discussion regarding an

unspecified OSHA investigation – stated "The inspector was a woman.  She probably didn't

know what she was doing.  She was a woman."  (Facts, ¶ 150.)  Nichani did not recall anything

more about the incident, nor did she complain to human resources about the comment.  (Facts, ¶

151.)  When Nichani filed her CHRO complaint one month later, she did not allege anything

about such comments.  (Facts, ¶ 152.)

Nichani also alleges that a co-worker once sent her an e-mail regarding a "safety

topic" of "Why Men Die Younger," which Nichani now claims offended her.[32]  (Facts, ¶ 153.)

However, even if such evidence were admissible, it is irrelevant because Nichani does not claim

a sexually hostile work environment, nor does she claim that the decision makers, Moncini and

Page, were aware of this e-mail or were involved in any way with the e-mail.

---

[31] Ms. Nichani has no evidence to support her claim that Moncini or Page discriminated
against her because of her race or national origin.  Nichani does refer to one incident when she
worked in New York in the 1990s, when two co-workers allegedly called her "dot-head" or
"Indian princess" in an apparent reference to her Indian national origin.  (Facts, ¶ 148.)
However, Nichani could not remember the context of the statements because it had "been so
long."  (Id.)  Nichani never complained about the statements and, because there is no hostile
work environment claim, these alleged remarks – even if made – cannot form a basis that
Moncini or Page discriminated against her.  There is no allegation that either Moncini or Page
knew of these statements or in any way agreed with or condoned such statements.  In any event,
these are the only statements that she alleges were made about her race or national origin.
(Facts, ¶ 149.)

[32] Indeed, although Nichani's complaint refers to this friendly e-mail as having "scantily
clad women" (Third Amended Complaint, ¶ 15), the e-mail is actually a copy of clever
marketing-campaign advertisements done by an upscale British fashion designer, named Wallis,
targeting women.  See http://www.wallis-fashion.co.uk  (last visited Feb. 23, 2005); see
generally "A Semiotic Analysis of Wallis Adverts" by Sarah Richards, at
http://www.aber.ac.uk/media/Students/sar9502.html (last visited Feb. 23, 2005).

In support of her claim of gender discrimination against Page, Nichani claims that she once witnessed Page ask a female executive to get a cup of coffee for NAA President William Miller during an accident review.  (Facts, ¶ 154.)  Ms. Nichani was never asked to get a cup of coffee and ultimately Ms. Nichani did not recall any first-hand knowledge of any other facts in support of her claim that Page discriminated against her.[33]  (Facts, ¶ 155.)

### M.    Procedural History

After receiving a right to sue letter from the CHRO and the Equal Employment Opportunity Commission, Nichani filed her initial complaint in this matter on August 9, 2002. On October 2, 2002, Nichani amended her complaint.  On or about July 17, 2003, Plaintiff filed a Second Amended Complaint.  On or about June 22, 2004, Plaintiff filed her Third Amended Complaint – which is now the operative complaint in this matter.  The Third Amended Complaint has fifteen separate counts, alleging the following causes of action:  (1) national origin (Asian Indian) discrimination, in violation of Title VII; (2) race discrimination, in violation of Title VII; (3) gender discrimination, in violation of Title VII; (4) race discrimination, in violation of 42 U.S.C. §1981; (5) a violation of the Equal Pay Act, 29 U.S.C. §206, in compensating her differently than a male employee; (6) retaliation, in violation of Title VII; (7) defamation, under Connecticut law; (8) race and national origin discrimination, in violation of Conn. Gen. Stat. §46a-60; (9) gender discrimination, in violation of Conn. Gen. Stat. §46a-60; (10) retaliation, in violation of Conn. Gen. Stat. §46a-60; (11) wrongful discharge, under Connecticut law; (12) a violation of Conn. Gen. Stat. §31-51q; (13) breach of contract, under

---

[33] Nichani also stated that she heard from another employee, Tim Beck, that Page did not like a female employee, Lisa Sczefzul, but Nichani did not know why.  (Nichani Tr. at 386, Ex. 39.)

Connecticut law; (14) negligent misrepresentation, under Connecticut law; and (15) promissory estoppel, under Connecticut law.

Defendants denied the allegations of the complaint and pled various affirmative defenses on July 9, 2004.  Defendants now move for summary judgment on all fifteen counts because there is no genuine issue of material fact.  Based on the undisputed facts and the law, this court should grant Defendants' Motion.


## II.    ARGUMENT

### A.    Summary Judgment Standard

The Federal Rules of Civil Procedure provide that a party is entitled to summary judgment if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 324-25 (1986).  Accordingly, Defendants are entitled to summary judgment unless Plaintiff can set forth "specific facts," supported by admissible evidence, showing that there is a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(e); Weinstock v. Columbia Univ., 224 F.3d 33 (2d Cir. 2000).  Summary judgment is not a disfavored procedural shortcut, but rather is "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Celotex Corp., 477 U.S. at 327 (emphasis added) (citations omitted).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  "[A] scintilla of evidence in support of the [P]laintiff's position [is] insufficient; there must be evidence [from] which [a] jury could reasonably could find for [her]."  Id. at 252.  The

party opposing the motion must, therefore, go beyond the pleadings, and cannot rely solely on conclusory statements or on the "mere hope" that discovery proceedings or a trial will disclose further evidence. Gray v. Town of Darien, 927 F.2d 69, 74 (2d Cir. 1991); see Easterling v. Connecticut, No. 3:02CV393 (MRK), 2005 U.S. Dist. LEXIS 1691, at *6 (D. Conn. Feb. 1, 2005). Moreover:

> If the nonmoving party has failed to make a sufficient showing on an essential element of [her] case with respect to which [she] has the burden of proof at trial, then summary judgment is appropriate. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Barlow v. Connecticut, 319 F. Supp. 2d 250, 259 (D. Conn. 2004) (internal quotation marks and citations omitted.).

Accordingly, a plaintiff alleging employment discrimination may not rest on "mere allegations" but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000); James v. N.Y. Racing Ass'n, 233 F.3d 149 (2d Cir. 2000); Schnabel v. Abramson, 232 F.3d 83, 85 (2d Cir. 2000). "The time has come, as James and Hazard put it, 'to put up or shut up.'" Weinstock v. Columbia Univ., 224 F.3d at 41 (quoting Fleming James, Jr. & Geoffrey C. Hazard, Jr., Civil Procedure 150 (2d ed. 1977)). Thus, Plaintiff cannot defeat this motion for summary judgment "by offering purely conclusory allegations of discrimination, absent any concrete particulars." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).

**B.** **Defendants Are Entitled to Summary Judgment on Plaintiff's Claims of Discrimination under Title VII, 42 U.S.C. § 1981 and State Law (Counts One, Two, Three, Four, Eight, Nine)**

Plaintiff alleges that Defendants discriminated against her because of her national origin, race, and sex, in violation of Title VII, 42 U.S.C. § 1981 and state law.  (Third Amended Complaint, Counts One, Two, Three, Four, Eight, Nine.)  All these claims fail because Plaintiff cannot demonstrate that any alleged adverse employment actions were due to her national origin, race, or gender.

**1.** **Plaintiff always carries the burden of proving discrimination in Title VII cases.**

All Plaintiff's discrimination claims are governed by the analytical framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973) and <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 257 (1981).[34]  Under this rubric, Plaintiff has the initial burden of demonstrating a prima facie case of discrimination.  <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>Burdine</u>, 450 U.S. at 252-53.  A prima facie case requires Plaintiff to prove:  (1) she was a member of a protected class; (2) she was qualified for the position at issue; (3) she was subjected to an adverse employment decision; and (4) the decision occurred under circumstances giving rise to an inference of discrimination.  <u>McDonnell Douglas</u>, 411 U.S. at 802-04; <u>see</u>

---

[34] The <u>McDonnell Douglas</u> framework developed for Title VII cases also applies to discrimination claims under 42 U.S.C. § 1981.  <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506 n. 1 (1993); <u>Love-Lane v. Martin</u>, 355 F.3d 766, 786 (4th Cir.), <u>cert. denied</u>, ___ U.S. ___, 125 S. Ct. 49, 69 (2004); <u>Hudson v. Int'l Bus. Mach. Corp.</u>, 620 F.2d 351 (2d Cir. 1980).  In addition, Connecticut courts rely on federal law to review claims of discrimination under Conn. Gen. Stat. §§ 46a-51 and 46a-60.  <u>See</u> <u>Levy v. Comm'n on Human Rights & Opportunities</u>, 236 Conn. 96, 103-04, 671 A.2d 349 (1996) ("Although this case is based solely on Connecticut law, we review federal precedent concerning employment discrimination for guidance in enforcing our own antidiscrimination statutes.").  Defendants therefore analyze Plaintiff's discrimination claims, whether brought under Title VII, 42 U.S.C. § 1981, or state law, under the same framework.

Cockfield v. United Techs. Corp., 340 F. Supp. 2d 197, 213 (D. Conn. 2004) (explaining discrimination framework).

Assuming Plaintiff demonstrates a prime facie case, the Defendants must proffer a nondiscriminatory business rationale for their actions. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000); James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000); Schnabel v. Abramson, 232 F.3d 83, 88 n.2 (2d Cir. 2000). To satisfy its burden of production, the Defendants need only "introduce evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the [unfavorable employment decision]." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993); Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998).

Finally, if the Defendants satisfies its burden of production, Plaintiff still must produce enough evidence permitting the trier of fact to find that the "asserted justification is false." Reeves, 530 U.S. at 148. "'[I]t is not enough . . . to disbelieve the employer; the fact finder must believe the plaintiff's explanation of intentional discrimination.'" Id. at 147 (quoting Hicks, 509 U.S. at 519). As the Second Circuit explained:

> [F]ollowing Reeves, we decline to hold that no [] defendant may succeed on a summary judgment motion so long as the plaintiff has established a prima facie case and presented evidence of pretext. Rather, we hold that the Supreme Court's decision in Reeves clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.

