<u>SUJATA NICHANI</u>
<u>VS.</u>
<u>UNITED TECHNOLOGIES CORP. AND OTIS ELEVATOR COMPANY</u>
CIVIL ACTION NO. 3:02CV1384 (MRK)

# Exhibit 21

to Defendants' Memorandum of Law
in Support of Its Motion for Summary Judgment

| Business Unit | LOST TIME INCIDENCE RATE ||||||| TOTAL RECORDABLE INCIDENCE RATE ||||||| SEVERITY RATE |||||||
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1999 | 2000 | 2001 | 2001 Area Goal | 2002 Area Goal | 2006 Global Goal | | 1999 | 2000 | 2001 | 2001 Area Goal | 2002 Area Goal | 2006 Global Goal | | 1999 | 2000 | 2001 | 2001 Area Goal | 2002 Area Goal | 2006 Global Goal |
| Improvement Percent | | -21.3% | 27.3% | -24.7% | 23.2% | | | | -28.0% | 26.0% | 26.0% | 20.5% | | | | -21.3% | 41.2% | 100.0% | 0.0% | |
| CEA | 1.27 | 1.54 | 1.12 | 1.16 | 0.86 | 0.22 | | 1.33 | 1.70 | 1.26 | 1.28 | 1.00 | 0.45 | | 14.99 | 18.19 | 10.69 | 100.0% | 10.69 | 3.25 |
| Improvement Percent | | -3.6% | 42.0% | 33.9% | 26.5% | | | | -12.7% | 22.7% | 21.9% | 21.1% | | | | 1.9% | 25.2% | 100.0% | 10.2% | |
| NEA | 3.08 | 3.19 | 1.85 | 2.11 | 1.36 | 0.22 | | 3.20 | 3.61 | 2.79 | 2.71 | 2.20 | 0.45 | | 62.24 | 61.07 | 45.67 | 100.0% | 41.00 | 3.25 |
| Improvement Percent | | -1.3% | 32.8% | 20.2% | 26.3% | | | | -5.9% | 20.4% | 20.0% | 20.9% | | | | -8.5% | 25.2% | 100.0% | 10.5% | |
| SEA | 2.35 | 2.38 | 1.60 | 1.90 | 1.18 | 0.22 | | 2.55 | 2.70 | 2.15 | 2.16 | 1.70 | 0.45 | | 39.95 | 43.36 | 32.42 | 100.0% | 29.00 | 3.25 |
| Improvement Percent | | 31.5% | -41.0% | 15.0% | 39.7% | | | | 18.2% | 23.9% | 27.0% | 20.5% | | | | 61.3% | -43.8% | 100.0% | 0.0% | |
| LAA | 1.46 | 1.00 | 1.41 | 0.85 | 0.85 | 0.22 | | 2.83 | 2.31 | 1.76 | 1.69 | 1.40 | 0.45 | | 28.92 | 11.20 | 16.10 | 100.0% | 16.10 | 3.25 |
| Improvement Percent | | -43.2% | 27.8% | -24.6% | 26.4% | | | | -10.7% | 17.6% | 26.0% | 24.7% | | | | -90.0% | 47.3% | 100.0% | 0.0% | |
| NAA | 0.88 | 1.26 | 0.91 | 0.95 | 0.67 | 0.22 | | 4.66 | 5.16 | 4.25 | 3.87 | 3.20 | 0.45 | | 14.83 | 28.17 | 14.85 | 100.0% | 14.85 | 3.25 |
| Improvement Percent | | -66.7% | 36.0% | -12.0% | 0.0% | | | | -15.2% | 26.3% | -21% | 14.3% | | | | -282.9% | 32.3% | 100.0% | 0.0% | |
| NAPA | 0.15 | 0.25 | 0.16 | 0.28 | 0.16 | 0.22 | | 0.33 | 0.38 | 0.28 | 0.54 | 0.24 | 0.45 | | 1.99 | 7.62 | 5.16 | 100.0% | 5.16 | 3.25 |
| Improvement Percent | | 35.3% | 34.5% | 49.1% | 16.7% | | | | 37.2% | 14.0% | 41.9% | 16.3% | | | | 3.6% | 28.9% | 100.0% | 0.0% | |
| SAPA | 0.85 | 0.55 | 0.36 | 0.28 | 0.30 | 0.22 | | 1.48 | 0.93 | 0.80 | 0.54 | 0.67 | 0.45 | | 14.43 | 13.91 | 9.89 | 100.0% | 9.89 | 3.25 |
| Improvement Percent | | -75.0% | 66.7% | 67.1% | -28.6% | | | | -125.0% | 59.3% | 55.6% | 0.0% | | | | -46.9% | 77.1% | 100.0% | -133.8% | |
| JPA | 0.12 | 0.21 | 0.07 | 0.09 | 0.09 | 0.22 | | 0.24 | 0.54 | 0.22 | 0.24 | 0.22 | 0.45 | | 4.14 | 6.08 | 1.39 | 100.0% | 3.25 | 3.25 |
| Improvement Percent | | 34.8% | 51.2% | 100.0% | 100.0% | | | | 51.1% | 35.9% | 100.0% | 100.0% | | | | 88.4% | -55.8% | 100.0% | 100.0% | |
| WHQ-ENG | 0.66 | 0.43 | 0.21 | 0.00 | 0.00 | 0.22 | | 1.31 | 0.64 | 0.41 | 0.00 | 0.00 | 0.45 | | 3.72 | 0.43 | 0.67 | 100.0% | 0.00 | 3.25 |
| Improvement Percent | | 5.5% | 30.7% | 25.5% | 27.4% | | | | 2.2% | 19.0% | -24.0% | 22.3% | | | | -1.6% | 30.2% | 100.0% | 0.0% | |
| OTIS GLOBAL | 1.45 | 1.37 | 0.95 | 1.02 | 0.69 | 0.22 | | 2.26 | 2.21 | 1.79 | 1.68 | 1.39 | 0.45 | | 24.57 | 24.96 | 17.43 | 100.0% | 17.43 | 3.25 |

