**DOROTHY CONIGLIARO, Plaintiff, -against- HORACE MANN SCHOOL, Defendant.**

**95 Civ. 3555 (CSH)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2000 U.S. Dist. LEXIS 556; 141 Lab. Cas. (CCH) P34,105; 78 Empl. Prac. Dec. (CCH) P40,090*

**January 18, 2000, Decided**
**January 19, 2000, Filed**

**DISPOSITION:** **[*1]** Motion for summary judgment granted. Plaintiff's Title VII and *New York Executive Law § 296* claims dismissed.

**LexisNexis(R) Headnotes**

**COUNSEL:** For DOROTHY CONIGLIARO, plaintiff: Craig T. Dickinson, Garrison, Phelan, Levin-Epstein, Chimes, Richardson, P.C., New Haven, CT.

For HORACE MANN SCHOOL, defendant: Peter N. Hillman, Marjorie L. Cohen, Aime L. Hendricks, Chadbourne & Parke LLP, New York, NY USA.

**JUDGES:** CHARLES S. HAIGHT, JR., SENIOR UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** CHARLES S. HAIGHT, JR.

**OPINION:**

MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge:

Plaintiff, a long-time employee in the Development Office of Horace Mann School, a private school in the Bronx, brought this case asserting claims of sex-based wage discrimination pursuant to the Equal Pay Act of 1963, *29 U.S.C. § 201* et seq. ("EPA"), Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e* et seq., and the New York State Executive Law § 296 et. seq. The complaint originally asserted claims against the school and three individuals in their personal and representative capacities: Philip Foote, then Head of School; Michael Hess, Chairman of the Board of Trustees; and Lawrence Lowenstein, then Director of Development **[*2]** and Alumni Affairs whose higher salary sparked Conigliaro's disparate wage claim. The claims against Foote, Hess and Lowenstein were dismissed with prejudice pursuant to a Stipulation and Order entered August 12, 1998. Horace Mann thereafter filed the motion for summary judgment which the Court considers in this opinion. For the reasons that follow, I conclude that plaintiff has not shown that she and Lowenstein performed substantially equal work, and therefore grant the motion.

I.

A. Summary Judgment Standards

Under familiar and well-established principles, "summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *D'Amico v. City of New York, 132 F.3d 145, 149* (2d Cir.), cert. denied, *524 U.S. 911, 118 S. Ct. 2075, 141 L. Ed. 2d 151 (1998).* In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. America Piles, Inc., 138 F.3d 81, 87 (2d Cir. 1998)* **[*3]** (citing *Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)).* The party seeking summary judgment bears the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).*

Once such a showing is made, the party opposing the motion must come forward with "specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e).* In so doing, the "non-moving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).* Moreover, while the party resisting summary judgment must show a dispute of fact, it must also be a material fact in light of the substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* However, "the mere existence of a scintilla of evidence in support of the [non-movant's] **[*4]** position will be insufficient" to defeat a properly supported motion for summary judgment. *Anderson, 477 U.S. at 252.* Instead, the non-movant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Id. at 256.* Summary judgment should only be granted if no rational factfinder could find in favor of the non-moving party. *Heilweil v. Mount Sinai Hospital, 32 F.3d 718, 721 (2d Cir. 1994).*

In the employment context where discriminatory animus is at issue, a trial court must be "cautious" about granting summary judgment, given that direct evidence supporting a plaintiff's claim of intentional discrimination is rare. *Gallo v. Prudential Residential Services Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994); Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994).* However, summary judgment is not necessarily precluded in an employment discrimination case, even when the employer's intent or state of mind is at issue. *Chambers, 43 F.3d at 40; Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).* **[*5]**

B. EPA Standards

With some exceptions not applicable here, the Equal Pay Act subjects employers to essentially strict liability for paying female employees less than their male counterparts performing equal work. To prevail on an Equal Pay Act claim, a plaintiff need not prove intentional gender discrimination. *Belfi v. Prendergast, 191 F.3d 129, 136 (2d Cir. 1999).* Instead, she must prove that: "i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions." *Tomka v. Seiler Corp., 66 F.3d 1295, 1310 (2d Cir. 1995),* abrogated on other grounds by *Burlington Indus. Inc., v. Ellerth, 524 U.S. 742, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998).* Once a plaintiff has established the elements of a prima facie case, a defendant may prevent a finding of liability by demonstrating that the wage disparity resulted from one of four permissible factors delineated in the Act: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity **[*6]** or quality of production; or (iv) a differential based on any factor other than sex." *29 U.S.C. § 206*(d)(1). If an employer relies on the fourth factor to justify the pay differential, the employer must also show that "it had a legitimate business reason for implementing the gender-neutral factor that brought about the wage differential." *Belfi, 191 F.3d at 136.* In other words, the employer must show that the qualification is "job-related." *Tomka, 66 F.3d at 1312.*

