**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

SUJATA NICHANI                    :
                                        :
                    Plaintiff,        :         CIVIL ACTION NO.
                                          :         3:02CV1384 (MRK)
v.                                :
                                          :
UNITED TECHNOLOGIES CORP. and    :
OTIS ELEVATOR COMPANY          :
                                          :
                    Defendants.     :         JUNE 9, 2005

<u>**REPLY TO PLAINTIFF'S OPPOSITION TO**</u>
<u>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

      To oppose Defendants' Motion for Summary Judgment, Plaintiff has served up her

conclusions, impressions and opinions, much of which she has taken from her 22-page

argumentative "affidavit," and much of which directly contradicts the factual record and her

prior deposition testimony.  Notwithstanding this effort, Plaintiff has failed to identify any

genuine issues of material fact for trial, and Defendants are entitled to summary judgment on all

of Plaintiff's claims.  To avoid repetition of the arguments presented in Defendants' February 28,

2002 Memorandum of Law in Support of Its Motion for Summary Judgment ("Defendants'

Summary Judgment"), this Reply addresses only selected points raised in Plaintiff's Opposition

to Defendants' Motion for Summary Judgment ("Plaintiff's Opposition") that warrant a

response, as discussed below.

**I.**
<u>**ARGUMENT**</u>

**A.**     <u>**Plaintiff's Opposition is Wrought With Unsupported Allegations That Have No**</u>
       <u>**Bearing On Summary Judgment**</u>

      Under the guise of an "affidavit," Plaintiff offers her impressions, opinions, and

conclusions, as well as her narrative version of her beliefs as to how and why Defendants have

violated the law, all of which is improper under the Federal Rules of Civil Procedure.  See

Plaintiff's Opposition, Exhibit I.  Rule 56(e) of the Federal Rules of Civil Procedure provides, in

pertinent part:

> Supporting and opposing affidavits shall be made on personal knowledge, shall
> set forth such facts as would be admissible in evidence, and shall show
> affirmatively that the affiant is competent to testify to the matters stated therein. . .
> .  When a motion for summary judgment is made and supported as provided in
> this rule, an adverse party may not rest upon the mere allegations or denials of the
> adverse party's pleading, but the adverse party's response, by affidavits or as
> otherwise provided in this rule, must set forth specific facts showing that there is a
> genuine issue for trial. If the adverse party does not so respond, summary
> judgment, if appropriate, shall be entered against the adverse party.

Under Rule 56(e), courts may strike or disregard portions of an affidavit that are not

based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized

and conclusory statements.  Hollander v. American Cyanamid Co., 172 F.3d 192, 198 (2d Cir.

1999) (affirming trial court's striking of affidavit because it was "riddled with inadmissible

hearsay, conclusory statements and arguments, and information clearly not made on the affiant's

personal knowledge") (internal quotation marks omitted); see Barlow v. Connecticut, 319 F.

Supp. 2d 250 at *25 (D. Conn. 2004) (EBB) ("general averments or conclusory allegations of an

affidavit do not create specific factual disputes").

In her affidavit, Plaintiff does not swear that her statements are made on personal

knowledge.  This omission is completely understandable because her affidavit contains

numerous conclusory and hearsay assertions, about which she would not possibly have personal

knowledge.  In short, it reads more like an "an adversarial memorandum than a bona fide

affidavit."  Hollander, 172 F.3d at 198.  For instance, under the boldface heading  "The Old

Boy's Network," Plaintiff states: "During my employment with Defendants, I faced the reality

that the elevator business is a man's business, especially for a position such as EH&S, and the

prior positions I had held."  Plaintiff's Opposition, Exhibit I ¶ 23.  In addition, prior to discussing

-2-

the draft report concerning the McQuillan fatality, and her reasons why she believes her version was the better version, Plaintiff states: "I find it interesting how Attorney McNamara claims my report was inaccurate, but he fails to specifically identify any inaccuracies, speculation or perception." Id. ¶ 59. Finally, Plaintiff states: "Immediately after I filed my charge of discrimination, Moncini . . . [gave me] the silent treatment," and "Otis and UTC have been entirely inconsistent with their explanations about who made the decision to remove me from my position . . . ." Id. ¶¶ 63, 72. These statements are arguments, not facts,[1] as evidenced by the absence of factual support cited for them. Rather than discuss every paragraph of her "affidavit" here, however, Exhibit 1, attached hereto, details the specific paragraphs and reasons why this Court should ignore Plaintiff's "affidavit."

Moreover, as the Second Circuit has indicated, Plaintiff's affidavit should be disregarded to the extent that she contradicts her prior admissions. Hale v. Mann, 219 F.3d 61, 74 (2d Cir. 2000) ("a party's affidavit [that] contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment" (internal quotation marks omitted)); Macaluso v. Herman Miller, Inc., 2005 U.S. Dist. LEXIS 3717 at *22 (S.D.N.Y. 2005) ("It is well-settled that an affidavit submitted by a party in response to a motion for summary judgment must be disregarded to the extent that it contradicts that party's prior deposition testimony.").[2] It is also well settled that a party cannot create a genuine issue of material fact sufficient to survive summary judgment simply by contradicting his or her deposition testimony. Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (U.S. 1999); Barlow, 319 F. Supp. 2d 250 at *25

---

[1] In fact, leaving no doubt that she states her beliefs rather than facts, Plaintiff uses the phrase "I believe" at least seven times in her "affidavit." See Plaintiff's Opposition, Exhibit I ¶¶ 11, 14, 18, 22, 27, 61, 69.

[2] See Exhibit 2 for all unreported decisions.

("conclusory statements that contradict evidence are insufficient to create a genuine issue of material fact"). Here, for instance, Plaintiff testified in her deposition that none of the changes made to the McQuillan report were false, see Defendants' Summary Judgment at 23, but now argues in her "affidavit" that certain changes were false. See Exhibit 1 ¶¶ 59(c), 61, attached hereto. After this Court appropriately ignores most of Plaintiff's affidavit and the arguments that it contains, there is no doubt that Plaintiff has failed to meet her burden in opposing summary judgment.

