<u>SUJATA NICHANI</u>
<u>VS.</u>
<u>UNITED TECHNOLOGIES CORP. AND OTIS ELEVATOR COMPANY</u>
CIVIL ACTION NO. 3:02CV1384 (MRK)


# Exhibit 1


**Defendants' Reply to Plaintiff's Opposition to**
**Motion for Summary Judgment**

# EXHIBIT 1

The following chart highlights selected paragraphs of Plaintiff's affidavit (Plaintiffs Opposition, Exhibit I) that are: (1) not in compliance with Rule 56(e) of the Federal Rules of Civil Procedure; (2) contradict her prior deposition testimony; and/or (3) are based on evidence that would be inadmissible at trial. See Fed. R. Evid. 602 (witness must have personal knowledge of the matter in question), 701 (opinions of lay witnesses are generally inadmissible), and 802 (rule prohibiting hearsay).

| Paragraph Number | Reason(s) Why Court Should Ignore Statement |
|---|---|
| 1.    I am the Plaintiff in the above matter, and make this affidavit in opposition to the Defendants' Motion for Summary Judgment. | Defendants note that affidavit was not made on personal knowledge. |
| 2.    I am of Asian Indian Ancestry, and was formerly and most recently employed by the Defendants at Otis' North America Area ("NAA"), up until my termination on March 21, 2003, as Senior Manager for Environment, Health and Safety ("EH&S"). | |
| 3.    Roland Tillison, Vice President of the Southern Area, told me that I "would be the first female president of Otis." William Miller also told me when I was hired as Senior Manager EH&S, that if my performance was good, I would be promoted to an L3, executive level after one year.  I perceived this as a clear representation to me that if I performed well for one year, I would become an L3. Indeed, I had been identified as having the potential to be an executive level employee early on in my career. | This paragraph is contradicted by Plaintiff's deposition testimony, wherein she admitted that Miller did not have authority to promote her.  See Defendants' Facts, 20; see also Defendants' Summary Judgment at 5. |
| 4.    During my career, I also worked for a man by the name of William Gooding, who was a Regional General Manager at Otis. Mr. Gooding admitted to me at the time that I was paid much less than men doing the same job as I was doing, and therefore he gave me a few "good raises" to help me get closer to their pay. Mr. Gooding also stated that he would have promoted me to Lead Supervisor during my time in New York, but he did not "because the guys would not be able to handle it." | This paragraph is based on inadmissible hearsay, opinion and specualation. |
| 5.    On Thursday, April 26, 2001, Ellen McGroary, Vice President of Human Resources, entered my office and, in McGroary's words, gave me a "heads up." She explained that Brad Russell had been given my job and that Moncini would be offering me Branch Manager positions in Atlanta, Georgia or San Jose, California. I had previously been a branch (or "location") manager with Otis, and these positions were graded at one to two levels | |

| Paragraph Number | Reason(s) Why Court Should Ignore Statement |
|---|---|
| below what my grade was at that point, a 51. | |
| 6.　　Moncini offered me the lower level positions on April 26, 2001. Because the positions entailed fewer responsibilities than my present job did, and were graded at lower levels, I was not interested in taking them. | |
| 7.　　Moncini also suggested I seek an operations manager position with Otis' North American Acquisition Company. This job would also entail significantly fewer responsibilities than those I had as Safety Manager of NAA. I spoke with the head of NAES (who worked directly for Moncini) who told me that there was no operations job available. Moncini also said he would set up a dinner meeting to help me find another position, with him, Christopher Doot and Ed Minich, but Moncini never got back to me about that dinner. | |
| 8.　　Otis sent out a company-wide announcement which stated that I would be taking a "senior NAA Line Management Position" - and that Brad Russell would be taking my position. Also, when I was shown the announcement, McGroary asked me if I was okay with the announcements. I responded with a question: "Do I have a choice?" to which McGroary said "No." | |
| 9.　　McGroary told me that the announcements would not go out until Thursday, when the dinner meeting was to occur with Moncini and I, presumably because a position might be in place for me. Yet the announcements went out anyway. | |
| 10.　　The representation in the announcement that I would be taking a senior line management position was false since no position was in place. Also, because of the rapidity within which I was moved out of my position and Russell placed into it, and a recent announcement about a Business Practices Officer acting unethically, other Otis employees thought I had done something wrong in connection with my job.  I received dozens of phone calls inquiring as to what new position I would be taking, why the change had been made, and why the announcement did not designate what my position would be. Some people asked me what I did wrong. Trudy White and Judy Sessions, Otis employees, told me that everyone that had read the announcement thought that I was removed from my position because of wrongdoing. | This paragraph is based on inadmissible hearsay, and states Plaintiff's unsupported conclusions, beliefs, and speculations. |
| 11.　　My direct reports, after that announcement went out, and after I resumed the position, seemed to lose faith | This paragraph is an argument that lacks factual support and states |

