FILED

**UNITED STATES DISTRICT COURT** 2: 29
**DISTRICT OF CONNECTICUT**

SUJATA NICHANI,       :      CIVIL NO. 302CV1384 (MRK)

      Plaintiff      :

      v.      :

OTIS ELEVATOR COMPANY and    :
UNITED TECHNOLOGIES
CORPORATION      :

      Defendants    :      NOVEMBER 21, 2005

**PLAINTIFF'S MOTION FOR LEAVE TO AMEND**
**AND FILE FOURTH AMENDED COMPLAINT**

Pursuant to Fed. R. Civ. P. 15(a) plaintiff hereby moves for leave to amend

her Third Amended Complaint dated April 20, 2004, in the particulars described

below:  A copy of plaintiffs' proposed Fourth Amended Complaint is attached hereto

as Exhibit A.  In support of her Motion for Leave to Amend, plaintiff states as

follows:

1.    Plaintiff's Third Amended Complaint was filed on or about June 25,

2004.

2.    Plaintiff amends her Third Amended Complaint to reflect the Court's

ruling on summary judgment, which permitted the following claims to remain in the

case:

a. Sex discrimination under Title VII and state law (Counts 1 and 5 of the

Proposed Fourth Amended Complaint);

b. Plaintiff's Equal Pay Act claim (Count 2 of the Proposed Fourth Amended Complaint);

c. Retaliation under Title VII and state law (Counts 3 and 6 of the Proposed Fourth Amended Complaint);

d. Defamation concerning the Performance Review (Count 4 of the Proposed Fourth Amended Complaint);

e. Breach of Implied Contract and Promissory Estoppel based on the Code of Ethics (Counts 8 and 9 of the Proposed Fourth Amended Complaint);

3.      Plaintiff also seeks leave to amend her Third Amended Complaint to explicitly reference 29 U.S.C. §215(a)(3), in a separate count for retaliation for filing her formal complaints and charges of discrimination with the Connecticut Commission on Human Rights, the Equal Employment Opportunity Commission, and this Court.  This is Count Seven in the Proposed Fourth Amended Complaint.

4.      Pursuant to Rule 15 leave to amend "shall be given freely when justice so requires."  Fed. R. Civ. P. 15(a).  "When evaluating a motion to amend, a court must consider several factors, including the likelihood of prejudice to the opposing party, the existence of bad faith or dilatory motive, and whether the proposed amendment would be futile."  Bleiler v. Cristwood Contracting Co., Inc., 868 F. Supp. 461, 463 (D. Conn. 1994) (citing Foman v. Davis, 371 U.S. 178, 182-83

2

(1962)).  However, the decision whether or not to grant leave to amend is within this

Court's discretion.  See id.

      5.      Here, defendants will not be prejudiced if the Court allows plaintiff to

file her proposed Fourth Amended Complaint.  Plaintiff's amendment does not

prejudice Defendants because the facts that support the amendments were plead in

the Third Amended Complaint to which Defendants did not file an objection.

Further, plaintiff's Third Amended Complaint asserted that these predicate facts

supported claims for retaliation under Title VII and state law (Counts Six and Ten of

Third Amended Complaint).  The proposed amendment is in essence a

housekeeping amendment that inserts mirror images of the existing allegations of

retaliation under the specific heading of retaliation in violation of the Equal Pay Act.

      6.      For example, plaintiff's Third Amended Complaint included the

following general allegations which form the basis for all of her allegations of

retaliation, including the proposed new Count Seven alleging retaliation in violation

of the Equal Pay Act:

> 34.     Plaintiff filed a claim with the CHRO and the EEOC on or about
> August 23, 2001.  The Defendants responded to these claims, but they
> passed the Merit Assessment Review.
>
> 35.     Defendants therefore knew that Plaintiff was engaged in an
> activity protected by both federal and state law.

Third Amended Complaint, ¶¶ 34-35; Proposed Fourth Amended Complaint,  ¶¶

34-35.  Plaintiff's Third Amended Complaint also included explicit allegations that

3

the defendants retaliatory conduct was undertaken "with malice and/or reckless indifference to plaintiff's rights, and constitutes intentional retaliation against Plaintiff for her protected activity of filing charges of discrimination." These allegations are merely repeated in the proposed Count Seven under the new heading of retaliation in violation of the Equal Pay Act.

7.      Plaintiff's proposed amendment to expressly allege a claim for retaliation in violation of 29 U.S.C. §215(a)(3), for her filing formal complaints of violations of the Equal Pay Act, will not prejudice the Defendants in any manner. Plaintiff has consistently alleged that Defendants have retaliated against her for filing her charges of discrimination (which expressly included violations of the Equal Pay Act) and opposing Defendant's otherwise discriminatory conduct.

