American Arbitration Association

☐ MEDIATION: Please consult the AAA regarding mediation procedures. If you want the AAA to contact the other party and attempt to arrange a mediation, please check this box.

## Voluntary Labor Arbitration Rules
### AMENDED DEMAND FOR ARBITRATION

Date: May 21, 2003

To: Name  Otis Elevator Company
Address  516 West 34th Street
City and State  New York, NY    ZIP Code  10001
Telephone ( )    Fax:
Name of Representative  Paul Barrett, Manager, Human Resources
(if known)
Representative's Address  (Same as above)
City and State
Telephone ( )    Fax

The named claimant, a party to an arbitration agreement contained in a written contract, dated March 17, 2000 providing for arbitration under **Section** ____: Should no agreement be reached within ten (10) working days the Union may submit the grievance to arbitration under the rules and procedures of the American Arbitration Association which shall designate an impartial arbitrator and conduct the arbitration hearing in accordance with its procedures. All such submissions of grievances to arbitration shall be to the American Arbitration Association in New York City. Failure to process the issue to arbitration within the foregoing ten (10) day period shall result in the issue being considered null and void.

**NATURE OF DISPUTE:** The Union grieves the unjustified and unwarranted discharge of Sean Murphy, the penalty or punishment imposed upon Peter Bohlig and the suspensions of Guy Crowl, Edward Ahrens, Edward Vialonga, Jr. and Patrick Austin.

**REMEDY SOUGHT:** The Union requests that Sean Murphy be reinstated to employment and paid back pay for all time lost, together with full seniority and all other fringe benefits. The Union further requests that the punishment imposed upon Peter Bohlig be rescinded and that the suspensions of Guy Crowl, Edward Ahrens and Edward Vialonga, Jr. and Patrick Austin be rescinded, stricken from their record and that be paid for all lost time with all fringe benefits.

**HEARING LOCALE REQUESTED:** New York, NY
(City and State)

You are hereby notified that copies of our arbitration agreement and of this demand are being filed with the American Arbitration Association at its  New York, NY  office, with the request that it commence the administration of the arbitration. Under the rules, you may file an answering statement after notice from the administrator.

Signed  [signature]    Title  Attorney
(may be signed by a representative)
Name of Claimant  Local 1, International Union of Elevator Constructors, AFL-CIO
Address (to be used in connection with this case)  47-24 27th Street
City and State  Long Island City, NY    Zip Code  11101
Telephone: (718) 767-7004   Fax:  (718) 767-6730
Name of Representative:  Richard H. Markowitz, Esquire
Representative's Address:  121 South Broad Street, Suite 1100
City and State:  Philadelphia, PA    ZIP Code  19107
Telephone: (215)  875-3111    Fax: (215)  790-0668

To institute proceedings, please send three copies of this demand with the administrative fee, as provided for in the rules, to the AAA. Send the original demand to the respondent.

SUBJECT TO    OTIS09488
PROTECTIVE ORDER    CONFIDENTIAL

AMERICAN ARBITRATION ASSOCIATION
-----------------------------------------------------------x
In the Matter of the Arbitration                    Docket #13300-01010-03

    between                                      Re:  Discipline of
                                                             Four MICs
OTIS ELEVATOR COMPANY

        "Company"
                                                Hearings:  June 10, 2003
    -and-                                                      June 24, 2003
                                                                       July 10, 2003
LOCAL NO. 1, I.U.E.C.,                                                 August 5, 2003

        "Union"
-----------------------------------------------------------x
APPEARANCES

   For the Company:

   PROSKAUER ROSE LLP
   Donald W. Savelson, Esq.


   For the Union:

   MARKOWITZ & RICHMAN
   Richard Markowitz, Esq.

SUBJECT TO
PROTECTIVE ORDER

OTIS09807
CONFIDENTIAL

## BACKGROUND

This grievance challenges disciplinary actions given to four Mechanics-In-Charge ("MICs") assigned to the Goldman Sachs high rise project in Jersey City, N.J. The Union asserts the Company lacked just cause to discipline any of the four MICs. It seeks relief described below.

