**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SUJATA NICHANI, | : | CIVIL ACTION |
| | : | NO. 3:02CV1384 (MRK) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED TECHNOLOGIES CORP. and | : | |
| OTIS ELEVATOR COMPANY, | : | |
| | : | |
| Defendants. | : | APRIL 6, 2006 |

### DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE IN PART THE TESTIMONY OF SHELDON WISHNICK

INTRODUCTION ..................................................................................................1

RELEVANT FACTS ...........................................................................................1

    I.     Brief Background Facts ......................................................................1

    II.    Wishnick's Damages Testimony ......................................................3

          A.    The Black-Scholes Method......................................................7

          B.    The Black-Scholes Method and Employee Stock Options........9

          C.    Wishnick's knowledge of, experience with, and use of the Black-Scholes Method...................................................13

          D.    Wishnick's Crunching of Speculative Numbers To Produce The "Executive Forecast" Calculation ..........................16

ARGUMENT ....................................................................................................18

    I.     Legal Standard...................................................................................18

    II.    Wishnick Is Not An Expert On Valuing Stock Options .....................19

    III.   Wishnick's Analyses Are Neither Reliable Nor Relevant ...................21

          A.    Neither the Black-Scholes Calculation Nor The Executive Forecast Calculation Are Reliable .........................................21

          B.    The "Executive Forecast" Calculation Is Not An Accepted Method Of Valuing Stock Options .....................................25

          C.    The Black-Scholes Calculation Is Not Relevant To The Facts Of This Case ...................................................................26

CONCLUSION ..................................................................................................................29

## INTRODUCTION

Defendants, United Technologies Corp. ("UTC") and Otis Elevator Company ("Otis"), (collectively, "Defendants"), respectfully move to exclude in part the testimony of Plaintiff's damages expert, actuary Sheldon Wishnick ("Wishnick"), as unreliable and irrelevant. Wishnick's testimony concerning the number and value of employee stock options to which Plaintiff, Sujata Nichani ("Nichani"), claims she is entitled over a twenty-six year period and his projection of future losses should be excluded under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993) and Kumho Tire, Co. v. Carmichael, 526 U.S. 137, 147 (1999) pursuant to the Court's "gatekeeper" function. Wishnick's testimony is unreliable because he relied on data and assumptions provided by Plaintiff's counsel—without any underlying evidentiary support and without any independent investigation into their reasonableness or accuracy—and because the "methodologies" he employed are themselves unreliable, especially in the context of employee stock options. Further, his testimony is irrelevant because the "methodologies" he employed do not "fit" the facts of this case.

## RELEVANT FACTS

### I.    Brief Background Facts

Nichani was employed by Otis from October 1990 until March 2003, when she was terminated from her employment as a senior manager for the Environmental, Health and Safety area ("EH&S") at Otis following the accidental death of an Otis worker and a resulting investigation through which Otis learned that Nichani had improperly failed to implement and deploy Otis's world-wide job site safety standards and policies. (See Moncini Dep. at 384-89.)[1] Nichani's salary upon termination at Otis was approximately $118,000. She was also, at times,

---

[1] Cited portions of Moncini's deposition are attached hereto as Exhibit 1.

eligible to receive up to 500 stock options per year, based on her performance.  (See Moncini

Dep. Exs. (attached hereto as Exhibit 2).) [2]  Her eligibility to receive any stock options was not a

guaranteed part of her compensation.[3]  Her options history is as follows:

- 100 stock options in 1997;

- 200 stock options in 1998;

- 400 stock options in 1999;

- 500 stock options in 2000 and 2001;

- 0 stock options in 2002 and 2003.

(See id.; Wishnick Report at 5b (attached hereto as Exhibit 3).)  The employee stock options in

question had a ten-year term and vested three years after grant.  (Ex. 2)

       While still at Otis, in August 2002, Nichani sued Defendants claiming that it violated the

Equal Pay Act.  After her discharge in 2003, Nichani sued Defendants claiming that her

termination resulted not from her failure to implement and deploy certain safety standards, but as

a consequence of her race, national origin, and sex and in retaliation for her complaints of such

discrimination.  She further claimed that Defendants were liable on a number of related common

law claims.[4]  Defendants deny that they violated any law with respect to Nichani's employment

---

[2] For "special recognition," however, an extremely exceptional employee may have been
granted up to 1,000 stock options.  (See Ex. 2.)  Nichani was never granted over 500 shares—and
that, only twice.  (See id.)

[3] Indeed, the terms of the stock option plan specifically provided that decisions are made
on an annual basis and that "participation in the Program for any particular year does not ensure
that you will receive additional Program awards in the future."  (Id.)

[4] Pursuant to this Court's ruling on summary judgment, only the following claims remain:
sex discrimination claims under Title VII and state law; an Equal Pay Act claim; retaliation
claims under Title VII and state law; a defamation claim related to her performance review; and
state law claims for breach of an implied contract and promissory estoppel regarding

at Otis or her subsequent termination.  At issue in the present motion, however, is not Nichani's allegations concerning Defendants' purportedly discriminatory conduct, but her wildly inflated, completely unsupported, and speculative projection of future damages.

## II.    **Wishnick's Damages Testimony.**

Nichani provided two damage reports from Wishnick, an actuary who served as her retained expert on the issue of damages.  While he initially put Nichani's economic losses at anywhere from $9 million to $30 million, Wishnick subsequently revised his report to opine that her economic losses fell between approximately **$10 million and $12 million**—representing approximately **_100 times her total annual salary_** while at Otis.  Such a figure is wholly speculative, pulled essentially from whole cloth.  It is, quite clearly and undeniably, nothing more than a mammoth number Plaintiff's counsel hopes to flash in front of a jury.  The largest component of these projected damages is employee stock options that Nichani claims she would have been granted had she remained employed at Otis for twenty-six years, and that she claims can be reliably valued, through one of two different "models," at between $5.38 and $6.01 million dollars in present value.  (See Ex. 3 at 1.)[5]

---

Defendants' Code of Ethics.  (Dkt. # 106.)  All other claims were disposed of through summary judgment.  (See id.)

