| Executive Summary- Briefing Document ||
|---|---|
| Type of Serious Accident: | Fatal |
| Date of Accident: | December 23, 2002 |
| Location: | Jersey City, New Jersey |
| Date of Company Review Board: | December 30, 2002 |
| Date of Area Review Board: | January 14, 2003 |
| Date of this Report: | February 11, 2002 |
| Report Prepared by | E. Lauterbach |
| (Name of Area EH&S Director): | S. Nichani |

| Employee(s) Information | |
|---|---|
| Name: | Daniel McQuillen |
| Job Title: | Foreman |
| Office: | Manhattan Construction |
| Age: | 41 Years |
| Years Served: | 19 Years |
| Experience: | 23 Years |

1. **Description of Accident:**

On December 23, 2002, a team was preparing to rope elevator #14, the third of six low-rise elevators, at the Goldman Sachs Building, Jersey City, New Jersey. The elevator is an HVS, with a capacity of 4000 pounds and a running speed of 1000 feet per minute. Turner Construction Company is the General Contractor.



1

EXHIBIT A

The machine room for the subject elevator is located on the 23rd floor, and the hoistway rise is approximately 340 feet. The hoistway is "blind" from the 4th to 10th floors and cannot be accessed.

The rails were installed on this elevator by utilizing a false car. During this process, the rails were "jumped" at the 10th floor. Johnson clips were installed on the rails at this time in order for it to be possible to align the "jumped" rail sections at a later time. Subsequent to this, the drywall was added to the hoistways, which made this portion of the hoistway inaccessible.



2

The team working in the low-rise group of elevators consisted of Dan McQuillen (victim), Pete Bohlig (low rise machine room), Mike Kerrigan (high rise machine room), John Davoren (hoist operator), Rob Smith (victim's helper), Joe Stivale (lobby), and Ed Hunt (helper).

The car frames were built using Johnson Clips as supports, rather than the prescribed building blocks. A wooden block is used on top of the Johnson clip in order to hold the safety wedges, which in turn keeps the car frame in position. It was determined as a result of this process that the safeties were not set up to operate.

On Friday, December 20th, the team was preparing to relocate the rigging from elevator #13 to elevator #14. In order to do that, the team repositioned the cable and associated rigging over the elevator #14 hoistway. The rigging that was hoisting the car frame consisted of shackle-type clevises, headache balls and slings. This rigging was typically disconnected at a clevis and laid on the floor in front of the elevator hoistway.



3

It was believed that Local #1 only allowed one-piece sheave and reeving blocks to be used. This necessitated the connection of the hoist cable that was assembled in the factory to be disassembled or loosened, and re-assembled whenever it was required to feed the rope through a one-piece block. Furthermore, whenever the cable is damaged from use and job conditions, it is necessary to remove the damaged end of the cable and re-make the connection in the field.

Friday, December 20 was the day of the Otis/Goldman Sachs jobsite Christmas Party, and the team was finishing up early that day (approximately at noon). The team's intention was to have elevator #14 rigged and ready to be roped on Monday morning. It is believed that as a result, the team forgot to tighten the fist grips once they were reinstalled.

On Monday morning, the team arrived on the jobsite individually and at various times prior to 7:30am. They each proceeded to the Otis shanty, where they had a safety talk on power tools. At approximately 7:45am, they went to the lobby to discuss the work that they had planned to do that day. The plan was to hoist the elevator to the top of the hoistway with the compensation ropes attached in order to hang the elevator at the top so the hoist ropes could be installed. Before the elevator could be hoisted to the top, it was determined that the Johnson clips on the 9th floor had to be removed.

Pete Bohlig went to the low-rise machine room and Mike Kerrigan went to the high-rise machine room, both to check that the rigging was clear. Joe Stivale and Dan McQuillen (victim) stayed in the lobby, as did John Davoren who operated the hoist. Dan McQuillen asked his helper Rob Smith and another helper Ed Hunt to go up to the top floor (22nd floor) with a bucket of tools and advised that he would see them up there. It is presumed that the tools were going to be used to hang the car at the top of the hoistway. All team members had radios with the exception of the two helpers. The car frame was picked up and placed back down, as Pete Bohlig radioed from the low-rise machine room that he had to clear a cable that was rubbing on the machine bedplate. Once he cleared the cable, the car frame was again picked up and placed back down. Pete Bohlig confirmed that the cable had been cleared and the team was ready to hoist the elevator.

It was at this time that Dan McQuillen placed a ladder near the #14 elevator hoistway from the lobby. He used the ladder to access the overhead protection that was on top of the crosshead. Once positioned on top of the overhead protection, Dan McQuillen radioed John Davoren to "take it up." Dan was not wearing a harness, nor was a lifeline accessible in that section of the elevator #14 hoistway.

