Privileged Document – Attorney Work Product – Attorney Client Communication

# Executive Summary- Briefing Document

| | |
|---|---|
| Type of Serious Accident: | **Fatal** |
| Date of Accident: | **December 23, 2002** |
| Location: | **Jersey City, New Jersey** |
| Date of Company Review Board: | **December 30, 2002** |
| Date of Area Review Board: | **January 14, 2003** |
| Date of this Report: | **February 11, 2002** |
| Report Prepared by | **John McNamara, Esq.** |
| | **Harold Engel, Esq.** |
| With technical assistance from: | **Erv Lauterbach** |
| | **Sue Nichani** |

| Employee(s) Information | |
|---|---|
| Name: | Daniel McQuillen |
| Job Title: | Foreman |
| Office: | Manhattan Construction |
| Age: | 41 Years |
| Years Served: | 19 Years |
| Experience: | 23 Years |

1. **Description of Accident:**

On December 23, 2002, a team was preparing to rope elevator #14, the third of six low-rise elevators, at the Goldman Sachs Building, Jersey City, New Jersey. The elevator is an HVS, with a capacity of 4000 pounds and a running speed of 1000 feet per minute. Turner Construction Company is the General Contractor.

1

Privileged Document – Attorney Work Product – Attorney Client Communication



The machine room for the subject elevator is located on the 23rd floor, and the hoistway rise is approximately 340 feet. The hoistway is "blind" from the 4th to 10th floors and cannot be accessed.

The rails were installed on this elevator by utilizing a false car. During this process, the rails were "jumped" at the 10th floor. Johnson clips were installed on the rails at this time in order for it to be possible to align the "jumped" rail sections at a later time. Subsequent to this, the drywall was added to the hoistways, which made this portion of the hoistway inaccessible.

2

Privileged Document – Attorney Work Product – Attorney Client Communication



The team working in the low-rise group of elevators consisted of Dan McQuillen (victim), Pete Bohlig (low rise machine room), Mike Kerrigan (high rise machine room), John Davoren (hoist operator), Rob Smith (victim's helper), Joe Stivale (lobby), and Ed Hunt (helper).

3

Privileged Document – Attorney Work Product – Attorney Client Communication

The car frames were built using Johnson clips as supports, rather than utilizing building blocks. A wooden block is used on top of the Johnson clip in order to hold the safety wedges, which in turn keeps the car frame in position. As a result of the process utilized, the safeties would not be set up to operate until later in the installation process.

On Friday, December 20th, the team was preparing to relocate the rigging from elevator #13 to elevator #14. In order to do that, the team repositioned the cable and associated rigging over the elevator #14 hoistway. The rigging that was hoisting the car frame consisted of shackle-type clevises, headache balls and slings. This rigging was typically disconnected at a clevis and laid on the floor in front of the elevator hoistway.

Privileged Document – Attorney Work Product – Attorney Client Communication

### The Contemplated Steps on December 20th

1. Detach the clevis shackle from the sling attached to the overhead on car #13.
2. Lift the hoisting arrangement to the 21st floor and land the arrangement there.
3. Detach the hoist rope from the upper clevis shackle.
4. Pull hoist rope to low rise machine room.
5. Move snatch block from hoistway #13 to hoistway #14.
6. Extend hoist rope to 21st floor in hoistway #14.
7. Reattach the upper clevis shackle to hoist rope.
8. Pull hoisting arrangement into hoistway and drop hoisting arrangement to lobby level in #14 hoistway.
9. Attach lower clevis shackle to car sling #14 via a sling attached to the crosshead.



5

Privileged Document – Attorney Work Product – Attorney Client Communication

Friday, December 20 was the day of a jobsite Christmas Party, and the team was finishing up early that day (approximately at noon). The team's intention was to have elevator #14 rigged and ready to be roped on Monday morning. The compensation ropes were already attached to the bottom of the #14 car frame, and the compensation rope spools were in position at the lobby level.

On Monday morning, the team arrived on the jobsite individually and at various times prior to 7:30am. They each proceeded to the Otis shanty, where they had a safety talk on power tools. At approximately 7:45am, they went to the lobby to discuss the work that they had planned to do that day. The plan was to hoist the elevator to the top of the hoistway with the compensation ropes attached in order to hang the elevator at the top so the hoist ropes could be installed. It was determined at some prior time that the Johnson clips on the 9th floor had to be removed in order to hoist the car frame to the top of the hoistway.

Pete Bohlig went to the low-rise machine room. Mike Kerrigan went to the high-rise machine room and then to the 23rd floor snatch block. Both were to check that the rigging was clear. Joe Stivale and Dan McQuillen (victim) stayed in the lobby in front of hoistway #14. John Davoren operated the hoist from the high rise bank where the hoist was located. Dan McQuillen asked his helper Rob Smith and another helper Ed Hunt to go up to the top floor (22nd floor) with a bucket of tools needed to hang the car and advised that he would see them up there. The helpers had the tools to hang the car. All team members had radios with the exception of the two helpers. The car frame was picked up and placed back down, as Pete Bohlig radioed from the low-rise machine room that he had to clear a cable that was rubbing on the machine bedplate. Once he cleared the cable, the car frame was again picked up and placed back down. Pete Bohlig confirmed that the cable had been cleared and the team was ready to hoist the elevator.

