# Day, Berry & Howard LLP

### COUNSELLORS AT LAW

Albert Zakarian, Esq.
(860) 275-0290
azakarian@dbh.com
www.dbh.com

January 6, 2003

<u>VIA FACSIMILE AND U.S. MAIL</u>

<u>FOR SETTLEMENT PURPOSES ONLY</u>

Anthony R. Minchella, Esq.
Zeldes Needle & Cooper P.C.
100 Lafayette Boulevard
P.O. Box 1740
Bridgeport, Connecticut  06601-1740

     Re:   *Nichani v. Otis*

Dear Tony:

This letter is in response to your letter of December 10, 2002.  We are providing this factual information for settlement purposes only.  We are able to provide a great deal of your requested information.  However, we cannot provide some information you requested because we do not keep our records in such a way that would allow us to do so.  Also, some of the requested information is private and confidential regarding our employees.  Other requests are unduly broad.  Where we were unable to provide certain information we have so indicated and have, instead, provided other useful information.  If, after reviewing this response, you believe you need additional wage and benefit information to calculate your client's claimed losses, please let us know what specific information you seek and why, and we will try to provide that information.

As to your requests:

1.     We are able to provide the current salary range for an L3 which is $105,000 to $195,000.  In addition, the average starting salary for executive appointments to an L3 within NAA in the last two years was $119,791.33.  The average salary increase associated with these promotions was 7.5%.

2.     We do not maintain records in a way that would allow us to respond to this request.  Moreover, we do not have a way to determine "positions at United Technologies Corp. and Otis Elevator Co. that require equal skill effort and responsibility as the position held by Sue Nichani ."  Please see the information provided in 1 above.  In addition, Mr. Bradford Russell's base salary in his L3 position for 1999-2001 was as follows:

Day, Berry & Howard LLP

Anthony R. Minchella, Esq.
January 6, 2003
Page 2

<u>1999</u>
Base Salary                $136,500.00

<u>2000</u>
Base Salary                $145,000.00

<u>2001</u>
Base Salary                $153,000.00

3.    As above, we do not maintain records in a way such that would allow us to respond to this request.

4.    As an L3, Mr. Bradford Russell's benefits for 1999-2001 were as follows:

<u>1999</u>
Incentive Compensation ("IC")    $ 45,000.00
Stock Options                         4,000.00

<u>2000</u>
IC                               $ 51,000.00
Stock Options                       3,100.00

<u>2001</u>
IC[1]                            $     0.00
Stock Options                       3,000.00

Mr. Russell was also eligible for a car allowance toward the lease of a new vehicle. That allowance was $16,000 over the life of the lease. Mr. Russell and Ms. Nichani participated in the same insurance, pension and savings plans, and were entitled to the same benefits under those plans.

5.    As to your client's benefits for the years 1999-2002, they were as follows:

---

[1] Mr. Russell's IC was a target of 25% of his base salary. He received IC only if he and Otis met certain performance goals. In 2001, Mr. Russell resigned in May, he was thus ineligible for IC for that year.

# Day, Berry & Howard LLP

Anthony R. Minchella, Esq.
January 6, 2003
Page 3

| | | |
|---|---|---:|
| **1999** | | |
| Position Allowance[2] | $ | 12,150.00 |
| 1998 Regional IC Payout | $ | 9,214.00 |
| Stock Options | | 400.00 |
| | | |
| **2000** | | |
| Position Allowance[2] | $ | 16,200.00 |
| 1999 Regional IC Payout[3] | $ | 3,367.00 |
| Stock Options | | 500.00 |
| | | |
| **2001** | | |
| Position Allowance[2] | $ | 10,800.00 |
| Position Allowance[2] | $ | 5,897.52 |
| Position Allowance "Make-Up"[2] | $ | 1,431.90 |
| 2001 PIP Payout-(2000 Program)[4] | $ | 12,000.00 |

---

[2] Ms. Nichani was "kept whole" for pay purposes when she was moved from a Field Operations Manager position to her Senior Manager, Safety position. When she moved to the headquarters staff, she was no longer eligible for Regional Incentive Compensation. Accordingly, she was paid a "position allowance" so she would maintain her compensation level. This arrangement was more beneficial in that she received a predetermined amount semi-monthly, as opposed to Regional IC which is paid in one lump sum in February of each year. Additionally, her amount was guaranteed. In contrast, the regions only received IC if and when the region reached its target to receive such compensation, the amount of which is variable.

Ms. Nichani's position allowance was and is 15% of base salary. She had two salary increases since assuming her position on April 1, 1999. Due to inadvertence, her position allowance remained at $675 per pay after both. As a result, she was underpaid through August 2001, by a total of $1,431.90. A "make-up payment" was made to her of $1,431.90. That amount equals the underpayments from April 1, 2000 through September 1, 2001. Further, her position allowance increased to $737.19 per pay effective September 1, 2001. That amount represents 15% of her current salary.

[3] Due for time in region.

[4] The PIP began in 2000 and payouts for that year were made in 2001. The PIP is intended for non-incentive compensation eligible employees. Ms. Nichani receives a position allowance which replaces the IC for which she was eligible when she was on the regional staff. She is not and has never been eligible to participate in PIP. Due to an oversight, Ms. Nichani incorrectly participated in and was paid under the PIP in 2001 (for 2000).

Day, Berry & Howard LLP

Anthony R. Minchella, Esq.
January 6, 2003
Page 4

<u>2002</u>
Position Allowance[2]               $ 17,692.56

6.      There are currently no projected salary range changes for 2003, 2004 or 2005.

7.      Mr. Bradford Russell had a significant environment, health and safety background and experience for twelve (12) years prior to joining UTC in its corporate office in 1989. He has a master's degree in environmental health and over twenty-two (22) years experience in the environment, health and safety field. Mr. Russell began with UTC in the environment, health and safety area as manager, human and natural resources protection. Throughout his UTC career, Mr. Russell held a variety of environment, health and safety positions both at UTC and at Otis World Headquarters (WHQ).

Mr. Russell was appointed to the North America Area (NAA) position because of the change in leadership at WHQ. Specifically, Bob Isaman, former Vice President Environment, Health and Safety was named Vice President, Marketing & Field and Senior Business Practices Officer for the Asia Pacific Area. Upon Mr. Isaman's departure, Danny Reese joined WHQ as Vice President of Environment, Health and Safety. At that same time, Pat Dowson replaced Mr. Russell as WHQ Director of Environment, Health and Safety Programs. Mr. Russell was then named Director of Environment Health and Safety Programs for NAA effective May 1, 2001, based on his significant expertise in the EH&S field and over twenty-two years of experience. The position at NAA has similar duties and responsibilities than those at WHQ, but is more limited in scope (worldwide responsibilities versus a specific area). However, Mr. Russell, who had been a director for ten years, retained his title, compensation and the commensurate perquisites of his employment.

We hope this information will assist you in formulating a reasonable proposal for settling this dispute in the form of a separation package as we briefly discussed in your office. We look forward to hearing from you.

Very truly yours,

Albert Zakarian

cc:    Joseph C. Zemetis, Esq.