UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SUJATA NICHANI, | : | CIVIL ACTION |
| | : | NO. 3:02CV1384 (MRK) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED TECHNOLOGIES CORP. and | : | |
| OTIS ELEVATOR COMPANY, | : | |
| | : | |
| Defendants. | : | APRIL 28, 2006 |

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION
TO EXCLUDE IN PART THE TESTIMONY OF SHELDON WISHNICK**

Plaintiff's entire argument rests on two premises that the Court must accept to permit Wishnick to opine as to the value of Plaintiff's alleged stock option damages: (1) Wishnick is a qualified to express an opinion on the basis of the Black-Scholes Method ("BSM"); and (2) the BSM is capable of reliably valuing employee stock options.[1]  Both premises are absurd.

**I.    Wishnick Is Not Qualified to Testify About the Black-Scholes Method.**

Plaintiff has no answer to Defendants' identification of the numerous areas on which Wishnick is shockingly uninformed or, worse yet, misinformed as to the BSM.

- Most notably, he is not aware of any drawbacks or shortcomings in using the BSM to value employee stock options (Wishnick Dep. at 146);

---

[1] Plaintiff seeks to support the latter premise by submitting a new expert report from Wishnick, which report employs a new methodology – the Black-Scholes-Merton formula.  This new report is wholly impermissible, and, accordingly, Defendants file herewith a motion to strike it pursuant to Federal Rule of Civil Procedure 26(e).

- He does not know whether the BSM method assumes that an option is exercised at the end of its term (Id. at 59);

- He does not know whether a higher interest rate would increase or decrease the value of the option (Id. at 63);

- He does not know how volatility—one of the key components of the BSM—is measured(Id. at 63-64);

- He does not know whether it would be important to know the expected life of the options (Id. at 81);

- He does not know whether the BSM is based on the assumption that each option would be held and not exercised until the term had expired or was about to expire (Id. at 82);

- He is not aware of the kind of option Black & Scholes used to develop their theory (Id. at 139);

- He does not know whether the BSM is based on the assumption that market price will exceed strike price (Id. at 143);

- He does not know whether the BSM is based on the assumption that options are freely transferable at any time (Id. at 149).

Of course, the BSM is in fact based on the assumption that options are freely transferable at any time, but that assumption would have no bearing in this case if one believes, as Wishnick incorrectly does, that employee stock options are freely transferable:

> Q: Now, is it your understanding that these option grants that Ms. Nichani got could be sold, delivered to a broker and have the broker sell them on the open market?
>
> A: I don't know the procedure for their disposal but it was my understanding that they could be traded for cash somehow. I don't know if it was through a broker or open market or exactly how it worked.
> . . . .
>
> Q: Isn't it a fact that employee stock options are not traded on securities markets?
>
> A: That may be. I just don't know.

(Wishnick Dep. at 97, 144.) As these excerpts from Wishnick's testimony reveal, and as Plaintiff's silence on these points makes clear, Wishnick knows nothing about the BSM beyond

the fact that if he inputs a couple of numbers into a spreadsheet that a CPA friend provided to him—one that is readily available on the internet—it outputs a value.

In the face of Wishnick's astounding lack of knowledge of the BSM, Plaintiff identifies just two bases on which to qualify Wishnick as an expert: the BSM's inclusion "on the syllabus of the [actuarial] society exams"—several of which Wishnick failed, some more than once (Wishnick Dep. at 17)—and Wishnick's "having read up on it." (Pl.'s Br. at 19 (citing Wishnick's Dep. at 49).) These two facts are woefully inadequate to qualify Wishnick as an expert on the BSM.

Plaintiff does not dispute, nor could she, that an expert is required to be knowledgeable about the subject matter of his testimony, but she nonetheless asserts, without any citation, that her expert need not have "special expertise" in the subject matter of his testimony. This assertion is wrong. See Fed. R. Evid. 702 (expert must have "scientific, technical, or *other specialized knowledge*" (emphasis added)); Free v. Bondo-Mar-Hyde Corp., 25 Fed. Appx. 170, 172-73 (4th Cir. 2002) (affirming district court's exclusion of expert, because, although he was an "accomplished metallurgist," he lacked knowledge of aerosol cans and thus could not opine concerning whether scratches on can caused explosion); Arredondo v. Uniroyal Goodrich Tire, Co., No. 95-17309, 1997 U.S. App. LEXIS 12502, at *3 (9th Cir. May 29, 1997) (affirming trial court's exclusion of testimony for reasons including expert's "lack of knowledge about adhesion failures generally, and his inability satisfactorily to explain the reasoning behind his opinions," as well as the lack of "reliable scientific or technical knowledge that would assist the trier of fact"); Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn., 98 F. Supp. 2d 729, 740 (W.D. Va. 2000) (after Daubert hearing, court concluded that antitrust economics expert had insufficient expertise because, inter alia, although he had prepared numerous market analyses of

coal industry, his expert testimony concerned defining the "relevant market" in vermiculite industry, in which he had not worked); Nelson v. Tenn. Gas Pipeline Co., No. 95-1112, 1998 U.S. Dist. LEXIS 22769, at *36-39 (W.D. Tenn. Aug. 28, 1998) (excluding under Daubert both of the plaintiff's proposed medical experts because their opinions were not based on reliable methodologies).[2]