Schnabel, 232 F.3d at 90 (internal quotation marks and citations omitted). Indeed, the Second Circuit reiterated that "Reeves recognized that in some circumstances a defendant could prevail as a matter of law even after a plaintiff's showing of pretext . . ." Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001). Throughout this analysis, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff

remains <u>at all times</u> with the plaintiff."  <u>Burdine</u>, 450 U.S. at 253 (emphasis added); <u>see also</u>

<u>Cousins v. Howell Corp.</u>, 113 F. Supp. 2d 262, 268 n.6 (D. Conn. 2000) (noting that "the final

burden is on the plaintiff to show the employer intentionally discriminated against her because of

her [protected characteristic]").  Finally, it is well-settled that a stray or isolated remark cannot

constitute proof of discriminatory animus on the part of the employer unless the alleged

statement has some causal relationship to the decision to discharge the plaintiff.  <u>See, e.g.</u>, <u>Price</u>

<u>Waterhouse v. Hopkins</u>, 490 U.S. 228, 251 (1989); <u>Danzer v. Norden Sys.</u>, 151 F.3d 50, 56 (2d

Cir. 1998); <u>Giordano v. Gerber Sci. Prods.</u>, No. 3:99CV00712 (EBB), 2000 U.S. Dist. LEXIS

22178, at *18 (D. Conn. Nov. 14, 2000), <u>aff'd</u>, 24 Fed. Appx. 79 (2d Cir. 2001).

> **2.  Plaintiff cannot establish a prima facie case of national origin or race discrimination because her termination did not occur under circumstances giving rise to an inference of discrimination.**

Plaintiff claims that her national origin and race were motivating factors behind her

termination, and other employment decisions at Otis.  (Third Amended Complaint Counts One,

Two, Four, Eight ¶ 58.)  These claims have no merit because Plaintiff's <u>only</u> allegations of race

or national origin discrimination were stray remarks that cannot be attributed to any employment

decision at Otis.  In any event, she certainly has offered no <u>proof</u> of discrimination.

Plaintiff alleges that her race and national origin were connected with the following

employment decisions: (1) as part of Otis' corporate transfers, moving Brad Russell to Director

of EH&S for NAA on April 26, 2001; (2) Otis paying Russell and Pat Dowson more than

Plaintiff, who both were directors (Grade L3) and earning more than Plaintiff prior to the

corporate transfers; (3) providing Plaintiff with less benefits; (4) denying her a promotion or a

raise at some unspecified time; and (5) her termination.  (Third Amended Complaint Counts

One, Two, Four, Eight ¶ 58.)  There is no dispute that Otis President Stephen Page and Otis

President of NAA Ray Moncini were the decision makers here – Page made the decisions in

April 2001 to move Russell to EH&S in place of Nichani; and Moncini made the termination

decision in March 2003.  (Facts, ¶¶ 36-39, 48-50, 127.)  Plaintiff's only allegations of race or

national origin discrimination while at Otis, however, were stray remarks made by individuals

who had nothing to do with employment decisions, and certainly cannot be attributed to either

Page or Moncini.  See Golove v. Monroe Cmty. College, 29 Fed. Appx. 695, 699 (2d Cir. 2002)

(stray remarks, even by a decision maker, cannot alone prove workplace discrimination).

Plaintiff testified that Moncini and "possibly" Page discriminated against her.  (Facts,

¶ 147.)  In support of her case of race and national origin discrimination, Plaintiff refers to a

single incident, which occurred sometime in the 1990s, when two employees allegedly called her

"dot-head" or "Indian princess" as a purported reference to her Indian national origin.[35]  (Facts, ¶

148.)  Plaintiff could not remember the context of the statements because it had "been so long,"

but she thinks that the employees were joking.  (Id.)  Nichani never complained about the

statements did not take advantage of Otis's internal complaint process.  (Id.)  Plaintiff makes no

suggestion, however, that Moncini, or any other individual who made any employment decisions

at Otis, condoned such statements, much less were even aware of them.

The stray remarks alleged by Plaintiff cannot reasonably be construed to relate to her

termination, or any other decision made at Otis.  First, as discussed above, stray remarks, along

with nothing else, cannot establish an inference of discrimination.  Second, there is no proof that

these remarks, even if actually made, caused any employment decisions at Otis.  See Rajcoomar

v. TJX Cos., 319 F. Supp. 2d 430, 435 (S.D.N.Y. 2004) ("The Second Circuit has held that

allegations than an individual uttered racial slurs does not raise an inference of discrimination in

---

[35] Again, these are the only statements that Plaintiff alleges were made about her race or
national origin.  (Facts, 149.)  Because there is no hostile work environment claim, these alleged
remarks – even if made – cannot form a basis that Moncini or Page discriminated against her.

connection with an adverse employment action against a plaintiff if the 'utterer' was not involved in making the adverse decision.")  And third, these remarks, even if true, occurred years before Plaintiff's termination.  See, e.g., Campbell v. Alliance Nat'l Inc., 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) ("Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision."); Graham v. Renbrook Sch., 692 F. Supp. 102, 108-09 (D. Conn. 1988) (granting summary judgment to employer in discrimination case where remark was made one year before the decision to terminate plaintiff's employment); Phelps v. Yale Sec., Inc. 986 F.2d 1020 (6th Cir. 1993) (comment made one year prior to decision to discharge). Accordingly, Plaintiff cannot possibly establish that Otis terminated her because of her race or national origin, and summary judgment should be granted on Counts One, Two, Four and Eight.

Even assuming Plaintiff could establish the causation element of the prima facie case under McDonnell Douglas, much of her alleged adverse employment actions, with the exception of her termination, were not "materially adverse," as is required under Title VII.  (Third Amended Complaint Counts One, Two, Four, Eight ¶ 58.)  The Second Circuit defines "an adverse employment action as a 'materially adverse change' in the terms and conditions of employment.  To be materially adverse, a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'"  Sanders v. N.Y. City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004) (citations omitted).  Although a demotion is certainly an example of an adverse employment action, it must be "evidenced by a decrease in wage or salary, or less distinguished title."  Id.

Plaintiff never was "demoted" in April 2001; rather, she was expected to move to a Senior Line Manager position as a result of Otis' corporate transfers.  (Facts, ¶¶ 52, 53.)  She

was not to receive less salary, and, in fact, Moncini expected the new position to match or exceed her previously salary.  (Facts, ¶ 48.)  Shortly thereafter, after Russell's unexpected resignation, Plaintiff immediately resumed her position as Senior Manager, based on her approval.  (Facts, ¶¶ 60-63)  Thus, Plaintiff's position at Otis never was adversely affected in April 2001; in fact, it did not change at all.

As to Plaintiff's other allegations in ¶ 58 of her discrimination claims, simply alleging that she received less pay than Dowson or Russell does not, in any way, suggest a change in the terms of her employment.  Russell and Dowson were executive-level employees before the April 2001 transfers, and Plaintiff cannot prove, as she is required, that she was qualified to earn their salaries.  Finally, Plaintiff's allegation that Otis denied her a promotion fails to allege that she applied for and was denied a promotion, which is a fundamental aspect of a failure to promote claim.[36]  See Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 (2d Cir. 2000) (dismissing claim for failure to promote for failing to allege applying for, or being denied a promotion).

> **3.    The plaintiff cannot establish a prima facie case of gender discrimination because her termination did not occur under circumstances giving rise to an inference of discrimination.**

Plaintiff also alleges that Defendants discriminated against her because of her gender. (Third Amended Complaint Counts Three and Six.)  These counts are identical to Plaintiff's claims of race and national origin discrimination, and fail for the same reasons — any arguments and authority discussed above apply with equal force to Plaintiff's gender discrimination claims.[37]  Again, Plaintiff merely alleges stray remarks, mostly not attributable to any decision

---

[36] To the extent that Plaintiff's claim is based on receiving no merit increase in 2002, that claim fails because Otis denied all merit increases for that year.  (Facts, ¶ 79.)

[37] Indeed, ¶ 58 of Count Nine actually fails to allege gender discrimination; it simply takes verbatim one of Plaintiff's previous race and national origin claims.

maker, and certainly has offered no <u>proof</u> of discrimination attributable to Otis.  (Facts, ¶¶ 150-155.)

Plaintiff's only other reference to gender discrimination involves an instance that could not reasonably have affected any employment decisions in this case.  One such incident involved a "presentation" regarding a "safety topic" of "Why Men Die Younger" sent via e-mail, which Plaintiff now (unrealistically) finds offensive.[38]  (Facts, ¶ 153.)  Neither Page nor Moncini were connected to this incident, nor has Plaintiff has even suggested that they were aware of it.  Moreover, such evidence it is irrelevant in this matter because Plaintiff does not claim a hostile work environment.

As discussed above, numerous courts have held that stray remarks cannot support a reasonable inference of intentional discrimination.  <u>See</u> <u>Price Waterhouse</u>, 490 U.S. at 251 (1989) ("Remarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision.  The plaintiff must show that the employer actually relied on her gender in making its decision."); <u>Danzer</u>, 151 F.3d at 56 (2d Cir. 1998) (citing <u>Woroski v. Nashua Corp.</u>, 31 F.3d 105, 109-10 (2d Cir. 1994, which states the proposition that some evidence of stray remarks cannot defeat summary judgment); <u>Wagner v. NutraSweet Co.</u>, 900 F. Supp. 959, 968 (N.D. Ill. 1995) (statement that there were "too many attractive women in human resources" and comment questioning the "closeness" of plaintiff's relationship with supervisor were insufficient to prove gender discrimination); <u>see also</u> <u>Carpenter v. Am.</u>

---

[38] Plaintiff also said she once saw a coworker conducting a presentation using his computer projected onto a viewing screen.  During the presentation, the subject lines of several e-mails were displayed, with one e-mail entitled, "Petite women, tight asses."  (Nichani Tr. 367-69, Ex. 39; Third Amended Complaint ¶ 15.)  Plaintiff never saw the text of the e-mail (only the title), and the e-mail was removed as soon as it was pointed out.  (<u>Id.</u>)  Plaintiff also testified that this incident was possibly an accident, and that the unnamed individual was "embarrassed" that it had happened.  (<u>Id.</u>)  This incident cannot form the basis of any discrimination claim.

Excelsior Co., 650 F. Supp. 933, 938 (E.D. Mich. 1987) (statements by company official that he liked his salespeople "young, mean and lean" and that plaintiff was not as young as he used to be were not sufficient to prove age discrimination); Perry v. Prudential-Bache Sec., Inc., 738 F.Supp. 843, 851 (D.N.J. 1989) (stray remarks describing plaintiff as "a stupid old bastard" and "burned out and forgetful" were insufficient to prove age discrimination), aff'd mem., 904 F.2d 696 (3d Cir. 1990). None of Plaintiff's alleged instances of gender discrimination can be used to support the inference that her termination was, in any way, related to her gender. The only incident attributable to Moncini, i.e., the comment about the OSHA inspector, occurred approximately 1½ years before Plaintiff's termination, and it was not even directed at Plaintiff. Accordingly, Plaintiff cannot establish a prima facie case of gender discrimination because she cannot link her termination with any alleged instances of gender discrimination, and summary judgment is therefore appropriate. See W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990). ("Mere speculation or conjecture" is insufficient to defeat a motion for summary judgment.)