<u>**SUJATA NICHANI**</u>
**<u>VS.</u>**
<u>**UNITED TECHNOLOGIES CORP. AND OTIS ELEVATOR COMPANY**</u>
**CIVIL ACTION NO. 3:02CV1384 (MRK)**

# Exhibit 22

to Defendants' Memorandum of Law
in Support of Its Motion for Summary Judgment

# Nichani, Susan

**From:** Nichani, Susan
**Sent:** Thursday, January 23, 2003 4:57 PM
**To:** Moncini, Raymond
**Subject:** RE: NAA safety review

Ray,

I can tell you what we are out of compliance on with regard to the WWJSSS. There are basically 3 issues:

1 - The interpretation of whether fist grips are allowed or not is unclear. WHQ says no fist grips are allowed, but as you saw, that's not exactly what the WWJSSS say. In any case, the false cars cables are being changed over now. The issue with hoists is that there has to be a way to attach the rope to the rigging. It is not recommended by any hoisting documentation that any moveable rope be swedged because it reduces capacity by up to 30% and the swedged area is a weak point in the system. This creates another problem for us in that this condition exists on our other hoists (Therns, Mi-tees, etc) which is currently being investigated. No matter what connection existed on the hoist in NY, it would have been cut and re-made because they only allow one piece snatch blocks and multi-woven blocks.
2 - False cars do not have an audio/visual (A/V) alarm. The reason they were not put on is because the false car motor is louder than the A/V. This is a $550 add per traction elevator (added to every false car) with no safety value I am told by our experts and engineers.
3 - WHQ wants all of our mechanics to wear gloves for electrical protection. I believe the other areas use latex gloves and we were asked to do the same. However, latex gloves are not suitable for electrical protection. The only gloves approved for this type of work are lineman gloves which are heavy rubber gloves topped by leather gloves. As you know, it would not be possible to work on controllers with these 2 gloves on. I have a set in my office if you would like to see them. I was instructed by WHQ to give our mechanics latex gloves anyway, but have not done that because it is a direct violation of OSHA's federal regulation.

The other issue we had was with overhead protection. The NAA rule implemented in 1998 by Pat Dowson was that no overhead protection was required for elevators under 5 openings/60 feet rise. We changed that (despite a lot of pushback from RFOMs) and now every elevator has overhead protection.