Although intent is not part of a prima facie EPA case, if the employer brings forward proof of a permissible non-discriminatory explanation for the wage differential, a plaintiff may rebut it by producing evidence showing that the reasons the employer advances are a pretext for sex discrimination. "The appropriate inquiry to determine if the factor put forward is a pretext, is whether the employer has used the factor reasonably in light of the employer's stated purpose as well as its other practices." *Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 526 (2d Cir. 1992)* (internal quotation marks omitted; alteration in Aldrich).

Turning to **[*7]** the case at bar, two of the three elements of the prima facie case are not seriously in dispute. The only male employee whose salary Conigliaro unfavorably compares to her own is Lawrence Lowenstein. It is

uncontested that Lowenstein's salary was considerably higher than Conigliaro's during their entire overlapping tenure at Horace Mann and that the two worked in the same office under essentially the same working conditions. The principal point of contention between the parties is the second factor: the equality of their work. In its motion, Horace Mann argues that Conigliaro cannot establish a prima facie case because while she may have been paid less than Lowenstein, she cannot show that it was for equal work. Alternatively, Horace Mann contends that even if plaintiff were able to demonstrate an issue of fact with respect to that element, her EPA claim must nonetheless be dismissed because Horace Mann can justify paying Lowenstein more than Conigliaro because of a gender-neutral factor directly related to his position in the Development Office -- his deep involvement with the Horace Mann community.

II.

The facts of this case, considered in the light most favorable to plaintiff **[*8]** as the non-moving party, are as follows.

Plaintiff graduated from State Teachers College at New Paltz in 1958. For a number of years after graduation and after taking some time off to raise her children, plaintiff worked as a teacher, a librarian and a secretary in various public and private schools. In 1977, she joined Horace Mann as a secretary to Russell Ames, the school's newly hired Director of Development, with whom she had worked for several years at Riverdale Country School and who asked her to join him at Horace Mann. In 1980, Conigliaro's title at Horace Mann was changed from secretary to Assistant Director of Development. Her duties as such included collaborating on and implementing fundraising plans, acting as assistant editor of the yearly school magazine and working on other publications. See Deposition of Dorothy Conigliaro ("Conigliaro Aff."), attached as Ex. 1 to Affidavit of Craig T. Dickinson dated October 5, 1998 ("Dickinson Aff."), at pp. 39, 65; see also Plaintiff's Memorandum of Law ("Pl. Mem.") at 5. Plaintiff continued in this position reporting to Ames until 1992 when Ames retired from Horace Mann. At that time, plaintiff's title became Associate **[*9]** Director of Development, a position she kept until she resigned in January of 1998.

Lawrence Lowenstein graduated from Horace Mann in 1939 and from Cornell University in 1943. In the years between his graduation and 1981, when Horace Mann offered him a paid position, Lowenstein was involved on a voluntary basis in a variety of positions with Horace Mann and its alumni association. He served as a Trustee of Horace Mann for eleven non-consecutive years, was elected President of the Horace Mann Alumni Association for three separate three-year terms, and participated in Horace Mann fundraising efforts and alumni activities while serving as a class and decade agent in connection with many annual funds. During this time, Lowenstein was also involved in alumni relations and fundraising for Cornell University, serving as a class agent for over thirty-five years, and played a fundraising role in various other philanthropic organizations. In his professional life Lowenstein was involved in the restaurant business, owning and operating a succession of New York City restaurants from 1946 to 1981.

In 1981, after his last restaurant venture failed, Lowenstein was hired by Horace Mann as Director **[*10]** of Alumni Affairs, reporting to Russell Ames who was then head of the Development Office. When Ames left in 1992, Lowenstein became the Director of Development and Alumni Affairs. n1 In that position, Lowenstein reported to the Head of School and the Board of Trustees, and Conigliaro and the three other Development Office employees reported to him. Lowenstein's responsibilities and activities in that position, which were comparable to those involved in his previous position as Director of Alumni, included attending and speaking at in-town and out-of-town reunions, networking regularly with alumni, reviewing potential donor lists, participating in phone-a-thons, writing and signing solicitation letters to potential donors, attending lunches with actual and potential donors, and attending industry conferences. After Ames left and Lowenstein became the Director of Development and Alumni Affairs, Lowenstein's additional responsibilities included preparing the Development Office budget and exercising primary overall responsibility for fundraising activities and for administering the Development Office. See Affidavit of Dr. Eileen Mullady, Head of Horace Mann School, dated December 7, 1998 ("Mullady **[*11]** Aff.") at P 3.

n1 Lowenstein held this position until July of 1997 when he became Special Assistant to the Head of School for capital campaign and Director of Gift Planning at a reduced salary.