**B.    Defendants Did Not Violate the Equal Pay Act (Plaintiff's Opposition at 20)**

    **1.    Plaintiff fails to establish a prima facie case.**

Despite Plaintiff's implication that no employer has <u>ever</u> been granted summary judgment on an EPA claim because all issues are factual and should be given to the jury (<u>see</u> Plaintiff's Opposition at 22), Plaintiff has completely ignored <u>her burden</u> to establish a prima facie case; rather, she jumps directly to her attempted rebuttal of Defendants' affirmative defenses, and offers no evidence, other than the circumstance that she received her old job back after Russell abruptly resigned, tending to show that her duties and responsibilities were substantially equal to Russell's.[3] <u>E.g.</u>, <u>Cavuoto v. Oxford Health Plans, Inc.</u>, 2001 U.S. Dist. LEXIS 14357 at * 15 (D. Conn. 2001) ("Cavuoto faces a high standard of proof and, as it is her burden to prove her prima facie case, she may not argue an inference of equal work merely from

---

[3] Plaintiff's citations, for the proposition that the jury must determine whether two jobs are equal, <u>see</u> Plaintiff's Opposition at 22, are unpersuasive. <u>Lavin-Mceleney v. Marist College</u>, 239 F.3d 476, 480 (2d Cir. 2001), reviewed a jury's verdict where "the question whether the plaintiff has established a prima facie case is no longer relevant," and <u>Martin v. Westport</u>, 329 F. Supp. 2d 318, 329 (D. Conn. 2004) featured a disparate impact claim under Title VII and did not even involve a claim under the EPA. Finally, although Plaintiff correctly quotes a passage from <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1310 (1995), the court already had concluded that the plaintiff had not made out a prima facie case under the EPA with respect to some of her comparators "because Tomka has set forth no specific facts to indicate that she performed substantially equal work to either of the two [remaining comparators]."

the defendant's failure to prove otherwise."); see also Wheatley v. Wicomico County, 390 F.3d

328, 332 (4th Cir. 2004) (citing Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974);

Tenkku v. Normandy Bank, 348 F.3d 737, 741 (8th Cir. 2003) (even though employees had the

same title, when comparator had seven more years experience than the plaintiff, "conclusory

allegation that her total work responsibilities were equivalent to those performed by [comparator]

is insufficient to survive summary judgment"). Plaintiff has no competent evidence, for

example, as to what Russell's job objectives and goals were. Plaintiff argues instead that she "is

prepared to present evidence regarding other male comparators in the safety area at Otis,"

without stating what that evidence is, or providing citations thereto. Plaintiff's Opposition at 22-

23. To defeat summary judgment, however, Plaintiff must offer evidence now, not at some later

point.[4] Barlow v. Connecticut, 319 F. Supp. 2d 250, 259 (D. Conn. 2004) (nonmoving party's

complete failure of proof on an issue for which she has the burden of proof at trial renders all

other facts immaterial).

### 2.    Plaintiff fails to acknowledge deference owed to employers' decisions.

Plaintiff has ignored the deference that courts pay to employers' decisions on

compensating executives. See Defendants' Summary Judgment at 44 and cases cited therein;

Georgen-Saad v. Tex. Mut. Ins. Co., 195 F. Supp. 2d 853, 857-858 (D. Tex. 2002) ("These are

Senior Vice Presidents in charge of different aspects of Defendant's operations; these are not

assembly-line workers or customer-service representatives. . . . Requiring Defendant and other

---

[4] The Second Circuit did not, as Plaintiff contends, virtually reject Defendants' argument
in Tomka v. Seiler Corp., 66 F.3d 1295, 1310 (1995). Plaintiff's Opposition at 24. Tomka
involved employees on the same or similar level. In fact, the court concluded the plaintiff, a
"Starts and Surveys Manager," failed to show that she performed equal duties as "District
Managers," and granted summary judgment with respect to those comparators. Id. Tomka
would be analogous only if a District Manager was moved into a Starts and Surveys Manager
position, but retained his or her District Manager salary.

companies to either pay senior executives the same amount or to come to court to justify their

failure to do so is simply beyond the pale."); <u>Wheatley v. Wicomico County</u>, 390 F.3d 328, 334

(4th Cir. 2004) ("We decline to hold that having a similar title plus similar generalized

responsibilities is equivalent to having equal skills and equal responsibilities . . . .  Were we to

adopt that position, we would deprive compensation structures of all flexibility and deny

employers the chance to create pay differentiations that reflect differing tasks and talents.").

Here, Plaintiff tries to create a genuine issue of material fact by comparing her credentials with

Russell's, as though it would be proper for this Court to determine de novo whether Plaintiff and

Russell should have been paid the same.  <u>See</u> Plaintiff's Opposition at 25.  Her argument thus

ignores the applicable legal standards, which require deference to Defendants' decision that

Russell should be paid more because of his undisputed substantial EH&S experience in the

elevator industry and already higher compensation.  <u>See</u> Exhibit 3, attached hereto; Defendants'

Summary Judgment at 7, 45.  Neither this Court nor a jury could or should properly determine

whether Otis made the right decision to move Russell where it did—especially in light of

Plaintiff's failure to establish a prima facie case, except for the evidence that she is "prepared" to

present.

**3.      Defendants have established, as a matter of law, a valid factor other than sex.**

Only after Plaintiff has established a prima facie case does the Court need to consider

Defendants' affirmative defenses.  As discussed in Defendants' Summary Judgment, Russell

received higher compensation than Plaintiff because of factors including his already-established

salary as an Otis executive, his prior EH&S experience, his education, and the expectation that

he would work according to the standards of an Otis executive.  <u>See</u> Defendants' Summary

Judgment at 7, 45; Exhibit 3, attached hereto.  For instance, Otis President Stephen Page testified

that Russell's twenty years of experience in EH&S allowed the position to be more focused on

decreasing Otis's fatality rate worldwide.  (Dep. Tr. of Steve Page ("Page Tr.") at 83-84,

attached hereto at Exhibit 4.)  Moreover, Plaintiff admitted that she did not have the same

experience as Russell, and that Russell had twenty years of EH&S experience while she had only

two to three (Plaintiff originally said four years, then corrected the number).  See Defendants'