-2-

| Paragraph Number | Reason(s) Why Court Should Ignore Statement |
|---|---|
| in me, and were less cooperative. I did not have the same authority or leadership level over them after that announcement, making my ability to perform my job more difficult. I believe my business reputation was harmed as a result of that announcement. | Plaintiff's conclusions, beliefs, and speculations. |
| 12.     After Russell stepped into the position, on Thursday, May 10, 2001, Mr. Rangnekar, the Communications Manager, asked me to speak on elevator safety for an NBC television broadcast. I told him that I was no longer the Senior Manager for Safety, but that Brad Russell was and should speak. He told me that Mr. Russell was not knowledgeable enough. This reinforced the fact that Russell was not as skilled or qualified as me to perform that EH&S job. Others, including Ray Moncini, and Russell himself, said that Russell needed to learn the elevator business. Russell also, while he held the safety position at NAA, made a freshman mistake of characterizing a particular accident as serious, something an experienced safety professional would not have done since there are clear guidelines to define serious versus non-serious accidents. | This paragraph is based on inadmissible hearsay, and states Plaintiff's unsupported conclusions, beliefs, and speculations. |
| 13.     I learned that Russell later resigned from the Otis, and Moncini asked me to take the EH&S position back, saying he'd love to have me back in safety (although he previously told me safety was not right for me when he asked me to take the branch manager positions). I took my old position back, in part because I had no other place to go. | |
| 14.     I discovered soon after resuming the role of EH&S leader of NAA, that Russell had been compensated as an L3, which I knew to be the first executive level position for UTC and Otis. I believed that the reason I was not compensated as an L3, or promoted to an L3, was because of my race and gender. Almost every other EH&S leader for the other Otis Areas was a male and was compensated at Level 3. Axel Moeller, the Director of Safety and Environment at Otis Central Europe, did not have a safety degree or any safety or operational experience but was made an L3 after being in the position for approximately one year. | This paragraph is an argument that lacks factual support and states Plaintiff's conclusions, beliefs, and speculations. |
| 15.     On May 23, 2001, I inquired of McGroary why Brad Russell had received greater pay and benefits than I for doing less work (I was also the Business Practices Officer while Russell did not assume those | |

-3-

| Paragraph Number | Reason(s) Why Court Should Ignore Statement |
|---|---|
| responsibilities). McGroary did not respond at all for two weeks and then responded only after I sent her a reminder e-mail on June 5, 2001. She only responded after several e-mails from me and the reminders went on for 7-8 weeks. | |
| 16.    McGroary suggested that we meet to discuss the issue, but never made any attempt to arrange this meeting, and appeared unresponsive to my concerns. For example, on Monday July 2, 2001, I e-mailed McGroary saying that I was available to meet with her on July 9, 2001. McGroary's secretary responded and asked me whether I was available to meet with McGroary on July 12, 2001, to which I said yes. McGroary never made any arrangements for this meeting, and no such meeting occurred. | This paragraph is an argument that is based on inadmissible hearsay and lacks factual support, and also states Plaintiff's conclusions, beliefs, and speculations. |
| 17.    I did not think it appropriate to discuss this issue with Ray Moncini, since I understood that he had made the decision to remove me from my position. I thought it more proper to pursue my complaint through Human Resources and McGroary. | This paragraph states Plaintiff's beliefs, opinions, and conclusions. |
| 18.    I filed my charge of discrimination because it was clear to me that McGroary and Otis were not going to change their position. I did not file the charge "instead" of anything else; I filed it because I believed it was the only thing left to do. | This paragraph states Plaintiff's beliefs and opinions. |
| 19.    When Russell took over my job, and I spent the several days before he resigned helping him transition, it was clear he was going to do the same work as I did, with an office in the same building, covering the same area and regions, with the same responsibilities, direct reports and staff. Indeed, I was teaching him how to perform my job, as Moncini instructed me to. | This paragraph contradicts Plaintiff's deposition testimony, wherein she stated that Russell showed no interest in being taught the job. (Nichani Tr. 131, 225-26, attached hereto as Exhibit 2.) It also is argumentative. |
| 20.    I have reviewed all of the duties and responsibilities contained in Russell's Recommendation Package, and they describe the work that I performed as safety leader of NAA, both prior to and after Russell resigned, up until my termination in March 2003. Indeed, all EH&S leaders of the various areas have the same core responsibilities. | This paragraph in an argument that states an unsupported conclusion. |
| 21.    Every position I held with Otis had a significant safety component to it, and as I was promoted up through the company, I acquired additional safety experience and education. Defendants rated me on safety-related topics in my performance appraisals in my previous positions. I was appointed to the Regional EH&S Steering Committee and helped lead the Region into the next level of safety. | This paragraph is a vague argument and hearsay. |