8.      No additional discovery at all is necessary, as the same facts which were recently presented to the Court in connection with the Defendant's Motion for Summary Judgment, form the basis for the violation of 29 U.S.C. §215(a)(3). Moreover, since those facts were found to create a genuine issue of material fact as to Plaintiff's retaliation claims under Title VII and State law, and the same analysis applies to a retaliation claim under the Equal Pay Act as Title VII, Defendants are not prejudiced by having already filed their summary judgment motion. Additionally, trial of the matter is not scheduled until May 2006.

9.      Plaintiff's complaint in this action, moreover, has always incorporated by reference her CHRO and EEOC charges, which identify the Equal Pay Act and

4

retaliation for filing her discrimination claims as their basis.

      10.    Defendants do not object to the Fourth Amended Complaint in so far as it reflects the Court's Summary Judgment order, but do object to Count Seven of the Proposed Fourth Amended Complaint.

      **WHEREFORE**, Plaintiff respectfully requests that her Motion for Leave to Amend be granted and that she be permitted to file the proposed Fourth Amended Complaint attached as Exhibit A.

_____
Anthony R. Minchella (ct 18890)
Law Offices of Anthony R. Minchella, L. L.C.
530 Middlebury Road, Suite 203-204B
Middlebury, CT  06762
(203) 758-1069 (Telephone)
(203) 758-2074 (Facsimile)
anthonyminchella@sbcglobal.net

Jeffrey J. Tinley, Esq.
Tinley, Nastri, Renehan & Dost, LLP
60 North Main Street, 2nd Floor
Waterbury, CT 06702
(203) 596-9030 (Telephone)
Federal Bar No. ct00765
jtinley@tnrdlaw.com

ATTORNEYS FOR PLAINTIFF

5

## CERTIFICATION

This is to certify that a copy of the foregoing was this date mailed by first

class United States mail, postage prepaid, to the following:

Albert Zakarian, Esq.
Day, Berry & Howard LLP
185 Asylum Street
Hartford, CT  06103-3499

Jeffrey J. Tinley, Esq.
Tinley, Nastri, Renehan & Dost, LLP
60 North Main Street, 2nd Floor
Waterbury, CT 06702


Dated:       November 21, 2005
             Middlebury, CT              Anthony R. Minchella

6

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SUJATA NICHANI, | : | CIVIL NO. 302CV1384 (JBA) |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| OTIS ELEVATOR COMPANY and | : | |
| UNITED TECHNOLOGIES | : | |
| CORPORATION | : | |
| | : | |
| Defendants | : | NOVEMBER 21, 2005 |

## FOURTH AMENDED COMPLAINT

Plaintiff, Sujata (Sue) Nichani, brings this action, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq., 29 U.S.C. § 206 et seq., 42 U.S.C. 1981 Connecticut General Statutes § 46a-51 et seq., and Conn. Gen. Stat. § 31-51q, seeking back pay, front pay, compensatory and punitive damages, attorney fees and costs.

### I. JURISDICTION

1.      This Court has jurisdiction over the federal claims herein pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(4), and 42 U.S.C. § 2000e-5 (f)(3). Jurisdiction as to Counts Seven, Eight, Nine, Ten, Eleven, Twelve and Thirteen and Fourteen lies pursuant to 28 U.S.C. § 1367.

2.      Plaintiff filed timely charges of discrimination on the basis of race, color, sex, national origin and ancestry, and charges of violations of the Equal Pay Act of 1964, with the United States Equal Employment Opportunity

Commission and the Connecticut Commission on Human Rights and

Opportunities.  She received a Dismissal and Notice of Rights from the Equal

Employment Opportunity Commission, dated May 10, 2002, a copy of which is

attached hereto as Exhibit A.  By Notice dated May 21, 2002, the Connecticut

Commission on Human Rights and Opportunities released jurisdiction of

plaintiff's state law claims pursuant to Public Act No. 01-95.  A copy of this

release is attached hereto as Exhibit B.  This action is filed within 90 days of her

receipt of Exhibits A and B.  Plaintiff thereafter filed second charges of

discrimination with the CCHRO and EEOC dated April 26, 2002, CCHRO number

0210475 and EEOC number 16aa201211.  The Equal Employment Opportunity

Commission issued a Dismissal and Notice of Rights, dated December 9, 2002,

a copy of which is attached hereto as Exhibit C.  By Notice dated December 18,

2002, the Connecticut Commission on Human Rights and Opportunities released

jurisdiction pursuant to Public Act No. 01-95.  A copy of this release is attached