The Company was awarded the elevator construction contract for the high-rise office building which Goldman Sachs was building in Jersey City. The building was designed to rise as high as 42 floors. A portion of it would rise only 23 floors. Turner Construction Company was the General Contractor. Otis was charged with the responsibility of installing some three dozen elevators. To do this, it assigned over 30 Mechanics to the job.

Overall responsibility for the project was put in the hands of E. Lauterbach, the N.Y.C. Regional Vice President. B. Hish reported to him as the General Manager, as did William Cassidy, the Regional Field Operations Manager. R. Waters reported to Hish as Branch Manager. N. Boone reported to Waters as Project Manager.

S. Murphy, a MIC, was designated as Lead Foreman responsible for installation. He reported directly to N. Boone, as well as to William Cassidy. E. Ahrens, another MIC, was designated to provide technical/project administration support to Cassidy and Boone.

2

SUBJECT TO
PROTECTIVE ORDER

OTIS09808
CONFIDENTIAL

Reporting to Murphy were five MICs: D. Mc Quillen was the Low Rise Foreman; E. Vialonga was the High Rise Foreman; P. Bohlig was the Rigging and Materials Foreman; G. Crowl was the Podium Foreman; and P. Austin was the Mid Rise Foreman. (See Company Exhibit 2.) (The terms "MIC" and "Foreman" are used interchangeably.)

It serves no useful purpose to describe in detail how an elevator is constructed. Suffice to say, that four vertical rails are constructed, along which an elevator car runs. The rails are installed serially, rising from the elevator pit (at the bottom of the shaft) to the top. To ensure that the rails are aligned properly (i.e., in plumb) "U" shaped pieces of metal are affixed to the rail with set screws at various intervals. These are known as "Johnson clips." The record reflects that the Johnson clips were installed in the Low Rise shafts (Numbers 12, 13 and 14) in September 2002. They must be removed from the rails in each shaft before an elevator car can be hoisted. The MIC responsible for removing the Johnson clips from Shaft Nos. 12, 13 and 14 was D. Mc Quillen.

There are, it seems, two basic procedures which can be followed to remove Johnson clips from the rails. The safest way is to drop life lines attached to a solid beam down to the floor level at which the clips are installed. Then, to pass wooden planks across the shaft so that men –attached to the lifelines with safety harnesses – can stand on the plank while removing the clips. (If the shaft is closed, the dry

way can be removed by the General Contractor to permit access.) The other – less safe – way is to raise an elevator carriage to a level below the clips and drop a ladder down to the carriage, so that a man can climb the ladder (which would rest on the carriage floor) to remove the clips.

All agree that the <u>unsafe</u> way to remove the clips is to have someone ride on the top of the elevator carriage as it is hoisted to the level of the clips. Even if the carriage is backed down to engage safety blocking wedges, this is a dangerous – indeed, prohibited – procedure. The reason, simply stated, is that the rigging which holds the carriage could give way and the man would have no way of "tying off" with a safety harness.

Sometime during the week of December 16, 2002, Mc Quillen removed the Johnson clips in Shaft Nos. 12 and 13. No witness who testified observed him do so. Yet, there is good reason to conclude that Mc Quillen did not employ either of the two approved procedures for removing them. Instead, it appears, he rode the top of the car to the level of the clips and removed them. In brief, he did so in a clearly unsafe way.

The incident which gave rise to this case occurred on Monday, December 23, 2002. Early that morning, Mc Quillen was to remove the Johnson clips from the rails in Shaft No. 14. To do so, he – again – rode up on top of the elevator carriage. Before he reached the level of the Johnson clips, the cable holding the

4

SUBJECT TO
PROTECTIVE ORDER

OTIS09810
CONFIDENTIAL

elevator carriage came loose. (It drops from the 23rd floor to the elevator carriage, is hooked through a metal ring and run up the cable several feet. A series of "fist grips" are tightened to secure the cable.) The fist grips, it appears, were not properly tightened.* As a result, the elevator carriage –with Mc Quillen on top of it – crashed to the pit. Mc Quillen was killed.