[5] The remainder of the purported damages identified by Wishnick—for lost income, lost incentive compensation, and lost benefits—rely on unsupported assumptions with no basis in fact and based on predictions that are demonstrably untrue.  For example, Wishnick based his valuation on his assumption that Nichani would be employed by Otis for the next twenty-six years and that her compensation would increase annually, through the year 2028 and her anticipated retirement, at a rate of five percent, notwithstanding the fact that this percentage increase exceeded her actual earnings history.  He further assumed that Nichani would not find another job until September 2005, notwithstanding the facts that (1) at the time of his report she had already declined job offers, and (2) she had accepted a position in March 2004 earning a base salary of approximately $90,000 per year.  He further calculated that Nichani was entitled to twenty-six years of damages in an amount equivalent to twenty-two percent of her salary to account for benefits, notwithstanding the fact that once she obtained a new position, her benefits

Wishnick based his entire report on the assumption that Nichani would have been paid going forward as an L3 executive, i.e., the same as Brad Russell for the rest of her career. At the time of her termination in 2003, however, she was a senior manager, not an executive. Moreover, notwithstanding the fact that Nichani had never been eligible for nor received more than 500 employee stock options per year and that, during her later years, she had not received any, Wishnick assumed—solely at the direction of Plaintiff's counsel and without any independent investigation as to accuracy or reasonableness—that Nichani would have received 7,000 stock options in 2002 (which did not, in fact, happen) and 9,000 options every year thereafter through 2028, the presumed year of her retirement:[6]

> A:      . . . These seven thousand and nine thousand numbers were provided to me by Attorney Minchella.
>
> Q:      Do you know where he got those numbers?
>
> A:      No.
>
> Q:      Did you rely on those numbers?
>
> A:      I did.

---

were comparable and her damages for "lost benefits" nonexistent. (See Ex. 3 at 2a-2c; Report of Defs.' damages expert, Christopher Erath at 4-6, 9-10 (attached hereto as Exhibit 4).) Moreover, Wishnick assumed that Nichani would never find another job that offered any form of incentive compensation, notwithstanding the fact that her current job does, in fact, offer incentive compensation. (See Nichani Dep. at 400-02.) Cited portions of Nichani's deposition are attached hereto as Exhibit 5. Indeed, Nichani in fact received incentive compensation at her current job in 2004. (See Ex. 6.) Wishnick's forecast of future damages is especially unreasonable given that Nichani's position, Senior Manager, EH&S, NAA was eliminated about a year after her termination. On April 1, 2004, Otis created a new position in NAA whereby the EH&S function was combined with the Quality function. (See Def's Memo in Supp. of Summ. J. at 22.) Otis selected Edith DeFrancesco, a female L2 Executive, for that new position.

[6] Furthermore, despite the fact that Nichani had received 200 employee stock options in 1999, 400 employee stock options in 1999, and 500 employee stock options in 2000, Plaintiff's counsel, in an email dated March 6, 2003, instructed Wishnick to assume that she would have received none in 1999, 4000 in 2000, and 5000 in 2001. (See Exhibit 7.)

Q:      Did you question the size of those grants?

A:      Yes, I did.

Q:      Did you ask him where he got them?

A:      No.

Q:      Did he tell you to use those numbers?

A:      He did.

(Wishnick Dep. at 103.)[7]

Wishnick's inability to produce any justification for the hypothetical grant of between 7,000 and 9,000 stock options annually, extending out over a period of twenty-six years, is understandable, given that no such evidentiary foundation exists.  Indeed, as set forth in the report of Defendants' damages expert, Christopher Erath, the figures are wildly inflated:

> Mr. Russell [the executive who was red-circled, but whose compensation Nichani believes hers should have tracked] . . . received grants of 3,000 and 3,100 options in 2000 and 2001, his final two years with the company.  I also obtained information showing the magnitude of option grants given to people in grade L3, the grade Mr. Russell held before resigning. In 2002 the average grant for an L3 was 2,984 and in 2003 2,310.  No L3 received a grant as large even as 6,000 options, let alone the 7,000 or 9,000 Mr. Wishnick uses.
>
> As discussed above, the evidence does not support Mr. Wishnick's assumption that Ms. Nichani would have assumed an executive (L3) position.  I obtained information showing typical stock option grants to non-executives and found that typical grants were less than 250 options and did not occur annually.

(Ex. 4 at 6-7.)

At the time of her termination, Nichani was a grade 51 senior manager, not an L3 executive as was Brad Russell.  Accordingly, Wishnick's damages calculations, which assume she was an L3 executive receiving more than double the number of stock options of other L3

---

[7] Cited portions of Wishnick's deposition are attached hereto as Exhibit 8.

5

employees, overestimate by many orders of magnitude the stock option grants that Nichani was likely to have received in the future, had she remained employed at Otis and even assuming that the stock option grant program continued to exist throughout that entire twenty-six year period.

This last assumption, of course, is itself nothing more than speculation. In 2004, the Financial Accounting Standards Board ("FASB") announced its intention to require companies to value stock options for financial reporting purposes and to include the value as a charge against earnings. See Louis Lavelle, "Time to Start Weighing the Options," Business Week, Jan. 17, 2005, at 32-33, *available at* http://www.businessweek.com (last visited April 4, 2006) (attached hereto as Exhibit 9). In light of the pending regulation, many companies announced their intention to discontinue stock option grant programs such as the one currently implemented by UTC, or are at least seriously considering such a step. See, e.g., Diane Levick, "Aetna Axes Worker Options," Hartford Courant, Dec. 22, 2004, at E1 (reporting that Aetna will no longer give options to non-management workers due to FASB requirement, and that other companies are expected to follow suit) (attached hereto as Exhibit 10); Ruth Simon, "Stock-Option Awards Sharply Cut," Wall Street Journal, Dec. 14, 2004, at D3 (reporting that "many companies are sharply reducing their stock-option awards" in light of the new FASB rule and other factors) (attached hereto as Exhibit 11); Ex. 9 at 33 (reporting that "most companies are replacing some stock options with restricted stock").

The seismic shift in thinking about stock-option incentive compensation, coupled with the regulatory changes and their anticipated impact on public companies' ability to issue stock option grants, certainly calls into question the reliability of a prediction that assumes the continuation of UTC's program through 2028. Wishnick's opinion failed, however, to take any of these developments into account. Instead, as set forth above, he continued to "pyramid" his

assumptions by assuming that UTC would issue *substantially more* option grants than is currently its practice, and that it would continue to do so for the next quarter-century.

Wishnick valued these hypothetical future stock options according to two alternative "methods." The first is an algorithm called the Black-Scholes method, a controversial formula designed as a means of valuing short-term, exchange-traded options, not employee stock options, which are not traded on an exchange. The second, named by Wishnick the "executive forecast method," is essentially a construct he created based on an internal presentation made by UTC's vice-chairman, Stephen Page ("Page"), in which Page noted that if the company's stock continued to appreciate in value as it had done in the past, it would follow a corresponding trajectory.[8] Using the Black-Scholes method and the hypothetical grant of 7,000 to 9,000 options annually—as directed by Plaintiff's counsel—Wishnick calculated Nichani's purported losses from the stock options at a present value of over $5.7 million. Using what he designated as the "executive forecast method" and the same number of hypothetical grants, Wishnick calculated the purported losses from stock options at a present value of over $7.6 million.