The car frame was hoisted approximately 55 feet when the rigging failed. The car frame fell and crashed into the pit.

Dan McQuillen fell along with the car frame and was pronounced dead shortly after the fall.

4



Johnson clips on 9th floor rails.



View looking down onto overhead protection.

2. **Nature of Injury:**

The autopsy report indicates that Dan suffered fatal chest injuries as a result of the fall (blunt trauma to the chest).

3. **Regional Vice President Comments:**

Based on my interviews of the branch and project management teams, 17 field associates, and review of the project safety program, three fundamental issues have surfaced which are at the core of this incident:

1) **Installation Process**
   - Lack of a certified installation process for HVS "traditional" equipment, addressing high hazard operations such as hoisting and rigging is central to this accident. These important decisions have been left to the discretion of the local field and project management associates.
   - Several issues require resolution, such as selection of the proper hoisting device, rigging method, and hoist rope fastenings.

2) **Employee Behavior**
   - This associate elected to ride a load, unprotected from the fall hazard, clearly a violation of Otis safety policies. This is difficult to reconcile given the Otis policies and the training received, and raises questions about the training effectiveness and proper administration of our disciplinary policies.
   - Mr. McQuillen, his fellow crewmembers, and his foreman failed to adequately consider and mitigate the risks at hand, and the alternate means to accomplish the removal of the Johnson clips from the rails.

3) **Management System**
   - We witnessed a breakdown in the management system at both the project and branch level.
   - The procedure of riding the load to remove the Johnson clips was followed previously, and went undetected or uncorrected by the foremen and field management staff.

4. **Direct Causal Factors:**

1) Rigging Failure
   - Hoist design uses three fist grips
   - Hoist cable cut, fist grips re-tightened and not torqued to specifications
2) Employee riding hoisted load

6

**Indirect Causal Factors and Broken Barriers:**
1) Safeties did not set - car frames built on Johnson Clips preventing adjustment of safeties
2) General Contractor inspections reveal Otis personnel not wearing fall protection and action not taken
3) Perceived that union does not allow one piece sheave/reeving blocks – requiring field to cut hoist rope to feed through blocks
4) Drywall contractor closed in hoistway leaving Johnson Clips in accessible
5) Shortcut deemed necessary to ride overhead protection to access Johnson Clips.
6) No risk assessment (JHA) performed on task
7) Employee not wearing fall protection, lifeline not accessible

5. **Root Cause(s):**

**Accountability**
1) Audits not on target as required
2) Rules not enforced on job site (fall protection)

**Procedures**
1) No formal process to use fist grip clips on site
2) HVS Procedure in draft format, not deployed, does not address all aspects of installation
3) Car built on Johnson Clips; safeties not set up to operate
4) Risk Assessments not performed as required when standard work process does not exist

**Inspections**
1) Contractor audit findings not addressed by Otis
2) Otis inspections not performed on site

**Training/Tools**
1) Torque wrenches not available on site
2) Training not on target as required

**Risk Assessment**
1) Hazard known but perceived to be low risk (riding load)
2) Shortcut deemed appropriate to remove Johnson clips
3) Hoist sent out with fist grips; belief that union requires one piece blocks which necessitates cutting of hoist cable.

6. **3rd Party Investigations / Actions:**

OSHA Compliance Officer Lou Murphy was present on the site soon after the accident occurred. Mr. Murphy reports to the Parsippany, NJ regional OSHA office. Mr. Murphy has been on the site several times since the accident. During the course of his

7

investigation, he has taken photographs of the subject elevator hoistway and associated equipment. In addition, Mr., Murphy has interviewed several employees, as well as the following management associates: Bill Cassidy, Rod Waters, Nicole Boone, and Bo Hish.

OSHA is anticipated to cite Otis Elevator as a result of the accident.
Turner Construction Company has not retained an attorney at this time.

Attorney Keith VonGlahn jointly represents Goldman Sachs and AIG with regard to liability. Pat McPartland has been retained by AIG as an "expert." He appears to represent Goldman Sachs as well.

The widow has retained an attorney through the union.

No civil actions have been initiated at this time.

This project is part of an Owner's and Contractor's Insurance Policy (OCIP). Therefore, there is no impact expected to the company's worker's compensation.