At some time prior to ascension of the car frame, Dan McQuillen placed a ladder near the #14 elevator hoistway from the lobby. He used the ladder to access the overhead protection that was on top of the crosshead. Once positioned on top of the overhead protection, Dan McQuillen radioed John Davoren to "take it up." Dan was not wearing a harness, nor was a lifeline accessible in that section of the elevator #14 hoistway.

The car frame was hoisted approximately 55 feet when the rigging failed. The car frame fell and crashed into the pit.

Dan McQuillen fell along with the car frame and was pronounced dead shortly after the fall.

6

Privileged Document – Attorney Work Product – Attorney Client Communication



Johnson clips on 9th floor rails.



View looking down onto overhead protection.

Privileged Document – Attorney Work Product – Attorney Client Communication

## 2. Nature of Injury:

The autopsy report indicates that Dan suffered fatal chest injuries as a result of the fall (blunt trauma to the chest).

## 3. Regional Vice President Comments:

Based on my interviews of the branch and project management teams, 17 field associates, and review of the project safety program, certain fundamental issues have surfaced which are at the core of this incident:

**Employee Behavior**
- This associate elected to ride a load, unprotected from the fall hazard, clearly a violation of Otis safety policies. This is difficult to reconcile given the Otis policies and the training received, and raises questions about the training effectiveness and proper administration of our disciplinary policies.
- Mr. McQuillen, his fellow crewmembers, and his foreman failed to adequately consider and mitigate the risks at hand, and the alternate means to accomplish the removal of the Johnson clips from the rails.

Other secondary factors contributing to the accident included the following:

**Installation Process**
- Lack of a certified installation process for HVS "traditional" equipment, addressing high hazard operations such as hoisting and rigging could be a factor in this accident. These important decisions have been left to the discretion of the local field and project management associates. A certified installation process may have provided guidance. However, such a process may not have had any effect here given the clear departure from well-known and established safe work practices including but not limited to riding a load being lifted by a hoist.
- Several issues, such as selection of the proper hoisting device, rigging method, and hoist rope fastenings, should be formalized to remove discretion at the field level.

**Management System**
- It appears there were deviations from the required management protocol at both the project and branch level.
- Riding the load to remove the Johnson clips occurred previously, and went undetected or uncorrected by the foremen and field management staff.

8

Privileged Document – Attorney Work Product – Attorney Client Communication

**4. Direct Factors:**

1) Employee riding hoisted load
2) Rigging failure -- the reasons for the failure await further materials analysis
3) No formal risk assessment (JHA) performed on procedures for removal of the Johnson clips

**5. Indirect Factors:**

1) Fall protection (violations of company policy unrelated to accident)
   Harness not worn
   Lifeline accessibility
2) Safeties did not set completely

**6. Other Factors:**

1) Drywall contractor closed in hoistway leaving Johnson clips inaccessible.
2) Formal risk assessment (JHA) not performed for removing Johnson clips

**7. Other Issues to be Addressed:**

**Accountability**
• Audits/Inspections not conducted as required
• Rules not enforced on job site
**Procedures**
• HVS installation procedure not in place
• Car built on "Johnson Clips" - safeties not adjusted completely
**Risk Assessment**
• Hazard known but ignored (riding load)
• Inappropriate shortcut taken to remove "Johnson Clips"
• Risk assessments (JHAs) not performed as required when standard work process does not exist
• #10 hoist factory fastened fist grips
**Inspections**
• Handling of safety contractor audit findings

**8. 3rd Party Investigations / Actions:**

OSHA Compliance Officer Lou Murphy was present on the site soon after the accident occurred. Mr. Murphy reports to the Parsippany, NJ regional OSHA office. Mr. Murphy has been on the site several times since the accident. During the course of his investigation, he has taken photographs of the subject elevator hoistway and associated equipment. In addition, Mr., Murphy has interviewed several employees, as well as the following management associates: Bill Cassidy and Nicole Boone.

OSHA is anticipated to cite Otis Elevator as a result of the accident.

Privileged Document – Attorney Work Product – Attorney Client Communication

Turner Construction Company has not retained an attorney at this time.

Attorney Keith VonGlahn jointly represents Goldman Sachs and AIG with regard to liability. Pat McPartland has been retained by AIG as an "expert." He appears to represent Goldman Sachs as well.

The widow has retained an attorney through the union.

No civil actions have been initiated at this time.

This project is part of an Owner's and Contractor's Insurance Policy (OCIP). Therefore, there is no impact expected to the company's worker's compensation.