Plaintiff would have this Court conclude that, because Wishnick is an actuary, and because some actuaries and mathematicians have written about and testified as experts on the BSM, he should qualify as an expert as well. (See Pl.'s Br. at 19-20.) The logical flaw in this transitive argument is painfully obvious. A dermatologist and an obstetrician are both "doctors," and, although both may have successfully completed a dermatology examination in medical school, surely a court would not permit the obstetrician to give expert testimony on the causes of melanoma, whether or not the obstetrician purported to having "read up" on the topic.

Plaintiff further tries to salvage Wishnick by relegating the BSM to a mere "subcategory of expertise at issue." (Pl.'s Br. at 19.) Plaintiff's disingenuous description attempts to minimize the focus on the BSM, thereby signaling Plaintiff's own acknowledgment that Wishnick's misunderstanding of the BSM is problematic. The BSM is not, however, a subcategory of the "expertise" in question; it is precisely the category of expertise on which Plaintiff wishes to rely, especially in light of Plaintiff's repeated disclaimer that the rest of what Wishnick purports to do is "merely 'number-crunching'" or "simple addition, subtraction and multiplication" that does not call for expert testimony at all. (Pl.'s Br. at e.g., 1, 2, 3, 4, 5.)

Finally, although Plaintiff now mentions several other methods of valuing stock options, Wishnick confirmed his own lack any general expertise in valuing stock options, by admitting

---

[2] Copies of unreported cases are attached hereto as Exhibit 1.

that the BSM is "the only way [he] know[s] to . . . calculate" such value. (Wishnick Dep. at 49.) He was not aware of, for instance, the binomial model Plaintiff cites in her opposition brief. (See Pl.'s Br. at 9.) Nor was he aware of the Monte Carlo method. See "Option Pricing Theory," *at* http://www.riskglossary.com/link/ option_pricing_theory.htm (last visited April 27, 2006).[3] Nor was he even aware of the modified BSM – which takes into account the expected term of the option – to which Plaintiff refers in her opposition brief. (See Pl.'s Br. at 10.) Surely, an "expert" on the valuation of stock options would have, at the very least, an awareness of alternative methods of valuing them. In fact, an expert must understand those methodologies, including the BSM, before he can express an opinion based on them. Wishnick, whose expertise essentially boils down to his ability to use a calculator, will not assist the jury in determining Nichani's future losses, as required by Rule 702 of the Federal Rules of Evidence.

II. **Even If Wishnick Were Qualified to Testify About the Black-Scholes Method, His Testimony Must be Excluded Because the Black-Scholes Method Is Neither Reliable Nor Relevant.**

The mendacity of Plaintiff's erroneous assertion--"[b]y far the better and more accepted view, and the view accepted by UTC for executive and director compensation issues, is that the Black-Scholes method produces reasonable and reliable dollar values of employee stock options"--cannot be overstated. (See Pl.'s Br. at 2.) This assertion flies in the face of the great weight of literature and study concerning the BSM,[4] and misconstrues (or, more accurately,

---

[3] Copies of websites cited herein are attached hereto as Exhibit 2.

[4] For a modest listing of literature and study concerning the BSM generally, see Defendants' main brief.

*falsely* construes) UTC as having somehow endorsed the BSM as a reasonable and reliable means of valuing employee stock options.[5]

In the wake of recent corporate governance scandals, the Financial Accounting Standards Board ("FASB") now requires that U.S. companies account for grants of employee stock options as a charge to corporate earnings in their 10-K statements.  See Jude Rich, FASB's Stock Options Blunder, *available at* http://www.forbes.com/2003//01/22/ cx_0122opinion_print.html (last visited April 24, 2006).  In light of, among other things, concerns regarding the dilutive effect employee stock options may have on earnings as reflected in 10-K statements,[6] FASB revised its Statement of Financial Accounting Standards No. 123 ("FAS 123(R)") to "recognize in the financial statements the employee services received in exchange for equity instruments issued or liabilities incurred and the related cost to the entity as those services are consumed." FASB, FAS No. 123(R) at 4 (2004) *available at* http://www.fasb.org/pdf/fas123r.pdf (last visited April 24, 2006).