### 4.    Defendants have offered legitimate nondiscriminatory reasons for the plaintiff's termination.

Even assuming Plaintiff can establish a prima facie case of national origin, race or gender discrimination, Defendants have proffered a nondiscriminatory reason for Plaintiff's termination. As discussed in detail in the Statement of Facts, Otis terminated Plaintiff for her failure to implement the safety policies and procedures. President of NAA, Ray Moncini, viewed Plaintiff's failure to act as a "dereliction" of her duties to deploy safety policies across her areas of supervision. (Facts, ¶ 124.) Indeed, Mr. Moncini had been instructed by Otis President Ari Bousbib to take immediate actions to improve NAA leadership. (Facts, ¶ 125.)

These reasons, and others, were outlined to Plaintiff at her termination meeting, and in her Performance Feedback.  (Facts, ¶¶ 127, 129.)

### 5.    The plaintiff cannot prove pretext.

The final step under <u>McDonnell Douglas</u> requires Plaintiff to show Defendants' proffered explanation for her termination was "false" and that the real reason was her gender, her race or her national origin.  <u>See</u> <u>Reeves</u>, 530 U.S. at 143.  No reasonable jury could conclude that Defendants' proffered reason for terminating Plaintiff was merely pretext for race, national origin, or gender discrimination.  Indeed, even if Plaintiff claims that Otis' proffered reasons for her termination were pretextual because of her positive reviews in the past, the "soundness of the employer's business judgment . . . may not be questioned as a means of showing pretext." <u>Wexler v. White's Fine Furniture, Inc.</u>, 317 F.3d 564, 595 (6th Cir. 2003) (internal quotation marks and citation omitted); <u>see</u> <u>Rosengarten v. J.C. Penney Co.</u>, 605 F. Supp. 154, 157 (E.D.N.Y. 1985) ("It is the perception of the decision-maker, and not that of the plaintiff himself, which is relevant."); <u>Menard v. First Sec. Servs. Corp.</u>, 848 F.2d 281, 285 (1st Cir. 1988) (the plaintiff must show that "'he was doing his job well enough to <u>rule out the possibility</u> that he was fired for inadequate job performance, absolute or relative.'"); <u>McDonald v. Union Camp Corp.</u>, 898 F.2d 1155, 1160 (6th Cir. 1990) (plaintiff cannot " 'raise a material issue of fact on the question of the quality of his work merely by challenging the judgment of his supervisors'") (citations omitted).  Accordingly, because Plaintiff cannot prove that Defendants' proffered reasons for her termination were false, Defendants are entitled to summary judgment on all Plaintiff's discrimination claims.  <u>D'Amico v. City of N.Y.</u>, 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.")

C.     **Plaintiff Cannot Meet Her Burden on Her Retaliation Claims (Counts Six and Ten)**

Plaintiff claims that she was retaliated against in violation of Title VII, 42 U.S.C. 2000e-3, and Conn. Gen. Stat. § 46a-60(a)(4).  (Third Amended Complaint Counts Six and Ten.)  Specifically, Plaintiff claims that Otis retaliated against her by: (1) not awarding certain stock options; (2) not giving Plaintiff a bonus under the Performance Incentive Plan; (3) promoting "every other person" on Moncini's staff, including a woman[39]; and (4) terminating her employment.  (Third Amended Complaint Counts Six and Ten ¶ 58.)  These claims fail because Plaintiff has no evidence that her termination or other alleged adverse employment actions were causally connected to her charge to the CHRO.

A prima facie case of retaliation under Title VII or Connecticut law requires a plaintiff to establish: (1) that she was engaged in protected activity; (2) that the employer was aware of that protected activity; (3) that she suffered an adverse personnel action; and (4) that a causal connection exists between the protected activity and the adverse personnel action.[40]

---

[39] Plaintiff's claim that others were promoted fails to allege an adverse employment action; it simply says that others were promoted, not that she should have been promoted, or even was qualified to be promoted.  To establish a failure to promote claim, the plaintiff must allege, among other things, that she applied for and was denied a promotion, and that the position remained open and that the employer continued to seek applicants.  Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 (2d Cir., 2000) (dismissing claim for failure for failing to allege applying for or being denied a promotion).  Plaintiff has made no such allegations, and her claim therefore is not actionable.  Also, as a factual matter, Plaintiff cannot prove that Otis promoted "every other person on Moncini's staff."  (Third Amended Complaint, Counts Six and Ten ¶ 58.)  Finally, Plaintiff's allegation that "the woman who replaced Dilip Rangnekar . . . was quickly moved up to Director" belies all of her claims of gender discrimination against Otis.  (Third Amended Complaint Counts Six and Ten ¶ 58.)

[40] Courts reviewing retaliation claims under Conn. Gen. Stat. § 46a-60(a)(4) analyze such claims under the same analysis.  Newtown v. Shell Oil Co., 52 F. Supp. 2d 366, 374 (D. Conn. 1999).  Accordingly, Defendants discuss Plaintiff's claims under state law contemporaneously with her claims under Title VII.

Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000); Galdieri-Ambrosini v. Nat'l

Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998).  Once the plaintiff establishes these four

factors, the familiar McDonnell Douglas burden-shifting rules apply.  See Raytheon Co. v.

Hernandez, 540 U.S. 44, 50 (2003); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768-69 (2d

Cir. 1998); see discussion Part B 1, supra.

> **1.    Plaintiff cannot establish a prima facie case of retaliation because there is no causal connection between her protected activity and her termination.**

Even if Plaintiff could establish the first three elements of a prima facie case, her

claims fail because she cannot show a causal connection between her termination, or any other

alleged employment decision, and her CHRO charge in 2001.  "A causal connection may be

established either indirectly by showing that the protected activity was followed closely by

discriminatory treatment, or through other evidence such as disparate treatment of fellow

employees who engaged in similar conduct, or directly through evidence of retaliatory animus

directed against a plaintiff by the defendant."  Johnson v. Palma, 931 F.2d 203, 207 (2d Cir.

1991); see also Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990).  "'[A]

substantial time lapse between an employee's protected activity and the adverse employment

action is counter-evidence of any causal connection between the two for purposes of a retaliatory

action.'"  Jute v. Hamilton Sundstrand Corp., 321 F. Supp. 2d 408, 418 (D. Conn. 2004) (quoting

Reed v. Conn. Dep't of Transp., 161 F. Supp. 2d 73, 83 (D. Conn. 2001)); see Hollander v. Am.

Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990) (passage of three months too long to suggest a

causal relationship); Johnson v. Univ. of Wisconsin-Eau Claire, 70 F.3d 469, 480 (7th Cir. 1995)

(concluding that twenty-month gap between the protected activity and adverse employment

decision discounted evidence of causal connection); Bayard v. Riccitelli, 952 F. Supp. 977, 987

(E.D.N.Y. 1997) (one-year gap between employee's complaints and adverse employment action

was too long to establish a causal connection between those complaints and her termination).  A court should examine whether "the employment decisions followed close in time to the protected activity, [whether the employee] was treated differently after the complaint, or [whether] other similarly situated employees were treated more favorably after the . . . the protected activity." Parmlee v. Conn. Dep't of Revenue Servs., 160 F. Supp. 2d 294, 304-05 (D. Conn. 2001), aff'd mem., No. 01-9197, 2002, U.S. App. LEXIS 13312 (2d Cir. May 13, 2002); see also Barlow v. Connecticut, 319 F. Supp. 2d 250 (D. Conn. 2004) (plaintiff not terminated until two years after filing CHRO complaint).  Finally, when there is no other evidence that suggests retaliation connected to the protected activity, cases "uniformly hold that the temporal proximity must be 'very close.'"  (emphasis added.) Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001), and cases cited therein (action taken 20 months later suggested "no causality at all"); see, e.g., Kodengada v. IBM, No. 00-7434, 2000 U.S. App. LEXIS 31322 (2d Cir. Dec. 4, 2000) (a five-month interval is too long to support a causation argument without other probative evidence).

Here, Plaintiff has not shown any causal connection between her charge to the CHRO and her termination, or any other alleged adverse employment action.  She filed her claim with the CHRO in August 2001, and she was terminated in March 2003.  (Facts, ¶¶ 78, 127.)  Thus, approximately 1½ years elapsed between her allegation of gender discrimination and her termination.  Plaintiff has presented no evidence that establishes a causal connection between her charge to the CHRO and her eventual termination for failing to implement the WWJSSS.  Moreover, Plaintiff admitted that she expected to be disciplined at her March 21, 2003 meeting with Otis President of NAA, Ray Moncini.  She testified that she "suspected that [she] was going to be disciplined for [the McQuillan fatality]."  (Facts, ¶ 128.)  This demonstrates Plaintiff's own

awareness that the actions taken by Otis, i.e., terminating Plaintiff as opposed to merely disciplining her, were not related to her CHRO charge, but were related to her failure as head of EH&S for NAA.  Plaintiff cannot now question Otis' "subjective business judgment" to terminate rather than discipline her.  See Pisana v. Merrill Lynch & Co., No. 93 Civ. 4541 (LMM), 1995 U.S. Dist. LEXIS 10296, at *11-13 (S.D.N.Y. July 20, 1995) (employers are free to terminate employees for subjective business reasons, and employers need not prove the wisdom of those actions).

By the same token, Plaintiff cannot show a causal connection for her claims that she failed to receive stock options or a performance bonus in 2002 and 2003.  With respect to the stock options, Plaintiff claims that she previously received stock options in the years up to and including 2001, but not for 2002 or 2003.  (Third Amended Complaint ¶¶ 38-40.)   The decision not to award stock options for 2002, however, occurred many months after Plaintiff filed her charge to the CHRO (and Moncini had received criticisms of NAA's safety area), and there was not even a non-executive plan in place permitting Plaintiff to receive stock options for 2003. (Facts, ¶¶ 82-84).  Moreover, the stock option program explicitly provided that past awards do not guarantee awards in the future.  (Facts, ¶ 83.)  With respect to Plaintiff's claim that Otis retaliated against her by not giving her a merit increase, Otis deferred all merit increases for 2002, effective January 1, 2002.  (Facts, ¶ 79; Ex. 49.)  Thus, Plaintiff cannot possibly show that her failure to receive stock options or a merit increase was remotely connected to her charge to the CHRO.