These are the same issues that we have been talking about as a result of the UTC Assurance Reviews for the last 4 years. If you have changed your position on this, and would like me to fix these issues before this meeting, please let me know.

With regards to MELT, we had 2 classes scheduled - one last year and 1 this year. They were going to include multiple regions each. They were cancelled as a result of the travel policy (each class requires travel for ~40 people). Because the travel policy was becoming more and more restrictive, we came up with a more cost effective and more productive way to deploy the same content, however, we did not call it "MEL:T." We deploy it via teleconference in one full day. We compiled a CD-ROM that contains the entire management system and all of the required templates. Each section outlines what is exactly required of that particular section (i.e., Policy & Leadership, Assessment, Prevention, Control, etc). It also includes the requirements of all UTC SPs. The other thing MELT had was some "commitment" exercises, which we deployed to all NAA during Stand Down Day. The only thing our program does not contain that MELT does contain is a case study on the Johns Manville company (asbestos case). So far, it has formally been deployed to the Northeast, New York, Midwest and Western Regions. The feedback from the managers has been very positive. It was deployed to the safety managers of the remaining regions last Monday, and will be fully implemented in the next two weeks. We can do MELT but it would be repetitive at this point since we already covered the same topics. Just let me know how you would like to handle and I will get it done.

Thanks, Sue.

> -----Original Message-----
> **From:** Moncini, Raymond
> **Sent:** Sunday, January 19, 2003 9:00 AM
> **To:** Reese, Danny
> **Cc:** Nichani, Susan
> **Subject:** NAA safety review
>
> Danny,
> I would like to impose on you and your staff to do a full management system review of NAA. What I am particularly interested in is the discrepancies we may have in the WWJSS versus our practices in the field. I want to ensure that

1

we are in full compliance with WHQ directives and guidance.

I propose that we have a meeting sometime in the next 3 weeks to generally discuss this issue, with Sue, Doug LaBrecque from service, Joe Barna from mod and Scott Simmons from construction operations. I would like to discuss the FPA areas, particularly hoisting and rigging, to ensure that we understand the issues and come to consensus on the resolution on the tools and processes that we will use. I would also like to discuss the status of MELT training and NAA's commitment to be fully deployed as soon as practical.

From this meeting we will establish action items that should be reviewed in subsequent meetings. Thanks for your consideration of this idea.

Ray

<u>SUJATA NICHANI</u>
<u>VS.</u>
<u>UNITED TECHNOLOGIES CORP. AND OTIS ELEVATOR COMPANY</u>
CIVIL ACTION NO. 3:02CV1384 (MRK)

# Exhibit 23

to Defendants' Memorandum of Law
in Support of Its Motion for Summary Judgment

# Nichani, Susan

**From:** Nichani, Susan
**Sent:** Wednesday, August 21, 2002 9:47 AM
**To:** Simmons, Scott (Bloomington); Dowson, Patrick A; Nichani, Susan
**Cc:** Doot, Chris; Black, Tony   OTIS WHQ
**Subject:** RE: Making safety value added!

Scott, I see that you were not hired for your spelling. Since I struggled with interpreting a few of your words, I thought I would correct them once I figured them out in case anyone else had the same problem. No offense but do not give up your day job in exchange for becoming a writer!

Seriously, I think Scott brings up a few great points. We have made the WWJSSS in a box. We need to have field operations input into the rules that are made. I know we had some field ops from other countries involved in the meetings at one time, but from what I recall, they added little to no value. We should have picked people like Scott who are the leaders in process improvement & implementation and truly experts in their areas. Lately, we have implemented standards that no one (including safety) knows how to implement - such as no more fist grips. That's backwards and unrealistic. I bet if we got people like Scott on board with WWJSSS, that the compliance of all of the areas - and thus safety - would improve drastically. Clearly, we do not have the expertise on the committee in and of the safety directors to make these decisions by ourselves. I believe that was what Axel and Jean-Louis were trying to point out two meetings ago.

-----Original Message-----
**From:** Simmons, Scott (Bloomington)
**Sent:** Wednesday, August 21, 2002 9:21 AM
**To:** Patrick A Dowson (E-mail); Nichani Susan (E-mail)
**Cc:** Doot, Chris; Tony OTIS WHQ Black (E-mail)
**Subject:** Making safety value added!