Lowenstein described his work substantially as follows:

> The main duties were to run the development office, to direct the fund raising and alumni activities, to supervise anything in the area of alumni and development, to interface with trustees, to deal with major

> donors, to solicit, cultivate and keep happy people who made gifts. When somebody's made a major gift we like to make them feel they are important and visit with them. I felt responsible for anything that was done in our office, whether it would be a mailing piece or magazine or letter or any activity that we did I was responsible for it will [sic] as the director, and so instructed others as to how to carry out what I felt should be done.

Deposition of Lawrence Lowenstein ("Lowenstein Dep."), attached as Exhibit 3 to Dickinson Aff., at 22-23. **[*12]**

For Conigliaro's part, the tasks she performed as Associate Director of Development (a title bestowed upon her in 1992) included planning and writing solicitation letters for the annual fund; overseeing the production of alumni directories; helping Lowenstein write foundation proposals; planning and assisting in phone-a-thons; designing reunion invitations and Christmas cards; writing thank-you letters; coordinating the conversion of the office computer system; interacting with parents, trustees and alumni in connection with phone-a-thons, reunions, production of the school magazine and other special projects; and overseeing publication of the school magazine as its Editor. Before Ames left, Conigliaro also spearheaded an effort to incorporate the female alumni from Horace Mann's affiliated girls' school into the school's development efforts. See Conigliaro Dep. at 102-05; Pl. Mem. at 5-6. Plaintiff also testified that she absorbed many of the scheduling, meeting planning and coordination work that Lowenstein should have been doing as Director of Development, and therefore oversaw the "effective running of the office." Conigliaro Dep. at 72, 95.

Conigliaro's complaint avers that **[*13]** since 1981 she has been paid considerably less than Lowenstein. The complaint puts a figure on a specific wage disparity only for the academic years of 1992-93 in which Lowenstein's salary was allegedly $ 30,000 higher, and 1993-94 in which it was allegedly $ 31,800 higher. Complaint at P 14. The parties' briefs and deposition testimony reveal that the gap in their salaries persisted for the academic year 1995-96 of approximately $ 46,000, and 1996-97 of approximately $ 47,000. Conigliaro Dep. at 9. To the Court's knowledge, neither the briefs nor the deposition testimony speak to the salary differential for any other year.

III.

A. Equal Work

What comes through clearly from a thorough reading of plaintiff's brief and deposition testimony is her argument that she was more experienced professionally, more competent and worked harder than Lowenstein in a job in which she performed many of the same tasks as he did and, indeed, took over some of the tasks he should have undertaken. Conigliaro maintains that despite Lowenstein's higher title and nominal responsibility for running the Development Office, it was Conigliaro who in reality ran the office and did so more effectively **[*14]** than Lowenstein could have done. Essentially, Conigliaro's argument is that her talents, hard work, experience and worth were not recognized or fairly remunerated, while Lowenstein's relatively lower worth, less professional experience and inefficiency were inappropriately rewarded.

These arguments, even if the facts on which they are founded are true, do not establish a prima facie case under the EPA. The EPA does not mandate equal pay for equal competence, effort or intrinsic worth. It mandates equal pay for equal work. In order to establish that aspect of an EPA prima facie case, Conigliaro must demonstrate that she and Lowenstein performed "substantially equal" work. *Lambert v. Genesee Hospital, 10 F.3d 46, 56 (2d Cir. 1993)* (internal quotation marks omitted). Under this standard the positions need not be identical in all respects, but "jobs which are merely comparable are insufficient to satisfy" this showing. *Tomka, 66 F.3d at 1310* (internal quotation marks omitted). In assessing the substantial equality of two positions, one must not focus rigidly on titles or job description; it is the content of the job that controls. Id. **[*15]** "This determination is, by its nature, necessarily a particularized one not amenable to the application of broad job classifications or reliance on job title nomenclature." *Waterman v. New York Tel. Co., 1984 U.S. Dist. LEXIS 19093, No. 82 Civ. 1512, 1984 WL 1482,* *2 (S.D.N.Y. Feb. 24, 1984).

The evidence in this case does not bear out plaintiff's assertion that she and Lowenstein performed equal work. Plaintiff's own deposition testimony demonstrates precisely the contrary -- that the work they performed was dissimilar in many material respects.