Summary Judgment, Exhibit 37, Nichani Tr. at 129-30, 379-81; Defendants' Facts ¶ 73.  It is not

material whether Plaintiff now believes that her credentials or abilities exceeded Russell's;

rather, all of these factors set forth by defendants establish that Russell's salary was based, long

before Plaintiff came into the mix, on factors other than sex.[5]

Additionally, it is immaterial whether Russell was "red circled"; rather, it is the

undisputed fact that Russell simply retained his prior salary and executive title that establishes a

valid factor other than sex.[6]  See Defendants' Summary Judgment at 46-47; Plaintiff's

Opposition at 30.  Further, Plaintiff does not even address the well-established principle that the

concept of "red circling," or simply retaining an individual's salary after a move, is a "valid

factor other than sex."[7]  E.g., Rodriguez v. SmithKline Beecham, 224 F.3d 1, 6 (1st Cir. 2000)

(although the plaintiff also failed to establish a prima facie case, defendant established a valid

---

[5] Indeed, Plaintiff and Russell make for an inapt comparison because, after Russell was transferred from World Headquarters to EH&S for NAA, he occupied that position for only a few days before he resigned.

[6] Plaintiff's colloquy about whether McGroary, Bousbib, Moncini, or Page believed that Russell was "red circled," or whether the position was regraded, upgraded, or reclassified, makes much ado about nothing.  Plaintiff's Opposition at 30-31.  Notwithstanding Plaintiff's failure to provide citations for many "facts" on this point, it does not affect the analysis at all.  At the most, it shows that some of the deponents were unfamiliar with the semantics involved; they all agreed that Russell was moved into a different position and kept his old salary.

[7] Plaintiff's carefully selected quotations from EEOC v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994) do not show that Defendants have offered "inconsistent explanations."  See Plaintiff's Opposition at 33.  The employer in Ethan Allen (an ADEA case) provided one reason for the plaintiff's termination to state investigators then changed its story, some time later, at the time of trial.  Id.

factor other than sex because comparators' salaries were based on their previous levels and positions); see Defendants' Summary Judgment at 46 and cases cited therein. Finally, Plaintiff had no problem with "red circling" in 1994 when she retained her salary when she switched from Labor Grade 48 to 47 position.[8] See Defendants' Summary Judgment at 47, and cases cited therein.

> **4. Defendants are entitled to judgment as a matter of law on Plaintiff's EPA claim.**

The undisputed facts establish that: (1) when Plaintiff was promoted to the position of Senior Manager for EH&S for NAA in February 1999, she was paid more than was her male predecessor, Pat Dowson, then a Labor Grade 51, (Defendants' Summary Judgment at 4); (2) prior to his move to Director of EH&S for NAA in May 2001, Brad Russell had been an Executive (L3) at UTC and Otis World Headquarters for ten years and was paid more than Plaintiff (Defendants' Summary Judgment at 7); (3) Plaintiff does not claim that Otis was required to demote Russell or give him a pay-cut to effectuate the move; and (4) Russell occupied the position of Director of EH&S for NAA for only about a week before he resigned.[9] Defendants' Summary Judgment at 9. Plaintiff essentially is claiming that, after Russell resigned

---

[8] Further illustrating Plaintiff's lack of understanding of the "red circle" issue is her refusal to admit that she herself benefited from the policy, by arguing that the transfer document never says "red circle" on it. See Plaintiff's Corrected Rule 56(1) Statement ¶ 5, and responses thereto. It is the fact that Plaintiff was transferred to a position with a lower labor grade while also keeping her salary that establishes that she benefited from the practice; it is not the presence or absence of the words "red circle." Id.

[9] It is also undisputed that, after Plaintiff was terminated, Dowson, then an Executive (L3) and Director of EH&S at Otis World Headquarters, assumed Plaintiff's EH&S responsibilities for NAA, in addition to his own duties at World Headquarters, i.e., he effectively was doing two jobs for a period of time. Defendants' Summary Judgment at 22. In addition, Plaintiff's old position with EH&S was eventually combined with the Quality function in early 2004, and was filled by a female Executive (L2). Id. Plaintiff completely ignores this in her Statement of Facts and her "affidavit." Plaintiff's Opposition at 19.

within a week of accepting the NAA position, the EPA <u>required</u> Otis to pay her the same

compensation as Russell, a long-time Executive (L3).  This premise is Plaintiff's back-door

attempt to obtain a promotion to Executive.  Indeed, following Plaintiff's logic, Otis was left

with two alternatives after Russell's resignation: either hire a woman and pay her the same or

more than Russell had been earning; or hire a man, and pay him anything it wanted.  The EPA

does not support such a result.

C.     <u>Plaintiff Has Not Met Her Burden On Her Discrimination Claims (Plaintiff's
       Opposition at 35)</u>

Plaintiff fails to offer any evidence of gender or race discrimination: "Nichani will not

reiterate here all of the evidence showing that the defendants' proffered reasons for their

decisions are pretextual.  Rather, Nichani respectfully submits that the preceding discussion has

shown that there is overwhelming evidence of pretext."  Plaintiff's Opposition at 36.  Plaintiff

does not identify <u>any</u> admissible evidence, much less sufficient evidence, to defeat summary

judgment on her discrimination claims, which she <u>must</u> do at this stage.  <u>See</u> Fed. R. Civ. P.

56(e) (nonmoving party "must set forth specific facts showing that there is a genuine issue for

trial"); <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000) ("The time has come, as

James and Hazard put it, 'to put up or shut up.'").

Significantly, Plaintiff has failed to establish that she suffered "a materially adverse

change," which is an element of her prima facie case.[10]  <u>Sanders v. N.Y. City Human Res.</u>

<u>Admin.</u>, 361 F.3d 749, 755 (2d Cir. 2004); <u>see</u> Defendants' Summary Judgment at 28, 32;

Plaintiff's Opposition at 35-36.  Plaintiff never went through any change at all—she always

_____

[10] Plaintiff offers no support in this Circuit for the proposition that a Plaintiff
automatically has established a prima facie case under Title VII if he or she also has alleged an
EPA violation.  Given the Title VII requirement that a plaintiff establish "a materially adverse
change," the claims are hardly identical.

maintained her employment and salary, and she moved back into her position in less than a week. In addition, there is no evidence to suggest that, had Russell not resigned, moving Plaintiff to a Line Management would have been adverse: indeed, Plaintiff previously expressed interest in taking a Line Management position when she completed her staff duties as Senior Manager of EH&S and Moncini expected her move to be an upgrade. See Defendants' Summary Judgment at 8. Although there is no doubt that Plaintiff's eventual termination constituted an adverse employment action, she cannot link it to her gender, and Plaintiff has wholly abandoned any discussion of her race claims. Finally, Plaintiff's "affidavit" (¶¶ 24-27, 70) merely presents unsupported conclusory assertions that this Court should ignore. See Plaintiff's Opposition at 37; Exhibit 1, attached hereto.