-4-

| Paragraph Number | Reason(s) Why Court Should Ignore Statement |
|---|---|
| And while I was a Field Operations Manager in 1997 and 1998, I was recognized as "a key member of [the] Regional Safety Committee and led . . . training of location managers in EH&S policy." | |
| 22.    I was never given a written job description, and was never told, nor do I believe, that a requirement exists that safety directors have an EH&S or safety degree. | This paragraph states Plaintiff's beliefs and opinions. |
| 23.    During my employment with Defendants, I faced the reality that the elevator business is a man's business, especially for a position such as EH&S, and the prior positions I had held. Events occurred during my career that support this belief. | This paragraph states Plaintiff's beliefs and opinions. |
| 24.    For example, during a June 26, 2001 Regional Field Operations Management meeting in Nogales, Mexico, Robert Wolf projected a safety tip on the screen entitled "Why Men Die Young" depicting disasters that happen as men are distracted by scantily clad women. The entire group laughed hysterically, including a Regional Vice President, Lou Rinaldo. This was witnessed by Scott Simmons, Mark Dye, Steve Martin and Regional Field Operations Managers. Otis does not dispute that this presentation was made, (and I find it offensive that its attorneys would characterize it as "a friendly email;" and a "clever marketing campaign advertisement"). Here, it was used in connection with a safety meeting at which I was the only woman. After that presentation I told the person running the meeting that it was inappropriate. | This paragraph is an argument that states Plaintiff's beliefs, perceptions, and opinions and also contains hearsay.  See also Defendants' Summary Judgment at 24. |
| 25.    Other sexually charged events have occurred that lead to the inference that gender is involved in the employment decision making at Otis. During a safety class in Bloomington, Indiana, William Bowling started the class with a joke about a woman's vagina, which was witnessed by Wendy Cramer, another Otis employee. | This paragraph is vague, based on hearsay, and has never been raised until now, even though Plaintiff was asked in her deposition who had discriminated against her at Otis.  See Defendants' Summary Judgment at 23-24. |
| 26.    Also, during an Otis World Headquarters Meeting, an Otis manager projected an e-mail from his laptop which included a screen that was titled "Petite Women, Tight Asses" which was witnessed by Tiz Weber, Lou DeLoreto, Maryann Simonetti, Melanie Rakita and Scott Gaskill, in addition to me. | |
| 27.    In my 1995 Performance Review, I was rated Exceptional in the category labeled "Initiative and Adaptability", and the rater stated that I was "always willing to take initiative and seek solutions on [my] own. | This paragraph states Plaintiff's beliefs, opinions, and conclusions. |