hereto as Exhibit D.  Thereafter, Plaintiff filed her third charge of discrimination

with the CCHRO and EEOC on September 16, 2003, which was assigned Case

Number 0410094 and EEOC Case Number 16A-2004-00030.  The Connecticut

Commission on Human Rights and Opportunities released its jurisdiction over

CCHRO case number 0410094 by release dated January 20, 2004. A copy of

this release is attached hereto as Exhibit E.  The Equal Employment Opportunity

Commission released its jurisdiction over its Charge number 16A-2004-00030 by

Notice of Right to Sue dated January 15, 2004.  A copy of this release is

2

attached hereto as Exhibit F.  This complaint is filed within 90 days of her receipt of exhibits E and F.

      3.       Venue lies in this District pursuant to 28 U.S.C. §1391(b)(1), (2).

## II. PARTIES

      4.       Plaintiff Sujata (Sue) Nichani is a resident of the State of Connecticut and a woman of Asian Indian ancestry.

      5.       Defendant Otis Elevator Company ("Otis") is a New Jersey corporation, with its corporate headquarters in Farmington, Connecticut. Defendant Otis is a wholly owned subsidiary of Defendant United Technologies Corporation ("UTC").

      6.       Defendant UTC is a Delaware corporation with a business address at One Financial Plaza, Hartford, Connecticut.  UTC and Otis constitute an integrated enterprise, with common management and ownership or financial control, centralized control of labor relations, and a functional interrelation of operations.  Otis is a mere instrumentality and/or alter ego of UTC.  The personnel decisions alleged herein, including those involving Plaintiff, were made by Otis and/or UTC employees.  Plaintiff's benefits were provided through Otis and/or UTC benefits plans, including UTC stock and medical and health plans. Human resource and labor relations decisions are regularly made by Otis and UTC personnel, and employees of Otis and UTC regularly and routinely transfer between the two entities.  Also, the two entities share common management with regard to policies and procedures.

7.     At all times relevant to this complaint, the defendants were

Plaintiff's "employer," as defined in 42 U.S.C. § 2000e(f) and C.G.S. § 46a-51(9),

and an "employer," as defined in 42 U.S.C. § 2000e(b) and C.G.S. § 46a-51(10).

### III.  STATEMENT OF FACTS

8.     Plaintiff began her employment with defendants on October 15,

1990.  Up until March 21, 2003, she was employed as the Senior Manager in

Safety & Environment ("EHS") for Defendant Otis at its Farmington, Connecticut

headquarters, a position she held since April 1, 1999.  Safety is widely touted by

Defendants to be a top priority at Otis.  In addition to having safety-related

responsibilities as Safety Manager, she was also the Business Practices Officer

for her Area.

9.     From approximately October 1990 through October 1994, Plaintiff

was a Maintenance Supervisor for Otis' New York location.  She was then

promoted to Location Manager (a Location Manager is now called a Branch

Manager) and relocated to Otis' Winston-Salem, North Carolina offices.  In May

1995, Plaintiff was named Location Manager for Otis' Charlotte, North Carolina

location.  Plaintiff was later promoted to Regional Field Operations Manager for

the Southwest Region and relocated to Otis' Dallas, Texas location. In April 1999,

she accepted an offer to become the Senior Manager in Safety and Environment

and relocated to Connecticut.

10.     Plaintiff was the only woman in a high-level field operational role

out of approximately 8,000 employees in North America.

4

11.     The Defendants utilize a system involving grades and levels for personnel, compensation and seniority purposes.  Although this system has recently changed, during most of the period relevant to this complaint, the grade levels (which determine salary) went up to Grade 51.  The next step beyond Grade 51 was Level 3, Level 2 and Level 1.  The recent change created designations, for example, for grade levels 49-51 as Level 4, and grade levels 46-48 as Level 5.

12.     During Plaintiff's interview for her position as Senior Manager in Safety and Environment, Bill Miller, then President of North American Area, indicated that a Regional General Manager position was an option for her next assignment, and that if her performance was good at EHS, she would be promoted to Level 3 after 1 year.

13.     Throughout her career, except for the events alleged herein, Plaintiff has received recognition for her job performance, in the form of salary increases, positive performance appraisals, written and spoken praise, and increasingly important job responsibilities.  For example, Plaintiff's Regional General Manager while she was Location Manager in Charlotte stated that Plaintiff "demonstrated outstanding leadership capabilities" and "show[ed] potential to be a Regional General Manager."  By letter dated September 24, 1991, Gary Faltin described Plaintiff as having a "high degree of integrity." Plaintiff's Performance Appraisal in her current position for the period January 1, 2000 through December 1, 2000, described her performance level as "fully

competent." Plaintiff did not receive another written formal performance appraisal until March 21, 2003.