This tragic accident prompted an intensive investigation. At its conclusion, on April 29, 2003, the Company disciplined four of the MICs at the Goldman Sachs project:

S. Murphy was discharged for his "failure to ensure safety practices, policies and procedures were properly and consistently followed."

P. Bohlig received a two-day suspension for his "poor safety performance" and was transferred to another job site as a Mechanic.

E. Ahrens received a five-day suspension for "poor safety performance."

E. Vialonga received a two-day suspension for "poor safety performance."

All of the disciplinary "suspensions" were with pay. That is, the MICs were taken off the Goldman Sachs project and assigned to safety related duties elsewhere for the "suspension" period. (See Joint Exhibit 1**

---

* To ensure that they are tightened to the proper tension, a torque wrench should be used. It was not. One was not at the job site.
** Originally, the Company planned to issue two-day suspensions to P. Austin and G. Crowl as well. It has since decided not to discipline them. I note that four management officials – Boone, Waters, Hish and Cassidy – were either reassigned (Boone, Cassidy and Waters) and/or had their incentive compensation reduced. (Boone lost 100 percent; Waters and Cassidy lost 75 percent; and Hish lost 50 percent.) See Company Exhibit 6B.)

5

SUBJECT TO
PROTECTIVE ORDER

OTIS09811
CONFIDENTIAL

The instant grievance was filed to protest Murphy's discharge, the "suspensions" and Bohlig's reassignment. Failure to resolve it amicably led to this dispute.

## DISCUSSION AND FINDINGS

### The Issue

The core question here is whether the Company had just cause to discipline Murphy, Ahrens, Bohlig and Vialonga.

### Positions of the Parties

The parties' basic positions may be succinctly stated:

The Company contends that the grievants – as MICs – bear a heavy responsibility for ensuring that safe practices and procedures are followed strictly. The grievants failed to live up to that responsibility. Hence, discipline was warranted. And Murphy, as the MIC in overall charge of the project, has a specific contractual obligation to "enforce the safety practices and procedures on the job to which he is assigned by the Company." It insists Murphy must be held accountable for his actions – or lack of actions – in not preventing Mc Quillen from following safe procedures. It asks, accordingly, that the grievances be denied.

The Union, on the other hand, regards the Company's action as singularly inappropriate. It accuses the Company of seeking scapegoats. Indeed, it stresses

6

SUBJECT TO
PROTECTIVE ORDER

OTIS09812
CONFIDENTIAL

that Murphy was not even at work on December 23, 2002. (He was on a pre-scheduled vacation.) It is ludicrous for the Company to attempt to single him out for discharge. Certainly, it suggests, if he is to be discharged others above him in the managerial hierarchy should not escape with mere monetary penalties. For these reasons, it asks that the grievance be granted, the disciplinary actions reversed and Bohlig reinstated to his MIC position.

**Opinion**

This much is beyond dispute: Otis Elevator and its employees are involved in a dangerous business. Safety, therefore, is a paramount concern. It is ingrained in all aspects of the business. Enormous efforts are made to ensure that safe practices are taught, practiced and enforced. That, of course, is as it should be.

Accidents, nevertheless, do occur. And, on occasion, they result in a fatality. That is bad enough. But when a fatality grows out of a safety infraction, it is far worse. For the fatality need not have occurred.

It is important to place the December 23, 2002 incident which led to McQuillen's death in proper perspective. His death clearly resulted from the seven-eight story fall of the elevator carriage on which he was riding. The fall did not grow out of his having ridden on top of the elevator carriage. Rather, it resulted from the slippage of the hoist cable out of fist grips which evidently had not been properly tightened with a torque wrench. When that happened, the cable

7

came loose and left the elevator carriage unsupported, causing it to plummet to the bottom of Shaft No. 14.

The Company, I note, has not sought to blame Murphy for McQuillen's death. It does not – and should not – hold him directly responsible. It appears to recognize – as it should – that in large measure McQuillen is responsible for putting himself in harm's way.

The core question here is to what extent Murphy and the other disciplined MICs (i.e., Ahrens, Vialonga and Bohlig) can be held accountable for failing to ensure that safe practices, policies and procedures were observed by McQuillen. Each must be examined individually.