A.    **The Black-Scholes Method.**

The Black-Scholes method ("BSM"), in essence, is a complex mathematical formula developed by two economists, Fisher Black and Myron Scholes, in the early 1970's, which allows for the calculation of a "theoretical price" of an <u>exchange-traded</u> option. <u>See</u> "Black-Scholes Option Pricing Model," *at* http://daytrading.about.com/cs/options/a/black_scholes.htm (last visited Mar. 27, 2006) (attached hereto as Exhibit 13). Its major determinants include strike

---

[8] In an email to Wishnick dated February 24, 2003, Plaintiff's counsel instructed him to assume that "from 2002 to 2007 stock price will rise from $62 share to $135 share." (<u>See</u> Exhibit 12.) Wishnick based his "executive forecast" on these figures without any underlying support or independent investigation.

price, time until expiration, volatility, prevailing risk-free interest rate, and dividends to be paid. Id. The strike price is the specified price on an option contract at which the stock option may be exercised. "Strike Price Definition," *at* http://www.investorwords.com/4780/strike_price.html (last visited Mar. 27, 2006) (attached hereto as Exhibit 14). Time until expiration is important because the value of a stock option will decrease at an accelerating rate as the expiration date of the option approaches. This is known as "time decay." See Ex. 13. Volatility essentially measures "how much the stock moves around." Id. The Black-Scholes method "likes" volatility: "the greater the volatility, . . . the greater the value Black-Scholes assigns." Daniel Garcia Swartz, Ph.D., "Tea Leaves and Damages Experts: Which is More Exact?," Nat'l Econ. Research Assocs., Inc. at 10 (Nov. 2000) (attached hereto as Exhibit 15). The prevailing risk-free interest rate concerns the interest an investor could have earned with the premium he or she paid to purchase the option, had he or she not bought the option. It is priced into the value of the stock option; the lower the rate, the lower the effect on option price. See Ex. 13. Conversely, any dividends that are paid out on the underlying shares reduce the value of the stock (and, therefore, any options associated with them.) Id.

In addition, the BSM, like any other formula, is based on a number of assumptions. These assumptions include:

- The stock price follows a particular probability distribution, the lognormal distribution;

- The volatility of the stock is known;

- The risk-free interest rate is known;

- The dividend yield of a stock is known;

- Options are freely transferable at any time;

- There are no transaction costs; and

8

- There are risks involved

Ex. 15 at 8 (Nov. 2000).  The Black-Scholes valuation "is very sensitive to its inputs, and these must be accurate for the valuation to be accurate."  Id. at 15.  Indeed, even extremely slight changes in any of the assumptions under which the Black-Scholes method operates will cause significant variance in "valuation."  Kim Marie Boylan, et al., "The IRS's Proposed Cost Sharing Regulations—Same Position, Different Venue," Tax Planning Int'l e-commerce, at 4, Oct. 2002 *available at* http://www.lw.com/resource/publications/_pdf/pub558.pdf (last visited Apr. 4, 2006) (attached hereto as Exhibit 16).

### B.    The Black-Scholes Method and Employee Stock Options.

The BSM was designed to value exchange-traded options which have an extremely short lifetime of weeks or months.  (See Ex. 4 at 7.)  Even as an indicator of the value of exchange-traded options, however, the BSM is not without its critics—among them, Warren Buffett.[9]  The longer the duration of the exchange-traded option, the less accurate and less reliable the calculation will be.  See Burton G. Malkiel, Professor of Economics, Princeton University, & William J. Baumol, Professor of Economics, New York University, "Stock Options Keep the Economy Afloat," Wall Street Journal, Apr. 4, 2002, at A18 (stating that the Black-Scholes model "does not provide reliable estimates for longer-term options, such as those lasting six

---

[9] As the Chairman of Berkshire Hathaway, the "Oracle of Omaha," and by many accounts, the world's greatest stock market investor, pointed out, "Black-Scholes is an attempt to measure the market value of options and it cranks in certain variables, but the most important value it cranks in is the past volatility of the asset involved and past volatilities aren't the best judge of value."  Warren Buffett, Financial Times, May 4, 2003, *quoted in* "The Black-Scholes Method," *at* http://www.savestockoptions.org/pdf/black-scholes.pdf (last visited Apr. 4, 2006) (attached hereto as Exhibit 17).  Similarly, Charlie Munger, Vice Chairman of Berkshire Hathaway, remarked, "Black-Scholes is what I would call a knownothing value system.  If you don't know anything at all about value compared with price . . . . then Black-Scholes, on a very short-term basis, is a pretty good guess over, say, a 90-day option.  The minute you get into longer-term options . . . . it's crazy to use Black-Scholes."  See id.

months to one year, and market prices often differ substantially from predicated values")
(attached hereto as Exhibit 18). But experts agree that the BSM was not designed to value
employee stock options and, indeed, such use often results in wildly-inflated values.[10] As
William Margrabe, Ph.D., research assistant to Fisher Black, remarked, "an employee option
*must* be worth less than an option of the type that Black-Scholes was meant to value. So any
result obtained by using this method would need a 'haircut' or a discount to a lower figure.
***Nobody knows how much of a haircut to take and nobody will probably ever know***."
Bloomberg, Jul. 23, 2002 (*quoted in* Ex. 17) (emphases added).

The BSM is an unreliable method for valuing employee stock options because "[a]ll the
assumptions ending with 'is known' are of course inaccurate, no stock exactly follows a
lognormal distribution, employee stock options are never transferable, and transaction costs

---

[10] See, e.g., Richard H. Wagner, Executive Compensation 2004 Guide at 139 (Kennedy
Information, Inc. 2004) (noting that the Black-Scholes method was "never intended to be used
for employee stock options") (attached hereto as Exhibit 19); Kim Marie Boylan, Latham &
Watkins, "FASB's New Method To Value Options Is Flawed," Venture Capital Journal (Feb.
2004), *available at* http://www.privateequityweek.com/vcj/protected/1070549625240.html (last
visited Mar. 22, 2006) (noting the use of the Black-Scholes method to value employee stock
options, "while simple and mechanical, is problematic because it was designed to value freely-
tradable, short term options") (attached hereto as Exhibit 20); Rodney Mollen, et al., "Black-
Scholes: A Failed Model for Executive Options," (Mar. 24, 2003), *available at*
http://www.imakenews.com/sibson/e_article000137189.cfm (last visited Apr. 4, 2006)
(conducting study that confirms that "Black-Scholes cannot successfully predict the value of
long-term non-traded stock options") (attached hereto as Exhibit 21); James DeLong, Senior
Fellow for the Project on Technology and Innovation at the Competitive Enterprise Institute,
(stating that "[a]ccording to experts, the Black-Scholes options pricing model is not designed to
deal with options having the characteristics of those granted to employees, so the initial value
will not even represent an accurate starting point") (*quoted in* Ex. 17); Brian J. Hall & Kevin J.
Murphy, "Stock Options for Undiversified Executives" 33 Journal of Accounting & Economics
3 (Feb. 2002) (analysis supporting "frequent claims by executives that Black-Scholes values are
'too high'") (attached hereto as Exhibit 22); Financial Executives Research Foundation,
"Employee Stock Option Valuation Models Compared," Feb. 19, 2003 (stating that "[t]he Black-
Scholes model systematically overvalues employee stock options") (*quoted in* "Expensing
Without Accuracy" *at* http://www.savestockoptions.org/pdf/ expensing_without_accuracy.pdf
(last visited Apr. 4, 2006) (attached hereto as Exhibit 23).