6. **Training & Auditing Effectiveness:**

The employee received the following training during the year.

| Date | Topic |
|---|---|
| Jan 2002 | Policy Review |
| | **Job Hazard Analysis** |
| | Jumpers & Defeating Circuits |
| | Warning Labels |
| Feb 2002 | **Fall Protection** |
| Mar 2002 | Incident Reporting |
| | Eye Protection |
| Apr 2002 | **Hoisting & Rigging** |
| | Environmental Policy |
| | Ladders |
| May 2002 | Scaffolding |
| | Wheel Grinding |
| | Oxygen Acetylene Use |
| | LOTO |
| Jun 2002 | Pit Safety |
| | **Hoisting & Rigging** |
| | **Working in Hoistway** |
| Jul 2002 | Working on Car Top |
| | Jumper Process |
| | False Cars |
| | **Fall Protection** |
| Aug 2002 | **False Cars and Running Platforms** |
| | Wiring Platforms |

8

|              | Escalator Safety Rules |
|              | Cleaning of Elevator & Dumbwaiter Pits |
| Sep 2002 | Landings & Machine Room |
|              | **Job Hazard Analysis** |
| Oct 2002 | GFCI Use |
|              | Respirators |
|              | General Storage |
|              | Battery Handling |
| Nov 2002 | NAA Safety Stand Down Day |
|              | Transferring of Waste Material |
|              | Waste Minimization |
| Dec 2002 | FPA Process |
|              | **Personal Protective Equipment** |
|              | Hand Power Tools & GFCI Use |

There were no fatality prevention audits conducted on this particular site or on Dan McQuillen throughout the course of the year.

Turner Construction Company conducted regular audits of the trades working on the site. The Turner audits assert that fall protection was not used and/or worn by Otis personnel on 13 separate occasions from June 7, 2002 until December 19, 2002.

Turner conducted a total of 57 audits (from June 7, 2002 until December 19, 2002) identifying safety issues. Of the 57 audits, 3 fines were issued to Otis. The details of the fines are as follows.

| 2/02 | Discharged fire extinguisher | Paid $100 fine |
| 9//02 | Multi-incident (barricades missing unsafe material storage, cables and netting missing) | Open |
| 11/02 | PPE (no safety glasses) | Paid $200 fine |

There were 34 documented Field Memos from Otis to Turner advising them of safety concerns and issues that required correction.

**8. Corrective Actions:**

Immediate Actions:
- Implement "Safety Time Out" in all GNY Branches to discuss accident and focus on safety policies and awareness (1/12/03 - complete).
- Communicate accident causes and reinforce requirements to wear fall protection and tie off, never to ride a load that is being hoisted, and to ensure connections are tightened to proper torques (12/26/02 - on-going).
- Implement Fall Protection Daily Log and verification process (12/26/02 - complete).

9

- Ensure lifelines are accessible in every hoistway (on-going).
- Ensure car frames are built on building blocks and safeties are set up to operate (on-going).
- Audit all GNY construction sites and employees for safety conditions and FPA compliance (1/31/03 - complete).
- Conduct meeting with all Foremen to discuss Hazard Recognition and Mitigation (1/8/03 to 1/09/03 - complete).
- Conduct meeting with all Project Managers to reinforce FPA requirements and roles/responsibilities (1/15/03 - complete).
- Communicate "An Accident" to all NSAA Associates (1/08/03 - complete).
- Review findings and lessons learned from this accident with all NSAA senior management at 2003 NSAA Leadership Meeting (1/20/03 - complete).
- Develop process to inspect, torque, and label all fist grips currently being used in construction (2/6/03 - complete).
- Ensure building blocks are utilized to build car frames as required in lieu of Johnson clips (complete).

Near Term Actions:
- Ensure multi-part sheave and reeving blocks are utilized (by 3/31/03).
- Revise connection of hoists to include redundant safety (i.e., cable secured with fist grips and swaging) (by 3/31/03).
- Implement Pre-Work Hoisting and Rigging Checklist (by 3/31/03).
- Strengthen accountability requirements for field personnel and line management (by 3/31/03).
- Document and communicate HVS installation process (by 6/30/03).
- Conduct FPA certification and Management System training with all line managers (3/26/03-3/27/03).
- Assign dedicated safety manager to Greater New York Region (3/31/03).
- Assign New Equipment Superintendent to Manhattan Construction Branch (4/30/03).

9. **Company Safety Performance:**

|  | 2000 | 2001 | 2002 | 2003 (Through 1/03) |
|---|---|---|---|---|
| Incident Rate | 6.83 | 5.20 | 5.13 | 7.80 |
| Lost Time Rate | 3.40 | 2.00 | 1.20 | 0.00 |
| Severity Rate | 10.20 | 24.70 | 13.40 | 0.00 |
| UTC Fatality Prevention Audit Score | - | 83% | - | 88% |
| UTC Assurance Review Rating | - | 80% | - | 73%* |

* The management system rating tool used in the 2003 Assurance Review differs from that used in 2001.

10