### 9.  Employee Training & Auditing:

The employee received the following training during the year.

| Date | Topic |
|------|-------|
| Jan 2002 | Policy Review |
| | **Job Hazard Analysis** |
| | Jumpers & Defeating Circuits |
| | Warning Labels |
| Feb 2002 | **Fall Protection** |
| Mar 2002 | Incident Reporting |
| | Eye Protection |
| Apr 2002 | **Hoisting & Rigging** |
| | Environmental Policy |
| | Ladders |
| May 2002 | Scaffolding |
| | Wheel Grinding |
| | Oxygen Acetylene Use |
| | LOTO |
| Jun 2002 | Pit Safety |
| | **Hoisting & Rigging** |
| | **Working in Hoistway** |
| Jul 2002 | Working on Car Top |
| | Jumper Process |
| | False Cars |
| | **Fall Protection** |
| Aug 2002 | **False Cars and Running Platforms** |
| | Wiring Platforms |
| | Escalator Safety Rules |
| | Cleaning of Elevator & Dumbwaiter Pits |
| Sep 2002 | Landings & Machine Room |
| | **Job Hazard Analysis** |
| Oct 2002 | GFCI Use |

Privileged Document – Attorney Work Product – Attorney Client Communication

|  |  |
|---|---|
|  | Respirators |
|  | General Storage |
|  | Battery Handling |
| Nov 2002 | NAA Safety Stand Down Day |
|  | Transferring of Waste Material |
|  | Waste Minimization |
| Dec 2002 | FPA Process |
|  | **Personal Protective Equipment** |
|  | Hand Power Tools & GFCI Use |

There were no fatality prevention audits conducted on this particular site or on Dan McQuillen throughout the course of the year.

Turner Construction Company conducted regular audits of the trades working on the site. The Turner audits assert that fall protection was not used and/or worn by Otis personnel on various occasions from June 7, 2002 until December 19, 2002. A number of the audit reports are either inaccurate or of questionable validity when compared to Otis work at the time. There were, however, notations from the safety consultant between November 25th and December 11th relating to fall protection and/or PPE. Our investigation has revealed that all but one was not received prior to December 23rd. The one that was received contained no specific information as to employees involved. Field management elected to address this issue through onsite retraining.

Of the safety consultant audits, 3 fines were issued to Otis. The details of the fines are as follows.

| | | |
|---|---|---|
| 2/02 | Discharged fire extinguisher | Paid $100 fine |
| 9//02 | Multi-incident (barricades missing unsafe material storage, cables and netting missing) | Open |
| 11/02 | PPE (no safety glasses) | Paid $200 fine |

There were 34 Field Memos from Otis to Turner detailing numerous safety concerns and advising of issues that required correction by Turner.

## 10. Action Items:

Immediate Actions:

- Implement "Safety Time Out" in all GNY Branches to discuss accident and focus on safety policies and awareness (1/12/03 - complete).
- Communicate accident causes and reinforce requirements to wear fall protection and tie off, never to ride a load that is being hoisted, and to ensure connections are tightened properly (12/26/02 - on-going).
- Implement Fall Protection Daily Log and verification process (12/26/02 - complete).
- Ensure lifelines are accessible in every hoistway (on-going).

11

Privileged Document – Attorney Work Product – Attorney Client Communication

- Ensure car frames are built on building blocks and safeties are set up to operate (on-going).
- Audit all GNY construction sites and employees for safety conditions and FPA compliance (1/31/03 - complete).
- Conduct meeting with all Foremen to discuss Hazard Recognition and Mitigation (1/8/03 to 1/09/03 - complete).
- Conduct meeting with all Project Managers to reinforce FPA requirements and roles/responsibilities (1/15/03 - complete).
- Communicate "An Accident" to all NSAA Associates (1/08/03 - complete).
- Review findings and lessons learned from this accident with all NSAA senior management at 2003 NSAA Leadership Meeting (1/20/03 - complete).
- Develop process to ensure proper tightening and label all fist grips currently being used in construction (2/6/03 - complete).
- Ensure building blocks are utilized to build car frames as required in lieu of Johnson clips (complete).

Near Term Actions:
- Ensure multi-part sheave and blocks are utilized (by 3/31/03).
- Revise connection of hoists to include redundant safety (i.e., cable secured with fist grips and swaging) (by 3/31/03).
- Implement Pre-Work Hoisting and Rigging Checklist (by 3/31/03).
- Strengthen accountability requirements for field personnel and line management (by 3/31/03).
- Document and communicate HVS installation process (by 6/30/03).
- Conduct FPA certification and Management System training with all line managers (3/26/03-3/27/03).
- Assign dedicated safety manager to Greater New York Region (3/31/03).
- Assign New Equipment Superintendent to Manhattan Construction Branch (4/30/03).

**11. Company Safety Performance:**

|                                       | 2000  | 2001  | 2002  | 2003 YTD |
|---------------------------------------|-------|-------|-------|----------|
| Incident Rate                         | 6.83  | 5.20  | 5.13  | 5.90     |
| Lost Time Rate                        | 3.40  | 2.00  | 1.20  | 1.96     |
| Severity Rate                         | 10.20 | 24.70 | 13.40 | 3.90     |
| UTC Fatality Prevention Audit Score   | -     | 83%   | -     | 88%      |
| UTC Assurance Review Rating           | -     | 80%   | -     | 73%*     |

* The management system rating tool used in the 2003 Assurance Review differs from that used in 2001.