---

[5] Plaintiff's reliance on R.A. Mackie & Co., L.P. v. Petrocorp. Inc., 329 F. Supp. 2d 477 (S.D.N.Y. 2004) is misplaced.  In that case, the court relied on the expert's opinion in light of "his perception of the [w]arrants' value based on his long experience trading and valuing warrants."  Id. at 514.  Wishnick, by contrast, has "valued" stock options by plugging in numbers into the BSM an estimated three or four times.  (Wishnick Dep. 94-95.)  In light of the literature and study to the contrary, Defendants respectfully disagree with the Court's dicta that, with regard to warrants, the BSM has been subject to testing and found reliable and that it has received favorable commentary.

[6] FASB cited four principal reasons for issuing FAS 123(R):  (1) addressing concerns of users and others, (2) improving the comparability of reported financial information through the elimination of alternative accounting methods, (3) simplifying U.S. GAAP, and (4) international convergence.  See Nicholas G. Apostolou & D. Larry Crumbley, "Accounting for Stock Options: Update on the Continuing Conflict," The CPA Journal *available at* http://www.nysscpa.org/ cpajournal/2005/805/essentials/p30.htm (last visited April 26, 2006).  As Warren Buffett noted in 1998, "[e]xisting accounting principles ignore the cost of stock options when earnings are being calculated . . . ."  Id.  FASB, through the adoption of FAS 123(R), sought to rectify this shortcoming.

Indeed, although FASB did not prohibit the use of the BSM—much to the dismay of scores of reputable economists who have written on the subject[7]—it mandated that if a corporation were to use the BSM for reporting purposes, it "*must* be adjusted to take account of certain characteristics of employee share options and similar instruments that are not consistent with the model's assumptions (for example, the ability to exercise before the end of the option's contractual term)." Id. at 41. Even with this modification--which Wishnick does not use--[8] however, the BSM is not a reliable means of valuing employee stock options, nor does FASB suggest this, as Plaintiff asserts. (Pl.'s Br. at 9.)

FASB's failure to prohibit the use of the BSM for accounting and reporting purposes provides no basis for concluding that the BSM is a reliable method for valuing employee stock options. First, as Plaintiff points out, FASB is the "authoritative source of standards *of financial accounting*." (Pl.'s Br. at 8.) It is not an authoritative source of methods for reliably valuing employee stock options. Second, as Plaintiff points out, FASB now requires the reporting of employee stock options, by some method, to improve the relevancy and reliability of financial statements by virtue of the fact that employee stock options are reported. (Pl.'s Br. at 12.) Plaintiff has fallen far short of demonstrating that recognizing an expense for stock options in a

---

[7] For a modest listing of the profusion of criticism, see Defendants' main brief.

[8] FAS 123 states that if an entity uses the BSM for reporting purposes, "the expected term would be used as an input instead of a suboptimal exercise factor." FASB, FAS No. 123(R) at 70 (2004) *available at* http://www.fasb.org/pdf/fas123r.pdf (last visited April 24, 2006). Only now, after Defendants' filing of this motion, does Wishnick attempt to craft a new report that takes into account *some* of the BSM's limitations and shortcomings in valuing employee stock options. The impropriety of this new report is addressed in Defendants' Motion to Strike New Report of Sheldon Wishnick.

financial statement for accounting purposes has any relationship to reliably valuing past and future hypothetical grants of employee stock options.[9]

Wishnick's analysis is further rendered unreliable in his failure to account for each relevant grant date. Generally, past volatility—the most important input to any option pricing model—is measured over a certain period of time. See "Black Scholes Option Pricing Model," *at* http://www.derivativesone.com/kb/black_scholes.aspx (last visited April 27, 2006). Wishnick does not know the time period over which the volatility figure he used was measured, but he believed the standard approach was one year. (Wishnick Dep. 63, 148.) In other words, if a stock option is granted in year "X" and is valued using the BSM, the volatility input would be the volatility of the underlying stock during the preceding year ("X-1" through "X").

Wishnick projects his Black-Scholes value out approximately 26 years through the year 2028, yet he does not account for the grant dates over that time period. Wishnick's approach