**2.    Defendants have proffered a nondiscriminatory reason that Plaintiff cannot prove was false.**

As discussed in detail in Defendants' Statement of Facts, Defendants terminated Plaintiff for her failure to implement the WWJSSS.  President of NAA, Ray Moncini, viewed

Plaintiff's failures as a "dereliction" of her duties to deploy safety policies across her areas of supervision. (Facts, ¶ 129.) Indeed, Mr. Moncini had been instructed by Otis President Ari Bousbib to take immediate actions to improve NSAA leadership. (Facts, ¶ 125.) These reasons, and others, were outlined to Plaintiff at her termination meeting, and in her Performance Feedback. (Facts, ¶¶ 127, 129.) Plaintiff has not, and cannot, prove that Otis' proffered reason for her termination was untrue, as required under the McDonnell Douglas framework. See Reeves, 530 U.S. at 143 (2000). In any event, even if she could establish pretext, for the reasons discussed above, Plaintiff cannot satisfy her ultimate burden of demonstrating that her termination was in retaliation for her engaging in protected activity.

### D.    Defendants are Entitled to Summary Judgment Because They Have Not Violated the Equal Pay Act (Count Five)

Plaintiff claims that she was paid less than Russell and Dowson because she was a woman, in violation of the Equal Pay Act. (Third Amended Complaint Count Five ¶ 58.) This contention fails because any pay discrepancies were based not on Plaintiff's gender, but on Otis' corporate position change, whereby more experienced individuals with more skills and experience in safety, who were already executives, retained their executive-level salaries. There is no dispute that Russell had superior experience and education than did Plaintiff, and there is no dispute that he was an executive (L3) earning a higher salary before he ever was moved to EH&S for NAA. Plaintiff's claim with respect to Dowson fails simply because the two did not hold the same position. Following Plaintiff's termination, Dowson continued to serve as Director of EH&S of Otis World Headquarters, and also assumed the EH&S safety functions previously occupied by Plaintiff.

As an initial matter, it is important properly to contextualize Plaintiff's salary discrepancy with Russell.[41] This was not an instance in which Plaintiff and Russell were production workers performing identical tasks along side one another; rather, both were high-level employees—Nichani a senior manager and Russell a director/executive—and their positions were changed due to corporate transfers. Because of Russell's extensive safety background and experience, he was moved to Director of EH&S for NAA as an executive, with the expectation of executive-level performance, in line with Otis' corporate goals. Only a few days after the change, however, Russell unexpectedly decided to leave Otis entirely. Needing to fill this vacancy, Otis asked Plaintiff to move back into her old position, assuming the same level of responsibility she had before. With that backdrop in mind, Defendants turn to Plaintiff's claim that Otis was paying her less than Russell simply because of her gender.

To prove a violation of the Equal Pay Act; 29 U.S.C. § 206(d), a plaintiff must first establish a prima facie case of discrimination by showing: (1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions. Tomka v. Seiler, 66 F.3d 1295, 1310 (2d Cir. 1995). Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to show that the wage disparity is justified by either: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any factor other than sex."[42] 29 U.S.C.

---

[41] The claim with respect to Mr. Dowson requires less explanation, and is discussed below.

[42] The last enumerated justification, "any factor other than sex," provides for a "broad general exception" because Congress realized the difficulty of listing every legitimate business reason justifying a wage disparity. Christiana v. Metro. Life Ins. Co., 839 F. Supp. 248, 254 (S.D.N.Y. 1993). In this connection, courts should be hesitant to question the legitimate business decisions of the employer, as well as the employer's job classification system. (Id.)

§ 206(d)(1).  Once the employer shows that the wage disparity is justified, the plaintiff must

demonstrate that the reasons advanced are actually a pretext for sex discrimination.

Ryduchowski v. Port Auth., 203 F.3d 135, 142 (2d Cir. 2000).

> **1.    Plaintiff cannot show that the positions required "equal skill, effort, and responsibility."**

Plaintiff has the burden of showing that she performed substantially equal work as did

Russell and Dowson, in a position requiring equal skill and responsibility.  Although positions

need not be "identical," it is insufficient to show that jobs are "merely comparable."  Tomka v.

Seiler, 66 F.3d at 1310.  Whether two jobs entail equal skill, effort, or responsibility requires

practical judgment, and includes considerations such as experience, training, education and

ability.  29 C.F.R. § 1620.15; see Buettner v. E. Arch Coal Sales Co., 216 F.3d 707, 719 (8th Cir.

2000) (plaintiff, who acknowledged that she had less experience than her male counterpart,

unable to make out a prima facie case because of differing responsibilities, seniority, and

background).  Moreover, courts should not look solely at job title, but at the work actually to be

performed.  29 C.F.R. § 1620.13(e); see Conigliaro v. Horace Mann Sch., No. 95 Civ. 3555,

2000 U.S. Dist. LEXIS 556, at *14-15 (S.D.N.Y. Jan. 18, 2000) ("In assessing the substantial

equality of two positions, one must not focus rigidly on titles or job description; it is the content

of the job that controls."); Sobol v. Kidder, Peabody & Co., Inc., 49 F. Supp. 2d 208, 219

(S.D.N.Y. 1999) ("Merely because jobs carried the same title does not mean that they required

the same skill.")  Finally, in the context of the supervisory positions, "no judge or jury should be

allowed to second guess the complex remuneration decisions of businesses that necessarily

involve a unique assessment of experience, training, ability, education, interpersonal skills,

market forces, performance, tenure, etc."  Georgen-Saad v. Tex. Mut. Ins. Co., 195 F. Supp. 2d

853 (W.D. Tex. 2002) (granting summary judgment because various responsibilities of senior vice presidents).[43]

      First, with respect to Dowson taking over the Plaintiff's responsibilities after her termination on March 21, 2003, it is undisputed that he assumed Plaintiff's former responsibilities on an interim basis, <u>and</u> still maintained his existing job as Director of EH&S for Otis World Headquarters.  (Facts, ¶ 133.)  It is also undisputed that Dowson already was an L3 executive before Plaintiff was terminated.  (Facts, ¶ 13.)  Thus, following Plaintiff's termination, Dowson was performing two jobs essentially:  Director of EH&S for Otis world wide and heading EH&S for NAA, the former already commanding a greater salary.  It cannot reasonably be maintained, therefore, that Plaintiff and Dowson were performing equal work requiring equal responsibility.  Accordingly, Plaintiff cannot make out a prima facie case under the EPA with respect to Dowson.

      Plaintiff similarly cannot show that she was performing (or would have been performing) equal work to Russell, who oversaw EH&S for NAA for less than a week.  Russell was moved to EH&S for NAA from his position as Director of EH&S of Otis World Headquarters.  (Facts, ¶ 36.)  As such, Russell took with him over 20 years of safety experience

---

[43] The court in <u>Georgen-Saad</u> also noted:

> These are Senior Vice Presidents in charge of different aspects of Defendant's operations; these are not assembly-line workers or customer-service representatives.  In the case of such lower-level workers, the goals of the Equal Pay Act can be accomplished due to the fact that these types of workers perform commodity-like work and, therefore, should be paid commodity-like salaries.  However, the practical realities of hiring and compensating high-level executives deal a fatal blow to Equal Pay Act claims. . . .  Requiring Defendant and other companies to either pay senior executives the same amount or to come to court to justify their failure to do so is simply beyond the pale.

<u>Georgen-Saad</u>, 195 F. Supp. at 857 (W.D. Tex. 2002).

and acquired knowledge.[44]  (Facts, ¶ 37.)  Russell also took with him his executive-level (L3)

labor grade, which he had held for the previous ten years.  (Id.)  Because of Russell's safety

expertise and executive level, he was expected to deliver "executive level performance" to the

newly reclassified position.[45]  See Footnote 10. (Moncini Tr. at 237, Ex. 38.)  Moreover, it was

anticipated that with his superior skills and safety experience, Russell would be doing the job in

a better or different way than Plaintiff.  (Page Tr. at 85-86, Ex. 40.)  Thus, more was expected in

terms or performance and responsibility from Russell, as Director of EH&S, than was expected

from Plaintiff as Senior Manager.  Accordingly, Plaintiff cannot establish that she was

performing equal work requiring equal responsibility as Russell, or that she had skills equal to

Russell, and cannot make out a prima facie case under the EPA.  See Stopka v. Alliance of Am.

Insurers, 141 F.3d 681, 685-66 (7th Cir. 1998) (female vice president unable to establish that she

had the same responsibilities as other vice presidents).

> **2.    Plaintiff received less compensation because of a valid "factor other than sex."**

Even assuming Plaintiff can meet her burden of establishing that she was to perform

equal work requiring equal responsibilities as Russell or Dowson, any pay differential had

nothing to do with gender.  Russell and Dowson simply were paid more based on their

qualifications, and their executive levels prior to the transfers.

---

[44] Plaintiff acknowledged that she did not have the same experience as did Russell, in that he had 20 years of safety experience versus her two years.  (Nichani Tr. at 129-30, Ex. 39.)  See Buettner, 216 F.3d at 719 (8th Cir. 2000) (plaintiff, who acknowledged that she had less experience than her male counterpart, unable to make out a prima facie case because of differing responsibilities, seniority, and background).

[45] Russell's rec-pack also noted that Russell was particularly well suited "by virtue of his prior experience and education."  (Facts, ¶ 42.)  The rec-pack also described the extensive "duties and responsibilities" of the new position.  (Id.)

Nothing prevents an employer from paying different amounts to different individuals based on subjective criteria, so long as those criteria are not gender-based. See Sabol, 49 F. Supp. 2d at 220, and cases cited therein ("An employer may pay higher wages to a male than a female when it is necessary to do so in order to hire or retain an employee with particular desired skills.") Further, "'superior experience, education, and ability may justify pay disparities if distinctions based on these criteria are not gender based.'" Stanley v. Univ. of S. Cal., 178 F.3d 1069, 1075 (9th Cir. 1999) (university demonstrated that basketball coach's prior experience entitled him to a higher salary, establishing a valid "factor other than sex'") (citations omitted); see Howard v. Cmty. Action Org., No. 01-CV-0784E(F), 2003 U.S. Dist. LEXIS 9998, at *10 (W.D.N.Y. May 30, 2003) (experience and seniority are valid factors other than sex). As discussed above, Russell had greater experience than Plaintiff, and was expected to perform at a higher level with greater responsibility. This establishes a valid "factor other than sex," and easily satisfies Defendants' burden under the EPA.