Pat and Sue, I cannot stop thinking about the SE conference call from this morning. I thought the auditors did a nice job in presenting their findings but I do want to point out real world hurdles the field goes through everyday. Pat, you made a comment that even though there where some standards and rules put in place in NAA when you were in charge that you tasked NSA with revisiting some items to further improve safety. I think that may be a good idea but at the same time there are some WWJSSS rules that also need to be revisited to make safety on job sites real world as well as value added to the field. We also need to be sensitive to the managing companies around the world so not to waste money that may cost us a contract on a very low percentage of safety risk. I have problems with rules or lists of items we want followed but they are not realistic. This was the same thing we did with SIP a few years back. The original concept was great but the execution and process was not real world so the Field could only follow part of the SIP. We had only a few offices that were successful with early SIP and that was because they strayed from the process. It wasn't until we made it real world with no excuses and clearly value added that everyone began managing and our performance has soared as well as are serious accidents have almost evaporated in New Equipment in NAA. I mean I can show you I have offices with under 2.9 % incident rate with great efficiencies and I have regions with almost a 13% incident rate and they are on the bottom of the list when it comes to efficiencies. Safety needs to be built around SIP, they are one in the same. An item that needs revisiting is overhead protection. You have stated on 2 stop hydros that overhead protection is needed. I say the risk is so low that we have more exposure walking into a job site or up a stairwell where NO overhead protection is in place. Lets be honest, when we enter a pit we have no overhead protection in service or construction but when we walk on a platform of a 2 stop hopeless ( rise is under 10ft on 90% of all contracts) you expect overhead protection. Value added? I question the value of exposure -Vs-investment from the companies point of view. Never the less I will implement this change but it will cost Otis NSA lots of money for very little safety improvement. Matter of fact it will cause some added safety concern due to less light through the mesh. Lets be real, the first 16ft the field is working off a ladder and by the second day the Field is building a cab. I know we never want people working above or below each other but real world, we have to do this at the time of roping because the car is at the bottom and the cwt is at the top. Lets think about rope jobs, we have to work above and below with no over head protection for a period of time, real world is a hard hat used or required when doing rope jobs? No, but they should be because you cannot argue with the exposure and the field would follow. Next point is false cars. NSA false cars have the 2 means of automatic safeties as well as a third means of safety being the stop block. No accident I can remember of happening on NSA false cars since the tool facility started managing. Sonar alert, is it needed? As you know the motor makes more noise then the sonar alert so why try and force the field to waste 100 of 1000 of dollars a year in this non added value. I know the law came about do to a elevator killing someone in Mexico and not anything to do with a false car. I would dare bet if Ari new we were wasting over 100 thousand a year for no real risk he would want to know why? Next item is barricade on all car platforms, again I am not going to say that it doesn't add value in mistake proofing but it does meet OSHA and makes it real world to the field. What do you think it would cost Otis NSA if we put barricades on almost 8,000 units a year? Big bucks for a short time they are needed in most cases, now don't

1

get me wrong because it makes sense on many large projects but on 5000 hydros that we are building the cab on the second or third day? Capstan hoist brakes, this is something I took upon myself to mandate because of the risk for error, this is not a FPA issue. I plan to do away with capstans but it is going to be big money and I need a real world tool to replace them so in the meantime the brake was a added as a Band-Aid to improve safety immediately. As you well know I am from the Field and I have traveled all over the world for Otis and understand what is real. Sub contractors for the most part do not follow our WWJSSS as well as they don't report accidents the way they should. I am saying is people are basically the same everywhere and we (The people that make the rules) need to make the rules be real for everyone and be able to demonstrate the value of added task and tools. Mistake proofing is the direction we all want but obtaining this all at once on products that are several years old is not always easily attainable. Mistake proofing built into the product makes it much easier to implement. In my mind I believe we should be accident free or of a reasonable incident rate of below 1% and also have the highest quality and the best performance of any elevator company in the world. My two cents.

PS Not that I have extra time, but I would like to be on the WWJSSS committee to speak from the Fields point of view when making rules of the future.

Scott Simmons
Field Support
517-719-6466