Plaintiff testified that the basis for her allegation in the complaint that she and Lowenstein performed substantially similar "functions" for Horace Mann was that:

> both he and I were interested in, or at least supposedly interested in improving the financial welfare of the school. That was our number 1 goal. He may have done it through contacting alumni and soliciting funds. I did it through my own methods of making friends with the school with publications and doing -- sort of overseeing the annual fund. And also working with the alumni. As I said, I worked to reincorporate the girls' school into the Horace Mann alumni body. And that has **[*16]** resulted in a lot of contributions from women graduates.

Conigliaro Dep. at 175-76 (emphasis added). When asked whether there were any other reasons for her assertion, she responded, "No, that's all." Id. at 176. Later, Conigliaro reiterated that the basis for her allegation that there was "substantial similarity" between their positions was "that both of our positions were aimed toward raising money for the school, raising money and -- as they like to say, friend-raising and fund-raising for the school." Id. at 230. This testimony undercuts any claim that the jobs were substantially similar because it confirms that she and Lowenstein performed markedly different tasks in working toward the same goal. In particular, Lowenstein's focus was on personally networking with alumni and major donors. As Conigliaro testified, "Russ [Ames] and Larry [Lowenstein] were out visiting trustees and visiting parents [and] alumni. I was keeping the home fires burning, so to speak." Conigliaro Dep. at 135-36. Conigliaro confirmed that she did not possess the extensive alumni contacts that Lowenstein had developed over the years:

> Q: In 1992 when you became associate director **[*17]** and Mr. Lowenstein became director, did you have the contacts with the alumni at that point?
>
> A: Did I have any contacts?
>
> Q: Did you have the contacts that Mr. Lowenstein had with the alumni at that point?
>
> A: No, I did not.

Conigliaro Dep. at 172-73.

As all this testimony suggests, plaintiff does not and could not dispute that she and Lowenstein performed different tasks in working toward a shared goal. Indeed, plaintiff admitted that their roles were different in numerous respects in the following interchange:

> Q: Did you report to the head of the school?
>
> A: No, I did not.
>
> Q: Did Mr. Lowenstein report to the head of the school?
>
> A: Yes, he did.
>
> Q: Who prepared the budget for the development and alumni office?
>
> A: Mr. Lowenstein did.
>
> Q: So you did not prepare the budget?
>
> A: I did not.
>
> Q: Did you make presentations to alumni for fund-raising activities?
>
> A: Yes.
>
> Q: In what instances?
>
> A: I'm sorry, could you repeat -- what do you mean by "presentations"?

Q: Did you make presentations to groups of alumni?

A: No, I did not.

Q: Did you network with alumni?

A: On certain matters I did.

Q: **[*18]** For example, what are those matters?

A: For example, I correspond with alumni authors because I did synopses of their books in the alumni magazine. So I maintained a correspondence with them and their publicists.

> I also -- further back, I initiated the reincorporation of the girls' school, which meant that all those records which were sort of dwindling were now reinstated. I initiated a great effort to reincorporate them into the Horace Mann School.

Conigliaro Dep. at 104-05.

The substantial equality of their work is further belied by Conigliaro's disclosure that she did not desire Lowenstein's position. In her deposition testimony, after she judged Lowenstein as an incompetent Director of Development because he was "late in doing things," "spent inordinate amounts of time on the phone," and "did not know how to either delegate responsibilities or direct [or] manage the office," she was asked point blank:

Q: Did you want his job?

A: No.

Q: Were you qualified for his job?

A: Yes.

Q: On what basis?

A: I could have done all the things he did. I could have done them all. And I could have done them better.

Conigliaro **[*19]** Dep. at 171-72 (emphasis added). Implicit in this testimony is plaintiff's recognition by plaintiff that the jobs were different in substantive respects -- not just in title. Plaintiff admits that she "could have done all the things he did," reflecting that there were tasks that Lowenstein performed that she did not. Moreover, if there were no material differences between the two jobs in terms of overall content they should logically have been basically interchangeable to plaintiff, but according to her testimony they were not.

Plaintiff's brief contains a similarly telling argument. After describing Lowenstein's responsibilities as a paid Horace Mann staff member, plaintiff concludes that:

> Simply put, the school decided to pay [Lowenstein] for things he had done in the past voluntarily. Thus, his work on and attendance at reunions was similar to his participation as a member and officer of the Alumni Association. The fact that he did this out of state, as well as locally was as much a perk to Mr. Lowenstein as it was a benefit to the school. Likewise, his attendance at meetings and worked [sic] on the budget was comparable to his duties as a trustee. Indeed, he was required **[*20]** to attend fewer meetings and work on a departmental rather than school-wide budget.