### D.    Plaintiff's Retaliation Claims Fail (Plaintiff's Opposition at 41)

Contrary to Plaintiff's assertions, see Plaintiff's Opposition at 40, Defendants both dispute the causation element of her retaliation claims and challenge many of her alleged adverse actions as insufficient as a matter of law. See Defendants' Summary Judgment at 37 n. 39.

First, as to causation, Plaintiff fails to demonstrate a causal connection between her protected activity (filing the CHRO charge) in August 2001 and her termination in March 2003. This time gap is far too long to support a reasonable inference that the two events are linked. See Defendants' Summary Judgment at 40-41 and cases cited therein. Plaintiff adduces no other evidence, however, that would tend to link her August 2001 CHRO charge and her March 2003 termination. Apparently recognizing this lack of connection, Plaintiff tries to argue that her protected activity was, in fact, her alleged refusal to modify her conclusions about the root causes of the McQuillan fatality in her draft report, which allegedly occurred close to her termination. That alleged conduct, however, even if taken as true, is not protected under Title VII, which protects only against opposing a discriminatory practice or participating in a Title VII

proceeding.  Deravin v. Kerik, 335 F.3d 195, 203 (2d Cir. 2003);  see Jute v. Hamilton

Sundstrand Corp., 321 F. Supp. 2d 408, 415 (D. Conn. 2004) ("Title VII's definition of

'protected activity' does not include participation in an internal investigation").  Accordingly,

Plaintiff cannot establish that any protected activity that took place close in time to the

termination, thus deflating any causal link between the two.

        Second, as to the alleged adverse employment actions, Plaintiff suggests that she suffered

a host of "adverse employment decisions" before her employment termination, which decisions

she recognizes are not independently actionable, but nonetheless claims they support her

allegation that her treatment "plainly changed after her CHRO filing."[11]  Plaintiff's Opposition at

42 n.5.  This assertion, however, ignores Second Circuit law, which requires, in the absence of

showing independently actionable retaliation, that a plaintiff show that her overall working

conditions have become "unreasonably inferior" or there exists a "pattern of nearly constant

harassment."  Deters v. Lafuente, 368 F.3d 185, 189 (2d Cir. 2004); see Hepburn v. City of

Torrington, 2004 U.S. Dist. LEXIS 15163 at *15-16 (D. Conn. 2004) (being moved to a smaller

office and being excluded from meetings did not constitute an adverse employment actions

because they did not change terms and conditions of employment); Petrario v. Cutler, 187 F.

Supp. 2d 26, 32 (D. Conn. 2002) (failing to show unreasonably inferior working environment

despite several acts geared only toward the plaintiff, for instance, assigning unpleasant tasks,

recommending suspension, not offering certain training, giving poor evaluations, and

disconnecting his computer).  Plaintiff has not even attempted to advance such claims.

Accordingly, Plaintiff has failed, as a matter of law, to show any adverse employment action

_____

        [11] Likewise, Plaintiff's unsupported claim that "Moncini became hostile . . . and
unapproachable, requiring most communications in writing," see Plaintiff's Opposition at 41, is

other than her termination.  The centerpiece of her retaliation claim is that she filed a charge with

the CHRO in August of 2001 and was "summarily fired in March 2003,"[12] some eighteen

months later.  This extended time-period is insufficient to establish causation, and her retaliation

claim should be dismissed.  See Defendants' Summary Judgment at 40-41 and cases cited

therein.

**E.      Plaintiff's Defamation Claims Fail (Plaintiff's Opposition at 43)**

> **1.      The Performance Feedback (located at Defendants' Summary Judgment, Exhibit 20) is not actionable.**

First, Plaintiff does nothing to address the publication requirement of her defamation

claim.  See Defendants' Summary Judgment at 52 n. 49.[13]  The Performance Feedback was seen

only by Moncini and Ellen McGroary (the Vice President of Human Resources), who were both

present during the meeting to terminate Plaintiff's employment in furtherance of their duties of

employment.  Id.  Because Moncini actually made some of the allegedly defamatory statements,

this Court must, for the Plaintiff's claim to succeed, hold that the presence of McGroary, who

was undisputely acting solely in her capacity as NAA Vice President of Human Resources,

satisfied the publication requirement.  See Cweklinsky, 267 Conn. 210, 217 (2004) (defamatory

statement must be communicated to third persons other than plaintiff).

---

contradicted by the undisputed facts.  See Defendants' Summary Judgment at 19 (Moncini e-mail asking her to stop by so they may speak directly rather than through email).

[12] Plaintiff's assertion that she was "summarily fired" flies in the face of the undisputed facts.  Defendants outlined their reasons for terminating Plaintiff (for which Plaintiff now claims were defamatory), and Plaintiff communicated with Moncini extensively in the weeks leading up to her termination.  See Defendants' Summary Judgment at 18-22.

[13] For the sake of clarity, footnote 49 of Defendants' Summary Judgment is supposed to appear on page 51 at the close of the defamation discussion.  Plaintiff addressed that footnote in her Opposition on page 46 at footnote 6.