| Paragraph Number | Reason(s) Why Court Should Ignore Statement |
|---|---|
| [I was] also smart enough to run ideas by [my] superiors to get feedback and consultation." I continued to perform at that level, and indeed Moncini reviewed my performance in 2000 and made glowing comments about my performance. These reasons, and others discussed below and in my attorneys' documents being filed, with the court, are why I believe that my termination was pretextual and was motivated by unlawful bias and by my charge of discrimination. | |
| 28.    Otis NAA at any one time had thousands of new and modernization projects occurring. Otis has layers of line management and field personnel to ensure that safety process are implemented and followed. One of those processes included a Job Hazard Analysis, as discussed in the Defendants' papers. It would be impossible for one individual (meaning me) to ensure that, because of the numerous situations in which a Job Hazard Analysis was required to be used and the fact that thousands of these situations could occur simultaneously throughout NAA on a daily basis, that a JHA was used throughout NAA. I did, however, implement fully the policy to use a JHA in the field when there was no standard work process. | This paragraph is an argument that states Plaintiff's beliefs, opinions, and conclusions. |
| 29.    Defendants continue to try and establish that I completely failed in my duties as safety leader, by, for example, seeking to blame solely me for the increase in accident rates from 1999 to 2000, my first year in the position. Well, it is not uncommon among any Otis Area to have years when accident rates increased and others when they declined.  The accident rate increase in NAA from 1999 to 2000 occurred largely because of the numerous reorganizations that were taking place in the regions and, as I explained to Moncini in an e-mail dated March 7, 2001 (with attachment), because of the high number of new and inexperienced employees hired during that period. An increase in accident rates, especially the increase from 1999 to 2000, can also be attributed to a corresponding increase in construction activity in certain re regions within NAA. More construction means more opportunity for accidents. | This paragraph is an argument that states Plaintiff's conclusions, beliefs, and speculations. |
| 30.    Moreover, during that same period, a restructuring reduced the number of regions from approximately 20 to approximately 7, further negatively affecting the safety statistics. | This paragraph is an argument that states Plaintiff's conclusions, beliefs, and speculations. |
| 31.    Moncini, during my 2000 Performance Review | This paragraph is an argument that |

| Paragraph Number | Reason(s) Why Court Should Ignore Statement |
|---|---|
| never criticized me for the accident rate increase from 1999-2000. The accident rate improved from 2000 up until the time of my termination and, from my observations of him, these statistics were the primary way that Moncini measured safety performance. | states Plaintiff's conclusions, beliefs, and speculations. |
| 32.    Concerning compliance with the WWJSSS, no Otis Area was ever in full compliance. That was impossible. | This paragraph is a conclusory argument that states Plaintiff's opinion. |
| 33.    Otis relies on various type of audits to identify compliance with WHQ policy, including the World Wide Job Site Safety Standards. These include Field Audits, Fatality Prevention Audits, and Assurance Reviews. All Assurance Reviews go to the NAA President Ray Moncini. And Moncini must make the decision about compliance with WHQ policy. More often than not, compliance Issues raised cost Issues, and Moncini did not want to spend the money to address many of these issues. | This paragraph contains Plaintiff's opinions, impressions, and conclusions. |
| 34.    Moncini had put in place the management structure in the New York region, including hiring Erv Lauterbach, and also placed people in management positions with very little field experience, so Moncini did not want to sanction those individuals as severely, but rather used safety compliance issues as cover for his decision to terminate me. | This paragraph is an argument that contains Plaintiff's opinions, impressions, and conclusions. |
| 35.    Otis has stated that one of the reasons for my termination was my failure to implement the WWJSSS concerning fist grips, a standard that evolved from 2 iterations of the WWJSSS, one effective December 2000, and another effective December 2001. | This paragraph is a vague conclusion based on hearsay. |
| 36.    Otis, soon after the McQuillan fatality, took the position that I failed to implement the WWJSSS by eliminating fist grips entirely. When they, meaning those who knew about my discrimination lawsuit, realized that the facts did not support their position, they changed to say that I did not communicate the standard to the regions, especially that a JHA had to be performed. | This paragraph is vague and argumentative, and contains Plaintiff's opinions, impressions, and conclusions. |
| 37.    Prior to the McQuillan fatality, I sent an e-mail to Tim Beck, Director of Safety and Quality for Otis WHQ, confirming that NAA had eliminated U-Bolt Clips and stating that fist grips were to be used as per the WWJSSS. Mr. Beck did not respond to that e-mail. I expected, reasonably, that WHQ would inform me if I was interpreting the standard incorrectly. | Plaintiff has provided no factual support for this assertion. |
| 38.    Also, on August 17, 2001, Pat Dowson (WHQ | Plaintiff has provided no factual |