14.    Plaintiff was always a dedicated employee, and envisioned a lifelong career with Defendant United Technologies and its companies.

15.    During her career, Plaintiff was consistently faced with adverse treatment of women in her work environment based upon sex. She has witnessed comments by male superiors about the professional inadequacies of women, comments about the inability of women to perform as well as men, and overall unequal treatment of women as compared to men.  For example, Plaintiff's immediate superior, Ray Moncini, President of North American Area, commented while discussing with Plaintiff an OSHA violation that "the inspector was a woman, she probably didn't know what she was doing, she was a woman." Another recent example occurred when a field operations manager explained during a field operations meeting -- using a Power Point Presentation with visual slides -- how workers get injured on the job because their attention is focused on scantily clad women, rather than on the work they are performing.  This presentation was entitled "Why Men Die Young."  Plaintiff was the only woman at that meeting.  During a meeting at World Headquarters attended by Plaintiff, a communications manager displayed on his laptop for people including Plaintiff to see, an e-mail entitled "Petite women, tight asses."

16.    On Monday, April 2, 2001, Ray Moncini, Plaintiff's superior, asked Plaintiff to consider taking a position as operations manager with Otis' North

American Acquisition Company.  He commented that a position in safety was "not the right job for [her]."  An operations manager position would entail significantly fewer responsibilities than those Plaintiff had as Safety Manager.  At Mr. Moncini's request, Plaintiff agreed to speak with the President of North American Elevator Services ("NAES"), Mark Boelhouwer, about the operations manager position, and did so.  Interestingly, Mr. Boelhouwer stated that he did not need an operations manager and that the position was in fact not available.

17.     Although Plaintiff herself had never been informed of any adverse job decision affecting her, on Tuesday, April 24, 2001, Dilip Rangenkar, Otis' Manager of Communications North American Area, informed Plaintiff that the Vice President of Otis Worldwide Communications asked him to prepare an announcement regarding Plaintiff's "new assignment."  When Plaintiff responded that she had never been formally offered nor accepted any new position, he told Plaintiff that the Vice President of Worldwide Communications had said it was confirmed that she had accepted a new position.

18.     On Thursday, April 26, 2001, Ellen McGroary, Vice President of Human Resources, entered Plaintiff's office to give Plaintiff, in her words, a "heads up."  She explained to Plaintiff that Brad Russell, then Director of EHS Programs Worldwide, had been given Plaintiff's job and that Ray Moncini would be offering her Branch Manager positions (entailing significantly fewer job responsibilities) in Atlanta, Georgia and San Jose, California.  Plaintiff had previously held Branch/Location Manager positions in North Carolina.

19.     Later, on Thursday, April 26, 2001, Plaintiff met with Mr. Moncini. He offered Plaintiff lower level positions than the Senior Manager position she had been in since April 1999. Those positions carried significantly fewer responsibilities, and were posted at one to two grade levels below Plaintiff's grade level.  During this meeting, Mr. Moncini stated that he did not want Plaintiff to think that he had given her job away while she was still in it.  Plaintiff told him that that was the reality of the situation, and excused herself.  This event, in addition to the others leading up to and subsequent to this, shocked Plaintiff, and caused her embarrassment, shame, and emotional distress.

20.     On Friday, April 27, 2001, Ray Moncini asked Plaintiff to come into his office to review a draft announcement outlining the personnel changes involving Mr. Russell and Plaintiff.  Ellen McGroary, who was also present, asked Plaintiff whether she was okay with the announcements.  Plaintiff asked her whether she had a choice, to which Ms. McGroary responded "no."

21.     On Monday, April 30, 2001, Ellen McGroary told Plaintiff that she had been thinking about how she must have felt over the weekend, and decided not to release the announcements until Plaintiff knew where she was going.  The announcements were released that evening on the intranet anyway, distributed to thousands of people, including Plaintiff's colleagues, her staff, people she manages, supervises, and is expected to lead and direct as part of her job.

22.     The company-wide announcement had stated that she was being removed from her position, taking a "senior NAA Line Management Position"

(even though no position was in place), and that Brad Russell would be taking over her position. This representation and others, implied that Plaintiff had done something wrong in connection with her job. Indeed, Plaintiff received dozens of phone calls inquiring as to what new position she would be taking, why the change had been made, and why the announcement did not designate what her position would be. Some people even asked Plaintiff what she did wrong.