### 1.    S. Murphy

Murphy testified at length. He explained that McQuillen was the MIC responsible for removing Johnson clips from the vertical rails in Shafts 12, 13 and 14. McQuillen, he knew, had removed those clips from Shaft 12 in the week of December 16, 2002. However, he stated, he does not know exactly what procedure McQuillen followed to do so. McQuillen did not tell him. He did not inquire. They simply did not discuss the matter.

They did, he said, discuss the removal of the clips in Shafts 13 and 14. Murphy says he offered to have the dry wall removed from the shafts to permit access from the floor(s) below the clips. McQuillen rejected the offer. Instead, he

said, he would bring the elevator carriage up to the clips and "drop" a ladder down to the carriage from the tenth floor. Murphy says he instructed McQuillen to be sure to put the carriage on "safety," i.e., back it down so that the safety wedges would lock onto the rails. McQuillen, he said, agreed to do so.

Murphy did not observe McQuillen remove the clips from Shaft 13 either. When he asked him how the work went, McQuillen replied that it was "bumpy and dark." Murphy construed that to mean McQuillen rode on the top of the carriage roof. He states he told him he "knows better" than to do that. McQuillen agreed not to do so again.

Murphy was on a pre-scheduled vacation on the day (December 23rd) McQuillen was going to remove the Johnson clips from Shaft 14. And, it is evident, McQuillen did not follow either of the two approved procedures for removing the clips from that shaft. Instead, he rode the top of the carriage. He was doing so when the cable came loose from the fist grips and the carriage plunged to the bottom of the shaft.

The Company has charged Murphy with failure to "ensure safety practices, policies and procedures were properly followed." He is, I am persuaded, guilty of that charge. A careful analysis of his testimony leads to that conclusion.

It is difficult for me to understand why Murphy failed to question McQuillen more closely about the procedure he used to remove Johnson clips from Shaft 12.

OTIS09815
CONFIDENTIAL
SUBJECT TO
PROTECTIVE ORDER

He had to have known that the planking procedure had not been used. For no request had been made to have Turner Construction remove dry wall to permit access to the shaft. Such a request would have flowed through Murphy. Thus, he must have realized that, at best, McQuillen was using the less preferable ladder drop procedure, or, at worst, rode the top of the carriage. His failure to press McQuillen – or even to discuss the point with him - strikes me as altogether too casual. It would not have been unreasonable for McQuillen to conclude Murphy chose to ignore his unsafe practice.

As regards Shaft 13, Murphy struck me as being rather cavalier as to the method McQuillen would employ to remove the clips. He says he "offered" to have the dry wall removed. He should, I believe, have directed that be done. He should have left no doubt that he wanted the task performed in the safest way possible.

Certainly, after McQuillen completed the clip removal in Shaft 13, Murphy should have had no doubt that McQuillen was being reckless. When McQuillen told him that the ride was "bumpy and dark" he understood –"I take that to mean" – McQuillen had been riding the top of the carriage. Yet, he did nothing more than tell McQuillen he "knows better" than to ride the carriage. Murphy, in my judgment, should have issued McQuillen a direct order not to do so. He should have done so in the presence of one or more witnesses. He should have alerted

SUBJECT TO
PROTECTIVE ORDER

OTIS09816
CONFIDENTIAL

other MICs to watch McQuillen. His passivity was singularly inappropriate. It did nothing to dissuade McQuillen from engaging in the unsafest possible procedure on December 23rd.

In brief, I believe Murphy had it within his responsible control to try harder to block McQuillen from being reckless. The Company has a right to hold him accountable for his failure to act more responsibly. That failure exposed him to appropriate disciplinary action.

I am not convinced, however, that discharge was the most appropriate action available. Murphy, after all, is a long-service employee. He has a pristine record. This is the first instance his judgment has been shown to have been faulty. And, moreover, there is no valid reason for the Company to have singled him –and him alone – out for a penalty as harsh as discharge. Having done so, it placed him in the position of a scapegoat for McQuillen's death. Given McQuillen's culpability, that is unacceptable.

For these reasons, I believe Murphy's discharge should be reduced to a disciplinary suspension. He is to be reinstated promptly upon receipt of this award.