exist." Ex. 15 at 9.  (See also Erath Dep. at 17-18 (noting that "it's one of the basic infirmities of

Black-Scholes as applied to employee stock options that neither I nor anyone else can predict

what volatility is going to be over a period of time as long as ten years or what the dividend yield

is going to look like or what risk-free interest rates are going to look like, so it's impossible to

have an opinion as to whether they're valid or not" and that "there's no one on this planet who

can answer that question because we don't know . . . what is going to happen with those three

factors over a period as long as we're discussing for these options).)[11]  As another commentator

noted, the Black-Scholes method "*cannot account for the unique aspects of employee stock*

*options such as the fact that they generally have a long life, vest over time, are not freely*

*tradable, are not hedgeable, are subject to forfeiture, and may be subject to external and*

*internal company policies with respect to the ability to exercise (such as black out periods)*."

Ex. 20 (emphasis added).  That employee stock options are not transferable "violat[es] one of the

most basic precepts of the method by which Black and Scholes derived their equation."  Ex. 15

at 15 (Nov. 2000).[12]

Indeed, in response to FASB's new regulations requiring the reporting of the value of

employee stock option in corporate 10-K statements, and in light of the unreliability of the BSM,

---

[11] Cited portions of Erath's deposition are attached hereto as Exhibit 24.

[12] See also Ex. 16 at n.41 (noting that employee stock options "are long-lived and subject
to substantial vesting requirements and restrictions on transferability [and, a]s a result, they
violate two underlying assumptions in the [Black-Scholes] model"); Burton G. Malkiel,
Professor of Economics, Princeton University, & William J. Baumol, Professor of Economics,
New York University, "Stock Options Keep the Economy Afloat," Wall Street Journal, Apr. 4,
2002, at A18 (*quoted in* Ex. 17) (noting that "[b]ecause employee stock options have durations
of five to 10 years, are complicated by not vesting immediately, are contingent on continued
employment and subject to various restrictions, it is virtually impossible to put a precise estimate
on the option's value.  Moreover, employee options cannot be sold, violating one of the key
Black-Scholes assumptions").

many companies are either eliminating stock option plans or adopting other methods of valuing

employee stock options, even though "no one has ever figured out a model that can value options

with *any* degree of accuracy." Craig R. Barrett, "More Options for Trial Lawyers," Wall Street

Journal, Mar. 31, 2004, at A14 (emphasis added) (attached hereto as Exhibit 25). FASB has left

it up to each corporation to use a 'legitimate' model to value employee stock options, "even

though there is no example of a legitimate model." Id. Many corporations have criticized the

BSM in particular as an unreliable method for valuing employee stock options.[13] Such criticism

is not surprising; a study of the ***actual gains*** of 1,445 companies during six periods between

1972 and 2002 revealed that "***the average actual gains as a percent of Black-Scholes value***

---

[13] See, e.g., Rudolph A. Bless, Managing Director and Chief Accounting Officer, Credit Suisse
Group, excerpt from Nov. 4, 2002 Comment Letter to FASB on its Exposure Draft (*quoted in*
Ex. 17) ("We strongly believe that the option pricing models that exist today provide imprecise
valuations for employee stock options. Models such as Black-Scholes can produce widely
varying and misleading results for such options. In addition, there is a growing consensus
among leading financial and academic experts that this formula should not be used to value
employee and executive stock options."); Statement of Proctor & Gamble, excerpt from "Global
News: Expensing Stock Options," Aug. 29, 2002 (*quoted in* Ex. 17) (". . . Black-Scholes can
provide misleading results when applied to employee stock options. It is on this basis that
[Proctor & Gamble] does not include the expense in profit reporting at this time."); Citigroup,
2005 Annual Report, at 129 (abandoning the Black-Scholes method) (attached hereto as Exhibit
26); Maxim Integrated Products, excerpt from FASB Comment Letter 66, ("It is disconcerting to
consider that operating results that are in every other way reported with rigor and precision will
be mingled with significant charges that result from 'make believe' results of a broad valuation
model . . ."); Apple Computer, Inc., excerpt from FASB Comment Letter 92 ("[I]t is our position
that the inadequacies inherent in available option-pricing models, including Black-Scholes, with
respect to valuing employee stock options are so great that they should not be used for
measurement of employee stock options."); Staples, excerpt from FASB Comment Letter 55
(describing the BSM as "an inherently unreliable measure in the income statement") (*quoted in*
"The Employee Stock Options Debate, Expensing Without Accurate Valuation: Why Mandatory
Expensing is Bad for Investors" *available at* http://www.fsa.org/resources/corpgov/debate.pdf
(last visited Apr. 4, 2006) (all three attached hereto as Exhibit 27); Letter from the Int'l
Employee Stock Options Coalition to FASB dated Jan. 30, 2003, at 3, *available at*
http://www.nvca.org/ pdf/IESOC%20letter%20to%20IASB%203-7-03.pdf (last visited Mar. 30,
2006) (noting that the BSM "produce[s] inaccurate and misleading information" and that it does
not "accurately and reliably measure the value of employee stock options") (attached hereto as
Exhibit 28).

*ranged from 95 percent to 910 percent*" and "*[o]nly 3 to 5 percent of stocks were within 90 to 110 percent of the price estimated by Black-Scholes.*"  Tim Reason, "The Holes in Black-Scholes:  Valuing stock-option grants with Black-Scholes may cause some confusion on the income statement," CFO Magazine, *available at* http://www5.cfo.com/printable/article.cfm/ 3008518?f=options (last visited Mar. 30, 2006) (emphasis added) (attached hereto as Exhibit 29). Indeed, even those companies who use the BSM for accounting and financial reporting purposes, use a modified version.  (See Ex. 24 at 16, 37, 40 (stating that companies use a modified version of Black-Scholes, using "expected lifetime rather than actual"[14] and noting that he does not know "that anybody would apply the straight Black-Scholes as Wishnick did").)  However, even this modified version is an overstatement.  (Id. at 124.)

### C.    Wishnick's knowledge of, experience with, and use of the Black-Scholes Method.

At his deposition, Wishnick conceded that he has no special expertise with the Black-Scholes method, and that he used it simply because it was the only method of which he was aware to value stock options.  (See Ex. 8 at 49.)  His knowledge of the BSM, however, over and above the generic fact that it has been used by some to value certain stock options for financial reporting purposes, is particularly limited.  He is not, for instance, aware of the kind of option Black and Scholes used to develop their theory.  (Id. at 139.)  He does not know whether the BSM is based on the assumption that market price will exceed the strike price.  (Id. at 143.)