---

[9] Plaintiff makes much of the fact that UTC has, in the past, used the BSM in its 10-K statements. Its use for financial reporting purposes, however, says nothing about its reliability for any other purpose. Moreover, Plaintiff glosses over the fact that, like so many companies in response to FASB's new requirement, UTC has abandoned the use of the BSM in this regard. See Ruth Simon, "Stock-Option Awards Sharply Cut," Wall Street Journal, Dec. 14, 2004, at D3 (cited in main brief at Ex. 9) (reporting that "many companies are sharply reducing their stock-option awards" in light of the new FASB rule and other factors); UTC Form 10-K For the Fiscal Year Ended Dec. 31, 2005, pp. 37-39. Indeed, UTC has replaced its employee stock option plan with a long-term incentive plan comprised of Stock Appreciation Rights ("SARs") and Performance Shares Units ("PSUs"). See UTC 2006 10-K, available at http://www.shareholder.com/ Common/Edgar/ 101829/1193125-06-24473/06-00.pdf; http://www.shareholder.com/Common /Edgar/ 101829/1193125-06-49739/06-00.pdf. Even assuming for argument, therefore, that the BSM can reliably value employee stock options, it is inapplicable from 2005 and beyond because UTC has abandoned its employee stock option plan and the BSM cannot reliably value SARs or PSUs. (See id.) See also Viktor Mirkin & Jeffrey Green, "Shouldering the Cost of Employee Stock Options, Society of Actuaries, *available at* http://www.soa.org/ccm/content/ about-soa-member-directory/the-actuary-newsletter/february-2006/shouldering-the-cost-of-employee-stock-options.en?g11n (last visited April 27, 2006) (The BSM cannot accurately or reliably value stock options "that include performance-based or other terms that not variables of the Black-Scholes-Merton calculation; for such options, an alternative valuation methodology would be required.").

thus begs the question: What will the 'grant date' be in 2020, for instance (or 2010, for that matter)? More to the point: What will the volatility of the underlying stock have been during the preceding year? Wishnick admitted that he cannot predict the future. (Wishnick Dep. at 50-51.) Having confirmed his lack of clairvoyance, Wishnick's valuation of these hypothetical future grants fails to present even a remote of indicia of reliability.

### III. Wishnick's Report Is Not Based on the Value of a Single Option on Each Relevant Grant Date

Plaintiff's contention that Wishnick's testimony and expert reports "consistently have reflected his opinion based on the value of a single option on each relevant grant date" is inconsistent with his report and should be rejected. (Pl.'s Br. at 1, 20.) On page one of his report, "Lost Income and Employee Benefits for Ms. Sujata Nichani," in a chart entitled "Loss Summary" that summarizes his "expert" opinions as to Nichani's losses, Wishnick estimates the *total* accumulated value of past loss with regard to stock options at $452,210 and present value of future loss with regard to stock options at $5,834,035, for a grand total of $5,834,035. (Wishnick Rep. at 1.) Wishnick never indicated that his expert opinion as to Plaintiff's damages was dependent on findings of fact concerning the number of options she would have been granted. As this Court has already observed, the 7000 and 9000 options on which Wishnick's based his ultimate conclusions were not mere placeholders, pending receipt of actual data.[10] Rather, Wishnick opined as to her damages in the aggregate, and the failings of that aggregate opinion—including but not limited to the highly exaggerated number of options he assumed she

---

[10] Again, the impropriety of Wishnick changing his ultimate opinion on Plaintiff's damages as a result of Defendants' arguments to preclude his testimony is obvious and is addressed in Defendants' Motion to Strike New Report of Sheldon Wishnick.

9

would receive in the future—cannot be corrected simply by changing one or more premises of that opinion.

### IV.     Wishnick's So-Called "Executive Forecast" Calculation

Plaintiff gives hardly a mention to Wishnick's so-called "executive forecast" calculation. She contends, simply, that the calculation is "derived from UTC's own forecasts (which are in turn based on past stock performance and management's understanding if the current business and future plans of the company)." Indicative of the weakness her position in this regard, Plaintiff fails to respond to *any* of Defendants' arguments as set forth in its main brief.  (See Pl.'s Br. at 26.)

### CONCLUSION

For the foregoing reasons, and the reasons set forth in Defendants' main brief, the Court should grant Defendants' motion in limine and exclude Wishnick's report and testimony to the extent it relates to losses attributed to employee stock options.

THE DEFENDANTS,
UNITED TECHNOLOGIES CORP. and
OTIS ELEVATOR COMPANY


By__/s/ Douglas W. Bartinik_____
Albert Zakarian (ct04201)
Victoria Woodin Chavey (ct14242)
Douglas W. Bartinik (ct26196)
Day, Berry & Howard LLP
CityPlace I
Hartford, CT 06103-3499
(860) 275-0100
(860) 275-0343 (fax)
*azakarian@dbh.com*
*vwchavey@dbh.com*
*dwbartinik@dbh.com*
Their Attorneys

## **CERTIFICATION**

I hereby certify that the foregoing was sent via overnight mail on this date, to:

Anthony Minchella, Esq.
Law Offices of Anthony R. Minchella, L.L.C.
530 Middlebury Road
Suite 203-204B
Middlebury, CT 06762

Jeffrey J. Tinley, Esq.
Robert Nastri, Esq.
Tinley, Nastri, Renehan & Dost, LLP
60 North Main Street
2nd Floor
Waterbury, CT 06702

                                                /s/_____
                                                 Douglas W. Bartinik