In addition, Defendants' use of the term "red-circling," i.e., retaining Russell's salary after the transfer, is also a valid factor other than sex.[46] Interpretive regulations of the Equal Pay Act specifically recognize the concept of "red-circle rates" as reasons for wage disparities unrelated to sex, for instance, the transferring of one employee to another position. See 29 C.F.R. § 1620.26; Christiana v. Metrop. Life Ins. Co., 839 F. Supp. 248, 254 (S.D.N.Y. 1993); see Timmer v. Mich. Dep't of Commerce, 104 F.3d 833, 844 (6th Cir. 1997) ("'The flexibility of the red circling concept has been preserved in anticipation of the need to reconcile legitimate business interests with the Act's purpose.'") (quoting Gosa v. Bryce Hosp., 780 F.2d 917, 919

---

[46] Defendants do not attach any specific meaning to the term "red-circling," other than the concept of transferring an employee from one position to another while keeping his or her salary in place.

(11th Cir. 1986)).  Along these same lines, a gender-neutral salary retention policy provides a valid justification for a wage disparity under the Equal Pay Act.  See Christiana, 839 F. Supp. at 255 (salary retention policy whereby transferred managers retained their salaries was lawful); see also Taylor v. White, 321 F.3d 710, 719 (8th Cir. 2003) (affirming summary judgment for the employer using a salary retention policy).  Irrespective of whether the term "red circle" or "salary retention policy" is used, the undisputed fact remains that Russell was transferred and his salary retained, which had nothing to do with gender.

As already discussed, any wage disparity stemmed from Russell's executive level and safety expertise prior to the transfer.  Further, the gender-neutral application of "red circling" is obvious in this case because Plaintiff herself was "red circled" when she took a Labor Grade 47 position and retained her Labor Grade 48 pay.  (Facts, ¶ 5.)  See Taylor, 321 F.3d at 716 (noting plaintiff herself benefited from salary retention policy); Christiana, 839 F. Supp. at 254 (noting that females were treated favorably under salary retention policy as well).  Moreover, when Plaintiff first took the position of Senior Manager EH&S, she was making more than her male predecessor, who at the time, was Dowson.  Therefore, Plaintiff's claim that salary differences were gender-based is untenable.

### 3.    Plaintiff cannot prove pretext.

Even if Plaintiff were able to make out a prima facie case, the burden now shifts back to her to demonstrate that the reasons advanced above are actually a pretext for sex discrimination.  Ryduchowski, 203 F.3d at 142.  For the reasons already discussed, Plaintiff cannot show that Otis' corporate transfers and salary retention were merely pretexts to discriminate against Plaintiff based on her gender.  Moreover, when Plaintiff became Senior Manager of EH&S in February 1999, she replaced Dowson, and was making more than he had been.  Thus, she cannot reasonably suggest that Otis was allowing gender to dictate its salaries.

Because Plaintiff has no evidence to suggest gender discrimination, and no reasonable jury could conclude otherwise, summary judgment is therefore appropriate.

     **E.**     **Plaintiff Cannot Prevail on Her Defamation Claim Because Defendants'**
                **Statements Were Not False, and/or Were Protected by a Qualified Privilege**
                **(Count Seven)**

     Plaintiff's defamation claim is tied to two internal documents:  (1) an Otis-wide announcement indicating that Russell would be replacing Plaintiff, as Director of EH&S; and (2) the Performance Feedback report presented to Plaintiff on the day of her termination.  (Third Amended Complaint Count Seven ¶ 58.)  Any statements in these documents cannot form the basis of a defamation claim because (1) none of the statements are false; and/or (2) the statements are protected by a qualified privilege and Plaintiff cannot demonstrate malice.[47]

     To establish a prima facie case of defamation, a plaintiff must demonstrate that the defendant published a defamatory statement identifying the plaintiff to a third person, and the plaintiff's reputation suffered injury as a result.  See Cweklinsky v. Mobil Chem. Co., 267 Conn. 210, 217, 837 A.2d 759 (2004) (stating elements of defamation claim).  In this connection, Plaintiff must prove that Defendants "published false statements that harmed the plaintiff, and that [Defendants were] not privileged to do so." Kelly v. City of Meriden, 120 F. Supp. 2d 191, 198 (D. Conn. 2000).  In addition, an alleged defamatory statement in question must convey an objective fact, as opposed to an opinion. Daley v. Aetna Life & Cas. Co., 249 Conn. 766, 795, 734 A.2d 112 (1999).  Finally, to be actionable, the alleged defamatory statements must be false. Cweklinsky, 267 Conn. at 228.

---

     [47] Because these are the only two specific references alleged in the complaint, Plaintiff's defamation claim is limited to those references.  See Mordhorst v. Skinner Valve, No. 3:99CV00561 (GLG), 2001 U.S. Dist. LEXIS 14397, at *7-8 (D. Conn. July 24, 2001) (plaintiff must sufficiently allege the facts surrounding each defamatory statement).

      1.     **The company-wide announcement was not false, and did not cause injury.**

Plaintiff alleges the April 30, 2001 company-wide announcement indicating that Russell would be replacing her and would have the title of Director of EH&S was defamatory. The announcement essentially indicated that Russell had been named Director of EH&S for NAA, and was succeeding Plaintiff, who would be "assuming a senior NAA line management position in the near future." The announcement also noted the "positive performance trend . . . seen under [Plaintiff]'s EH&S leadership," and thanked Plaintiff "for her capable leadership." (Facts, ¶ 53-55.)

Nothing in this announcement reasonably could be construed as defamatory. First, if anything, the announcement commends Plaintiff on her past performance; it does not, for instance, "injure reputation in the popular sense," "diminish . . . esteem, respect, goodwill or confidence," or "excite adverse, derogatory, or unpleasant feelings or opinions." Gore v. Colonial Penn Ins. Co., 335 F. Supp. 2d 296, 311 (D. Conn. 2004) (defining a defamatory statement); see also Cweklinsky v. Mobil Chem. Co., 267 Conn. at 217 (defamatory statement "tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him"). Second, the announcement was not false; rather, it accurately informed the company of just what was happening. Defendants also sent similar announcements on the same day regarding Danny Reese's arrival, and Pat Dowson's return from Europe to World Headquarters. (Facts, ¶ 56.) Although the truthfulness of an alleged defamatory statement ordinarily is a question of fact; see Cweklinsky v. Mobil Chem. Co., 267 Conn. at 228; no reasonable jury could conclude that this statement was false, or even derogatory. See Graff v. O'Connell, No. CV010095518S, 2003 Conn. Super. LEXIS 2686, at

*14-15 (Conn. Super., Sept. 29, 2003) (granting summary judgment because alleged statement was not false).

### 2.    The performance feedback report was a privileged managerial evaluation, and Plaintiff cannot demonstrate malice.

Plaintiff's claim that the March 2003 Performance Feedback was defamatory is without merit. As discussed above, the Performance Feedback was conducted by Moncini, with additional input from Lauterbach and Reese, and rated Plaintiff's performance in various categories. (NICH0816-20, Ex. 20.) As an initial matter, the statements made in the report are not actionable because they were the opinions and observations of Moncini, Lauterbach, and Reese, and did not contain anything "false."[48] See Grossman v. Computer Curriculum Corp., 131 F. Supp. 2d 299, 312 (D. Conn. 2000) ("While unprivileged, false statements of fact may constitute defamation, statements concerning work performance are merely expressions of opinion and, therefore, are not actionable as defamation."); Johnson v. Chesebrough-Pond's USA Co., 918 F. Supp. 543, 551-52 (D. Conn.) (internal company reviews not defamatory), aff'd mem., 104 F.3d 355 (2d Cir. 1996). Indeed, Plaintiff cannot show the statements were objectively false.

---

[48] It would serve no useful purpose to quote from the report, as the document speaks for itself. The threshold question of whether a statement is an expression of fact or mere opinion is a question of law for the court. Grossman v. Computer Curriculum Corp., 131 F. Supp. 2d 299, 312 (D. Conn. 2000) (opinion is a "personal comment about another's conduct, qualifications, or character that has some basis in fact") "Although this distinction [between fact and opinion] may be somewhat nebulous . . . the important point is whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact." Goodrich v. Waterbury Republican-American, Inc., 188 Conn. 107, 112, 448 A.2d 1317 (1982). No reasonable jury could conclude that the Performance Feedback report was not an expression of opinion. Any other conclusion would subject an employer to a defamation action any time it rates the performance of its employees.

In addition, even assuming the statements were "false," there is no reasonable dispute that the statements made in the Performance Feedback were protected by a qualified privilege. See Gaudio v. Griffin Health Servs. Corp., 249 Conn. 523, 544 n.23, 733 A.2d 197 (1999) (communications between managers regarding the review of an employee's job performance and the preparation of documents regarding an employee's termination are protected by a qualified privilege); Torosyan v. Boehringer Ingelheim Pharms., Inc., 234 Conn. 1, 27, 662 A.2d 89 (1995) (same). Once an occasion of privilege is found, it is presumed that the statements were made in good faith, and it is the plaintiff's burden to prove actual malice. Kelly v. City of Meriden, 120 F. Supp. 2d. at 198-99. This requires Plaintiff to "come forward with solid circumstantial evidence" that show Defendants either knew the statements were false or recklessly disregarded the falsity of the statements. Id. at 199. Plaintiff has presented no evidence whatsoever that the statements were made with actual malice; rather she testified that she merely disagreed with the statements. Absent such a showing, her claim fails.

### F.     Plaintiff Cannot Prevail on Her Claim for Common Law Wrongful Discharge (Count Eleven)

Plaintiff alleges that her termination "violates the important and substantial public policy requiring honesty and integrity in the workplace, and honest and factually accurate information in connection with . . . investigations that concern workplace safety . . . ." (Third Amended Complaint, Count Eleven ¶ 58.) Plaintiff's claim of common law wrongful discharge fails for a few reasons. First, Plaintiff had other statutory remedies available in this case, and therefore she cannot pursue a common law claim. Second, Plaintiff's termination does not

violate a recognized public policy. And third, Plaintiff cannot establish that Defendants terminated her <u>because</u> of the alleged violation of public policy[49].