Pl. Mem. at 8. The important point is that Lowenstein's work, described by Conigliaro in dismissive and disparaging terms, was in fact work that Conigliaro herself did not do. Thus, in trying to make the point that Lowenstein was unworthy of his salary because he had previously served the same functions for free, Conigliaro serves to highlight the

differences in the nature of their work. Yet this undercuts her EPA claim, which requires Conigliaro to show that the work they performed was substantially equal, not, as she argues here, that the school assigned an unfair relative value to their different functions. Whether Lowenstein was incompetent, a poor manager, or was being paid for work he previously performed gratuitously is meaningless for EPA purposes, as is plaintiff's argument that she was more qualified, worked harder and provided more value to the Development Office than Lowenstein. Again, the test is whether the work was substantially equal. Conigliaro has not provided any facts that show that their work meets this standard. As outlined above, at nearly every turn her testimony belies **[*21]** that claim.

While it is undisputed that there was much common ground in their general job tasks such as participating in phone-a-thons, work on annual appeals, writing solicitation letters and contacting and interfacing with parents, alumni and trustees, the performance of some common tasks does not make jobs substantially equal when material differences also exist. See *Doria v. Cramer Rosenthal McGlynn, Inc., 942 F. Supp. 937, 942 (S.D.N.Y. 1996)* ("When the additional tasks of one job in comparison to another job are substantial, then jobs are not congruent and the work is not equal."); *Kellett v. Glaxo Ent., Inc., 1994 U.S. Dist. LEXIS 17021, No. 91 Civ. 6237, 1994 WL 669975,* *7 (S.D.N.Y. Nov. 30, 1994) ("small degree of overlap" did not establish substantial equality); *DiNolfo v. Rochester Tel. Corp., 972 F. Supp. 718, 723 (W.D.N.Y. 1997)* (no substantial equality between jobs where plaintiff claimed that some of her duties were similar to those of higher paid male employees but did not deny that some of her duties were not shared by them); *Koster v. Chase Manhattan Bank, 609 F. Supp. 1191, 1194 (S.D.N.Y. 1985)* ("Certain areas of overlap" did **[*22]** not make jobs substantially equal; "it is the overall job, not its individual segments, that must form the basis of comparison") (internal quotation marks omitted).

Conigliaro described her additional responsibilities as chiefly including coordinating the conversion of a new computer system in the Development Office; reincorporating female alumni in development efforts; overseeing the production of and editing the school magazine and other school publications; ensuring the smooth operation of the Development Office by setting the schedule for the annual fund and initiating internal meetings; and other ancillary activities such as printing invitations and preparing a brochure for the admissions office. Conigliaro made it clear that Lowenstein did not share in these efforts.

On the other hand, Lowenstein performed a number of activities that Conigliaro did not take part in, either in substance or to the same degree as Lowenstein did. Lowenstein attended and made presentations at nearly every Horace Mann reunion held since 1981. He had regular and extensive personal interaction with alumni and donors in an effort to solicit donations. These interactions included phone calls, lunches **[*23]** and personal visits. Lowenstein also had daily contact by telephone or in person with members of the Board of Trustees to discuss development efforts and other matters, and attended and made presentations at Trustee meetings. He attended numerous out-of-town development conferences; determined who mailings should go to and set goals for solicitations from individual donors; prepared the Development Office budget and carried the responsibility of supervising all four other Development Office employees. He reported directly to the Head of School and the Trustees.

Construing the evidence in the light most favorable to her, Conigliaro did not have these activities or responsibilities in common with Lowenstein. Although she dealt with alumni and parents, she did so not in personal solicitation efforts but in connection with details attendant to phone-a-thons, publications and other special projects. Thus, unlike Lowenstein, she did not have regular personal meetings with them in an effort to solicit donations and maintain relationships. In fact, Conigliaro testified that she did not have a single one-on-one meeting with an alumnus until after 1990 when she had occasional meetings with **[*24]** individual alumni regarding school publications. Moreover, she attended at most one reunion and one development conference from 1992 to 1997 and never attended a Trustee meeting, while Lowenstein attended and delivered speeches and presentations at all reunions and attended and gave reports at many Trustee meetings.

To Conigliaro, these are distinctions without a difference because in her view both she and Lowenstein worked toward the greater good of development efforts, whatever the difference in their independent tasks. I cannot agree, at least within the governing context of the EPA. It is inescapable that Lowenstein's activities, taken together, reflect a focus on overall planning and strategy, a depth of contact with alumni and a level of accountability that Conigliaro, for all her manifest worth and experience, did not have. The distinction between Lowenstein's and Conigliaro's overall roles is reinforced by Eileen Mullady, the current Head of School:

> As Director, Lowenstein was in charge of the Development and Alumni Office and reported to me and to the Trustees. Lowenstein, an alumnus, was responsible for the fund-raising activities of the School and for administering **[*25]** the office. Lowenstein networked with alumni, attended almost every

reunion and many Trustee meetings and had extensive contacts with alumni. Lowenstein had been a Trustee for eleven years, President of the Alumni Association three separate times and was known by alumni of all decades. He had lunch with significant donors of the School, where large amounts were at times pledged to the School. . . .