The communication to McGroary does not, as a matter of law, constitute publication. This Court should distinguish Plaintiff's claim from the cases that have recognized intracorporate publication because those cases involved communications between more than merely the individuals responsible for the termination. See, e.g., Gaudio v., Griffen Health Servs., 249 Conn. 523, 544 n.23 (1999) ("at least three of the plaintiff's supervisors read the [defamatory] letter"); Torosyan v. Boehringer Ingelheim Pharms., Inc., 234 Conn. 1, 27, 662 A.2d 89 (1995) (there were "several supervisors present at [the] discharge [meeting]"); Gambardella v. Apple Health Care, Inc., 86 Conn. App. 842, 849 (Conn. App. Ct. 2005) (communication made to three other individuals between multiple locations). Further, the Connecticut Supreme Court recently encouraged this type of communication, stating that employers should give "specific feedback" regarding the termination because anything else might "actually harm employees by depriving them of the benefit of constructive criticism because of an employer's fear that the comments may be used against it in the future." Cweklinsky, 267 Conn. at 219.[14] Otis did exactly what an employer ought to do in a termination situation: it explained to Plaintiff the reasons why her performance was deficient and a dereliction of her duties as head of safety in an open yet confidential setting, and Plaintiff has not claimed otherwise.

---

[14] Although the Connecticut Supreme Court's decision in Cweklinsky involved a claim of self-compelled defamation, and this case does not, see Plaintiff's Opposition at 46 n.6, the court rejected a claim for self-compelled publication on the basis of the public policy favoring open communication in the termination process. Further, Cweklinsky does not, as Plaintiff suggests, support her position on privilege and malice because those questions were not certified to the court, Cweklinsky, 267 Conn. at 213 n.2, and the Second Circuit merely concluded that a portion of the jury's verdict must have been attributed to self-compelled publication, making it necessary to certify the question to the Connecticut Supreme Court. See Cweklinsky v. Mobil Chemical Co., 297 F.3d 154, 158 (2d Cir. 2002). The Connecticut Supreme Court's decision in Cweklinsky speaks to publication, not privilege or malice, and Plaintiff must prove a publication occurred before she can overcome a qualified privilege through a showing of malice.

Second, there can be no reasonable dispute that the Performance Feedback contained opinions and observations rather than objective facts.  In a futile effort to prove the falsity of some of the observations, however, Plaintiff either cites her "affidavit" or offers the hearsay opinions of others who praised her performance in years past.  Plaintiff's Opposition at 45. These irrelevant citations cannot change the fact that the Performance Feedback contained opinions and observations.  Plaintiff has said it best: "the Performance Feedback Report was replete with disparaging references to Nichani's incompetence, lack of initiative, specific and general failures, inability and/or unwillingness to work with others, inability to adapt, poor judgment and lack of creativity." Id. at 44.  All of these observations are <u>opinions</u> relating to Plaintiff's performance.  <u>See</u> Defendants' Summary Judgment at 50, <u>and cases cited therein</u>.

Finally, there is no dispute that managerial communications in this context are protected by a qualified privilege, <u>see</u> Defendants' Summary Judgment at 51, and Plaintiff has not met her burden of providing concrete evidence that would demonstrate malice to defeat that privilege. Plaintiff's Opposition at 47- 48.  To demonstrate malice, she merely cites paragraphs of her "affidavit," which paragraphs either: indicate that in the past she received good performance ratings or that she was doing a good job, ¶¶ 27-31; try to link her termination with her alleged refusal to mischaracterize the collaborative report of the McQuillan fatality, ¶¶ 57-62, 69; or attempt to show that she was unable to comply with Otis's safety directives, ¶¶ 40, 44-46, 56. None of these assertions, however, shows a malicious motive on the part of the authors of the Performance Feedback, and significantly, Plaintiff has not offered any deposition testimony in this regard from Moncini, Erv Lauterbach, or Danny Reese, all of whom she deposed.[15]  <u>Chadha</u>

---

[15] Plaintiff's citation to <u>Hollander v. American Cyanamid Co.</u>, 895 F.2d 80, 85 (2d Cir. 1990) for the proposition that issues of motive or intent must go to the jury is inapt in this

v. Shimelman, 75 Conn. App. 819, 828, 818 A.2d 789 (Conn. App. Ct. 2003) (holding that, in the defamation context, in order to show statements were made with knowledge of falsity or reckless disregard, "mere statements of legal conclusions . . . and bald assertions, without more, are insufficient to raise a genuine issue of material fact capable of defeating summary judgment").

     **2.**    **The company-wide announcement (located at Defendants' Summary Judgment, Exhibit 14) is not remotely defamatory.**

Defendants' Summary Judgment at 49 adequately disposes of this claim, pointing out that the announcement was not, as a matter of law, derogatory or false: one look at the announcement makes this clear. <u>See</u> Defendants' Summary Judgment, Exhibit 14. Plaintiff does not even argue that the announcement was false; instead, she speculates that someone might have perceived that she had done something wrong, relying on the theories outlined in her own "affidavit." Plaintiff's Opposition at 49-50. Accepting Plaintiff's argument would effectively subject employers to liability merely for announcing personnel moves. Indeed, if Defendants had never mentioned Plaintiff's name in the announcement (and they did so in only a favorable manner), Plaintiff would still likely complain that it created a false impression.[16] This is not a valid basis for a claim of defamation.

---

context. In that case, the court was discussing a plaintiff's burden on showing pretext for age discrimination, not showing malice for defamation.

[16] Moreover, it is irrelevant for defamation purposes that Plaintiff was "shocked" by the announcement. Plaintiff's Opposition at 50. The announcement simply communicated what had happened.

**F.    Plaintiff's Claim of Common Law Wrongful Discharge is Barred Because She Refused to Use Other Statutory Remedies and Has Not Pleaded a Recognized Public Policy (Plaintiff's Opposition at 51)**

Plaintiff walks a legal tightrope on her claim for common law wrongful discharge: on one hand, she tries to identify a specific public policy violation through state and federal workplace-safety statutes, while at the same time arguing that no statutory remedy was available to her.[17] See Plaintiff's Opposition at 53-56. Such an argument is logically untenable, is legally insufficient to invoke Connecticut's "narrow exception" to the employment-at-will doctrine, and comes far too late in this action to avoid summary judgment.