| Paragraph Number | Reason(s) Why Court Should Ignore Statement |
|---|---|
| EH&S) sent out a Standard Work Process, N-0.1.5-3 concerning Hoisting and Rigging which clearly states that fist grips were to be used instead of U-Bolts. | support for this assertion. |
| 39.    After the McQuillan fatality, and as I quickly realized that Defendants were taking the McQuillan death as an opportunity to retaliate against me and set me up for termination, I asked several times for the meeting minutes of the WWJSSS Committee for the period when the fist grip standard was changed, so that I could further clarify the issue and my understanding. Despite numerous requests, I was never provided those minutes. | This paragraph is an argument that states Plaintiff's conclusions, beliefs, and speculations. |
| 40.    Furthermore, Moncini received every single assurance review performed in NAA and did not care about anything other than the score as long as NAA was 80%+. He would also occasionally sit in on the briefing of the assurance reviews and argue with the UTC & Otis WHQ auditors about how they are wrong and their policies don't apply, particularly when they involved financial capital to implement. | This paragraph is an argument that states Plaintiff's conclusions, beliefs, and speculations. |
| 41.    Five (5) Assurance Reviews were completed for NAA and not one identified fist grips as an issue. | Plaintiff has provided no factual support for this assertion. |
| 42.    My final performance review finds fault for my failure to implement a WWJSSS requirement that the mechanics use lineman gloves. | |
| 43.    I was instructed by Patrick Dowson, the then Director of EH&S Programs for World Headquarters, to issue latex gloves and ensure that employees throughout NAA utilize these for electrical protection since lineman gloves could not be used. | |
| 44.    I informed Mr. Dowson that OSHA prohibits latex gloves to be used for electrical protection. He instructed me to use them anyway. | |
| 45.    I consulted with Douglas Labreque, Manager of Maintenance for NAA-also known as, the "process owner for service," regarding the use of any type of glove that could be used and was told that no glove would be suitable for this purpose and still allow the required tasks to be performed. | This statement is based on hearsay. |
| 46.    I discussed the use of gloves with Danny Reese who admitted that they could not be used and did not know what could be used in their place. | |
| 47.    I have been criticized, and indeed terminated, purportedly for not implementing the MELT program, or Mid to Executive Level Training. Moncini was well aware | This paragraph is an argument that states Plaintiff's conclusions, beliefs, and speculations. |

-8-

| Paragraph Number | Reason(s) Why Court Should Ignore Statement |
|---|---|
| that the program had not been implemented as deployed from WHQ, because his order that the travel restrictions be complied with made it impossible to implement MELT. Otis Implemented very strict travel restrictions in order to maintain profits. Moncini was incessant about enforcing these restrictions. | |
| 48.    I took steps to implement MELT training but was met with resistance by Moncini and Bousbib's travel policy restrictions. Such training would require at least 35-40 people to travel per class. Also, in order to comply with the travel policy, NAA instead implemented MELT on a CD ROM that could be used by the regions and with the help of their safety manager without violating the travel policy. I even setup a MELT class in Lou Rinaldo's region, and he cancelled the class due to the travel policy. | This paragraph is a vague argument that states Plaintiff's conclusions, beliefs, and speculations. |
| 49.    I have also been criticized, and terminated, purportedly for not filling safety manager positions. Well, I met resistance in filling the open Safety Manager positions, and early on in my attempt to fill these positions recommended two candidates whom were rejected by Lou Rinaldo. The regions demanded safety professionals, which were much more difficult to identify, and they still rejected one of the candidates even though the individual was a safety professional. | This paragraph is a vague argument that states Plaintiff's conclusions, beliefs, and speculations. |
| 50.    I also submitted a request for approval for one new hire and one replacement on January 12, 2001 to Moncini and McGroary. Again because of financial reasons, I was told by them to hold off because of the "current circumstances." | Plaintiff has provided no factual support for this assertion. |
| 51.    I have also been criticized, and indeed terminated, for not implementing a WWJSSS concerning audible alarms on false cars. This is another example of my attempts to implement a standard in the field which, as Moncini was always concerned about, was costly to implement without value added. | This paragraph is an argument that states Plaintiff's conclusions, beliefs, and speculations. |
| 52.    The standard required that false cars be made with an audio alarm to warn Otis employees who may be in an elevator shaft, that a false car is starting to move. | This paragraph contains no factual support and is a conclusory statement. |
| 53.    From the technical perspective, Scott Simmons and I reviewed the standard and primarily because the false car motor has a higher decibel level than the sonar alert, determined that the alarm would not bring any value or added safety. | This paragraph states Plaintiff's conclusions, beliefs, and speculations, and also is based on the hearsay opinion of another lay witness. |
| 54.    This issue was discussed with Moncini who did | This paragraph is an argument that |