23.    On Thursday, May 10, 2001, Mr. Rangnekar asked Plaintiff to speak on elevator safety for an NBC broadcast. When Plaintiff responded that she was no longer the Senior Manager for Safety, but that Brad Russell was and should speak, Mr. Rangnekar replied that Mr. Russell was not knowledgeable enough.

24.    In connection with Brad Russell's arrival, Ray Moncini told Plaintiff to be sure that Russell (her replacement) was adequately trained and that the transition go smoothly. It became clear through statements by Mr. Moncini and others, that Russell did not know enough to perform Plaintiff's position.

25.    As of May 14, 2001, Plaintiff still had not been reassigned. Ray Moncini informed Plaintiff that day that Brad Russell had resigned. Mr. Moncini said he'd love to have her back in safety (although he previously told Plaintiff safety was not right for her). Plaintiff agreed to take her old position back.

26.    Plaintiff then learned that Brad Russell was paid at a Level 3 salary (higher than Plaintiff), received greater benefits, including allowances, stock

9

options and performance payments, than Plaintiff, yet was less qualified to perform the job responsibilities of a Safety Manager.

27.    Over the next several weeks Plaintiff sought to have her concerns addressed.  On May 23, 2001, Plaintiff inquired of Ms. McGroary why Brad Russell had received greater pay and benefits than she for doing less work. Ms. McGroary did not respond for two weeks and then offered an inadequate explanation only after Plaintiff on June 5, 2001, reminded her of the May 23, 2001 inquiry.

28.    When Plaintiff continued to try to communicate via e-mail with Ms. McGroary about her concerns, Ms. McGroary suggested they discuss it rather than communicate via e-mail.  Plaintiff suggested to Ms. McGroary they meet in the next few days.

29.    Ms. McGroary agreed but never made any attempt to arrange this meeting, and appeared unresponsive to Plaintiff's concerns.  For example, on Monday July 2, 2001, Plaintiff e-mailed Ms. McGroary saying that she was available to meet with her on July 9, 2001. Ms. McGroary's secretary responded and asked Plaintiff whether she was available to meet with Ms. McGroary on July 12, 2001, to which Plaintiff said yes.  Ms. McGroary never made any arrangements for this meeting.

30.    On many occasions, Defendants have treated male employees more favorably than women under circumstances substantially similar as Plaintiff. For example, they permitted a male Senior Manager to retain his position instead

of being replaced and displaced by a male director.  Also, when a male controller

was assigned to Otis North America, the previous controller, a male, was moved

into another position before the other controller was assigned.  And, when one

male was promoted in January 2000, he replaced another male but was not

given the same title and compensation until he brought it to the company's

attention, and he was very quickly accommodated by a level and compensation

increase.

      31.    Despite being promised that she would be promoted to Level 3

after one year of good performance, Plaintiff was never promoted.

      32.    Plaintiff's counterpart in Germany, a male, was promoted to Level 3

from Grade 51 even though he had been in the position for approximately one

year.  All of Plaintiff's counterparts throughout the world with comparable size

territories are compensated at Level 3, or higher.

      33.    Of the 18 people who reported to Ray Moncini, the then Vice

President & Senior Area Executive for Otis' North America Area in August of

2001, only two were paid as Senior Managers rather than the higher salary level

of director:  Plaintiff and another person, Dilip Rangnekar, who were both of

Indian National Origin.  Mr. Rangnekar was moved laterally to World

Headquarters, and replaced by a female, who was kept at the Senior Manager

level. Since Plaintiff filed her charge with the CHRO and EEOC, that woman was

promoted to the Director level, so that Plaintiff was the only person on Ray

Moncini's staff that was not a director level or higher.

34.    Plaintiff filed a claim with the CHRO and the EEOC on or about August 23, 2001. The Defendants responded to these claims, but they passed the Merit Assessment Review.

35.    Defendants therefore knew that Plaintiff was engaged in an activity protected by both federal and state law.

36.    After Plaintiff filed her charges of discrimination with the CHRO and the EEOC, she continued to perform her job at the highest level. Up until the day she was terminated, the plaintiff received no formal or informal complaints about her work. Indeed, she continued to receive formal and informal praise from other employees. The Defendants, up until the day she was terminated, never communicated to Plaintiff any dissatisfaction in her performance.

37.    Defendants maintain a Recognition Stock Option Plan which is designed to permit "outstanding employees whose decisions impact the performance of the company, and whose skilled execution of those decisions helps to add value for shareowners" to "personally benefit from the value those key employees help create."