## 2.   E. Ahrens

The record, simply stated, does not support a finding that Ahrens is guilty of "poor safety performance" on the Goldman-Sachs project. His function on the job was to coordinate field operations and to provide technical support to N. Boone

SUBJECT TO PROTECTIVE ORDER

OTIS09817
CONFIDENTIAL

and W. Cassidy. He had no line supervisory responsibilities. Nor did he have anything to do with the hoisting or rigging in Shafts 12, 13 or 14.

The Company, plainly put, has failed to meet its burden of proof. The discipline imposed on Ahrens, therefore, is rescinded. The Company is directed to expunge it from his personnel file.

### 3.    E. Vialonga

The record does not support a finding that Vialonga is guilty of "poor safety performance" either. He had no role at all in the hoist of Car No. 14. Nor did he have one as regards Shafts 12 and 13.

The discipline imposed upon him is rescinded. His record is to be cleared as well.

### 4.    P. Bohlig

Bohlig was the MIC responsible for rigging on the Goldman Sachs project. He testified that he had told McQuillen to bring the carriage up as close as possible to the Johnson slips on the rails in Shaft 12. Then, he was to back down to engage the safety wedges. After that was done, he told him to hook up an extension ladder and bring it down to the carriage. So far as he knows, that is exactly what McQuillen did. In fact, he is not even sure whether McQuillen or one of his Mechanics removed the clips. For he was in the motor room on the 23rd floor and could not see down the shaft.

12

SUBJECT TO
PROTECTIVE ORDER

OTIS09818
CONFIDENTIAL

As to Shaft 13, Bohlig states he was not at work on the day the Johnson clips was removed. Accordingly, he does not know how they were removed.

Bohling stated that on December 23, 2002, before raising Car No. 14, he sent a Mechanic up to the 42nd floor to see if the cable line was clear. The Mechanic reported that there was scaffolding "all over the place." That concerned him. But he did not go up to check. Instead, he asked the Mechanic (via radio) if the cable was clear. He affirmed that it was. Nor, he reported, was anyone working on the scaffolding. In brief, the hoist was clear for lifting.

Bohlig insists that he has no idea if McQuillen rode the car up on December 23rd. Nor does he know whether he had a ladder dropped down to the car.

There is no valid reason to question Bohlig's credibility. His testimony was clear, consistent and convincing. I accept it at face value. Nothing he said serves to support a finding that he is guilty of poor safety performance on December 23, 2002. The discipline imposed is rescinded and his record is to be cleared.

Bohlig, the Union suggests, was also improperly reassigned from his MIC position at Goldman Sachs to a Mechanic's job on another project. That claim must be rejected.

The record leaves no doubt but that the Company has, over the years, regularly exercised the right to designate individuals to serve as MIC on a job. The right to do so is clearly delineated in Section IV (I) of the Agreement. In fact, as P.

13

Barrett's testimony made clear, the Company does not consult the Union relative to such designations. Moreover, Barrett stated, the Company has never consulted the Union about removing an employee from an MIC assignment. Nor has its right to effect such a change ever before been challenged.

Given this, it seems to me the Union has failed to establish that Bohlig's reassignment to a Mechanic's position was improper. The Company, in my view, simply exercised its managerial discretion. For that is cannot be faulted.

\*     \*     \*

SUBJECT TO
PROTECTIVE ORDER

OTIS09820
CONFIDENTIAL

## AWARD

1. The discharge of S. Murphy is reduced to a disciplinary suspension. He is to be promptly reinstated.

2. The suspensions issued to E. Ahrens, E. Vialonga and P. Bohlig are reversed. Their records are to be expunged of such disciplinary action.

3. The Company was within its rights to reassign P. Bohlig to a Mechanic's position.

_____
STANLEY L. AIGES

DATED: _____/2003

## AFFIRMATION

I, STANLEY L. AIGES, do hereby affirm upon my oath as Arbitrator that I am the individual who executed this instrument, which is my Award.

_____
STANLEY L. AIGES

15

OTIS09821
CONFIDENTIAL

SUBJECT TO
PROTECTIVE ORDER