---

[14] The BSM assumes that the holder of stock options will hold the options for the entirety of their term.  Because most employee stock options are exercised well before the end of their term, this "expected" lifetime is a less inaccurate measure.  For instance, UTC uses a five-year expected life in valuing for accounting and financial reporting purposes.  (Ex. 24 at 49.)  As Erath discussed, "the research shows that people don't achieve the Black-Scholes value and exercise early when we're talking about employee stock options."  (Id. at 53-54.)

Moreover, Wishnick is completely uninformed concerning one of the most basic precepts of the method by which Black and Scholes derived their equation:

> Q.    Does the formula of Black-Scholes assume that options are freely transferable at any time?
>
> A.    I don't know.

(Id. at 149); cf. Ex. 15 at 15.

Further, his deposition testimony, replete with misstatements of the BSM, demonstrates his fundamental misunderstanding of the method's proper uses and limitations.  Despite the deluge of criticism of the BSM as a means of valuing employee stock options, [15] Wishnick is amazingly "***not aware of any drawbacks or shortcomings in using the Black-Scholes formula to evaluate employee stock options***."  (Ex. 8 at 146 (emphasis added).)

Even putting aside his lack of knowledge of the BSM, Wishnick knows very little about employee stock options in general:

> Q.    Now, is it your understanding that these option grants that Ms. Nichani got could be sold, delivered to a broker and have the broker sell them on the open market?
>
> A.    I don't know the procedure for their disposal but it was my understanding that they could be traded for cash somehow.  I don't know if it was through a broker or open market or exactly how it worked.

(Id. at 97.)  Indeed, he admitted that he does not even know whether employee stock options are traded on a market:

> Q.    Isn't it a fact that employee stock options are not traded on securities markets?
>
> A.    That may be.  I just don't know.

---

[15] Indeed, any interested party would encounter article after article outlining the BSM's limitations and unreliability as it relates to employee stock options on an internet search simply using "Black-Scholes" and "employee stock options" as search terms—

(Id. at 144.)  Of course, employee stock options are nontransferable and, therefore, not traded on a securities market.

Given his lack of knowledge or understanding of the theoretical basis and practical limitations of the BSM, Wishnick acted as a mere "numbers-cruncher."  He testified that his Black-Scholes "calculation" involved nothing more than inputting numbers into a computer software program, a program that a CPA had given to him—one that is readily available for free on the internet for any interested party to plug in any numbers he or she wishes:

Q:     In order to use the Black-Scholes formula, did you have to use some software on your computer?

A:     I have a formula in the Excel program that I use.

Q:     So you have a spreadsheet?

A:     It's built into the spreadsheet, yes. . . .

Q:     Can you describe -- withdraw the question.  With this program of Black-Scholes, did you have to put any inputs in?

A:     Yes.

Q:     What were the inputs that you put in?

A:     You have to put in the current strike price, the current risk-free interest rate, the volatility of the underlying stock and the remaining duration of the option.  Also a dividend rate.

Q:     And are those the components of this Black-Scholes?

A:     That's right.  Once you have that you have a Black-Scholes value printed out.

Q:     So it doesn't take very long to do this with the program in your computer provided you give the inputs?

A:     That's true.

Q:     So you just have to strike your keys with the inputs?

A:     Correct. . . .

15

Q:     Where did you get that information for those inputs?

A:     The market price I looked up, the ten-year treasury was a risk-free rate I looked up and the volatility I had on a website that gave me the detail on the stock, United Technology stock.

Q:     And so basically the program gave you the spreadsheet, right, and the formula?

A:     Yes.

Q:     And then you just entered commands with the data?

A:     I entered the data and it developed the values.

Q:     All right. And did you have to do anything else?

A:     In order to what?

Q:     To come up with the value?

A:     The option value, no, no.

(Id. at 54-57.) Cf., e.g., ERI Black-Scholes Model, *at* http://www.erieri.com/scripts23/ blackscholes/ blackscholes.exe/main (last visited Mar. 28, 2006) (attached hereto as Exhibit 30). Simply plugging inputs into a prefabricated formula, with no knowledge or understanding of the theory behind the formula nor its proper uses and limitations, does not require any expertise.

### D.     Wishnick's Crunching of Speculative Numbers To Produce The "Executive Forecast" Calculation.

Wishnick further testified that, to derive his "executive forecast" calculation, he merely took, at face value, a document about the historical appreciation of UTC's stock price, extended it out through the year 2028, and applied a discount to present value. (Ex. 8 at 49, 99-106.) Wishnick conceded that, although the accuracy of the "executive forecast" calculation was based entirely on Page's ability to predict UTC stock's future performance (something Page testified he

was not doing),[16] he personally knew of no one—including himself—who could predict the

future price of a publicly-traded stock with any degree of certainty:

> Q:    Do you know of any executive of any Fortune 500 company who can predict
> within a certainty where the stock of a company will go over the next five or six
> years?
>
> A:    No.
>
> Q:    Are you able to predict where a stock will go over the next five or six years?  I'm
> talking about a publicly traded company.
>
> A:    I wish I could but I can't.

(Id. at 50-51.)   Accordingly, Wishnick did not dispute that the "executive forecast" calculation

was an exercise in simple math, based on complete speculation about where UTC's stock price

might be if it increased in value, as it had done in the past, over time.  (See id.)

---

[16] Page's testimony was as follows:

> Q:    Did you tell people at the conference that you expected UTC stock to do in the
> next five years?
>
> A:    No.
>
> Q:    You did not?
>
> A.    I don't think I'm capable of forecasting the stock for the next five years.
>
> Q:    Why would you talk about it?
>
> A:    I was showing the math between '93 and 2000, and if that math were to continue,
> this is the mathematical equation at this rate.

(Page Dep. at 98.)  Cited Portions of Page's deposition are attached hereto as Exhibit 31.

## ARGUMENT

### I.     Legal Standard.

Under the Federal Rules of Evidence, the trial court is required to perform a "gatekeeper"

function with respect to expert testimony.  See Fed. R. Evid. 702 advisory committee notes, 2000

Amendments.  Rule 702 of the Federal Rules provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

Id.  The Supreme Court has established a two-part inquiry by which trial judges must determine

the admissibility of expert testimony: (1) whether the reasoning or methodology rests on a

reliable foundation; and (2) whether it is relevant to the task at hand.  Daubert v. Merrell Dow

Pharms., Inc., 509 U.S. 579, 597 (1993); see also Altschuler v. Univ. of Pa. Sch. of Law, No. 99-

7423, 1999 U.S. App. LEXIS 34303, at *6 (2d Cir. Dec. 27, 1999) (citing Kumho Tire, Co. v.