Although employment relationships ordinarily are at will, and may terminated by either party for any reason; <u>Thibodeau v. Design Group One Architects, LLC</u>, 260 Conn. 691, 697, 802 A.2d 731 (2002); Connecticut recognizes a "narrow exception" to this rule when the termination violates public policy. <u>Morris v. Hartford Courant Co.</u>, 200 Conn. 676, 679, 513 A.2d 66 (1986); <u>see</u> <u>Parsons v. United Techs. Corp.</u>, 243 Conn. 66, 79, 700 A.2d 655 (1997) ("the public policy exception to the general rule allowing unfettered termination of an at-will employment relationship is a narrow one . . . [and] that courts should not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation"). To take advantage to this exception, however, Plaintiff must demonstrate that she is "otherwise without a remedy." <u>Burnham v. Karl & Gelb, P.C.</u>, 252 Conn. 153, 161, 745 A.2d 178 (2000) (holding that a remedy available under other statutes precludes a claim for wrongful discharge); <u>Atkins v. Bridgeport Hydraulic Co.</u>, 5 Conn. App. 643, 648, 501 A.2d 1223 (1985) (same); <u>see also</u>

---

[49] Plaintiff also cannot prove the "publication" requirement of a defamation claim with respect to the Performance Feedback. The document was created online, with Moncini, Lauterbach, and Reese each providing their comments independently, while not seeing each other's remarks. (Lauterbach Tr. at 172-76, Ex. 36.) Thus, the only people besides Plaintiff that ever saw the document were Moncini and Ellen McGroary, the NAA Vice President of Human Resources, who were both present during the meeting to terminate Plaintiff's employment, and were there under their duties of employment. Notwithstanding the doctrine of "intracorporate communications," whereby the publication requirement may be satisfied if the statement was communicated among supervisors and becomes part of the employee's personnel file; <u>see</u> <u>Gaudio</u>, 249 Conn. 523, 544 n.23 (1999); the statements in the Performance Feedback do not satisfy the publication requirement. Moreover, the cases that have found publication under that doctrine have involved communications between more than merely the individuals participating in the termination. Finding a publication under these facts would subject any employer to a defamation claim when a performance evaluation is used during the termination process. The Performance Feedback in this case was exactly the type of communication that the Connecticut Supreme Court recently <u>encouraged</u> in <u>Cweklinsky</u>, 267 Conn. at 219 (encouraging feedback so

Felekey v. AT&T, No. 3:02-CV-691 (CFD), 2004 U.S. Dist. LEXIS 25443, at *9-11 (D. Conn.

Nov. 3, 2004), and cases cited therein (discussing applicability of doctrine, and that claim is

precluded even if a plaintiff did not take advantage of the statutory remedy).  Thus, Plaintiff,

whose allegations for this count are taken verbatim from her claim under Conn. Gen. Stat § 31-

51q (Count Twelve), cannot sustain a claim under both legal theories, and the claim cannot stand

for that reason.[50]  See Lowe v. Amerigas, Inc., 52 F. Supp. 2d 349, 358 (D. Conn. 1999)

(rejecting wrongful discharge claim because Plaintiff also alleged violation of § 31-51q).

　　　　　Plaintiff's claim also fails because she has not alleged a recognized public policy, i.e.,

an "explicit statutory or constitutional provision" or a "judicially conceived notion of public

policy."  Thibodeau, 260 Conn. at 698-99 (rejecting claim that small employer terminating an

employee because of her pregnancy violated public policy because the conduct was not

prohibited by statute); see Iosa v. Gentiva Health Servs., 299 F. Supp. 2d 29, 36 (D. Conn. 2004),

and cases cited therein (right of employee to complain about improper expense reimbursements

not a recognized public policy); Daley, 249 Conn. 766, 804, 734 A.2d 112 (1999) (plaintiff could

not prevail on claim that public policy required employers to provide flexible work schedules for

working parents because no statute mandates such accommodation); Morris, 200 Conn. at 680

(falsely accusing an employee of criminal conduct is not a recognized public policy); Emerick v.

Kuhn, 52 Conn. App. 724, 731, 737 A.2d 456 (1999) (discussing narrowness of exception).

Here, it appears Plaintiff is claiming that, because Otis manufacturers elevators, there is a public

---

as not to chill workplace communication), and that reasoning should trump whatever concerns
supported the publication element in Gaudio.

　　　[50] Moreover, Plaintiff cannot recover under common law wrongful discharge because she
also is claiming she had a contract of employment with Defendant; in other words, that she was
not an employee at will.  (Third Amended Complaint, Count Thirteen.)  "[T]he right to recover
in tort for wrongful discharge extends only to employees at will."  D'Ulisse-Cupo v. Bd. of Dirs.
of Notre Dame High Sch., 202 Conn. 206, 212 n.1, 520 A.2d 217 (1987).

policy requiring honesty and integrity in the workplace, which is derived from state and federal regulations.  (Third Amended Complaint, Count Eleven ¶ 58.)  Whatever attenuated connection this may have to state and federal statutes, it certainly does not recite an "explicit statutory or constitutional provision" or a "judicially conceived notion of public policy."[51]

Finally, Plaintiff cannot establish that Defendants terminated her <u>because</u> of the alleged public policy violation, whatever it may be.[52]  As discussed above, Plaintiff was terminated for, among other things, her failure to implement the Otis worldwide safety rules as head of safety for Otis NAA, which failure came to light after the McQuillan fatality.  (Facts, ¶ 129.)  Plaintiff alleges, however, that she was terminated because she refused to mischaracterize her investigative report of McQuillan's death, which violates the important public policy of honest and accurate information in the workplace.  (Third Amended Complaint, Count Eleven.)  Even assuming that her allegations come within the <u>Sheets</u> public-policy exception, Plaintiff's own admissions directly contradict this claim.  Plaintiff testified that, at Defendants' request, she made "minor changes" to the draft investigative report.  (Facts ¶¶, 138-39.)  She also testified that none of these suggested changes were "false," and that the final report was accurate and

---

[51] To the extent that Plaintiff's public policy is grounded on the Occupational Safety Standards Act ("OSHA"), her claim is precluded because she could have pursued a remedy under OSHA.  <u>See</u> <u>Burnham</u>, 252 Conn. at 161, 745 A.2d 178 (2000) (common law claim precluded because Plaintiff could have proceeded under OSHA, or its state counterpart).

[52] In addition, the employee must prove that the employer <u>intentionally</u> violated the claimed public policy.  In other words, it is not enough to establish that the employer mistakenly accused an employee of wrongdoing, and terminated the employee as a result; instead, the employee must show that the termination <u>itself</u> was for an improper reason, and that reason was against public policy.  <u>See</u> <u>Battista v. United Illuminating Co.</u>, 10 Conn. App. 486, 496, 523 A.2d 1356 (1987) (citing and discussing <u>Morris</u>); <u>see also</u> <u>Sheets v. Teddy's Frosted Foods, Inc.</u>, 179 Conn. 471, 477, 427 A.2d 385 (1980) ("plaintiff must prove a demonstrably <u>improper</u> reason for a dismissal, a reason derived from some important violation of public policy").

truthful  (Id.)  Thus, it cannot reasonably be maintained that Plaintiff was forced to mischaracterize anything, because no such requests were made.[53]

**G.    Plaintiff's Claim Under Conn. Gen. Stat. § 31-51q Fails Because She Did Not Engage in Protected Speech (Count Twelve)**

Plaintiff's claim in Count Twelve, taken almost verbatim from Count Eleven, alleges that Defendants violated her First Amendment rights by demanding that she mischaracterize the internal investigative report and present false information.  (Third Amended Complaint Count Twelve.)  This claim fails because: (1) Plaintiff's speech, if any, was not a matter of public concern and was thus not protected by the First Amendment; and (2) as discussed above, she cannot establish that Otis either forced her to mischaracterize anything, or that Defendants terminated her <u>as a result</u>.

Conn. Gen. Stat. §31-51q provides, in pertinent part, that "[a]ny employer . . . who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the constitution of the state . . . shall be liable to such employee for damages caused by such discipline or discharge."  To assert a valid claim under section 31-51q, Plaintiff must show that: (1) she engaged in protected speech; (2) she was terminated because of that speech; and (3) that such speech did not substantially or materially interfere with her job performance or working relationship with her employer.  <u>Lowe v. Amerigas, Inc.</u>, No. 99-7813,

---

[53] To the extent that Plaintiff claims that she disagreed with the final revisions, and that such revisions violated some important public policy, that claim fails as well.  Plaintiff testified that one of her conclusions was not included in the final report, namely, that the fist grips had failed.  (Nichani Tr. at 252, Ex. 39.)  She also stated, however, that she did not have a problem with that change, because there was testing still being conducted on that issue.  (<u>Id.</u>)  Thus, Plaintiff's claim that Defendants mischaracterized her ideas, even assuming <u>that</u> is actionable, is contrary to her own admissions.

2000 U.S. App. LEXIS 3801 (2d Cir. Mar. 10, 2000); Conn. Gen. Stat. § 31-51q.  A precursor to

liability, therefore, requires Plaintiff to show that she was exercising rights protected by the First

Amendment.  Plaintiff cannot make such a showing here.

Section 31-51q does not apply to all arguably expressive activity in the workplace;

rather, it "applies <u>only</u> to expressions regarding public concerns <u>that are motivated by an</u>

<u>employee's desire to speak out as a citizen.</u>"  (Emphasis added.) <u>Cotto v. United Techs. Corp.,</u>

<u>Sikorsky Aircraft Div.</u>, 251 Conn. 1, 17, 738 A.2d 623 (1999).  In this connection, "[w]hether an

employee's speech addresses a matter of public concern must be determined by the content,

form, and context of the speech, as revealed by the whole record." <u>Connick v. Myers</u>, 461 U.S.

138, 146 (1983); <u>DiMartino v. Richens</u>, 263 Conn. 639, 667, 822 A.2d 205 (2003); <u>see</u>

<u>Bakelman v. Paramount Cards, Inc.</u>, No. CV 93-0457940S, 1994 WL 324363, at *3 (Conn.