On the other hand, Conigliaro, as Associate Director, prepared certain solicitation materials, edited the Horace Mann Magazine and performed other functions. Conigliaro did not have the contacts with the Horace Mann alumni that Lowenstein had over the years.

Mullady Aff. at PP 3-4.

Conigliaro does not substantially dispute that Lowenstein performed the additional tasks described above. She instead takes issue with Lowenstein's contention that he "ran" the office, had control over Conigliaro's work and performed his job competently. But as noted above, it is not enough under the EPA for plaintiff to raise an issue of fact as to these matters. Conigliaro cannot prevent summary judgment on her EPA claim by creating an issue of fact as to whether she worked harder or more diligently **[*26]** than Lowenstein. See, e.g., *Kellett, 1994 WL 669975,* *6 ("Congress could not have intended . . . that every hardworking employee be compensated at the same rate as their supervisor."); *Gibson v. Jacob K. Javits Conv. Ctr., 1998 U.S. Dist. LEXIS 3717, No. 95 Civ. 9728, 1998 WL 132796,* *3 (S.D.N.Y. Mar. 23, 1998) (proof that higher paid male was unqualified for job and female was overqualified and underpaid for hers did not establish substantial equality of jobs, nor did claims that male superiors delegated their own job tasks to lower paid females). Even if Conigliaro did perform more of the day-to-day scheduling and coordination work and pulled a stronger laboring oar than Lowenstein, she has presented no evidence rebutting Horace Mann's showing that Lowenstein performed significantly different work than Conigliaro did, which is the salient issue in an EPA action.

Conigliaro's argument that their jobs were substantially equivalent because she and Lowenstein were working towards the same end (improving the financial welfare of the school) and were equally important in that respect, is also unavailing. Possessing interrelated job functions or comparatively equivalent job worth **[*27]** is not the same as performing substantially equal work. See *Kellett, 1994 WL 669975,* *6 ("The Court holds that language of interdependency does not speak to the issue of substantial equality."); *Waterman, 1984 WL 1482,* *4 (rejecting plaintiff's assertion that equal value to employer of services of two employees rendered their positions substantially equal). Indeed, Conigliaro readily admits that she and Lowenstein pursued their common goal through separate means. See Conigliaro Dep. at 175 ("He may have done it through contacting alumni and soliciting funds. I did it through my own methods of making friends with the school with publications and doing -- sort of overseeing the annual fund. And also working with the alumni.").

Another uncontested distinction between the positions held by Conigliaro and Lowenstein which cannot be overlooked is the fact that Lowenstein had responsibility for supervising four employees including Conigliaro, and reported directly to the Head of School and the Trustees; whereas Conigliaro supervised at most one employee n2 and reported to Lowenstein, not directly to the Head of School. Plaintiff argues that Lowenstein **[*28]** did not in fact exercise any control over her work and disputes whether he "ran" the office. But she does not dispute the accuracy of this hierarchical structure or that Lowenstein was accountable -- in the view of the Trustees and the Head of School -- for supervising Conigliaro and the rest of the Development Office. This difference in the relative responsibilities and accountability of Conigliaro and Lowenstein lends further support to defendant's contention that the two jobs were substantially dissimilar. See *DiNolfo, 972 F. Supp. at 723* (court held that one of the factors which made jobs not substantially equal was fact that lower paid female supervised no employees while higher paid males each had "reportables"); *Grubb v. Broadcast Music, Inc., 699 F. Supp. 382, 385 (E.D.N.Y. 1987)* (jobs were not substantially equal where in addition to performing different tasks, female worked under higher paid male's supervision).

n2 Conigliaro testified that she supervised one employee, a secretary in the office, prior to 1992. Conigliaro Dep. at 46. It is unclear from her testimony whether that employee officially reported to Conigliaro or to Ames in the office hierarchy.

**[*29]**

In light of her own testimony which concedes numerous differences between her job and Lowenstein's, and the testimony of Lowenstein and the affidavit of Eileen Mullady which corroborate and expand upon those differences in

their overall roles, I conclude that defendant has adequately demonstrated that the two positions did not entail substantially equal work and that plaintiff has not demonstrated any facts that would allow a rational factfinder to conclude that their overall positions were substantially equal. As a result, plaintiff has not established a prima facie case of unequal pay for equal work under the EPA and that claim must accordingly be dismissed.