The Connecticut Supreme Court's opinion in Burnham v. Karl & Gelb, P.C., 252 Conn. 153, 161, 745 A.2d 178 (2000) sufficiently disposes of this claim, no matter how Plaintiff characterizes it. The plaintiff in Burnham claimed she wrongfully was discharged in violation of public policy because she reported unsafe working conditions to the state dental association. Id. at 161. The plaintiff identified Connecticut's whistleblower statute, Conn. Gen. Stat. § 31-51m, as the source of public policy, but could not maintain a private action under that statute because the dental association was a not a "public body" as required by the statute. Id. The court explicitly held that, because the plaintiff could not establish a violation of § 31-51m, she could not use that statute as giving rise to a public policy that would support a claim for wrongful discharge. Id.; Sturm v. Rocky Hill Bd. of Educ., 2005 U.S. Dist. LEXIS 4954 (D. Conn. 2005)

---

[17] Also flying in the face of the exclusive-remedy requirement of Connecticut's wrongful discharge jurisprudence are Plaintiff's claims that: (1) she was not an employee-at-will; and (2) the same conduct giving rise to her wrongful discharge claim also is actionable under Connecticut's free speech in the workplace statute, Conn. Gen. Stat. § 31-51q. Although Plaintiff maintains that she may plead wrongful discharge in violation of public policy in the alternative, in case her other statutory claims fail, see Plaintiff's Opposition at 51-52, courts in this District hold to the contrary. See Sturm v. Rocky Hill Bd. of Educ., 2005 U.S. Dist. LEXIS 4954 (D. Conn. 2005) (dismissing claim for wrongful termination based on public policy because plaintiff also alleged a violation of § 31-51q for the same conduct); Lowe v. Amerigas, Inc., 52 F. Supp. 2d 349, 358 (1999) (same).

("The Connecticut Supreme Court has held that a plaintiff who is not entitled to protection under a statute 'cannot use the public policy embodied therein to support her claim of wrongful discharge based upon a violation of public policy.'").

Here, Plaintiff argues that federal and state[18] Occupational Safety and Health Act ("OSHA") statutes supply an explicit public policy under which she can pursue a claim for common law wrongful discharge, but then also argues that she has no protection under those statutes.  Plaintiff's Opposition at 56.  Plaintiff's claim fails under <u>Burnham</u> because, as Plaintiff has argued the point, the public policy embodied in federal and state OSHA does <u>not</u> apply to Plaintiff's termination.  Indeed, the contents of a collaborative internal investigation and report, neither prepared under OSHA nor slated for public viewing, cannot be considered to implicate a specific public policy on which a cause of action for wrongful discharge would lie.

Moreover, the assumption on which Plaintiff relies, i.e., that she had no remedy under OSHA, is incorrect, as the court in <u>Burnham</u> aptly noted.[19]  <u>See</u> <u>Burnham</u>, 252 Conn. at 162-63.  Unlike Conn. Gen. Stat. § 31-51m, 29 U.S.C. § 660(c)(1) does not require that an employee report a violation to a "public body"; rather, it prohibits any discrimination because an employee has exercised "any right afforded" under OSHA.  The very next provision, 29 U.S.C. § 660(c)(2), allows an employee to report potential violations of OSHA to the Secretary of Labor,

---

[18] Plaintiff's assertion that Connecticut OSHA laws provide a source of public policy is without merit because Connecticut's version of OSHA does <u>not</u> apply to private businesses. Conn. Gen. Stat. § 31-367 (defining "employer" as "the state and any political subdivision thereof"); <u>see</u> http://www.ctdol.state.ct.us/osha/aboutosh.htm ("CONN-OSHA does not enforce occupational safety and health standards in private businesses in Connecticut"), last visited on June 6, 2005.  Plaintiff's claim in this regard is on-all-fours with the claim that failed in <u>Burnham</u>.

[19] This assumption is also contradictory to Plaintiff's retaliation claim, wherein she states: "Further, the undisputed facts show that in early 2003, Nichani challenged a decision to make important changes <u>in an OSHA report</u> . . . ."  Plaintiff's Opposition at 42.

who then conducts an investigation.  If Plaintiff truly believed that she was terminated for her refusal to take part in Otis's alleged attempt to conceal the cause of the McQuillan fatality and reduce its potential liability under OSHA, then she could have reported that conduct to the Secretary of Labor.[20]  See Donovan v. R.D. Andersen Constr. Co., 552 F. Supp. 249, 250-251 (D. Kan. 1982) (employee terminated for speaking to media regarding asbestos at a jobsite); see also Reich v. Cambridgeport Air Sys., Inc., 26 F.3d 1187, 1188 (1st Cir. 1994) (affirming recovery under OSHA for whistleblower's coworker-friend); Monique C. Lillard, Exploring Paths to Recovery for OSHA Whistleblowers, 6 Empl. Rts. & Employ. Pol'y J. 329, 339 (2002) (discussing how protection under OSHA is interpreted broadly).  The availability of this statutory remedy precludes any claim for common law wrongful discharge.  See Burnham, 252 Conn. at 164-65 (common law action is precluded even if statutory remedy is inferior).

Finally, Plaintiff's claim also fails because, even if the workplace-safety statutes cited in her Opposition provide a public policy supporting a wrongful discharge action, she failed to plead those specific statutes in her Complaint; instead, she merely pointed to the "policy requiring honesty and integrity in the workplace."  Third Amended Complaint, Count Eleven ¶ 58; see Sturm v. Rocky Hill Bd. of Educ., 2005 U.S. Dist. LEXIS 4954 at *11-12 (D. Conn. 2005) (granting motion to dismiss for failure to plead specific policy); Martin-Glave v. Aventis Pharms., 2003 U.S. Dist. LEXIS 23956 at *6 (D. Conn. 2003) (same); Thibodeau v. Design Group One Architects, LLC, 260 Conn. 691, 698-99 (2002) (must allege an "explicit statutory or constitutional provision" or a "judicially conceived notion of public policy"); Morris v. Hartford

---

[20] Plaintiff has not explained how Otis would have had exposure under OSHA.  If, as the Plaintiff points out, see Plaintiff's Opposition at 56, the internal report was neither required by nor prepared for OSHA, then it could not have implicated Otis's liability under OSHA. Moreover, it is unreasonable for Plaintiff to suggest that OSHA would not provide protection for

Courant Co., 200 Conn. 676, 680, 513 A.2d 66 (1986) ("the employee has the burden of pleading and proving that his dismissal occurred for a reason violating public policy"). Plaintiff's untimely attempt to sensationalize her claim with unsupported facts, and argue that she was terminated because she heroically tried to prevent Otis from concealing management failures and covering up OSHA liability (which somehow was not actionable through OSHA in the first instance) is neither what she pleaded in her Complaint nor sufficient to defeat summary judgment on this claim. See Plaintiff's Opposition at 56.