-9-

| Paragraph Number | Reason(s) Why Court Should Ignore Statement |
|---|---|
| not want to spend the money to add these alarms. | states Plaintiff's conclusions, beliefs, and speculations. |
| 55.    Additionally, WWJSSS required that these devices be used during modernization, but no product ever existed that could be used at the time because of the interface issues with the older controllers. Therefore, every Otis area was out of compliance with this standard, and this was known by Danny Reese, Tim Beck and Pat Dowson, at world headquarters. | This paragraph is an argument that states Plaintiff's conclusions, beliefs, and speculations. |
| 56.    There are other instances where lack of compliance with standards, whether WHQ or not, was because NAA, and Mancini, did not want to spend the money. Elevator cabs were found to not meet fire code, and Moncini instructed John Lillquist to keep the issue quiet and hide it because it was too expensive to fix. I requested that Moncini approve budgets to implement the WWJSSS concerning auto stop blocks on false cars, guardrails on running platforms, and the budget was never approved. | This paragraph is an argument that states Plaintiff's conclusions, beliefs, and speculations. |
| 57.    As EH&S leader I was assigned to investigate the McQuillan fatality. As with any serious accident investigation, the safety leader, I in this case, must follow a prescribed process called the Root Cause Analysis or Tap Root, which is designed to identify the root causes of the accident. One of the key aspects of this analysis is to eliminate management failures before finding fault anywhere else. In other words, if management failures caused the accident, identify those first. If, after investigating you do not identify management failures, then you can move to identify other causes, including employee fault. | This paragraph states Plaintiff's conclusions and beliefs. |
| 58.    My final report, attached as Exhibit A, was absolutely not inaccurate nor filled with speculation, conclusions or perceptions. Attorney McNamara just does not realize that the report must follow the Root Cause analysis. He was interested in, and I was told this by Danny Reese, reducing Otis' OSHA exposure on the accident, which at the time Otis faced criminal violations because the circumstances surrounding the accident involved "willfulness" and another fall protection violation. Fall protection was a major issue for the McQuillan fatality, because the fall protection requirements were being ignored in the New York Region. Indeed, the requirement that there be two lifelines in each | This paragraph is an argument that states Plaintiff's conclusions, beliefs, and speculations. In addition, there are no exhibits attached to Plaintiff's affidavit. |

| Paragraph Number | Reason(s) Why Court Should Ignore Statement |
|---|---|
| hoistway was ignored because it cost too much. | |
| 59.    I find it interesting how Attorney McNamara claims my report was inaccurate, but he fails to specifically identify any inaccuracies, speculation or perception. I will therefore review some of the changes to the report I prepared as compared to the final report McNamara relies on, which is attached as Exhibit B: | This paragraph is an argument that states Plaintiff's conclusions, beliefs, and speculations, and is based on hearsay.  In addition, there are no exhibits attached to Plaintiff's affidavit. |
| a.    The Goldman Sachs project where the McQuillan fatality occurred was staffed by members of Local Union #1. Local Union #1 required the use of only a certain type of sheave and reeving block, and this was a one piece sheave. This made it absolutely necessary for the mechanics to disassemble the hoist cable in order to feed it through the sheave, and subsequently to reassemble the rope using the fist grips. The McNamara report removed completely the first paragraph of my report at NICH000580 concerning this topic. This paragraph was not speculation, perception or inaccurate, and indeed Scott Simmons testified to this at his deposition. | This paragraph is an argument that states Plaintiff's conclusions, beliefs, and speculations, and is based on hearsay.  In addition, there are no exhibits attached to Plaintiff's affidavit. |
| b.    The McNamara report changed Section 3 "Regional Vice President Comments" at NICH000582, of my report. First, it placed Employee Behavior as the first "fundamental issue" which is contrary to the root cause analysis. Then, the McNamara report altered the "Management System" section of my report by stating that "It appears there were deviations from the required management protocol" when in fact the investigative team, including me, witnessed a breakdown of management protocol, as my report stated. | This paragraph is an argument that states Plaintiff's conclusions, beliefs, and speculations, and is based on hearsay.  In addition, there are no exhibits attached to Plaintiff's affidavit. |
| c.    Also, the "Causal Factors" section of my report at NICH000582, was changed to become the "Direct Factors" and "Indirect Factors" sections of the McNamara report. Importantly, and against the Root Cause Analysis requirement, the McNamara report stated "Employee riding hoisted load" as the first direct factor. More importantly, the McNamara report places the lack of fall protection as an "Indirect Factor" and describes it as a "violation of company policy unrelated to the accident." This is false: fall protection was a clear policy directly related to the accident as was the requirement for a lifeline in each hoistway. Had McQuillen utilized his fall protection as required, he would not have died from the accident. | This paragraph is an argument that states Plaintiff's conclusions, beliefs, and speculations, and is based on hearsay.  Moreover, it is contradicted by Plaintiff's deposition testimony wherein she stated that none the changes made to her report were false.  See Defendant's Summary Judgment at 23.  In addition, there are no exhibits attached to Plaintiff's affidavit. |
| d.    Additionally, my report at NICH 000583 | This paragraph is an argument that |