38.    Plaintiff received recognition stock options for five (5) years starting in 1997. From her experience and knowledge of the Defendants, she knows that prior to 2002, the award of recognition stock options was very selective, and only extremely high performing individuals awarded options. In 2001 Plaintiff received the maximum allowable award of stock options: 500 shares.

39.    The Recognition Stock Option Plan was expanded in 2002 to permit 40% additional participation than previous years; the obvious result being more employees received options under the Plan.

40.    These stock options are awarded through Statement of Award certificates that are issued every year. Plaintiff received none in 2002 nor 2003. Plaintiff believes this is in retaliation for her protected activity of filing charges of discrimination, since her performance has remained at the highest level.

41.    The Defendants also have a Performance Incentive Plan which identifies key employees and rewards them with a bonus up to 15% of the employee's salary.

42.    In 2001, Plaintiff received a 10% bonus payment under the Performance Incentive Plan for her performance in 2000. In 2002 she did not receive any bonus for the year 2001, the year she filed charges of discrimination with the CHRO and EEOC. Nor did she receive any in 2003, for her performance in 2002, the year she commenced this action in federal court.

43.    Defendants, upon information and belief, maintain and have maintained discriminatory seniority lists and systems that favor males over females, including the Grade Level compensation system and the general exclusion of females in high level field operational roles. In many occasions, as with Plaintiff, less-qualified males are selected over more qualified females, for equal work, and sometimes for less work than females are performing. These constitute discriminatory practices and/or policies.

13

44.    In 2002, Defendants implemented a Performance Review procedure that utilized the company's intranet.  This procedure requires the employee to establish goals for himself or herself, evaluate themselves against those goals, and then the applicable manager provides input along with other individuals who are permitted to "rate" the employee.  This procedure is performed "on-line."

45.    The final step in this performance review involves a face-to-face meeting with the employee and his or her manager, ending with the manager and the employee signing the performance review.

46.    This procedure was made mandatory for 2003 performance reviews, and Ms. Nichani received written policies concerning its implementation with her staff.

47.    On March 21, 2003, while Plaintiff was on vacation, she was summoned from home to Ray Moncini's office.  Upon her arrival, Plaintiff was presented with a completed "Performance Feedback" form, and met with Moncini and Ellen McGroary for approximately ten (10) minutes.  At the end of this meeting defendants terminated Plaintiff's employment.

48.    Ms. Nichani was never permitted to participate in the Performance Feedback process, as Defendants had mandated.

49.    Defendants maintain a progressive discipline policy that mandated verbal warnings followed by written warnings and, if necessary termination.  During her employment, Plaintiff has utilized this policy in disciplining certain

employees, and always believed and relied upon the Defendants adhering to this policy as a condition of her employment.

50.     Prior to being terminated on March 23, 2003, Plaintiff never received any formal or informal discipline.

51.     Defendants published a Code of Ethics in 1990 that governs its "business decisions and actions."

52.     In the Code of Ethics, Defendants represented, among other things, that:

    a.    "[They] maintain the highest ethical, environmental and safety standards everywhere;"

    b.    "[They] are committed to the highest standards of ethics and business conduct" in their relationships with employees at every organizational level;"

    c.    "[They] are committed to providing safe and healthy working conditions and an atmosphere of open communication for all [their] employees;"

    d.    No retribution will be taken against any employee for contacting . . . any level of supervision [or] the Legal Department. . . to express concerns with business policies or practices;"

    e.    Failure to comply with these Standards and associated UTC policies will result in appropriate sanctions; and

15

f.    UTC policy prohibits any retribution against an individual for making [reports of violations or suspected violations of the UTC Standards of conduct.]"

53.    Defendants further represented that "these Standards of Conduct" would be "enforced equitably at all organizational levels."

54.    On or about December 23, 2002, a fatal accident occurred in Jersey City, New Jersey, at a construction project involving the Defendant Otis. Plaintiff, as safety manager, was involved in the Defendants' internal investigation of this fatality.

55.    Plaintiff worked extremely long hours investigating this fatality, its causes, and remedial action that Defendants should take.

56.    While the investigation was ongoing, Defendants removed Plaintiff from the position of Business Practices Officer, a position that involved overseeing ethics compliance and Defendants' adherence to the Code of Ethics.

57.    Defendant conspired to blame Plaintiff for the fatality, by making false representations and statements concerning Plaintiff's performance as safety manager.

58.    Plaintiff prepared the internal investigation report concerning the fatality, and presented it to Defendants. Defendants proceeded to demand that Plaintiff mischaracterize the causes of the fatality, when such characterization would have been false and would have required Plaintiff to conceal management failures concerning the fatality.