Carmichael, 526 U.S. 137 (1999)) (Daubert applies to non-scientific expert testimony as

well.)).[17]  Thus, reliability and relevance are the hallmarks of the Daubert analysis.

In assessing reliability, courts are clear that an expert's opinion can only be as sound as

the information upon which it based.  Where an expert serves only as a "mouthpiece" to convey

otherwise inadmissible and unreliable data, his own testimony should also be inadmissible.  See

Crowley v. Chait, 322 F. Supp. 2d 530, 545 (D.N.J. 2004).  An "expert" is expected to conduct

an independent investigation into the accuracy of the data he or she uses.  Supply & Bldg. Co. v.

Estee Lauder Int'l, Inc., No. 95 Civ. 8136, 2001 U.S. Dist. LEXIS 20737, at *12 (S.D.N.Y. Dec.

---

[17] Copies of cited unreported cases are attached hereto as Exhibit 32.

13, 2001).  With respect to relevance, courts look to whether the proffered testimony is

"sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."

Daubert, 509 U.S. at 591 (internal quotation marks and citation omitted).  The Supreme Court

has continued to reiterate the importance of this "fit" in making expert testimony admissible:

> [C]onclusions and methodology are not entirely distinct from one another. . . .
> [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district
> court to admit opinion evidence which is connected to existing data only by the
> *ipse dixit* of the expert.  A court may conclude that there is simply too great an
> analytical gap between the data and the opinion proffered.

Gen. Elec. v. Joiner, 522 U.S. 136, 146 (1997).  Accordingly, even an accepted theory may be

inadmissible if it does not apply to the specific facts of a case.  See Kumho Tire, Co., 526 U.S. at

154; Joiner, 522 U.S. at 146.

In this case, Wishnick's calculations concerning the value of Nichani's hypothetical stock

options, whether based on the BSM or on the "executive forecast" calculation, are neither

reliable nor relevant.  They must be seen by this Court for what they are:  nothing more than rank

speculation.  In fact, Wishnick's training as an actuary does not even qualify him as an expert to

testify on stock option valuation, by either method.  As such, this Court should bar any testimony

regarding alleged stock option damages.

## II.  Wishnick Is Not An Expert On Valuing Stock Options.

As set forth above, Wishnick is an actuary, who describes his expertise as "calculat[ing]

the value of financial events that either occurred in the past or are likely to occur in the future."

(Ex. 8 at 17.)  Wishnick, who holds a bachelor's degree in mathematics but no advanced degrees,

acknowledges that his sole area of expertise is in such actuarial calculations.  (Id. at 41.)  He

lacks any specialized training or expertise in economics or in forecasting employee stock option

values over time, assuming anyone has such expertise.  (See id.)

Furthermore, Wishnick's background does not qualify him to testify on the complicated subject of employee stock option valuations.  He would not, for example, be able to analyze theoretical weaknesses in various analytic models such as the BSM, which, as set forth above, has been much-criticized for producing inflated valuations.  Indeed, Wishnick admits that he has no special expertise that would qualify him to discuss the theory behind such models.  (Id. at 49.)  His testimony exposes his fundamental lack of understanding of the Black-Scholes theory.  Notably, Wishnick did not need to comprehend this theory to produce his Black-Scholes calculation, which was instead nothing more than an exercise in pure numbers-crunching.  He merely input commercially available data into preprogrammed computer software—software that anyone so inclined can use for free on the internet—and wrote down the values that the computer generated.  Similarly, to produce his "executive forecast" calculation, Wishnick merely extended out over a period of years what the value of UTC stock would be if it appreciated in value as it had in the past—a function that anyone with a calculator could perform with equal "accuracy."  In neither case did Wishnick make a prior assessment about the underlying validity of the method he was applying or the accuracy of the underlying data, nor did he have the knowledge or ability to make such an assessment.

Wishnick's ability to manipulate computer keys or calculator buttons to generate results from these two methods, absent any expertise about the validity or reliability of the methods themselves, does not represent the kind of "knowledge, skill, experience, training, or education" needed to qualify him as an expert on employee stock option valuation.  Toussaint v. James, No. 01 Civ. 10048, 2003 U.S. Dist. LEXIS 12940 (S.D.N.Y. July 25, 2003), is instructive in this regard.  In that case, the plaintiff in ERISA litigation sought to offer testimony concerning proper asset allocation from a proposed expert with a background not in asset allocation, but in

mathematics.  Id. at *19-20.  Like Wishnick, the expert in Toussaint conceded that he had no

special expertise in the underlying area on which he was being asked to opine, but was merely

acting as a "numbers-cruncher."  Id.  (Cf. Ex. 8 at 49.)  The district court ruled that the proposed

expert was not qualified to testify at trial as to the propriety of the asset allocation scenarios that

he had selected.  Id.; see also Nemmers v. United States, 681 F. Supp. 567, 580-81 (C.D. Ill.

1988) (trial court refused to allow testimony of defense expert, a pension actuary with no formal

training in economics, where the proposed testimony required expertise in long-term economic

trends).

As in Toussaint and Nemmers, Wishnick's actuarial expertise and his ability to crunch

numbers do not qualify him to testify concerning substantive areas outside of his competence, in

this case the propriety of different scenarios for valuing Nichani's alleged employee stock option

damages and future losses.  Accordingly, Wishnick cannot properly testify as to the reliability or

justification for relying on either the BSM or the "executive forecast" method, and the Court

should preclude his "expert" testimony on those subjects.

## III.    Wishnick's Analyses Are Neither Reliable Nor Relevant.

Even if Wishnick had the background and expertise to provide testimony concerning

Nichani's alleged stock option damages and her future losses—which as set forth above he does

not—his proposed opinion fails both the "reliability" and the "relevance" prongs of Daubert.

Accordingly, neither of his calculations, based on either the BSM or the "executive forecast"

method, is admissible as a matter of law.

### A.    Neither the Black-Scholes Calculation Nor The Executive Forecast Calculation Are Reliable.

As set forth above, in order for proposed expert testimony to survive the trial court's

gatekeeper analysis, it must be "reliable," which the Second Circuit has defined as having a

21

"sufficiently reliable foundation to permit it to be considered." Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) (internal quotation marks and citation omitted). In case after case, courts have made clear that the empirical assumptions underlying a proposed expert's testimony cannot consist of pure speculation. Instead, those assumptions must have a sound evidentiary basis, or the resulting testimony will be inadmissible. See id. at 266-67 (stating that "[w]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony," and further noting that "any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible") (internal quotation marks and citation omitted).