Super. Ct. June 1, 1994) (issue "is not simply whether the subject matter of the employee's

complaints touches on a matter of public concern generally; the issue is whether acting as he did,

an employee was acting as a citizen attempting to speak out on a public issue, or whether the

employee was instead attempting to resolve a private dilemma relating to employment"); <u>Jewett</u>

<u>v. Gen. Dynamics Corp.</u>, No. 530943, 1997 WL 255093, at *3 (Conn. Super. Ct. May 7, 1997).

To appreciate the inaptness of characterizing this as a free-speech claim, one must see

the claim for what it really is: Plaintiff is upset because all of her ideas and opinions were not

incorporated into the final internal investigative report concerning McQuillan's death.  It defies

common sense to suggest that an employer, who is preparing a collaborative internal report, must

include the ideas of each and every employee involved in the investigation and drafting process.

Put simply, this does not amount to a violation of Plaintiff's freedom of expression under the

First Amendment.

Further, although Plaintiff likely will characterize her claim as touching on a matter of public concern, i.e., public safety, she never expressed any views on public safety "motivated by her desire to speak out as a citizen." Cotto, 251 Conn. at 17; see Volberg v. Pataki, 917 F. Supp. 909, 916 (N.D.N.Y.) (not enough that the subject matter "relates" to a matter of public concern; rather, the reason for the communication must be analyzed), aff'd mem., 112 F.3d 507 (2d Cir. 1996). In addition, speech that simply addresses issues between the employee and employer is not protected under § 31-51q. See Barlow v. Connecticut, 319 F. Supp. 2d 250 (D. Conn. 2004) (employee's complaints about improper gift of state-owned furniture not a matter of public concern); Emerick v. Kuhn, 52 Conn. App. at 744 (speech about perceived management wrongdoing was an issue between employee and employer, and not a matter of public concern); Jewett v. Gen. Dynamics Corp., No. 530943, 1997 Conn. Super. LEXIS 1264, at *8 (Conn. Super. Ct. New London May 1, 1997) (internal complaints about workplace safety not aimed at public at large, and not matter of public concern).

Plaintiff's claim simply is that Defendants revised her draft report, which was prepared for internal purposes only. This does not constitute an expression under the First Amendment, let alone communication that is a matter of public concern. First, Plaintiff testified that she disagreed with some of the revisions in the report, which was a collaborative effort between her and four other individuals, but that she did not state her disagreements with the revisions.[54] (Facts, ¶¶ 137-44.) Plaintiff also stated that she had prepared similar investigative reports in the past as part of her job. (Nichani Tr. at 251, Ex. 39.) Finally, Plaintiff testified that

---

[54] In this connection, Plaintiff states that she did not have an opportunity to complain about the changes in the report because she was terminated shortly thereafter. (Facts, ¶ 144.) It defies common sense that Plaintiff, who never had the "opportunity" to voice her concerns, could claim that her First Amendment rights were violated. It is equally untenable to suggest that

she prepared the report not knowing whether it would ever be shown to anyone outside the company, for instance, to OSHA. (Nichani Tr. 254-55, Ex. 39.) This demonstrates that whatever statements she made in the report were not intended to be communicated to the general public, i.e., communications expressed as a concerned citizen; rather, she simply was performing her job, i.e., preparing an internal report as part of an internal investigation. <u>Volberg v. Pataki</u>, 917 F. Supp. at 916 ("the First Amendment does not, under ordinary circumstances, protect an at-will high-level policy-making employee from being fired because of job-related opinions and ideas [she] expresses as part of [her] employment").

Even assuming Plaintiff engaged in protected First Amendment activity, she has failed to produce evidence that demonstrates a causal connection between her alleged speech and her termination. As noted above, Plaintiff made some changes to her draft of the report surrounding the McQuillan fatality at the request of her superiors. (Facts ¶ 138.) When asked if any of the suggested changes she made were false, however, she answered "not that I recall." (Facts, ¶ 139.) Plaintiff went on to testify that after she submitted her final report, the company's outside lawyers made additional changes to it. (Facts, ¶ 140.) Although Plaintiff disagreed with some changes that were made in the report, <u>she did not tell anyone that those changes should not have been made</u>. (Facts, ¶ 144.) Plaintiff also did not e-mail or otherwise communicate to Attorney McNamara, who was in charge of investigation, that she disagreed with the changes that he made to the report. (Nichani Tr. at 253, Ex. 39.) Plaintiff also indicated that she was terminated <u>before she had the opportunity to voice any concerns</u> over the changes made to the report. (Facts, ¶ 144.) It cannot reasonably be maintained, therefore, that Defendants terminated

Plaintiff could maintain an action under § 31-51q because her termination precluded her from speaking to her employer, <u>in violation of</u> the First Amendment.

Plaintiff for speaking out against the changes in the investigative report; indeed, she admitted that she did not do so.

### H.     Plaintiff's Breach of Contract Claim Fails Because She Was an at-will Employee (Count Thirteen)

Plaintiff claims that Defendants' "Progressive Discipline Policy" and "Code of Ethics" constituted contracts whereby she could not be terminated without just cause. This claim has no merit. Defendants did not have such a progressive discipline policy, and even if they had, it did not amount an employment contract. Similarly, there is no evidence that Otis intended the Code of Ethics to be a contract, or that is has any application to the facts of this case. In addition, Plaintiff recognized her employment-at-will status, and was given documents confirming that status throughout her employment. Finally, even if a contract existed, Defendants certainly had just cause to terminate Plaintiff.

Under Connecticut law, absent an employment contract for a specified term, an individual's employment is terminable at the will of his employer. Thibodeau, 260 Conn. at 697. To establish the existence of an employment contract, and defeat summary judgment, Plaintiff must prove that Defendants had agreed, either by words or action or conduct, to undertake an actual commitment under which Plaintiff could not be terminated without just cause. Torosyan, 234 Conn. at 15; see Kent v. AVCO Corp., 849 F. Supp. 833, 835 (D. Conn. 1994) (employment contract depends on the existence of an actual agreement between the parties, and requires an obligation created by law that imposes a duty to perform). Further, "to support contractual liability, representations must be sufficiently definite to manifest a present intention to undertake an immediate contractual obligation to the plaintiff." (Emphasis added.) Lowe, 52 F. Supp. at 356-57 (D. Conn. 1999), aff'd mem., 208 F.3d 203 (2d Cir. 2000).

With respect to a progressive discipline policy, Plaintiff cannot prove such a "policy" existed, let alone that it would have been intended to bind Otis in any way.[55]  First, Moncini testified that there was no formal progressive discipline policy for supervisors such as Plaintiff.  (Facts ¶ 56.)  Second, Page was aware of a "general practice" whereby supervisors were expected to counsel their employees, and if there was not improvement, the employees were dealt with accordingly.  (Facts ¶ 157.)  Page also indicated, however, that he was aware of other employees who had been terminated without prior written performance reviews.  (Facts, ¶ 158.)  Plaintiff, who was an at will employee, testified that she knew of other employees who had been terminated without first receiving discipline, e.g., for violating an ethics policy.  (Facts, ¶¶ 2, 159.)  In short, Defendants and Plaintiff did not have an <u>actual agreement</u> whereby Plaintiff could not be terminated without progressive discipline, despite Plaintiff's <u>belief</u> to the contrary, however unreasonable.  <u>See</u> <u>Reynolds v. Chrysler First Commercial Corp.</u>, 40 Conn. App. 725, 730, 673 A.2d 573 (1996) ("The mere fact that the plaintiff believed . . . [progressive discipline] guidelines to constitute a contract does not bind [the defendant] without some evidence that it intended to be bound to such a contract.") <u>see also</u> <u>Davis v. Liberty Mut. Ins. Co.</u>, 218 F. Supp. 2d 256, 263 (D. Conn., 2001) (no evidence to suggest employer meant to be bound by progressive discipline policy); <u>Schermerhorn v. Mobil Chem. Co.</u>, No. 3:99CV941 (GLG), 2001 U.S. Dist. LEXIS 519 (D. Conn. 2001) (customary practice of progressive discipline not enough to sustain a breach of contract claim); <u>Lawrence v. Aetna Life & Cas. Co.</u>, No. 2-90-CV-659

---

[55] As an initial matter, it is counterintuitive to suggest that a high-level supervisory employee would require "progressive discipline," without regard to the seriousness of the alleged misconduct or failure.  Similarly, Plaintiff has not even pleaded the essential terms of the "policy," for instance, what circumstances require what type of discipline.  Simply put, Plaintiff cannot prove Defendant's breached a contract without alleging the essential terms obligating the parties.

(WWE), 1998 U.S. Dist. LEXIS 15979 (D. Conn. June 4, 1998) (although progressive discipline policy was in handbook, it is was too vague to form a contract of employment).

With respect to the Code of Ethics, Plaintiff similarly has no evidence that it constituted an enforceable agreement, or that it has any application to this case. Plaintiff quotes selected provisions from the Code of Ethics in ¶ 52 of her Third Amended Complaint. The only provisions that arguably might apply to this case are the provisions prohibiting retribution for expressing concerns over business practices or reporting violations to supervisors. (Third Amended Complaint, ¶ 52.) Plaintiff has not alleged, however, that she expressed concerns about business practices, or reported violations of company policy; rather, she only alleges that Defendants forced her to mischaracterize her report—but she later testified in her deposition that such was not the case. (Facts, ¶ 138-139.) In addition, Plaintiff testified that she did not tell anyone that the changes to the report should have been made. (Facts, ¶ 144.) Thus, she cannot maintain that the Code of Ethics even applied to this case, or that Defendants breached it.

Likewise, a "contractual promise cannot be created by plucking phrases out of context; there must be a meeting of the minds between the parties." Foster v. Mass. Mut. Life Ins. Co., No. 3:02CV1433 (PCD), 2004 U.S. Dist. LEXIS 7759 (D. Conn., Apr. 14, 2004); Reynolds, 40 Conn. App. at 730. There is nothing in the Code of Ethics that expresses an intent to alter Plaintiffs' at-will employment status, nor an intention to undertake a contractual commitment in this context.

Further belying Plaintiff's breach of contract claim were the disclaimers that she received confirming her at will employment status. It is well settled that employers are free to protect themselves "by eschewing language that could reasonably be construed as a basis for a contractual promise or by including appropriate disclaimers of the intention to contract." Foster

v. Mass. Mut. Life Ins. Co., 2004 U.S. Dist. LEXIS 7759, at *9; see Gaudio, 249 Conn. at 535.