B. Gender-Neutral Justification

Even assuming arguendo that Conigliaro has established a prima facie case, her EPA claim is deficient because she has failed to rebut defendant's supported affirmative defense that factors other than sex justify Lowenstein's higher pay. Horace Mann contends that even if Conigliaro and Lowenstein could rationally be found to have performed equal work, any wage differential between the two was attributable to Lowenstein's long and extensive association with Horace Mann alumni and **[*30]** fundraising efforts which affected his ability to network with alumni and solicit funds. In support of this contention, defendant submits the testimony of Lowenstein which explains that as a result of his association with the school community he developed extensive donor contacts, ready access to alumni and experience in soliciting funds from them. Defendant also offers the affidavit of Eileen Mullady who attests that Lowenstein's "strong and long-standing association with the School enhanced his ability to contact donors and raise substantial funds for the School." Mullady Aff. at P 3. Mullady further explains that "based upon the significant differences in their responsibilities, experience and involvement in the Horace Mann community, there were clear legitimate reasons to pay Lowenstein a higher salary than Conigliaro." Id. at P 5.

Conigliaro does not dispute the factual details of Lowenstein's connection to the school and indeed admits that he had greater contacts with the alumni than she had. See Conigliaro Dep. at 173. Moreover, she implicitly confirms the accuracy of Lowenstein's asserted connection to the school by contending in her brief that "simply put, the school **[*31]** decided to pay him for things he had done in the past voluntarily." Pl. Mem. at 8. She does not offer any evidence to call into doubt defendant's assertion that the strength and duration of Lowenstein's connection to the school and its alumni affected his ability to raise funds and foster alumni relationships. Nor does she argue that this was not a significant aspect of his job. Instead, Conigliaro contends that this justification should be rejected as untenable because it was inconsistently applied, given that Conigliaro herself had "contacts and interaction with parents on the phone-a-thons and other projects" and successfully reincorporated the female alumni into development efforts, and yet was paid less. Pl. Mem. at 14.

This argument fails because it compares apples to oranges. Conigliaro admits that the depth and nature of Lowenstein's relationship with alumni was different than hers. Lowenstein is a Horace Mann alumnus who developed significant potential donor contacts over years of involvement with the school and its alumni association. He also spent a great deal of time in his paid position fostering and using those relationships to solicit funds. The school has demonstrated **[*32]** through Lowenstein's testimony and Mullady's affidavit that this aspect of his background was valuable to the school in that it afforded Lowenstein a volume of contacts and a level of access to alumni and potential donors that Conigliaro's interactions through the school publications and phone-a-thons did not. Although Conigliaro also seems to argue that the justification should be rejected because Lowenstein's background did not "improve" his job performance, Pl. Mem. at 14, that is not a requirement of the test. To prevail on its affirmative defense Horace Mann must show that it paid Lowenstein according to a gender-neutral factor which was job related, *Tomka, 66 F.3d at 1312,* not that the factor measurably improved the performance of the male comparator's job. Conigliaro has not shown through credible evidence that Lowenstein's contacts did not have any bona fide relationship to his job. Indeed, it is almost inconceivable that the Director of Development and Alumni Relations' ability to network with alumni and potential donors would not be related to his position.

What one senses in this particular contention by the defendant school is a manifestation of **[*33]** the "Old School Tie Network," that cultural and social tradition of mutual facilitation that nineteenth-century American private schools, primarily in the northeast, imported from such English models as Eton and Harrow. Lowenstein is an alumnus of Horace Mann, and the school regards that as an advantage in raising money (the sole raison d'etre of the more elegantly named "Development Office"). There is nothing unusual in that perception. I may judicially notice that graduates of private schools and universities are not infrequently found working in their alma mater's Development Offices, engaged in the never-ending quest for financial support from the greater school community (graduates, past and present parents of students, and assorted friends of the institution).

Whether an Old School Tie Network is on balance benign or malignant is a favorite subject of controversy among social and political historians and commentators, who debate, inter alia, whether the system elevates class connections over individual merit. Indeed, one may also sense in plaintiff's argument her belief that the school should not place such

a high value on the contacts and experience of Lowenstein, **[*34]** in derogation of her own contributions, unassisted and unvarnished by Network affiliation.