**G.    Plaintiff's Claim Under Conn. Gen. Stat. § 31-51q Fails Because She Did Not Speak Out On a Matter of Public Concern (Plaintiff's Opposition at 60)**

Plaintiff's claim under § 31-51q fails because, even taking the facts as Plaintiff has stretched them, there is no dispute that Plaintiff's "expressive conduct," however liberally that term is construed, was made in connection with her job duties and, therefore, was not "motivated by [her] desire to speak out as a citizen." Cotto v. United Techs. Corp., Sikorsky Aircraft Div., 251 Conn. 1, 17, 738 A.2d 623 (1999); see Defendants' Summary Judgment at 56. Plaintiff admits as much in her effort to pitch her common law wrongful discharge claim: "a fatal accident occurred at [Otis Elevator], which [Plaintiff] investigated in connection with job duties." (Emphasis added.) Plaintiff's Opposition at 53; Complaint ¶¶ 54-55. As discussed in Defendants' Summary Judgment at 56-58, Plaintiff cannot claim a First Amendment violation for communications: (1) made in the performance of job duties; (2) as part of an internal investigation; and (3) not intended for the general public or an outside agency. See Volberg v. Pataki, 917 F. Supp. 909, 916 (N.D.N.Y. 1996) (internal memo not a matter of public concern when made in the course of job duties).

---

an employee who was terminated for her unwillingness to falsify documents in violation of OSHA. See Plaintiff's Opposition at 56.

Further, Plaintiff has admitted that she never reported <u>to anyone</u> that the changes in the report were false; Plaintiff testified only that she refused Moncini's request to revise the report, i.e., to change her conclusion to read that the root cause of the accident resulted from employee misconduct rather than a deviation of process. Plaintiff's Opposition at 59; Defendants' Summary Judgment at 58. The deposition testimony stating that Moncini wanted to her to revise the report, however, also states that she never reported the incident to anyone, including UTC, OSHA, or the police.[21]  (Dep. Tr. of Sujata Nichani ("Nichani Tr.") at 480-81, Exhibit 5.) Plaintiff's demonstrated nonfeasance throughout this episode not only belies her contention that Otis was engaged in an illegal scheme to reduce its OSHA exposure, but it is also fatal to her claim under § 31-51q, which requires her to <u>speak out</u> as a citizen—Plaintiff did not speak out at all.[22]

## H.    <u>Plaintiff's Was Not Entitled to "Progressive Discipline"</u>

Plaintiff goes to great lengths to argue that Otis could not terminate her, even for cause, without first giving her a lesser degree of discipline. Plaintiff's Opposition at 65, 70, 73. Putting

---

[21] In her Opposition at 57, Plaintiff cites excerpts from her deposition, but fails to include fundamental admissions in her testimony that are fatal to her claims. Moreover, she fails to include those deposition pages in her attached exhibits, <u>see</u> Plaintiff's Exhibit KK, leaving the Court to view only her edited portions appearing at pages 57-59 of her brief. Defendants have attached the relevant portion of Plaintiff's deposition in its entirety, which undermines Plaintiff's assertion that she engaged in protected speech. <u>See</u> Exhibit 5, attached hereto.

[22] Lastly, Plaintiff's argument that she was speaking out on "safety concerns" is a mischaracterization. Plaintiff's Opposition at 62. The report on the McQuillan fatality was made pursuant to Otis's internal investigation; it was not a report for the general public about workplace safety. Much like her claim for common law wrongful discharge, Plaintiff has offered no explanation as to how an internal report, or alleged expressive activity stemming from it, is a constitutionally protected matter <u>public</u> concern. <u>See</u> Defendants' Summary Judgment at 56-57, <u>and cases cited therein</u>.

aside for the moment that such a proposition makes no sense,[23] especially for the head of EH&S

for NAA, see Defendants' Summary Judgment at 60 n.55, Plaintiff offers no proof of any

contractual obligation requiring progressive discipline.

Plaintiff cites her deposition testimony as establishing the existence of a progressive

discipline policy, and also cites to Defendants' Facts at ¶¶ 2, 156.  Paragraphs 2 and 156, and

Plaintiff's responses thereto, however, merely reference the depositions of Moncini and Page:

Moncini testified there was no formal progressive discipline policy for supervisors such as

Plaintiff, and Page testified that although he was aware of a "general practice," individuals have

been terminated in the past without receiving progressive discipline.  See Defendants' Summary

Judgment at 60.  Certainly this evidence does not satisfy Plaintiff's burden of proving her claims

for breach of contract, negligent representation, and promissory estoppel.

Plaintiff also refers to a "discipline matrix," which she has failed to produce to the Court,

and which she now refers to as "the PDP," to give it a tag of legitimacy.  Defendants assume that

Plaintiff is referring to a document entitled "Otis Safety Discipline Procedure," which was

produced to Plaintiff.  See Exhibit 6, attached hereto.  This document plainly states that it

illustrates the minimum amount of discipline that must be employed for a particular violation,

none of which is applicable to Plaintiff.[24]  Moreover, the document appears to be directed to field

employees and field supervisors, not Plaintiff, the Senior Manager of Safety for NAA.  Further,

---

[23] To accept Plaintiff's proposition would prohibit Otis from terminating any employee, no matter how egregious the conduct, without first imposing lesser discipline.

[24] For instance, the document lists "Discharge with Citation" as the fifth category of discipline an employee may receive for violating a category known as "Personal Protective Equipment."  That does not mean, however, that a particular employee must be disciplined four previous times before he or she could be terminated for failing to wear proper protective equipment; rather, it means that the particular employee must receive, at a minimum, one of the penalties listed in the chart, depending on the seriousness of the violation.

-21-

as Plaintiff attested to in her deposition, see Defendants' Summary Judgment at 64, the chart

gives managers and supervisors some guidance "to determine the minimum discipline for

violations." Exhibit 6, attached hereto (quoting the exhibit not the deposition). Nowhere does

the chart list the discipline that Plaintiff was required to receive for her dereliction of duty and

other failures, as head of safety for NAA, to implement Otis's worldwide job site safety

standards. Absent such a showing, her claim fails.