| Paragraph Number | Reason(s) Why Court Should Ignore Statement |
|---|---|
| noted the Root Causes, and included under the section "Inspections" that "contractor audit findings not addressed by Otis." This was accurate, not speculative and not a perception. Turner Construction, the General Contractor for the project, had audited the site and cited Otis on a dozen or so occasions prior to the McQuillan fatality for lack of fall protection. The McNamara report instead moved this to a section titled "Other Issues to Be Addressed" at NICH000567. The McNamara report also changed my statement at NICH000585 which read: "The Turner audits assert that fall protection was not used and/or worn by Otis personnel on 13 separate occasions from June 7, 2002 until December 19, 2002." This statement was factually accurate. The McNamara report instead states: The Turner audits assert that fall protection was not used and/or worn by Otis personnel on various occasions June 7, 2002 until December 19, 2002. | states Plaintiff's conclusions, beliefs, and speculations, and is based on hearsay. In addition, there are no exhibits attached to Plaintiff's affidavit. |
| 60.    My handwritten notes on NICH000577 through 000589 of Exhibit A note other changes to the report as compared to the McNamara report. | This paragraph is an argument that states Plaintiff's conclusions, beliefs, and speculations, and is based on hearsay. In addition, there are no exhibits attached to Plaintiff's affidavit. |
| 61.    The report which I prepared followed the root cause analysis as required, and Moncini told me to change the report, in disregard for the clear process. I refused to make the change. For example, I refused to take out the reference to fall protection because had McQuillan been wearing fall protection as required, he would not have died. I believe that the changes that were made, and the changes I was asked to make, would be false, because of the deviation from the Root Cause Analysis, and the implications for Otis exposure on fall protection because at the time of the McQuillan fatality. Otis was a repeat offender for fall protection violations, and faced potential criminal sanctions if McQuillan's death was attributed to lack of fall protection. | This paragraph is an argument that states Plaintiff's conclusions, beliefs, and speculations, lacks factual support, and is based on hearsay. Moreover, it is contradicted by Plaintiff's deposition testimony wherein she stated that none the changes made to her report were false. See Defendant's Summary Judgment at 23. In addition, there are no exhibits attached to Plaintiff's affidavit. |
| 62.    The Regional Vice President for the New York Region where McQuillan died, Erv Lauterbach, had safety oversight responsibilities to ensure that WHQ policies were implemented, yet he failed to perform his required audits, and the Region was extremely non-compliant with established processes, such as lifelines installed in hoistways and requiring employees to wear fall protection. | This paragraph is an argument that states Plaintiff's conclusions, beliefs, and speculations. |