16

59.    Plaintiff refused to agree to such characterization and stated her reasons for this refusal to Defendants.  Defendants proceeded to alter the report despite Plaintiff's opposition and statements that such conduct would be wrong.

60.    After Defendants' terminated Plaintiff's employment, they replaced her with a male, who is compensated at a director level, yet is less qualified for the position.

61.    As a result of defendant's actions, plaintiff has lost income, benefits and suffered severe emotional distress.

**COUNT ONE: Discrimination on the Basis of Sex in Violation of Title VII, 42 U.S.C. § 2000e-2**

1-61.    Paragraphs 1 through 61 of this Complaint are hereby incorporated as paragraphs numbered 1 through 61 of Count One.

62.    Plaintiff's sex was a motivating factor in defendants' decision to demote her and reduce her job responsibilities on April 26, 2001, to pay her at a lower salary grade level than her lesser qualified male counterparts, specifically Brad Russell and Pat Dowson, to provide her with less benefits, and deny her a promotion and/or raise, and to terminate her on March 21, 2003.

63.    In so doing, defendants acted with malice and/or reckless indifference to plaintiff's rights.

64.    As a result of defendants' actions as described above, plaintiff

has suffered damages including, but not limited to, loss of income, emotional distress and humiliation.

## COUNT TWO: Violation of 29 U.S.C. § 206 et seq. (Equal Pay Act)

1-61.   Paragraphs 1 through 61 of this Complaint are hereby incorporated as paragraphs numbered 1 through 61 of Count Two.

62.   Plaintiff received unequal pay and wages than her male counterparts, including Brad Russell and Pat Dowson, for performing work that is equal (and in Brad Russell's case, Plaintiff performed additional work), in the same establishment.

63.   Defendants' aforementioned conduct of paying unequal wages for equal work is on the basis of sex.

64.   As a result of defendants' actions as described above, plaintiff has suffered damages including, but not limited to, loss of income, emotional distress and humiliation.

## COUNT THREE: Retaliation in Violation of Title VII, 42 U.S.C. § 2000e-3

1-61. Paragraphs 1 through 61 of this Complaint are hereby incorporated as paragraphs numbered 1 through 61 of Count Three.

62.   The Defendants' aforementioned conduct was done with malice and/or reckless indifference to plaintiff's rights, and constitutes intentional retaliation against Plaintiff for her protected activity of filing charges of

18

discrimination by inter alia (1) not awarding Plaintiff stock options under the Plan even though Plaintiff has received them for the past 5 years and has continued to perform at the highest level; (2) not giving Plaintiff a bonus under the Performance Incentive Plan, even though she continued to perform at the highest level up until her termination; (3) promoting every other person on Mr. Moncini's staff except for the Plaintiff, including the woman who replaced Dilip Rangnekar and came in as a Senior Manager and was quickly moved up to Director; and (4) terminating her on March 21, 2003.

63. As a result of defendants' actions as described above, plaintiff has suffered damages including, but not limited to, loss of income, emotional distress and humiliation.

**COUNT FOUR:  Defamation**

1 -61.   Paragraphs 1 through 61 are hereby incorporated as paragraphs one through 61 of this Count Four of the Complaint.

62.   The statements made by Moncini, Lauterbach and Reese, concerning Plaintiff's performance in her position as safety manager contained in her Performance Feedback, were false.

63.   In making these false statements, those individuals and Defendants knew them to be false and/or acted with reckless indifference as to the truth of the statements.  They acted with improper and unjustifiable motive in making the statements.

64.    As a result of those false statements about her, Plaintiff suffered injury to her reputation, pecuniary losses, and emotional distress.

**COUNT FIVE: Discrimination on the Basis of Sex in Violation of C.G.S. § 46a-51 et seq.**

1- 61.    Paragraphs 1 through 61 are hereby incorporated as paragraphs 1 through 61 of this Count Five of the Complaint.

62.    Plaintiff's race and national origin were motivating factors in defendants' decision to demote her and reduce her job responsibilities on April 26, 2001, to pay her at a lower salary grade level than her lesser qualified male counterparts, specifically Brad Russell and Pat Dowson, and to provide her with less benefits, deny her a promotion and/or raise, and to terminate her on March 21, 2003.

63.    In so doing, defendants acted with malice and/or reckless indifference to plaintiff's rights.

64.    As a result of defendant's actions as described above, plaintiff has suffered damages including, but not limited to, loss of income, emotional distress and humiliation.

**COUNT SIX: Retaliation in Violation of C.G.S. § 46a-60(a)(4)**

1- 61.   Paragraphs 1 through 61 are hereby incorporated as paragraphs 1 through 61 of this Count Six of the Complaint.