Given that Wishnick's calculations using the BSM and what he calls the "executive forecast" are predicated on unreliable (indeed, completely fictional) assumptions about hypothetical stock options to be granted to Nichani over a twenty-six year period, his predictions clearly do not meet the most basic standard of reliability and cannot be admitted at trial. In his deposition, Wishnick conceded that the assumption that Nichani would receive as many as 7,000 stock options in 2002 and 9,000 options thereafter for twenty-six years was provided to him, with no substantiation, by her counsel. See RELEVANT FACTS, supra. An expert is expected to conduct an investigation into the reasonableness of the assumptions on which he bases his findings. Supply & Bldg. Co. v. Estee Lauder Int'l, Inc., No. 95 Civ. 8136, 2001 U.S. Dist. LEXIS 20737, at *12 (S.D.N.Y. Dec. 13, 2001) (noting that "[a]ssumptions based on conclusory statements of the expert's client, rather than on the expert's independent evaluation are not reasonable") (citation omitted). Experts "should be aware that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the

information they supply." Rowe Entm't, Inc. v. William Morris Agency, Inc., No. 98 Civ. 8272, 2003 U.S. Dist. LEXIS 15976, at *11 (S.D.N.Y. Sept. 16, 2003). Where an expert relies on information supplied by his client, and fails to verify that the information accurately reflects the facts as they exist, his opinion should be excluded. See id. at *33-35; Supply & Bldg. Co., 2001 U.S. Dist. LEXIS 20737 at *16-17.

Nichani has not pointed to any evidence to support the assumption that she would have received 7,000 stock options in 2002 and 9,000 options thereafter for the next twenty-six years, and in fact, as set forth above, the record directly contradicts it, showing that she did not receive any stock options in 2002, that even executives at a higher level than Nichani received substantially fewer options (less than 3,000) other that time period, and that employees at her grade 51 level received *less than five percent of the stock options her expert assumed she would get*. (See Ex. 4 at 6-7.) Any stock option valuation based on these predicate assumptions, whether it used the BSM or the so-called "executive forecast," therefore is unreliable as a matter of law.

Indeed, courts have rejected expert testimony based on much stronger "facts" than are presented here. In Crowley v. Chait, 322 F. Supp. 2d 530 (D.N.J. 2004), the trial court rejected proposed "expert" testimony from an accountant who had relied on deposition summaries prepared by the plaintiff's counsel. Although the court did not challenge the accuracy of the deposition summaries, it was troubled by the possibility that important facts might have been missed:

> [T]o make Kramer the mouthpiece of these deponents, and to allow him to offer testimony to a jury as to conclusions he has reached on the basis of this highly filtered version of events, is unacceptable. Kramer's reliance upon the spoonfed depositions led him to draw questionable conclusions about Ambassador that he might not have drawn had he properly reviewed all of the depositions in an unfiltered fashion. . . . By reviewing only those depositions provided to him by

> Plaintiff's counsel, and by reviewing what appears to be for the most part only preselected excerpts of those depositions, Kramer relied upon information that is simply too unreliable to be trusted.

Id. at 546-47; see also Lippe v. Bairnco Corp., 99 Fed. App'x 274, 278-79 (2d Cir. 2004)

(Second Circuit affirmed exclusion of two experts where the trial court had stated that it was

"simply not persuaded that their proposed testimony rests on a reliable foundation," in particular

due to their "inability to explain a number of variables and assumptions used in his analysis" and

their reliance on plaintiff's counsel to provide them with unverified information.). As such, the

fact that Wishnick relied on predictions of future option grants provided to him by Nichani's

counsel, and made no effort to verify the accuracy or even the plausibility of these numbers, is

sufficient grounds for the Court to reject his proposed testimony on stock option valuations and

future losses.

Where, as in this case, the empirical assumptions appear to be manufactured from whole

cloth, the analysis is that much simpler. See, e.g., Elcock v. Kmart Corp., 233 F.3d 734, 754-56

(3d Cir. 2000). In that case, the Third Circuit reversed the trial court's decision to admit expert

testimony in a personal injury case from an economist whose damages model, relying on several

empirical assumptions about the extent of the plaintiff's injuries, her earning capacity before and

after the accident, and her life expectancy, conflicted with real-world data about each of these

factors. Making clear that "an expert's testimony regarding future earnings loss must be

accompanied by a sufficient factual foundation before it can be submitted to the jury," the Court

held that the damages model "relied on several empirical assumptions that were not supported by

the record," and accordingly could not be considered. Id. at 754, 756. As the Third Circuit

concluded, "an expert should not depend on fictional or random data when rendering an opinion

about the quantum of economic harm in a particular plaintiff's case." Id. at 756.

Here, the record completely fails to support—indeed, contradicts—the empirical assumptions that are the basis both of Wishnick's Black-Scholes calculation and of his "executive forecast" calculation.  Wishnick clearly relied on "fictional or random data," and the principles of <u>Daubert</u> and Rule 702 require exclusion of this testimony as unreliable.

**B.**      **The "Executive Forecast" Calculation Is Not An Accepted Method Of Valuing Stock Options.**

Apart from the obvious and fatal flaws stemming from Wishnick's reliance on unsupported empirical assumptions, his "executive forecast" calculation is unreliable for another reason:  it is not a scientifically valid method for valuing stocks.  Wishnick admitted under oath that the "executive forecast" was nothing more than his extrapolation from a presentation made by a UTC executive, Stephen Page, at which Page pointed to the historical growth of UTC stock and posited what its value might be in 2007 if it continued to grow at the same rate.  Page did not purport to promise that UTC stock would continue to grow at the same rate, nor would this be a plausible promise if he had done so.  (<u>See</u> Ex. 36 at 98.)  Under questioning at his deposition, Wishnick freely conceded that neither he nor anyone else is able to predict the future price of a publicly-traded stock with any degree of certainty whatsoever.  (<u>See</u> Ex. 8 at 50-51.).

This method falls far short of <u>Daubert's</u> requirements.  According to the Supreme Court, in assessing the reliability of a particular methodology, a court may consider (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community.  <u>Daubert</u>, 509 U.S. at 592-95.  Clearly, "executive forecast" does not satisfy a single one of these criteria:  it is an untested,

unreviewed, uncontrolled exercise in speculation with not a shred of scientific underpinning. As such, it is unreliable under <u>Daubert</u> and cannot be the subject of trial testimony.

**C.    The Black-Scholes Calculation Is Not Relevant To The Facts Of This Case.**

Even if Wishnick's calculation using the BSM had the veneer of reliability, which it does not, the lack of "fit" between this method and the purported goal here, an accurate analysis of Nichani's alleged future damages, is sufficient to exclude the testimony.[18]  Courts are clear that, in order for expert testimony to be admissible under <u>Daubert</u>, the method in question must be reliable and scientifically proven.  Equally important, it must also be relevant to the particular facts of the case.  If it is not relevant, then the fact that the method is based on reliable science will not overcome this defect.  A hammer is an exceptional tool for hammering nails.  It is an abysmal tool for performing delicate brain surgery.  Speaking metaphorically, where an expert attempts to use a hammer to perform brain surgery, <u>Daubert</u> and its progeny require that a court exclude his testimony.