Plaintiff's job description indicated that she was an employee at will. (Facts, ¶ 27) Moreover,

she admitted that she understood, "in general terms," that her employment could be terminated

for any reason. (Facts, ¶ 2.) In addition, Plaintiff's Recognition Stock Option Plan, under which

Plaintiff could receive periodic stock options, contained an at-will disclaimer, which reserved the

right discharge Plaintiff "at any time for any reason." (Facts, ¶ 27.) These disclaimers plainly

refute any intention to disrupt the at-will employment relationship. See Lowe, 52 F. Supp. 2d at

356-57 (existence of disclaimers and lack contractual commitment by defendant precluded

contract recovery); see also Foster, 2004 U.S. Dist. LEXIS 7759, at *9-10, and cases cited

therein ("Connecticut courts, state and federal, have consistently granted summary judgment in

cases where the personnel manual at issue in a breach of contract claim contains an express

disclaimer.").

Finally, even if the Plaintiff could prove the existence of a contract, express or

implied, she still would have to prove that the defendant breached that contract. In other words,

even if she could establish that a contract superceded the ordinary at will employment

relationship, Plaintiff still must prove that she was fired without just cause; otherwise, nothing

prevented Defendants from terminating her. See Gaudio, 249 Conn. at 537-39 (where jury found

employer promised not to terminate unless there were "repeated violations" or "serious

misconduct," defendant still may terminate employee for just cause). Just cause simply means

that employers cannot "act arbitrarily or capriciously," and "must do nothing more rigorous than

proffer a proper reason for dismissal." (Internal quotation marks omitted.) Id. at 539. Further,

just cause does not require that the employee in fact engaged in the alleged conduct; rather, the

inquiry is whether the employer reasonably believed in the reason for termination. Id. at 542.

Here, Defendants terminated Plaintiff because of her critical failure, as head of EH&S for NAA, to implement the World wide safety rules. The reasons for Plaintiffs termination were outlined in detail in her Performance Feedback report (Ex. 20), which was presented to her on the day of her termination. Plaintiff also admits that she expected to receive a warning at her termination meeting, or other discipline, instead of being terminated. (Facts, ¶ 128.) This demonstrates Plaintiff's awareness that she had done something wrong, or the defendant's <u>reasonable belief</u> that she had done something wrong, which certainly establishes that Defendants' had a "proper reason for [her] dismissal." <u>Gaudio v. Griffin Health Servs. Corp.</u>, 249 Conn. at 542.

## I.    Plaintiff's Negligent Misrepresentation Claim Fails Because Defendants Never Provided False Information (Count Fourteen)

Plaintiff's negligent misrepresentation claim is based on the same "promises" alleged in her breach of contract claim, Count Thirteen. Plaintiff also alleges that Defendants recklessly made representations in the "Progressive Discipline Policy" and Code of Ethics, and that Plaintiff relied on those statements. Finally, Plaintiff alleges that she was led to believe that complying with the Code of Ethics could not result in her termination. (Third Amended Complaint Count Fourteen.) All these claims fail because Plaintiff cannot demonstrate any "misrepresentations," or that she justifiably relied on them.

The tort of negligent misrepresentation extends only to supplying <u>false</u> information. <u>Key v. Wal-Mart, Inc.</u>, No. 3:03CV144 (RNC), 2004 U.S. Dist. LEXIS 21107, at *6-7 (D. Conn. Sept. 29, 2004). Section 552 of the Restatement (Second) of Torts sets forth negligent misrepresentation: "One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to

liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." D'Ulisse-Cupo v. Bd. of Dirs. of Notre Dame High Sch., 202 Conn. 206, 218, 520 A.2d 217 (1987); Burnham v. Karl & Gelb, P.C., 50 Conn. App. 385, 390, 717 A.2d 811 (1998), aff'd, 252 Conn. 153, 745 A.2d 178 (2000).  As an initial matter, it is Plaintiff's burden to prove the information was false.  Daley, 249 Conn. at 792-93.  Even if a plaintiff can demonstrate the information was "false," a defendant is subject to liability only if the plaintiff justifiably relied upon the information.  See Lowe v. Amerigas, Inc., 52 F. Supp. 2d at 361 (dismissing claim because employee could not have reasonably relied on information).  Accordingly, Plaintiff must prove the alleged statement was false at the time it was made, and that she relied on those statements, and she was justified in doing so.  See Citino v. Redev. Agency, 51 Conn. App. 262, 275, 721 A.2d 1197 (1998) (upholding jury instruction that promise must induce "absolute reliance").

        With respect to progressive discipline, as discussed above, Plaintiff cannot even establish such a policy existed.  Here, Plaintiff testified that she became aware of the progressive discipline policy from "situations where [she] had to discipline employees in the past . . . ." (Facts, ¶ 159.)  She also testified, however, that she had seen other employees terminated without first receiving discipline.  (Facts, ¶ 159.)  Finally, Plaintiff cannot establish that such a policy was communicated to her in any way, or that such a policy would apply to her.  Thus, Defendants never made a "representation" to Plaintiff, let alone a false one, and therefore no reliance could possibly be justified.  See Burnham, 50 Conn. App. at 390 (must have communication to the plaintiff).

Similarly, with respect to the Code of Ethics, Plaintiff cannot establish that anything in it was false. Plaintiff never has claimed that she was terminated for reporting violations of the Code of Ethics; rather, she claims that she was led to believe that she could not be terminated for complying with the Code of Ethics. (Count Fourteen ¶ 62.) Even assuming that Plaintiff <u>actually</u> relied on the Code of Ethics, it is ridiculous to suggest that the document prevents Otis from terminating an employee if that employee also complied, <u>in one way or another</u>, with the Code of Ethics. As discussed throughout, Plaintiff was terminated because she failed to implement the WWJSSS. Whether Plaintiff also complied with the Code of Ethics has no bearing on her termination. Simply put, complying with the Code of Ethics and being terminated for reasons unrelated to the Code were not mutually exclusive events—nothing prevented both from happening.

### J.    Plaintiff's Promissory Estoppel Claim Fails Because There Was No Clear and Definite Promise (Count Fifteen)

Plaintiff's promissory estoppel claim is identical to her breach of contract claim, except that she also alleges that Defendants should have expected their "promises" to induce action or forbearance. (Third Amended Complaint Count Thirteen.) Considering that a successful claim for promissory estoppel requires a <u>clear and definite promise</u> and reliance thereon, this claim fails for the same reasons as do the breach of contract and negligent misrepresentation claims. <u>See</u> discussion, <u>supra</u>.

A successful promissory estoppel claim must contain three essential elements: (1) a clear and definite promise; (2) a reasonable expectation by the promisor that the promise would induce reliance; and (3) actual and reasonable reliance on that promise by the promisee. <u>D'Ulisse-Cupo</u>, 202 Conn. at 213; <u>see</u> <u>Cowen v. Fed. Express Corp.</u>, 25 F. Supp. 2d 33, 38 (D.

Conn. 1998).  Furthermore, a valid promissory estoppel claim requires a meeting of the minds;

phrases evaluated out of context cannot support liability.  Davis, 218 F. Supp. 2d at 262.

        As discussed above, Plaintiff cannot prove a "clear and definite promise" with respect

to Defendants' progressive discipline policy (which does not exist) or its Code of Ethics.  See

Cardona v. Aetna Life & Cas., No. 3:96CV1009 (GLG), 1998 U.S. Dist. LEXIS 7246, at *20 (D.

Conn. May 8, 1998) ("Statements contained in [handbook did] not manifest a present intent on

the part of defendant to undertake immediate contractual obligations to plaintiff.").  Even if she

could, Plaintiff's promissory estoppel claim is otherwise without merit.  It cannot reasonably be

maintained that she detrimentally relied on the alleged progressive discipline policy.  Plaintiff

has admitted no wrongdoing in the present case—indeed, she disagreed with the comments in the

Performance Feedback review during her termination meeting.  (Nichani Tr. at 163, Ex. 39.)

Thus, it cannot be said that she would have acted differently had she known termination was a

possibility, as opposed to a reprimand through the progressive discipline policy.  Moreover,

Plaintiff testified that she expected no discipline at all for not meeting the requirements

established by Otis World Headquarters. (Facts, ¶ 160.)  If Plaintiff expected to receive no

discipline for not following orders from World Headquarters, and she eventually was terminated

for that reason, she is hard-pressed to argue that she relied on a policy of progressive discipline.

        Much the same can be said of the Code of Ethics.  There is no indication that Plaintiff

relied on the Code of Ethics for anything, even it could be called a "clear and definite promise."

As discussed above, Defendants were free to terminate Plaintiff, irrespective of whether she

complied with the Code of Ethics.  There is also no indication that Plaintiff would have acted

differently had she known her failure to act may have led to her termination.  Finally, with

respect to the internal investigative report, and as discussed above, Plaintiff never had the

opportunity to voice her concerns about the final version of the report, so she could not have been relying on the Code of Ethics in that regard. (Facts, ¶ 144.)

## III.    CONCLUSION

After sorting through a laundry list of claims, inspecting thousands of documents, and poring over the deposition transcripts from Otis' top executives, there remains no genuine issue of material of fact in this case. Plaintiff presents no viable claims that Otis ever violated the law, and her own admissions run contrary to her allegations. Defendants respectfully request summary judgment on all counts.

THE DEFENDANTS,
UNITED TECHNOLOGIES CORP. and
OTIS ELEVATOR COMPANY

By_____/s/_____
        Albert Zakarian (ct04201)
        Daniel A. Schwartz (ct15823)
        Day, Berry & Howard LLP
        CityPlace I
        Hartford, CT 06103-3499
        (860) 275-0100 (telephone)
        (860) 275-0343 (facsimile)
        *azakarian@dbh.com*
        *daschwartz@dbh.com*

        Their Attorneys

## **CERTIFICATION**

I hereby certify that the foregoing was sent via regular mail, postage prepaid, on this date, to:

Anthony Minchella, Esq.
Law Offices of Anthony R. Minchella, L.L.C.
530 Middlebury Road
Suite 212-213B
Middlebury, CT 06762

Jeffrey J. Tinley, Esq.
Robert Nastri, Esq.
Tinley, Nastri, Renehan & Dost, LLP
60 North Main Street
2nd Floor
Waterbury, CT 06702

_____/s/_____
Daniel A. Schwartz