The difficulty for Conigliaro is that these considerations, while debatable on other levels of social discourse, have no relevance to the evaluation of a claim under the Equal Pay Act. Thus it may very well be that the Development Office could not have functioned without Conigliaro and that she played an irreplaceable role in fundraising and "friend-raising" for Horace Mann, one that Horace Mann did not adequately compensate and perhaps took for granted. And it may well be that Conigliaro and Lowenstein were equally valuable to Horace Mann in their different ways. But plaintiff's assessment of their relative worth, even if true, is beside the point. The uncontested evidence shows that Lowenstein possessed contacts and a connection to the school to an extent and in respects that Conigliaro did not, and that such connection was related to the performance of his job as Director of Development and Alumni Relations. These facts establish, according to the standard set forth above, the school's legitimate gender-neutral explanation for the wage differential. Whether or not the school should have chosen **[*35]** to put a premium on Lowenstein's extensive personal contacts and networking ability, a gender-neutral job related factor, is not relevant to an EPA analysis. So long as the school used the factor "reasonably in light of [its] stated purpose," *Aldrich, 963 F.2d at 526,* it is not for this Court to judge the wisdom of its decision. Cf. *Fallon v. State of Ill., 882 F.2d 1206, 1212 (7th Cir. 1989)* ("Employers may prefer and reward experience, believing it makes a more valuable employee, for whatever reason. And it is not [the court's] province to second-guess employers' business judgment.") (citations omitted).

Since there are no factual issues related to the merits of Horace Mann's affirmative defense, plaintiff's EPA claim cannot survive.

IV.

Plaintiff's Title VII and *New York Executive Law § 296* wage discrimination claims also fail to withstand summary judgment. Claims of unequal pay for equal work under Title VII and § 296 are evaluated under essentially the same standards as an EPA claim. *Tomka, 66 F.3d at 1312-13.* To establish a prima facie case under Title VII, a plaintiff must demonstrate that "(1) she is a member of **[*36]** protected class; and (2) she was paid less than non-members of her class for work requiring substantially the same responsibility." *Belfi, 191 F.3d at 139.* In addition, a Title VII claimant must prove that the pay differential resulted from intentional sex discrimination. n3 Id.

n3 Title VII analysis applies to claims under *New York Executive Law § 296.* See *Mauro v. Orville, 259 A.D.2d 89, 697 N.Y.S.2d 704, 707 n.3* (N.Y.A.D. 3d Dep't 1999); *Allen v. Argenbright Security, Inc., 1999 U.S. Dist. LEXIS 18579, No. 97 Civ. 5123, 1999 WL 1129058,* *3 (E.D.N.Y. Oct. 6, 1999).

As discussed above, plaintiff has not established a prima facie case under the EPA because she cannot show that she and Lowenstein performed substantially similar work. Her concomitant Title VII and § 296 claims necessarily fail for the same reason. Moreover, even assuming she were able to make out the elements of a prima facie EPA claim and therefore satisfy the first two elements of a Title VII claim, her Title VII and § 296 **[*37]** claims would still be fatally deficient because she has produced no credible evidence giving rise to an inference of discriminatory animus on the part of Horace Mann.

Plaintiff argues that Horace Mann's discriminatory intent may be inferred from the fact that she and another female in the Development Office, whom she asserts also performed work substantially similar to Lowenstein, were both paid less than him. The Second Circuit has explained that such evidence is not sufficient to support a finding of discriminatory animus. In Tomka, the Second Circuit dismissed a Title VII claim where the plaintiff's only evidence of intentional gender-based wage discrimination was the fact that three male employees were paid higher salaries than she was. The Court of Appeals held that the plaintiff had failed to produce any evidence that the employer was motivated in part by her gender, concluding that the more fact that she was paid less than the men "do[es] not support an inference that Seiler acted with discriminatory intent." *66 F.3d at 1313.* Similarly, Conigliaro has failed to adduce any evidence other than the disparity itself to suggest that the differential between her **[*38]** pay and Lowenstein's was the result of purposeful gender discrimination. As a result, plaintiff's Title VII and *New York Executive Law § 296* claims must be dismissed.

V.

For the reasons discussed above, I hold that plaintiff has not established that she performed work substantially equal to that of her higher-paid male comparator, and that even assuming she had, her failure to adequately rebut defendant's showing that any wage disparity was due to a gender-neutral job related qualification requires dismissal of her EPA claim. For the same reasons, and because plaintiff has failed to offer evidence demonstrating that the wage disparity resulted from discriminatory animus, I also dismiss her Title VII and *New York Executive Law § 296* wage-based discrimination claims.

The Clerk of the Court is directed to dismiss the complaint in its entirety with prejudice.

It is SO ORDERED.

Dated: New York, New York

January 18, 2000

CHARLES S. HAIGHT, JR.

SENIOR UNITED STATES DISTRICT JUDGE