Moreover, with respect to claims of negligent misrepresentation[25] and promissory

estoppel, Plaintiff must show that she detrimentally relied on the so-called disciplinary policy,

i.e., that she would have acted differently if she knew that her conduct could result in her

termination, as opposed to a lesser form of discipline. See Defendants' Summary Judgment at

66. Plaintiff maintains, however, that she performed her duties as best she could, and that her

termination had nothing to do with any deficiencies attributable to her. Plaintiff's Opposition at

Exhibit I (Nichani Affidavit) ¶¶ 28, 29, 32, 34, 37, 47, 51, 56.[26] Thus, she could not have relied

---

[25] Plaintiff's argument that she need only show that Defendants were "not committed" to
progressive discipline misreads Daley v. Aetna Life & Cas. Co., 249 Conn. 766, 794 (Conn.
1999). Plaintiff's Opposition at 70. In that case, the court affirmed jury instructions for a claim
of negligent misrepresentation following a verdict for the employer. Id. The instructions were
affirmed because they stated a necessary, but not sufficient, showing that the Plaintiff must have
made, and the defendant still prevailed. Id. ("Given Daley's express knowledge of the
discretionary nature of Aetna's alternative scheduling options, it is logical to conclude that Daley
could prevail on her negligent misrepresentation claim only to the extent that she successfully
showed that Aetna in fact had provided no such option."). Thus, Daley does not, as Plaintiff
suggests, establish the "correct standard" for showing negligent misrepresentation; it simply
holds that a party cannot prevail on appeal if the jury instruction actually lessened the prima facie
case at trial.

[26] Specifically, Plaintiff alleges that: (1) she did, in fact, properly perform Job Hazard
Analyses, Plaintiff's Opposition at Exhibit I (Nichani Affidavit) ¶¶ 28-29; (2) that it was
impossible to be in compliance with the world wide job site safety standards, id. ¶ 32; (3) she
expected world headquarters to inform her that if she was doing something incorrectly regarding
fist grips, which it never did, id. ¶ 37; (4) she could not implement MELT because of travel
restrictions; id ¶ 47; and (5) it was too costly to implement audible alarms and false cars, as well
as other aspects of the world wide job site safety standards, id. ¶ 51, 56.

on a progressive discipline policy—she now steadfastly maintains that she would not have done anything differently.

Finally, if those reasons are not enough, Defendants cite ample authority that progressive discipline policies do not create enforceable agreements. See Defendants' Summary Judgment at 60-62. Moreover, Plaintiff received several disclaimers affirming her at-will employment status,[27] and Plaintiff has not disputed that Otis had just cause to terminate her. Id. Accordingly, any claims regarding the so-called "progressive discipline policy" must be dismissed.

## I. Plaintiff's Claims Regarding the Code of Ethics are Without Merit

Plaintiff claims that the Code of Ethics constituted "an implied promise that [Defendants] would not discipline or terminate her for adhering to the standards set forth therein." Plaintiff's Opposition at 68; see id. at 70, 72. It is odd that Plaintiff does not identify specific provisions of the Code to which she adhered, or provisions she claims Defendants breached. Plaintiff does suggest that the Code prohibits retribution for contacting UTC to express concerns about, or report violations of, UTC business practices or standards of conduct, and argues (in discussing her claim for promissory estoppel), with no factual citation, that she was terminated because she refused Moncini's request to make certain changes to the collaborative internal report of the McQuillan fatality. Plaintiff's Opposition at 73. Plaintiff admitted in her deposition, however, that she never reported this incident to anyone at UTC. Nichani Tr. at 480-81, attached hereto at Exhibit 5. She also testified that she does not believe that she was terminated for raising safety concerns. Defendants' Summary Judgment at 23. Thus, she cannot maintain that Otis terminated her because she reported violation of a UTC practice.

---

[27] In addition to the disclaimers cited in Defendants' Motion for Summary Judgment, Otis's Human Resources Policy Manual states that "[e]mployment at Otis is on an at-will basis . . . ." Exhibit 7, attached hereto.

Plaintiff has failed to lay out any claimed contractual elements of the Code or identify facts tending to show that Defendants breached those provisions; instead, she merely argues that "one of the real reasons for her termination was her decision to abide by the Code of Ethics." Plaintiff's Opposition at 72. As discussed in Defendants' Summary Judgment at 61, 65, & 66, it is not material whether Plaintiff adhered to the Code of Ethics—she could comply with the Code and <u>still</u> be terminated for her failures and dereliction of duties as head of safety for NAA, for which Defendants have offered ample evidence. <u>See</u> Defendants Summary Judgment at 19-21.

## II.
## CONCLUSION

Although Plaintiff has offered up countless assertions as to why her termination was everyone's fault but her own, the fact remains that all of her hollow allegations, taken separately or together, fail to create a genuine issue of material fact. In other words, Plaintiff is "unable to avoid the inexorable mathematical law that [several] zeros still total zero." <u>Grand Union Co. v. FTC,</u> 300 F.2d 92, 102 (2d Cir. 1962). Defendants respectfully request that summary judgment be granted as to all claims.

-24-

THE DEFENDANTS,
UNITED TECHNOLOGIES CORP. and
OTIS ELEVATOR COMPANY


By_____/s/ Albert Zakarian_____


     Albert Zakarian (ct04201)
     Douglas W. Bartinik (ct26196)
     Day, Berry & Howard LLP
     CityPlace I
     Hartford, CT 06103-3499
     (860) 275-0100 (telephone)
     (860) 275-0343 (facsimile)
     *azakarian@dbh.com*
     *dwbartinik@dbh.com*

     Their Attorneys

## <u>CERTIFICATION</u>

I hereby certify that the foregoing was sent via regular mail, postage prepaid, on this date, to:

Anthony Minchella, Esq.
Law Offices of Anthony R. Minchella, L.L.C.
530 Middlebury Road
Suite 212-213B
Middlebury, CT 06762

Jeffrey J. Tinley, Esq.
Robert Nastri, Esq.
Tinley, Nastri, Renehan & Dost, LLP
60 North Main Street
2nd Floor
Waterbury, CT 06702


_____/s/ Albert Zakarian_____
Albert Zakarian