| Paragraph Number | Reason(s) Why Court Should Ignore Statement |
|---|---|
| Yet he received only financial sanctions. Interestingly, Lauterbach was hired by Moncini to work for Otis. And then there is William Cassidy, who Moncini described as wonderful and who directly oversaw the Goldman Sachs project and admitted that the fall protection rule was not being followed in New York and that lifelines cost too much. | |
| 63.     Immediately after I filed my charge of discrimination, Moncini became completely unapproachable. We no longer communicated in person, and everything was done through e-mail. I was given the silent treatment. After my charge of discrimination was filed, virtually the only method Moncini used to communicate with me was through e-mail, even though our offices were less than 50 feet apart. | This paragraph is an argument that states Plaintiff's conclusions, beliefs, and speculations. |
| 64.     Then, in the first award year after I filed my charge of discrimination, 2002, I received no stock options even though I had continued to perform at the highest level, and had received them for every previous year I was eligible. | This paragraph is an argument that lacks factual support and states Plaintiff's conclusions, beliefs, and speculations. See Defendants' Summary Judgment at 40. |
| 65.     I also did not receive any stock options in 2003. While Otis claims the program was discontinued, Steve Page testified that it was still in place. | This paragraph is an argument that lacks factual support and states Plaintiff's conclusions, beliefs, and speculations. See Defendants' Summary Judgment at 40. |
| 66.     Even though Otis has a policy of performing annual performance reviews, and I had received one glowing review by Moncini for the period ending December 2000, I never received another review, nor negative comment about my performance, until the Investigation of the McQuillan fatality, nor did I received any discipline until I was terminated on March 21, 2003, almost 27 months later. I also did not receive a PIP bonus after I filed my claim, nor did I receive a merit increase for the first time ever with Otis after I filed my claim. | This paragraph is an argument that lacks factual support and states Plaintiff's conclusions, beliefs, and speculations. See Defendants' Summary Judgment at 40. |
| 67.     Erv Lauterbach told me, during an Assurance Review in the New York region in early February following the McQuillan fatality, that the auditors had an agenda to discredit me and make me look as if I was not doing my job. | This paragraph is a vague argument based on hearsay, and lacks factual support. |
| 68.     On January 30, 2003, a meeting was held at WHQ at Moncini's request to review NAA's compliance with the WWJSSS and training initiatives. I participated by telephone conference and Erv Lauterbach was present in | |

| Paragraph Number | Reason(s) Why Court Should Ignore Statement |
|---|---|
| person. Afterwards, Lauterbach told me that he "could not believe how hostile they were towards you, it was unbelievable." Lauterbach also said that what he got out of the meeting was that I had asked for help and clarification several times and that my requests were ignored. | |
| 69.     I served as Otis NAA's Business Practices Officer from late 1999/early 2000 to just days before my termination. Those responsibilities were taken away from me during the McQuillan fatality Investigation. And it was done within days of when Moncini asked me to change the report I had prepared. I believe another reason for my termination was because of the ethical issues raised when I refused to change the report, and I was retaliated against for my refusal, in violation of the very Ethics Policy that I, as Business Practice Officer, was expected to apply. | This paragraph is an argument that states Plaintiff's conclusions, beliefs, and speculations. |
| 70.     Of the 18 people who reported to Moncini, in August of 2001, only two were paid as Senior Managers rather than the higher salary level of director: Dilip Rangnekar and me, who are both of Indian National Origin. Mr. Rangnekar was moved laterally to World Headquarters, and replaced by a female, who was kept at the Senior Manager level. | This paragraph is a vague argument that lacks factual support and states Plaintiff's conclusions, beliefs, and speculations. |
| 71.     After my employment was terminated, defendants' replaced me with a male, Patrick Dowson, who is compensated at a director level, yet is less qualified for the position. He does not possess a safety degree, professional safety experience, or any college degree. | This paragraph is an argument that lacks factual support and states Plaintiff's conclusions, beliefs, and speculations. It is also incorrect because Dowson, in addition to performing his other duties, merely assumed Plaintiff's former duties on an interim basis. See Defendants' Summary Judgment at 22. |
| 72.     Otis and UTC have been entirely inconsistent with their explanations about who made the decision to remove me from my position, who made the decision to bring Russell over, why Russell was brought over, why Russell was compensated at the L3 level. First they said the position was not re-graded, though the contemporaneous documentation says that it was; later they said that Russell was red-circled in the position; they have also stated that the job was not regraded or reclassified and that the job was reclassified but not red-circled. Whatever excuse or terminology they may choose, Russell was given my job, | This paragraph is an argument that lacks factual support and states Plaintiff's conclusions, beliefs, and speculations. |

| Paragraph Number | Reason(s) Why Court Should Ignore Statement |
|---|---|
| in which I was providing fully competent and satisfactory performance, at a higher salary and grade, even though he was not fully competent based upon relevant experience to perform the job. The defendants have been similarly inconsistent about the alleged deficiencies in my performance and whether the WWJSSS eliminated fist grips entirely, or not. | |