62.   The Defendants' aforementioned conduct was done with malice and/or reckless indifference to plaintiff's rights, and constitutes intentional retaliation against Plaintiff for her protected activity of filing charges of discrimination by <u>inter alia</u> (1) not awarding Plaintiff stock options under the Plan even though Plaintiff has received them for the past 5 years and has continued to perform at the highest level; (2) not giving Plaintiff a bonus under the Performance Incentive Plan, even though she continued to perform at the highest level up until her termination; and (3) promoting every other person on Mr. Moncini's staff except for the Plaintiff, including the woman who replaced Dilip Rangnekar and came in as a Senior Manager but was quickly moved up to Director; and (4) terminating her on March 21, 2003.

63.   As a result of defendants' actions as described above, plaintiff has suffered damages including, but not limited to, loss of income, emotional distress and humiliation.

**COUNT SEVEN: Retaliation in Violation of 29 U.S.C. § 215(a)(3)**

1- 61.   Paragraphs 1 through 61 are hereby incorporated as paragraphs 1 through 61 of this Count Seven of the Complaint.

21

62.    The Defendants' aforementioned conduct was done with malice and/or reckless indifference to plaintiff's rights, and constitutes intentional retaliation against Plaintiff for her protected activity of filing charges of discrimination, in violation of 29 U.S.C. § 215(a)(3), by inter alia (1) not awarding Plaintiff stock options under the Plan even though Plaintiff has received them for the past 5 years and has continued to perform at the highest level; (2) not giving Plaintiff a bonus under the Performance Incentive Plan, even though she continued to perform at the highest level up until her termination; (3) promoting every other person on Mr. Moncini's staff except for the Plaintiff, including the woman who replaced Dilip Rangnekar and came in as a Senior Manager and was quickly moved up to Director; and (4) terminating her on March 21, 2003.

63.    As a result of defendants' actions as described above, plaintiff has suffered damages including, but not limited to, loss of income, emotional distress and humiliation.

## COUNT EIGHT: Breach of Contract

1- 61. Paragraphs 1 through 61 are hereby incorporated as paragraphs 1 through 61 of this Count Eight of the Complaint.

62.    The statements and representations the Defendants made in the Code of Ethics constitute promises that Plaintiff would not be terminated or otherwise disciplined for adhering to those statements, and indeed Defendants required compliance with the standards.

63.     Defendants breached the aforementioned contract when they terminated Plaintiff on March 21, 2003.

64.     As a result of defendants' actions as described above, plaintiff has suffered damages including, but not limited to, loss of income, emotional distress and humiliation.

## COUNT NINE: Promissory Estoppel

1- 61.  Paragraphs 1 through 61 are hereby incorporated as paragraphs 1 through 61 of this Count Nine of the Complaint.

62.  Paragraph 62 of Count Eight is hereby incorporated as paragraph 62 of this Count Nine of the Complaint.

63.     Defendants' representations and statements to Plaintiff concerning its Code of Ethics constitute promises upon which the Defendants reasonably could have expected would induce action or forbearance on the part of its employees including Plaintiff.

64.     Plaintiff did in fact rely on these aforementioned promises to her detriment.

65.     The Plaintiff suffered damages as a result of her detrimental reliance on Defendants' aforementioned promises.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff Sue Nichani claims the following relief:

A.     Back pay, back benefits, front pay and benefits and prejudgment interest;

B.     Compensatory and punitive damages;

C.     Costs and attorney fees;

D.     Such other relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all claims triable to a jury.


THE PLAINTIFF,
SUE NICHANI


_____
Anthony R. Minchella (ct 18890)
LAW OFFICES OF ANTHONY R.
MINCHELLA L.L.C.
  530 Middlebury Road
  Suite 212-213B
  Middlebury, CT  06762
  (203) 758-1069
  (203) 758-2074 Facsimile
  anthonyminchella@sbcglobal.net

Jeffrey J. Tinley, Esq.
Tinley, Nastri, Renehan & Dost, LLP
60 North Main Street, 2nd Floor
Waterbury, CT 06702
203-596-9030
Federal Bar No.: CT00765

## CERTIFICATION

This is to certify that a copy of the foregoing was this date mailed by first

class United States mail, postage prepaid, to the following:

Albert Zakarian, Esq.
Day, Berry & Howard LLP
185 Asylum Street
Hartford, CT  06103-3499

Jeffrey J. Tinley, Esq.
Tinley, Nastri, Renehan & Dost, LLP
60 North Main Street, 2nd Floor
Waterbury, CT 06702


Dated:          November 21, 2005                     _____
                Middlebury, CT                        Anthony R. Minchella

25