The Supreme Court emphasized this point in <u>Kumho Tire, Co.</u>, when it held that court must focus on the "reasonableness of using such an approach, along with [the expert's] particular method of analyzing the data thereby obtained, to draw a conclusion regarding the particular matter to which the expert testimony was directly relevant."  <u>Kumho Tire, Co.</u>, 526 U.S. at 154. Following <u>Kumho Tire, Co.</u>, courts freely reject expert testimony that does not "fit" the facts of the case.  For example, in <u>Concord Boat Corp. v. Brunswick Corp.</u>, 207 F.3d 1039 (8th Cir. 2000), the plaintiffs in an antitrust action relied on expert testimony by a Stanford University

---

[18] The transparent lack of any scientific underpinning for the "executive forecast" calculation is, of course, sufficient to render it irrelevant for any purpose.

economics professor who had relied on a well-accepted theoretical model, the Cournot model, in order to assess the defendants' liability and damages.  Id. at 1046.

The defendants in Concord Boat did not challenge the validity of the Cournot model.  See id. at 1055-56.  Instead, they challenged its applicability to the case in question, claiming that the expert had ignored economic realities in the market.  The Eighth Circuit agreed, in the process rejecting the plaintiffs' claim that, where the challenge was to the implementation of a theory rather than the theory itself, the testimony was sufficient to withstand Daubert analysis:

> [T]he expert testimony must not only be based on reliable science but must also "fit" the particular facts of the case. . . . If a party believes that an expert opinion has not considered all of the relevant facts, an objection to its admission is appropriate. . . . Even a theory that might meet certain Daubert factors, such as peer review and publication, testing, known or potential error rate, and general acceptance, should not be admitted if it does not apply to the specific facts of the case.

Id. at 1055-56 (internal quotation marks and citation omitted).

In this case, Nichani and Wishnick rely heavily on the assumption that the BSM is a generally-accepted method of expensing employee stock options, albeit one widely viewed—even by many of its users—as inaccurate.  However, the utility of the BSM as a tool for public companies to comply with accounting regulations and financial reporting obligations has no bearing on its relevance for other purposes.[19]  Indeed, in two instances (both divorce cases) in which Connecticut courts have been asked to accept Black-Scholes valuations, they have declined to do so.  See Wendt v. Wendt, No. FA96 0149562 S, 1998 Conn. Super. LEXIS 1023,

---

[19] Indeed, corporations who use the BSM to value employee stock options for accounting and financial reporting purposes frequently include a disclaimer regarding its limitations.  See, e.g., Johnson & Johnson, Notice of Annual Meeting and Proxy Statement, at 28 (stating that "[t]he grant present values per option share were derived using the Black-Scholes option pricing model in accordance with the rules and regulations of the SEC and are not intended to forecast future appreciation of the Company's stock price") (attached hereto as Exhibit 33).

at *110 (Conn. Super. Ct. Mar. 31, 1998) (Part 4); <u>Chammah v. Chammah</u>, No. FA 95145944S, 1997 Conn. Super LEXIS 1896, at *14-15 (Conn. Super. Ct. Jul. 11, 1997). In an even more recent case, a federal court rejected the testimony of an "expert" employing the BSM "outside the principal context in which it has been customarily applied, namely, to valuing an option for a minority of *publicly traded* shares." <u>In re Med Diversified, Inc.</u>, 334 B.R. 89, 103 (Bankr. E.D.N.Y. 2005) (emphasis in original); <u>see also</u> <u>Cramer v. Comm'r</u>, 101 T.C. 225, 241 (1993) (stating that "[t]he Black-Scholes model was designed for publicly traded options"), *aff'd*, 64 F.3d 1406 (9th Cir. 1995); <u>Seinfeld v. Bartz</u>, No. C01-2259, 2002 U.S. Dist. LEXIS 2547, at *12-14 (N.D. Cal. Feb. 8, 2002) (noting that the Black-Scholes method may not pass evidentiary standards in cases dealing with subject matter outside of typical use and dismissing case as Black-Scholes method was not material), *aff'd*, 322 F.3d 693 (9th Cir. 2003); <u>Spicer v. Chicago Bd. Options Exchange, Inc.</u>, No. 88 C 2139, 1990 U.S. Dist. LEXIS 1478, at *38 (N.D. Ill. Jan. 30, 1990) (asserting that "without an independent way to set the volatility rate, the Black-Scholes theory is not the solution to the damage question"); <u>Snyder v. Comm'r</u>, 93 T.C. 529, 545 (1989) (rejecting the application of the BSM to the valuation of common stock); <u>Franklin Fed. Savs. Bank v. United States</u>, 60 Fed. Cl. 55, 74 (2004) (noting that the BSM is "difficult to use when a stock is not actively traded" and analysis is "vulnerable to attack")

Here, as in <u>Concord Boat</u>, the BSM as used by Wishnick ignores significant economic realities, including the uncertainty about the future of stock option grant programs; the well-acknowledged inaccuracies of the BSM; and the illusory nature of the hypothetical grants assumed by Wishnick in his calculation. Regardless of any underlying scientific merit to the BSM, it is not relevant to analyzing Nichani's alleged stock option damages; it does not "fit" the

facts here.  As such, it fails to meet the gatekeeper requirements of <u>Daubert</u> and Rule 702, and any testimony based on the BSM is inadmissible.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendants, Otis and UTC, respectfully request that this Court enter an order (1) precluding Nichani from offering the opinion of her damages expert, Sheldon Wishnick, as to her alleged "stock option damages" and future losses; and (2) granting such other and further relief as the Court deems just and proper.

THE DEFENDANTS,
UNITED TECHNOLOGIES CORP. and
OTIS ELEVATOR COMPANY


By___/s/ Albert Zakarian_____
Albert Zakarian (ct04201)
Victoria Woodin Chavey (ct14242)
Douglas W. Bartinik (ct26196)
Day, Berry & Howard LLP
CityPlace I
Hartford, CT 06103-3499
(860) 275-0100
(860) 275-0343 (fax)
*azakarian@dbh.com*
*vwchavey@dbh.com*
*dwbartinik@dbh.com*
Their Attorneys

29

## <u>CERTIFICATION</u>

I hereby certify that the foregoing was sent via overnight mail on this date, to:

Anthony Minchella, Esq.
Law Offices of Anthony R. Minchella, L.L.C.
530 Middlebury Road
Suite 203-204B
Middlebury, CT 06762

Jeffrey J. Tinley, Esq.
Robert Nastri, Esq.
Tinley, Nastri, Renehan & Dost, LLP
60 North Main Street
2nd Floor
Waterbury, CT 06702


      /s/ Albert Zakarian
           Albert Zakarian