LEXSEE 25 FED. APPX. 170

O'NEAL FREE; ARLEAN A. FREE, Plaintiffs-Appellants, v. BONDO-MAR-HYDE CORPORATION, Defendant & Third Party Plaintiff-Appellee, and U. S. CAN COMPANY, Third Party Defendant-Appellee.

No. 01-2240

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

25 Fed. Appx. 170; 2002 U.S. App. LEXIS 480

December 12, 2001, Submitted
January 10, 2002, Decided

**NOTICE:** [**1] RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the District of South Carolina, at Aiken. Cameron McGowan Currie, District Judge. (CA-00-636-1-22).

**DISPOSITION:** Affirmed.

**COUNSEL:** O'Neal Free, Arlean A. Free, Appellants Pro se.

Ronald Brian Cox, BOWERS, ORR & DOUGALL, Columbia, South Carolina; David Patrick Dekle, Sonja Renee Tate, FULCHER, HAGLER, REED, HANKS & HARPER, Augusta, Georgia, for Appellees.

**JUDGES:** Before NIEMEYER, LUTTIG, and MICHAEL, Circuit Judges.

**OPINION:** [*171] PER CURIAM:

O'Neal and Arlean Free appeal the district court's order dismissing their products liability claim stemming from the explosion of an aerosol can of paint remover. Plaintiffs contend the district court abused its discretion in granting Defendants' [*172] motion in limine to exclude their expert's testimony and erred in granting Defendants' motion for summary judgment. Finding no error, we affirm.

This Court reviews an order granting summary judgment de novo. *Higgins v. E.I. DuPont de Nemours & Co.*, 863 F.2d 1162, 1167 (4th Cir. 1988). Summary [**2] judgment is appropriate only when, viewing the record as a whole, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The plaintiff has the burden of producing evidence that would support a jury verdict, even when the evidence is likely to be within the possession of the defendant, as long as the plaintiff had a full opportunity to conduct discovery. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Once the defendant has pointed out the absence of an essential element of plaintiff's case, the burden is on the plaintiff to make a sufficient showing to create a genuine issue of fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

A district court's decision to admit or exclude expert testimony is reviewed for abuse of discretion. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001) (citing *General Electric Co. v. Joiner*, 522 U.S. 136, 138-39, 139 L. Ed. 2d 508, 118 S. Ct. 512 (1997)). In determining the admissibility of expert [**3] testimony, the district court must ensure the evidence is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993). A reliable expert's opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inference must be derived using scientific or other valid methods. *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). Reliability of specialized knowledge and methods for applying it to various circumstances may be indicated by testing, peer review, evaluation of rates of error, and general acceptability. *Id.* The proponent of expert testimony must establish its admissibility by a preponderance of proof. *Cooper*, 259 F.3d at 199.

We find the district court did not abuse its discretion in excluding the expert's testimony. The expert's opinion

25 Fed. Appx. 170, *172; 2002 U.S. App. LEXIS 480, **3

was based on his assumptions of what caused the can to explode rather than on scientific, technical, or other specialized knowledge. The expert appears to be an accomplished metallurgist, but he lacks knowledge of the aerosol can manufacturing process, [**4] the process of filling aerosol cans, the testing performed on cans during the manufacturing process prior to their distribution, the pressurization of the can, or the normal pressure expected of this type of can. Accordingly, he lacked the expertise necessary to determine (1) whether certain scratches on the interior of the can were defects or simply normal consequences of the manufacturing process and (2) whether those scratches actually caused the explosion. Because the expert's testimony is based merely on his belief and speculation and is therefore not reliable, the district court did not abuse its discretion in excluding his testimony.

Because Plaintiff's injury was sustained in South Carolina and filed in the federal district court of that state based upon diversity of citizenship, *see* 28 U.S.C. § 1332, we apply the substantive law of South Carolina to determine if summary judgment was proper. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941). Under South Carolina law, a plaintiff in a products liability action must demonstrate "(1) that he was injured by the product; (2) that the [**5] product, at the time of the accident, was in essentially the same condition as when it left the hands of the [*173] defendant; and (3) that the injury occurred because the product was in a defective condition unreasonably dangerous to the user." *Oglesby*, 190 F.3d at 251 (quoting *Allen v. Long Mfg. NC, Inc.*, 332 S.C. 422, 505 S.E.2d 354, 356 (S.C. App. 1998)). With out the expert's testimony, Plaintiffs cannot carry their burden of proof. Therefore, summary judgment in favor of the Defendants was properly granted.

Accordingly, we affirm the district court's order. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

*AFFIRMED*

LEXSEE 1997 U.S. APP. LEXIS 12502

MANUEL ARREDONDO, husband; IDELIA ARREDONDO, wife; RUDOLFO CORTEZ, husband; ALMA CORTEZ, wife, Plaintiffs-Appellants, v. UNIROYAL GOODRICH TIRE CO., a Delaware Corporation; THE B.F. GOODRICH COMPANY, a New York corporation; PACE MEMBERSHIP WAREHOUSE, INC., a Colorado corporation, Defendants-Appellees.

No. 95-17309

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

1997 U.S. App. LEXIS 12502

March 12, 1997, Argued and Submitted, San Francisco, California
May 29, 1997, FILED

**NOTICE:** [*1] RULES OF THE NINTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the District of Arizona. D.C. No. CV-93-1708-SMM. Stephen M. McNamee, District Judge, Presiding.

**DISPOSITION:** AFFIRMED.

**COUNSEL:** For MANUEL ARREDONDO, husband, Plaintiff - Appellant: W. Daniel Shelton, Esq., GOLDBERG & OSBORNE, Tucson, AZ. William H. Ricker, Tucson, AZ. For IDELIA ARRENDONDO, wife, Plaintiff - Appellant: W. Daniel Shelton, Esq., (See above). William H. Ricker, (See above). For RUDOLFO CORTEZ, husband, Plaintiff - Appellant: John E. Osborne, W. Daniel Shelton, Esq., (See above), GOLDBERG & OSBORNE, Tucson, AZ. William H. Ricker, (See above). For ALMA CORTEZ, wife, Plaintiff - Appellant: John E. Osborne, (See above), W. Daniel Shelton, Esq., (See above). William H. Ricker, (See above).

For UNIROYAL GOODRICH TIRE CO., a Delaware corporation, Defendant - Appellee: Michael L. McAllister, Phoenix, AZ. For THE B.F. GOODRICH COMPANY, a New York corporation, Defendant - Appellee: Michael L. McAllister, (See above). For PACE MEMBERSHIP WAREHOUSE, INC., a Colorado corporation, [*2] Defendant - Appellee: Michael L. McAllister, (See above).

**JUDGES:** Before: CHOY, BRUNETTI, and FERNANDEZ, Circuit Judges.

**OPINION:**

**MEMORANDUM ***

* This disposition is not appropriate for publication and may not be cited to or by the courts of this Circuit except as provided by 9th Cir. R. 36-3.

Federal Rules of Evidence 702 governs the admissibility of expert opinion testimony. It states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702. First, Rule 702 requires that the evidence "assist the trier of fact," in other words, that it be relevant. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 591, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993). Second, it demands that the evidence be reliable. Id.

**I. RELIABILITY OF TESTIMONY** [*3]

The district court has the obligation to ensure that testimony is reliable and will help the trier of fact. Id. at 590. To ensure reliability, Rule 702 demands that expert testimony relate to scientific, technical or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs. Id.

Having considered all of the testimony of Loren Forney, appellants' expert witness, including his failure to note a puncture in the tire, his inability to dismiss various other possible causes of the tread-off, his lack of

knowledge about adhesion failures generally, and his inability satisfactorily to explain the reasoning behind his opinions, the district court found that Forney's testimony, whether scientific or technical, was unsubstantiated and subjective, and therefore unreliable and inadmissible. The district court found that appellants failed to provide sufficient evidence to show that Forney based his conclusions on reliable scientific or technical knowledge that would assist the trier of fact. See id. We agree.

## II. APPLICABILITY OF DAUBERT

We need not decide whether Forney's testimony is scientific or technical in nature, [*4] and whether Daubert applies, because we find that his testimony does not meet Rule 702's reliability standard.

## III. BURDEN OF PROOF FOR PRODUCTS LIABILITY CLAIM

The Arredondo-Cortez families' claim that the district court abused its discretion by imposing a burden of proof higher than is required by Arizona law for strict products liability claims is meritless. The district court only required plaintiffs to prove sufficient to allow a trier of fact to reasonably infer it more probable than not, that the tire was defective and unreasonably dangerous. This is the correct standard of proof. See Dietz v. Waller, 141 Ariz. 107, 685 P.2d 744, 747 (1984); Restatement (Second) of Torts, § 402A (1965).

## IV. APPLICATION OF DAUBERT IN DIVERSITY CASE

The Arredondo-Cortez families also claim that the district court violated the twin aims of Erie R. Co. v. Tompkins, 304 U.S. 64, 82 L. Ed. 1188, 58 S. Ct. 817 (1938), by applying Daubert in this diversity action because Arizona state courts routinely admit expert testimony similar to Forney's under the more stringent test of Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (D.C. Cir. 1923). Because [*5] we do not reach the issue of the applicability of Daubert in this case, we decline to address appellants' contention.

## V. DISTRICT COURT'S CONSIDERATION OF UNTIMELY EVIDENCE

Plaintiffs argue that the district court abused its discretion by considering evidence that was untimely disclosed in violation of Rule 26 of the Federal Rules of Civil Procedure. Plaintiffs failed to object to the introduction of this evidence before the district court issued its decision, and the evidence is therefore admissible. Beech Aircraft Corp. v. United States, 51 F.3d 834, 841 (9th Cir. 1995) (citing Seamon v. Vaughan, 921 F.2d 1217, 1220 (11th Cir. 1991) (declining to hear argument on appeal where party failed to raise it to district court prior to final judgment, even though issue was presented to district court in Rule 59 motion)).

AFFIRMED.

LEXSEE 1998 U.S. DIST. LEXIS 22769

JAMES L. NELSON, et al., Plaintiffs, v. TENNESSEE GAS PIPELINE COMPANY, et al., Defendants.

No. 95-1112

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE, EASTERN DIVISION

1998 U.S. Dist. LEXIS 22769

August 28, 1998, Decided
August 31, 1998, Filed, Entered

**DISPOSITION:** [*1] Defendants' motion to exclude Dr. Hirsch's testimony GRANTED.

**COUNSEL:** For Plaintiffs: Gordon W. Jenkins, Idaho Falls, Idaho.

For Plaintiffs: Carl R. Ogle, Jr., Jefferson City, Tennessee.

For Plaintiffs: Joseph D. Davis, Los Angeles, California.

For Defendants: Walter H. Crouch, William H. Farmer, Nashville, Tennessee.

For Defendants: Russ M. Strobel, Chicago, Illinois.

**JUDGES:** Before: J. Daniel Breen, United States Magistrate Judge, Western District of Tennessee, Eastern Division.

**OPINIONBY:** J. Daniel Breen

**OPINION:**

ORDER GRANTING DEFENDANTS' MOTIONS TO EXCLUDE EXPERT TESTIMONY

Before the court are the motions of defendants, Tennessee Gas Pipeline Company, et al. (hereinafter sometimes referred to as "Tenneco"), to exclude from the trial of this matter the testimony of plaintiffs' experts Kaye Kilburn, M.D. and Alan Hirsch, M.D. This lawsuit was filed by numerous individuals who have lived or spent significant amounts of time within close proximity to defendants' natural gas pipeline compressor station located in Lobelville, Tennessee. According to plaintiffs, Tenneco, over a period of several years, released toxic substances, including poly-chlorinated biphenyls ("PCBs") into the [*2] soil, groundwater, and atmosphere in the vicinity of the pumping station, as well as into Marrs Branch Creek, which flows along defendants' property, causing various injuries to plaintiffs. Specifically, plaintiffs allege that Tenneco used chemicals including Pydraul AC, a lubricating oil containing a type of PCB known as Aroclor 1254, as a fire retardant in the crankcase and cylinder lubricating system of the starting air compressors at the Lobelville pumping station as well as at 35 other compressor stations along the 10,000-mile pipeline. As a result, plaintiffs charge, they have suffered from immune and nervous system impairments, bone degeneration, and related learning disorders. Plaintiffs have brought this action under the theories of negligence, trespass, common law nuisance, and strict liability.

The instant motions were filed April 16, 1998. Plaintiffs have opposed the motions and Tenneco has replied to the motion concerning Dr. Kilburn. None of the parties have requested a hearing on this matter, but have submitted voluminous exhibits in support of their positions. Thus, the court will determine the admissibility of these experts' testimony based on the parties' submissions. [*3]

Defendants seek to exclude the testimony of Drs. Kilburn and Hirsch on the grounds that the proffered testimony does not meet the standards set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). In Daubert, the Supreme Court concluded that the former "general acceptance" test governing the admissibility of scientific evidence articulated in Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (1923) was superseded by the adoption of Rule 702 of the Federal Rules of Evidence. n1 Daubert, 509 U.S. at 589, 113 S. Ct. at 2794. The Court explained that

> the [displacement of the] Frye test . . . by the Rules of Evidence does not mean, however,

Case 3:02-cv-01384-MRK    Document 153-2    Filed 05/01/2006    Page 8 of 19

Page 2
1998 U.S. Dist. LEXIS 22769, *3

that the Rules themselves place no limits on the admissibility of purportedly scientific evidence. Nor is the trial judge disabled from screening such evidence. To the contrary, under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.

The primary locus of this obligation is Rule 702, which clearly contemplates some degree of regulation of the [*4] subjects and theories about which an expert may testify. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" an expert "may testify thereto." The subject of an expert's testimony must be scientific . . . knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science. But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i.e., "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

* * *

Faced with a proffer [*5] of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) [Fed. R. Evid.], whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

Id. at 589-93, 113 S. Ct. at 2794-96 (internal citations omitted). The requirement that the expert's conclusions be based on "good grounds" applies to each step of his analysis. In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 743 (3d Cir. 1994), cert. denied sub nom. Gen. Elec. Co. v. Ingram, 513 U.S. 1190, 115 S. Ct. 1253, 131 L. Ed. 2d 134 (1995).

n1 Rule 702 provides as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

[*6]

The Daubert Court listed certain factors that bear on a court's determination of the validity of an expert's methodology: (1) whether the theory or technique in question can be or has been tested; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "in the case of a particular scientific technique, . . . the known or potential rate or error and the existence and maintenance of standards controlling the technique's operation"; and (4) the general acceptance of the technique. Daubert, 509 U.S. at 593-94, 113 S. Ct. at 2796-97 (internal citations omitted). The Court went on to note that

the inquiry envisioned by Rule 702 is . . . a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

Id. at 594-95, 113 S. Ct. at 2797 (footnotes omitted); see also Glaser v. Thompson Med. Co., Inc., 32 F.3d 969, 972 (6th Cir. 1994). In Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311 [*7] (9th Cir.), cert. denied, 516 U.S. 869, 116 S. Ct. 189, 133 L. Ed. 2d 126 (1995) ("Daubert II"), the Ninth Circuit, on remand, added another factor: "'whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying' because the former 'provides important, objective proof that the research comports with the dictates of good science.'" Smelser v.

Case 3:02-cv-01384-MRK    Document 153-2    Filed 05/01/2006    Page 9 of 19

Page 3
1998 U.S. Dist. LEXIS 22769, *7

Norfolk S. Ry. Co., 105 F.3d 299, 303 (6th Cir.), cert. denied, 522 U.S. 817, 118 S. Ct. 67, 139 L. Ed. 2d 29 (1997) (citing Daubert II, 43 F.3d at 1317). "These factors are to assist the court in determining whether the analysis undergirding the experts' testimony falls within the range of accepted standards governing how scientists conduct their research and reach their conclusions." 105 F.3d at 303 (citations and internal quotations omitted). Thus, an expert opinion based on valid scientific methodology will satisfy Rule 702, while a "subjective belief or unsupported speculation" will fail. [*8] Id. Daubert requires that the plaintiffs in this case establish by a preponderance of the evidence that the proffered testimony meets the standards of scientific reliability set forth therein. Daubert, 509 U.S. at 592, 113 S. Ct. at 2796; see also Smelser, 105 F.3d at 303.

The requirement that the proffered testimony "assist the trier of fact" was described by the Court in Daubert as one of "fit." Daubert, 509 U.S. at 591, 113 S. Ct. at 2796. Testimony based on theories that do not fit the facts of the case are not helpful to the trier of fact. See id.

"While [Rule 702] allow[s] district courts to admit a somewhat broader range of scientific testimony than would have been admissible under Frye, [it] leaves in place the 'gatekeeper' role of the trial judge in screening such evidence." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142, 139 L. Ed. 2d 508, 118 S. Ct. 512, 517 (1997). In Turpin v. Merrell Dow Pharmaceuticals, Inc., 959 F.2d 1349, 1352 (6th Cir.), cert. denied, 506 U.S. 826, 113 S. Ct. 84, 121 L. Ed. 2d 47 (1992), the Sixth Circuit, in an opinion [*9] authored by then Chief Judge Merritt, instructed courts to take a "hard look" at the expert's basis for his scientific opinion. As the court stated, "close judicial analysis of such technical and specialized matter is necessary not only because of the likelihood of juror misunderstanding, but also because expert witnesses are not necessarily always unbiased scientists." Turpin, 959 F.2d at 1352.

With these principles in mind, the court will address defendants' motions in turn.

KAYE H. KILBURN, M.D.

Dr. Kilburn's credentials are impressive. He is a professor of medicine at the University of Southern California School of Medicine and director of its environmental sciences lab and has been widely published. In connection with this case, Dr. Kilburn studied seven flagship plaintiffs: James Lonnie Nelson, Fred Junior Nelson, Betty Jean Nelson, Sally Sue Nelson, Lucy Louise Gray, Betty Joan Watkins, and Mary Jo Phebus. Each subject completed a toxic exposure questionnaire and was exposed to a battery of clinical tests designed to reveal brain and pulmonary abnormalities. The questionnaires sought information concerning the subjects' personal data, education and socioeconomic [*10] level, occupation, exposures to certain types of chemical agents, general medical history, and use of alcohol, tobacco, and drugs. The clinical testing consisted of evaluations of reaction time, balance, blink reflex, grip strength, color vision, contrast sensitivity, visual field, intelligence, recall, vocabulary, memory, moods, vibration senses, dexterity, and expiration. Dr. Kilburn then compared plaintiffs' responses to the questionnaire and test results with those of a control group from another Tennessee community not exposed to PCBs. Members of the control group were selected to match the plaintiffs with respect to age, sex, race, and education.

Based upon his evaluations, Dr. Kilburn opined that, more probably than not, each of the flagship plaintiffs suffered from encephalopathy, or disorders of the brain, due to PCB exposure from the defendants' facility. He further found that five subjects suffered from various levels of airway obstruction also caused, at least in part, by PCBs and, in some cases, dibenzofurans, expelled by Tenneco. In addition, he opined that plaintiff James Lonnie Nelson suffered from psychomotor epileptic seizures, cutaneous cancer, and choracne, all [*11] of which he testified in deposition were caused by PCB exposure.

Using similar methodology, Dr. Kilburn conducted an epidemiological study, upon which he also relies, which included the seven flagship plaintiffs and 91 other individuals from Lobelville, the results of which were set forth in a paper entitled "Visual and Neurobehavioral Impairment Associated with Polychlorinated Biphenyls (PCBs) From a Natural Base Pipeline." Dr. Kilburn compared these 98 subjects to 58 unexposed referents. Comparisons revealed abnormalities in the 91 Lobelville subjects similar to those found in the seven flagship plaintiffs. Specifically, Dr. Kilburn found that the Lobelville residents suffered from impaired reaction times, balance, vision, hearing, and diminished vigor and had higher levels of tension, depression, anger, fatigue, confusion, headache, lightheadedness, irritability, mood swings, phlegm, shortness of breath, and wheezing than the unexposed group. (App. to Defs.' Mem. in Supp. of their Mot. to Exclude Kaye Kilburn, M.D. (hereinafter referred to as "App. I"), Exh. 3 at Bates stamp nos. KIL000721-24.) He concluded that "prolonged residential exposure to PCBs since the mid-1950's was associated [*12] with severe visual defects and impaired neurophysiologic and neuropsychologic functions." (App. I, Exh. 3 at p. 3.)

In support of their motion to exclude Dr. Kilburn's testimony, defendants argue that the expert's opinions, and the methodology from which they are derived, are

Case 3:02-cv-01384-MRK    Document 153-2    Filed 05/01/2006    Page 10 of 19

Page 4
1998 U.S. Dist. LEXIS 22769, *12

not scientifically valid. Dr. Kilburn's study of the flagship plaintiffs can best be categorized as a "cohort" study. In a cohort epidemiological study, exposure to a particular agent is utilized as the independent variable between two groups. One group is made up of persons who have been exposed to a substance that is suspected of causing disease and the other, the control group, has not been exposed. Reference Manual on Scientific Evid. at 134-36 (1994). The weakness of the cohort study design is that "an increased risk of disease among the exposed group may be caused by agents other than the exposure." Id. at 135. Thus, the researcher must "identify factors other than the exposure that may be responsible for the increased risk of disease." Id. The consideration of so-called "confounding factors" is of particular importance in determining whether there is indeed a causal relationship between exposure [*13] to a substance and injury. Id. at 157.

While Tenneco has pointed to numerous shortcomings in Dr. Kilburn's methodology, the most glaring, and fatal in the court's opinion, is Dr. Kilburn's failure to consider confounding factors for the alleged injuries. In his deposition, Dr. Kilburn stated that alcohol was the most common cause of encephalopathy. (App. I, Exh. 2 at p. 45.) He also identified numerous other causes, including solvents (id. at p. 46), cocaine and heroin abuse (id. at pp. 57-58), spray paint (id. at pp. 62-63), and living in a mobile home or low-cost housing (id. at pp. 67-71). He further opined in his reports on the flagship plaintiffs that depression suffered by some of them was caused by exposure to PCBs.

In his study, Kilburn stated that "no competing chemical exposure, confounding factors or other attributable causes were found . . ." (Id.) He further noted in his report on flagship plaintiff Mary Jo Phebus that there were "no competing causes" of her encephalopathy and airway obstruction. The voluminous exhibits submitted to the court in this case are replete, however, with evidence of other factors or agents which, according to Dr. Kilburn's [*14] own testimony, may have been responsible for the symptoms suffered by the flagship plaintiffs—evidence which, it appears, Dr. Kilburn utterly ignored.

Plaintiff James Lonnie Nelson stated on his toxic exposure questionnaire that he had occupation exposure to spray paint (App. I, Exh. 5-15) and solvents (App. I, Exh. at 5-28). Nelson's medical records and deposition testimony revealed that he consumed large amounts of alcohol and had been a cocaine and heroin user (App. I, Exh. at 5-46 to 50), that he had been sexually abused as a child and had attempted suicide with a shotgun following a marital dispute (App. I, Exh. 5-45, 5-53 to 56), and that he had lived in a mobile home (App. I, Exh. 5-63 to 64.) Dr. Kilburn testified that there was no explanation for Nelson's depression other than PCB exposure.

Deposition testimony and medical records of the remaining flagship plaintiffs reveal the existence of other factors articulated by Dr. Kilburn as causes of encephalopathy. Fred Junior Nelson was also sexually abused as a child, for which he was treated for depression, and was an alcohol abuser. Betty Nelson's medical records indicated cocaine and alcohol abuse. Lucy Gray lived in a [*15] trailer for many years, as did Betty Watkins. Watkins' medical records stated that she had been treated for depression. Finally, Dr. Kilburn noted in his report on Mary Jo Phebus that her depression was "elevated," which he attributed, along with her other abnormalities, solely to PCB exposure. In her deposition, however, she reported that she had been treated for depression following her mother's suicide on her twenty-second birthday.

There are similar problems with Dr. Kilburn's association of the flagship plaintiffs' airway obstruction to PCB contamination. Dr. Kilburn testified in deposition that cigarette smoking is the primary cause of airway obstruction. (App. I, Exh. 2 at p. 460.) Working with textiles, according to Dr. Kilburn, can also cause airway problems. (App. I, Exh. 2 at p. 618.) According to the record, Betty Nelson had worked in a textile factory. Dr. Kilburn admitted in his deposition that he could not say the small airway obstruction from which she suffered could not have been caused by her occupational exposure. (App. I, Exh. 2 at p. 619.) Betty Nelson also smoked ten cigarettes per day for 20 years. In his report on Lucy Gray, Dr. Kilburn attributed her severe [*16] airway obstruction solely to PCBs, in spite of her admission in the toxic exposure questionnaire that she had smoked 70 cigarettes per day for 18 years. Sally Sue Nelson and Betty Watkins were employed as textile workers. Betty Watkins also stated in her questionnaire that she had smoked 20 cigarettes per day for 21 years. In his first report, Dr. Kilburn opined that Watkins' small airways obstruction was caused by PCBs and smoking. In a second report, he pointed to PCBs as the sole cause of her symptoms. Dr. Kilburn first reported that the airway obstruction suffered by Mary Jo Phebus was caused by PCBs and cigarette smoking, which she indicated amounted to some 20 cigarettes per day for 25 years. In his second report, he listed PCB exposure as the sole cause of her airway obstruction.

There is simply no basis for Dr. Kilburn's assumption that PCBs, and not one of numerous other factors, was the cause of plaintiffs' reported maladies. Tenneco makes much of the fact that Dr. Kilburn failed to consult the medical records of the plaintiffs prior to making his assessments. Although such failure does not in itself mandate a finding that the studies performed by this expert were unreliable, [*17] see Laski v. Bellwood, 1997 U.S. App.

Case 3:02-cv-01384-MRK   Document 153-2   Filed 05/01/2006   Page 11 of 19

Page 5
1998 U.S. Dist. LEXIS 22769, *17

LEXIS 34117, No. 96-2188, 1997 WL 764416, at *4 (6th Cir. Nov. 26, 1997), the court notes that a review of the plaintiffs' records would have been the most useful and reliable tool from which Dr. Kilburn could have obtained insight into possible alternate causes of their illnesses. See Eggar v. Burlington N. R.R. Co., 1991 U.S. Dist. LEXIS 19240, Nos. CV-89-159, 170, 179, 191, 236, 291, 1991 WL 315487, at *10 (D.Mont. Dec. 18, 1991), aff'd sub nom. Claar v. Burlington N. R. R. Co., 29 F.3d 499 (9th Cir. 1994). The record shows that he has failed to engage in adequate techniques to rule out alternative causes and offers no good explanation for why his opinion is nevertheless reliable in light of the other potential causes of the alleged injuries. See In re Paoli R.R. Yard, 35 F.3d at 760; see also Conde v. Velsicol Chem. Corp., 24 F.3d 809, 814 (6th Cir. 1994) (holding insufficient showing of causation where expert testimony failed to rule out other causes).

It also appears to the court that Dr. Kilburn failed to consider the temporal relationship between exposure to PCBs in Lobelville and some of the plaintiffs' reported [*18] maladies. According to the Reference Manual on Scientific Evidence, "[a] temporal or chronological relationship must exist for causation. If an exposure causes disease, the exposure must occur before the disease develops. If the exposure occurs after the disease develops, it cannot cause the disease." Reference Manual on Scientific Evid. at 162. The court notes that the expert admitted in his deposition that neither the questionnaires completed by the flagship plaintiffs nor his reports indicated the onset date of their illnesses. (App. I, Exh. 2 at p. 98.) Further, Dr. Kilburn stated in deposition that low educational achievement among the residents of Lobelville and the flagship plaintiffs, with the exception of perhaps one or two, was more likely than not caused by PCB exposure (id. at pp. 359, 365), even though, according to the record, five of the seven flagship plaintiffs had difficulties in school prior to moving to Lobelville.

The court also notes that Dr. Kilburn failed to establish that the flagship plaintiffs actually received a dose of PCBs from the Tenneco pumping station sufficient to make them ill. One of the three central tenets of toxicology is that "the dose [*19] makes the poison." Reference Manual on Scientific Evid. at 185. A dose-response relationship is, while not necessary to infer causation, a factor to be considered in determining the existence of a causal relationship. Id. at 160-64. In this case, Dr. Kilburn admitted in deposition that he made no attempt to determine the dose received by any of the 98 Lobelville residents tested or to determine the existence of a dose-response relationship. He has been perfectly willing to assume that plaintiffs had a sufficient dose of PCBs to cause their illnesses and to give an opinion devoid of any information concerning dosage. An appropriate methodology requires evidence from which the trier of fact could conclude that the plaintiff was exposed to levels of toxin sufficient to cause the harm complained of. See Wintz v. Northrop Corp., 110 F.3d 508, 513 (7th Cir. 1997) (citing Reference Manual on Scientific Evidence); Wright v. Willamette Indus., Inc., 91 F.3d 1105, 1107 (8th Cir. 1996). Defendants' experts, Phillip S. Guzelian, M.D. and Robert C. James, Ph.D., have submitted credible opinions to that effect. (Defs.' Reply Mem. in Supp. of their Mot. to Exclude [*20] Kaye Kilburn, M.D., Exh. C at p. 8.)

As the court has previously observed, general acceptance in the scientific community remains a factor to be considered by the court in passing on the admissibility of an expert opinion. It appears that the opinions expressed by Dr. Kilburn are "novel," to say the least, and do not enjoy general acceptance. Indeed, his paper prepared in connection with his study of the Lobelville residents concluded with the following statement: "This paper may be the first to show unequivocally central nervous system effects of PCBs." (App. I, Exh. 3 at Bates stamp no. KIL 000728.) When asked in deposition if he was aware of any scientific literature supporting the position that PCB exposure could cause what he has characterized as encephalopathy, Dr. Kilburn first replied as follows: "Almost every study made of populations finds mental complaints. I think they are headaches, peripheral nervous system complaints and general complaints. I think they are evidence that if testing had been done encephalopathy is there and would be discoverable." (App. I, Exh. 2 at p. 485.) He referred specifically to his own paper prepared in connection with this case and to two others [*21] also authored by him, indicating that they "show that applying the testing shows the effects." (Id.) He also pointed to other scientific literature, stating that "I think if they use similar methods they would come up with similar data from which they would probably draw somewhat the same conclusions." (Id. at 487.) When asked a second time whether he knew of any scientific literature to support his opinion that PCBs can cause encephalopathy, he simply responded "no." (Id.)

A review of the studies mentioned by Dr. Kilburn, other than his own, reveals no support for his position. The studies performed by Joseph and Sandra Jacobson, as well as the Yu, Hsu, Gladen & Rogan study, related to the effects of prenatal PCB exposure. Such prenatal effects on children were described as "modest" and "subtle" and there was "no evidence of mental retardation or gross impairment." (App. I, Exh. 23-4 at Bates stamp no. KIL 000938.) Another noted that the effects of prenatal exposure "may persist well into childhood." (App. I, Exh. 23-6 at Bates stamp no. KIL 000947.) Of the flagship plaintiffs, only one—Mary Jo Phebus—was born in Lobelville after Tenneco began using PCB-based products. [*22]

Case 3:02-cv-01384-MRK    Document 153-2    Filed 05/01/2006    Page 12 of 19

Page 6
1998 U.S. Dist. LEXIS 22769, *22

As she was born within two years thereof, it is unlikely, according to defendants' expert Robert James, that the substance, whose environmental transport is slow, could have leached from Tenneco's 50-acre property quickly enough to have had a prenatal effect on her. (App. 1, Exh. 13 at p. 2.)

Moreover, studies involving the much more highly toxic polychlorinated dibenzodioxins ("PCDDs") and polychlorinated dibenzofurans ("PCDFs"), or the Yusho poisoning in Japan, the primary causative agent in which was determined to be PCDFs, likewise lack the necessary "fit" to be of assistance to the trier of fact in this litigation. The expert admitted in his deposition that he knew of no evidence of the presence of PCDDs or PCDFs in this case, but merely assumed those agents to be present because it was "the most plausible way of explaining the evidence that we have . . ." (Id. at p. 373.) The study on the relationship between chloracne and 2,3,7,8-tetrachlorodibenzo-p-dioxin ("TCDD"), but failed to mention PCBs, is not relevant because there is no evidence that plaintiffs were exposed to TCDD. The Neal study, which focused on the mechanisms of toxicity of PCDDs and TCDDs, is likewise unsupportive, [*23] as is the Poland-Greenlee-Kende study on TCDDs. Courts have found that extrapolation from studies of chemicals different from those at issue does not rise to the level of accepted methodology. See Schudel v. Gen. Elec. Co., 120 F.3d 991, 996-97 (9th Cir. 1997), cert. denied, 523 U.S. 1094, 118 S. Ct. 1560, 140 L. Ed. 2d 792 (1998). Kimbrough's animal study on PCBs, PBBs, and related compounds, which makes no mention of an association between PCBs and central nervous system or pulmonary problems, also fails to support Dr. Kilburn's opinions. Similarly, Safe's paper on the health impacts of PCBs does not associate the substance with adult central nervous and pulmonary illness. Experts may not rely on studies that do not address the types of diseases at issue. See Christophersen v. Allied-Signal Corp., 939 F.2d 1106, 1115-16 (5th Cir. 1991), abrogated on other grounds, Daubert.; Valentine v. Pioneer Chlor Alkali Co., Inc., 921 F. Supp. 666, 673-74 (D. Nev. 1996). Excerpts from the Philp text provided to the court are too generalized to be of any value here. The Reggiani and Bruppacher paper noted increases in [*24] the prevalence of subjective neurologic symptoms such as a headaches, dizziness, and fatigue, but stated that such symptoms "were so frequent in control subjects that they were of little significance to the clinician." (App. 1, Exh. 23-18 at Bates stamp no. 230.) The paper also observed impressive respiratory findings at high levels of exposure but also noted a high number of confounding influences. (Id.)

In addition, Dr. Kilburn could point to no scientific literature to support his view that PCBs caused depression, stating only that "it doesn't make an iota of sense to consider that depression can be treated with chemicals unless it were also caused by chemicals." (App. I, Exh. 2 at p. 519.) He further conceded that, while the tests administered by him to the flagship plaintiffs and the residents of Lobelville could reveal brain damage, they were incapable of identifying the specific cause of the brain damage. (Id. at p. 110.) Furthermore, Dr. Kilburn admitted in his deposition that he was aware of no scientific literature indicating that PCBs caused the psychomotor epilepsy and skin cancer suffered by James Lonnie Nelson. (Id. at pp. 482-83.)

The plaintiffs appear [*25] to concede that their expert is weak as to the general acceptance factor but tempt the court with the old adage that "there has to be a first time for everything." The court is unpersuaded. While this factor is not dispositive, the Court in Daubert noted that "widespread acceptance can be an important factor in ruling particular evidence admissible, and a 'known technique which has been able to attract only minimal support within the community' may properly be viewed with skepticism." Daubert, 509 U.S. at 594, 113 S. Ct. at 2797 (internal citations omitted). The Court also recognized that, although the flexible test articulated in Daubert would sometimes "prevent the jury from learning of authentic insights and innovations," the Rules of Evidence were designed "not for the exhaustive search for cosmic understanding" but for the resolution of disputes. Id. at 597, 113 S. Ct. at 2798-99.

The court further notes that Dr. Kilburn's epidemiological study of the Lobelville residents has not been published or peer reviewed. In his deposition, Dr. Kilburn stated that the paper prepared in connection with his assessment of the Lobelville residents had [*26] been submitted for publication and was in the process of being peer reviewed. As the Court observed in Daubert,

> publication . . . is not a sine qua non of admissibility; it does not necessarily correlate with reliability . . . But submission to the scrutiny of the scientific community is a component of "good science," in part because it increases the likelihood that substantial flaws of methodology will be detected. The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.

Id. at 593-94, 113 S. Ct. at 2797.

In addition, the fact that the study was performed in connection with litigation and funded by plaintiffs' counsel does not militate in Dr. Kilburn's favor. In Daubert II, the Ninth Circuit found particularly significant the question of whether the expert had developed his conclusions as a result of independent research or for purposes of litigation testimony, finding that testimony provided by an expert based on legitimate, preexisting research unrelated [*27] to a lawsuit provided the "most persuasive basis for concluding that the opinions [expressed] were derived by the scientific method." Daubert II, 43 F.3d at 1317 (internal quotations omitted). Where the proffered testimony did not arise from independent research, the court required the party seeking admission of the evidence to "come forward with other objective, verifiable evidence that the testimony is based on scientifically valid principles." Id. at 1317-18 (internal quotations omitted).

Dr. Kilburn's deposition testimony and portions of his written work submitted by Tenneco suggest that he is a strong opponent of the use of chemicals. Expert opinions are about science, however, not advocacy. Based on the entire record in this case, Dr. Kilburn's studies suffer from significant methodological flaws. Moreover, his opinions are completely unsupported by any scientific research outside the litigation context. While "trained experts commonly extrapolate from existing date[,] . . . nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse [*28] dixit of the expert." Joiner, 522 U.S. at 146, 118 S. Ct. at 519. In this case, as in Joiner, "there is simply too great an analytical gap between the data and the opinion proffered." Id. (citing Turpin, 959 F.2d at 1360). Dr. Kilburn's opinions are based upon nothing more than conjecture, speculation, and litigation animus. Other courts have discussed Dr. Kilburn's methodology and expert testimony and have found them wanting for reasons similar to those stated herein. See Valentine (excluding Dr. Kilburn's testimony on the grounds that his conclusions were not derived from acceptable scientific methodology); Horne v. Pioneer Chlor Alkali Co., Inc., No. CV-S-93-1060 (D. Nev. Mar. 4, 1996) (same); Thomas v. FAG Bearings Corp., Inc., 846 F. Supp. 1400 (W.D. Mo. 1994) (finding Dr. Kilburn's study irrelevant and inadmissible); Lofgran v. Motorola, Inc., No. 93-CV-05521 (Ariz. June 1, 1998) (Dr. Kilburn's opinions not based on acceptable scientific methodology).

Although plaintiffs have urged the court to permit the jury to determine the weight to be accorded to Dr. Kilburn's testimony, the court must decline. This court [*29] is reminded of its "gatekeeping" role and of the Supreme Court's admonition in Daubert that, in passing on a proffer of expert testimony, the trial judge must be mindful of all applicable rules of evidence. Daubert, 509 U.S. at 595, 113 S. Ct. at 2797. In particular, the Court referred to Fed. R. Evid. 403, which permits exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." Fed. R. Evid. 403. The Daubert opinion also quoted Judge Weinstein, who cautioned that

> expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative proof under Rule 403 of the present rules exercises more control over experts that over lay witnesses.

Id. at 595, 113 S. Ct. at 2798.

As the court finds that, based on the foregoing, Dr. Kilburn's proffered testimony is not grounded on methodology that is scientifically valid, will not assist the trier of fact, and is likely to mislead the jury, defendants' motion to exclude [*30] his testimony is GRANTED.

ALAN R. HIRSCH

Plaintiffs have also proffered the testimony of Alan R. Hirsch, M.D., a neurologist, who proposes to testify that the flagship plaintiffs suffer from various conditions as a result of their exposure to PCBs. Dr. Hirsch examined the seven flagship plaintiffs, took medical histories, performed cognitive tests. In reports issued on each of the plaintiffs, he opined that all suffered from encephalopathy, four from polyneuropathy (peripheral nerve dysfunction), three from cephalgia (headaches), one from hyposmia (reduced ability to smell), two from hypogeusia (reduced ability to taste), one from optic neuropathy (optic nerve dysfunction), one from autonomic neuropathy (autonomic nervous system dysfunction), and one from phantosmia (hallucinating a smell). According to Dr. Hirsch's reports, the cause of all of these illnesses, more likely than not, was exposure to PCBs and "associated chemicals."

Defendants first argue that plaintiffs have failed to establish that Dr. Hirsch is "qualified as an expert by knowledge, skill, experience, training, or education" in accordance with Rule 702. Daubert requires that plaintiffs establish Dr. Hirsch's [*31] expert qualification by a preponderance of the evidence. According to his curriculum vitae, Dr. Hirsch is board certified in neurology and psychiatry. He has written papers on neurotoxicity resulting from ambient chemicals, neurotoxicity and cephalgia from acute nitrogen tetroxide exposure, and neurotoxicity from landfill exposure. Numerous articles have been

Case 3:02-cv-01384-MRK    Document 153-2    Filed 05/01/2006    Page 14 of 19

Page 8
1998 U.S. Dist. LEXIS 22769, *31

published and presentations made by Dr. Hirsch on smell, taste, and headaches. In deposition, the expert testified that he was exposed to the principles of toxicology in connection with medical school courses on other subjects and had some clinical experience with environmental toxins during his residency. In addition, he has examined individuals in connection with two other toxic tort cases, one of which involved PCBs. He conceded that he had conducted no research and had written no articles concerning PCB exposure.

In support of their argument that Dr. Hirsch is unqualified to give expert testimony in this case, defendants cite three cases: Mancuso v. Consol. Edison Co., 967 F. Supp. 1437 (S.D.N.Y. 1997); Diaz v. Johnson Matthey, Inc., 893 F. Supp. 358 (D.N.J. 1995); and Wade-Greaux v. Whitehall Labs, Inc. 874 F. Supp. 1441 [*32] (D.V.I.), aff'd, 46 F.3d 1120 (3d Cir. 1994). In both Mancuso and Diaz, the court noted that the qualification requirement of Rule 702 is to be interpreted liberally and that exclusion is improper simply because an expert does not have the most appropriate degree of training. Mancuso, 967 F. Supp. at 1442 (citing In re Paoli R.R. Yard, 35 F.3d at 741); Diaz, 893 F. Supp. at 372 (same). The experts in these cases were found unqualified to testify largely on the grounds that their experience in toxicology relative to the substances at issue was limited to the review of selected literature for the purposes of the litigation in which their testimony was being proffered. Mancuso, 967 F. Supp. at 1443; Diaz, 893 F. Supp. at 372; Wade-Greaux, 874 F. Supp. at 1476-77. Dr. Hirsch's experience is somewhat broader than that of the experts excluded in the cited cases and, thus, the court finds, under a liberal interpretation of Rule 702, that he satisfies the requirements of expert qualification in this matter.

The court further concludes, however, that Dr. Hirsch's opinions [*33] are not based on valid scientific knowledge. This court is required under Daubert to ascertain whether Dr. Hirsch arrived at his conclusions using scientific methods and procedures or whether they are mere subjective beliefs or unsupported speculation. See Claar, 29 F.3d at 502. It is painfully clear that Dr. Hirsch's opinions proffered in this case fall into the latter category.

An opinion that exposure to a particular substance caused disease is based upon an assessment of the individual's exposure to the toxin and the amount received, the temporal relationship between the exposure and illness, and the subject's exposure to other factors which could also cause illness. Reference Manual on Scientific Evid. at 205. Dr. Hirsch's opinion is completely devoid of any of the foregoing. Rather, he simply made the conclusory announcement at the end of each of his reports that the plaintiffs' diseases were caused by exposure to PCBs. In a declaration submitted as an attachment to plaintiffs' response to the instant motion, Dr. Hirsch stated that the tests administered to the plaintiffs were "standardized diagnostic tests employed by neurologists all around the country [*34] to detect impairment of patients' neurological systems." (Pls.' Exhs. in Opp'n to Defs.' Mot. in Limine to Exclude the Test. of Alan Hirsch, M.D., Exh. 1, Decl. of Alan Richard Hirsch, M.D., at p. 4.) He has offered no insight, however, into the reasoning process which led him from his opinion that the plaintiffs suffered from neurological impairments to the opinion that exposure to PCBs was the cause thereof.

As to the amount of exposure and temporal relationship, the essence of Dr. Hirsch's theory of causation, as expressed in his deposition, is that, although he had no knowledge of the intensity of plaintiffs' exposure to PCBs, the substance was found in Lobelville, plaintiffs were in Lobelville, disease was found in the plaintiffs, and, ergo, the degree of exposure must have been sufficient to cause the disease. (App. to Defs.' Mem. in Supp. of their Mot. to Exclude Alan R. Hirsch, M.D. (App. II), Exh. A, at pp. 163-67.) When asked in deposition upon what did he rely for his conclusion that the dose of PCBs received by plaintiffs was high enough to cause their illnesses, Dr. Hirsch replied, "Because that's what they had." (Id. at p. 167.) This circular reasoning without basis [*35] is improper and has been rejected by other courts. See Claar, 29 F.3d at 502-03; Mancuso, 967 F. Supp. at 1450, In re TMI Litig. Cases Consol. II, 911 F. Supp. 775, 826 (M.D. Pa. 1996).

Dr. Hirsch's methodology suffers from another fatal flaw. Like Dr. Kilburn, this expert made no attempt to consider confounding factors. Dr. Hirsch appears to have conducted medical examinations of the plaintiffs and perhaps reviewed their medical records and, thus, was aware of numerous other factors that could have caused their illnesses. In his deposition, Dr. Hirsch conceded that all of the diseases with which he diagnosed the plaintiffs could have been caused by a "host" of other factors, many of which were present in each of the flagship plaintiffs. Nevertheless, with the exception of notations on James Lonnie Nelson's report that his encephalopathy and polyneuropathy were due to PCB "with possible synergy from drugs and alcohol" (App II, Exh. B-14), he discounted other factors with no explanation whatsoever.

The court would also observe with regard to the basis of Dr. Hirsch's scientific knowledge his statement in deposition that "general symptomology, [*36] it's seen with such infrequency that it's usually only seen with PCB." To the extent that the expert's statement suggests that he engaged in some meaningful analysis with respect to cau-

Case 3:02-cv-01384-MRK    Document 153-2    Filed 05/01/2006    Page 15 of 19

Page 9
1998 U.S. Dist. LEXIS 22769, *36

sation, it is belied by his sparse experience with PCBs and by his woeful lack of knowledge of the scientific literature on the effects of PCBs, to which the court will next turn.

Dr. Hirsch has failed to point to any scientific literature to support his opinions that exposure to PCBs caused plaintiffs' ailments. In his declaration, he stated that, as a result of his physical examinations and neurological testing, he reached his causation conclusion because "prolonged exposure to PCBs . . . is associated with severe neurological damage in the Lobelville plaintiffs, including chemosensory dysfunction, reduced ability to smell and taste, headaches, brain disorders, optic nerve dysfunction, peripheral nerve dysfunction, autonomic nerve dysfunction, and liver disease." Id. at p. 4. In his deposition, when asked to identify the scientific literature linking autonomic neuropathy to PCB exposure, he vaguely referred to articles, but could not recall whether they concerned "the Asian exposure or the U. [*37] S. workers exposure or the Michigan or North Carolina exposure. I just cannot recall. Or whether it was the firemen exposure." (Id. at pp. 189-90.)

With regard to the "U.S. Worker Study," Dr. Hirsch testified that he could not "recall the exact study," but he thought "it was workers who worked amongst transformers or capacitors or something like that." (Id. at p. 190.) During the course of the deposition testimony, it became very clear that Dr. Hirsch remembered nothing about the studies or even the decades in which they were conducted. When pressed, he further stated that none of the articles actually said that PCBs caused autonomic neuropathy; rather, they talked about the "same thing using different language" and contained descriptions that "would meet criteria for what [Dr. Hirsch] would call autonomic neuropathy." (Id. at pp. 193-96.) He readily conceded that he was aware of no literature concluding that PCBs caused phantosmia (id. at p. 197), hypoguesia (id. at p. 207), hyposmia (id.), or optic neuropathy (id. at p. 211).

With regard to polyneuropathy, Dr. Hirsch testified that he had seen an article which might have concluded that PCBs caused the [*38] disease but he knew nothing about it other than that the word "polyneuropathy" was used. (Id. at pp. 199-202.) As to cephalgia, the expert referred to the same studies noted in connection with autonomic neuropathy but could recall no details, stating only that he drew the conclusion from one of them that cephalgia was caused by PCB exposure. (Id. at pp. 202-04.) He pointed to the same studies with regard to encephalopathy but "could not recall that specific word being used." (Id. at pp. 211-12.) Plaintiffs have attached to their response to the motion to exclude a "list of the scholarly papers and references on which Dr. Hirsch relied upon reaching his opinions after examination of the plaintiffs." (Pls.' Opp'n to Defs.' Mot. in Limine to Exclude the Test. of Alan Hirsch, M.D. at 9-10.) A mere listing of numerous articles falls short of a reasoned scientific analysis of the methods by which the expert formulated his opinions from the publications cited. See Eggar, 1991 WL 315487, at *6. Moreover, the court reminds plaintiffs that it is their responsibility, not that of the court, to sift through the dozens of articles listed in search of materials to support [*39] their expert's opinions.

Finally, and briefly, the court notes the existence of two other factors which weigh against admission of Dr. Hirsch's testimony. First, no evidence has been presented that Dr. Hirsch's theories have been published or subjected to peer review. Second, it is clear that Dr. Hirsch's theories were developed solely for the purposes of this litigation. See Valentine, 921 F. Supp. at 673 (Dr. Hirsch's failure to have published his novel conclusions or conducted pre-litigation research militated in favor of exclusion of his testimony under Daubert.)

Accordingly, the court finds that the opinions set forth by Dr. Hirsch are not based on scientific knowledge and would not assist the trier of fact at trial. Therefore, defendants' motion to exclude Dr. Hirsch's testimony is GRANTED.

IT IS SO ORDERED this 28th day of August, 1998.

J. DANIEL BREEN

UNITED STATES MAGISTRATE JUDGE

LEXSEE 329 F. SUPP. 477

In re PENN CENTRAL TRANSPORTATION COMPANY, Debtor. In re AMTRAK CONTRACT

No. 70-347

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

329 F. Supp. 477; 1971 U.S. Dist. LEXIS 13572

April 27, 1971

COUNSEL: [**1] Edwin P. Rome, Blank, Rome, Klaus & Comisky, Philadelphia, Pa., Robert W. Blanchette, Philadelphia, Pa., David Kelsa McConnell, Philadelphia, Pa., for Trustees of the Penn Central Transportation Company. Chapman Rose, Jones, Day, Cockley & Reavis, Cleveland, Ohio, for National Rail Passenger Corp. Joseph Auerbach, Sullivan & Worcester, Boston, Mass., for Trustee of the New York, New Haven & Hartford R.R. Co. Matthew J. Broderick, Dechert, Price & Rhoads, Philadelphia, Pa., for Penn Central Co. Richardson Blair, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for Girard Trust Bank and Morgan Guaranty Trust Co.

OPINIONBY: FULLAM

OPINION:

[*477]

MEMORANDUM OPINION IN SUPPORT OF ORDER NO. 238 (AMTRAK CONTRACT)

The Trustees seek approval of a proposed contract with the National Rail Passenger Corporation ('Amtrak'), pursuant to the Rail Passenger Service Act of 1970, P.L. 91-518, 45 U.S.C. 501 et seq. Hearings were held on April [*478] 20 and 23, 1971, at which testimony was presented and all persons interested had an opportunity to present their views.

The statute became effective October 30, 1970. In essence, it contemplates the designation of an essential network of national [**2] intercity passenger trains, to be owned and operated by a semi-public corporation, established pursuant to the Act. Because the deadline for implementation of the Act is May 1, 1971, the time pressures upon those involved have been enormous. By late March, the Secretary of Transportation had designated the 'basic system' pursuant to the statute, and the Amtrak incorporators had specified the trains which they proposed to operate. At about the same time, the basic contract proposals began to take shape, and it was possible for the Debtor to undertake the detailed analyses and to pursue the final negotiations leading to the proposed contract. It was not until shortly before the hearing on April 20 that the final terms with respect to job-protection provisions, as approved by the Secretary of Labor pursuant to § 401 of the Act, became known.

These same time pressures preclude detailed review of the provisions of the contract in this opinion; a general summary will suffice:

The contract requires the Debtor to provide the train service now or hereafter designated by Amtrak for a period of up to 10 years, and to keep available the required facilities for up to 25 years.

As mandated by [**3] the statute, the contract imposes upon the Debtor an initiation fee or entry fee in an amount equal to one-half of the fully distributed passenger deficit reported to the Interstate Commerce Commission for the year 1969. This payment, which comes to $52,382,109, is payable in monthly instalments over a three-year period. The parties have proceeded on the working-hypothesis that these payments may be made in the form of offsets against the payments to be made by the corporation to the Debtor for providing service under the agreement. The statute provides for alternative methods of computing this entry fee (100% Of the avoidable loss on intercity rail passenger service during 1969, or 200% Of the 1969 avoidable loss on the intercity rail service assumed by Amtrak). Pursuant to the statute, the Debtor has reserved the right to make these alternative computations; and the contract provides the machinery for having these computations arbitrated by the Interstate Commerce Commission if necessary. Since these alternatives are options granted to the Debtor, it is apparent that the entry fee will not exceed the $52,382,109 figure mentioned above.

Case 3:02-cv-01384-MRK    Document 153-2    Filed 05/01/2006    Page 18 of 19

Page 2
329 F. Supp. 477, *478; 1971 U.S. Dist. LEXIS 13572, **3

The labor-protective provisions approved [**4] by the Secretary of Labor provide full protection for affected employees for a period up to six years. Because of the wide range of options available to the affected employees, and the consequent impossibility of predicting accurately just which employees will ultimately be affected, the cost of this item to the Debtor is somewhat conjectural. The Trustees estimate that this figure could reach approximately $75 million over a six-year period, but there are indications that the amount may well prove to be considerably less than that.

Of major concern, of course, are the provisions governing the payments to be made by Amtrak to the Debtor for providing rail service under the contract. From the Debtor's standpoint, the contract ideally should provide reimbursement of fully allocated costs plus a reasonable return on investment. It early became obvious, however, that, a least during the start-up phase, Amtrak would be financially unable to make payments on such basis. What has emerged from the negotiations is a contract which provides a formula for computing the charges during the first 26 months of the contract; which provides areas within that formula for further negotiation and possible [**5] arbitration during the 26-month period; and which permits renegotiation of the formula after the expiration of i6 months. During the initial period, the Debtor will be reimbursed all expenses 'incurred solely for the benefit [*479] of' the designated service, plus either an override of 5% Or the actual avoidable costs. n1

Assuming that, as provided by the statute, the Debtor will be able to discontinue all intercity passenger service as of May 1, 1971, and thereafter operate all of those trains formerly operated by the Debtor which have been designated by Amtrak; assuming that the Debtor will continue to provide car repair service pursuant to the contract; and assuming that there are no appreciable delays in achieving the benefits of the contract, the evidence demonstrates that the proposed contract would have a positive impact on cash flow totalling at least $267 million over a seven-year period, ranging from $9.5 million in the first year and $27.6 million in the second year, to approximately $57 million in the seventh year and each year thereafter. n2 It is significant to note that, at the conclusion of the hearings, all but one of the parties who participated in the proceedings [**6] agreed that they had no objection to the Trustees entering into the proposed contract (the single exception will be discussed hereafter).

Several observations should be registered at this point: 'Positive impact on cash flow' does not mean that the contract would be a profitable one. On the contrary, in this respect, the contract leaves something to be desired; nevertheless, these substantial reductions in the rate of cash depletion do represent substantial immediate benefits to the Debtor's estate and to the reorganization. The alternatives to approval of the proposed contract are quite bleak. The statute provides that any railroad which has not entered into a contract with Amtrak by May, 1, 1971 will be precluded from discontinuing any existing intercity passenger train until 1975; and there would be no possibility of again considering entry into Amtrak until 1973. While the validity of these provisions may be open to question, the Trustees are in no position to sustain the huge losses which would be entailed in the continued operation of these trains while the validity of the statutory provisions might be litigated.

Penn Central trains comprise 70% Of all of the trains to be operated [**7] by Amtrak (40% Of the train miles). Without Penn Central's participation, it would obviously be difficult, if not impossible, for Amtrak to function. It is generally recognized that there is a crying need in this country for a rational unified policy in transportation matters, on a national basis. Clearly, every effort should be made to avoid frustrating at the outset this important step toward implementation of such a policy.

It may be argued that, at least on any prolonged basis, the 'solely related' concept of reimbursement may run afoul of constitutional limitations. The statute on its face does not require any such result, and I am not prepared to assume that the ultimate determination, by negotiation or ICC decision, will have that effect. In view of the combination of § 77(a) of the Bankruptcy Act, § 26 of the Bankruptcy Act, and General Order No. 33 (applicable to these proceedings under General Order No. 49), I am satisfied that the final determinations in these matters must be filed with this Court for review and approval; the order to be entered will so provide. This reservation is primarily intended to assure [*480] the procedural rights of creditors and other interested [**8] parties under the Bankruptcy Act, and is not to be construed as authorizing the Trustees to attempt any significant enlargement of the claim referred to in footnote 1, above, for the initial 26-months period. The Court also wishes to make clear that approval of the contract and its arbitration provisions does not constitute approval of a waiver of constitutional rights after the initial period, nor a judgment that such rights would or would not be impaired thereafter.

Since the conclusion of the hearings in this matter, the Court has been informally advised of various legal actions instituted in other tribunals seeking to invalidate or postpone implementation of the contract beyond the May 1 date. Whether these actions are properly maintainable, and what their ultimate outcomes may be, cannot, of course, be known at this time. Whether these lawsuits, or other factors beyond the control of the parties, may

329 F. Supp. 477, *480; 1971 U.S. Dist. LEXIS 13572, **8

wreak such a substantial change in circumstances as to give rise to a right of rescission on the part of either of the contracting parties need not, and obviously cannot, now be considered. In the unlikely event of such drastic change, jurisdiction of this Court over the contract [**9] will be reserved.

The only opposition to the proposed contract has been expressed by United States Trust Company of New York, Trustee under the Harlem River Division Supplemental Indenture of Mortgage (dated as of December 31, 1968). In essence, the position of this objector is that the railroad property over which its lien extends would be worth more on liquidation as real estate than as a railroad and that, since the proposed contract contemplates continuation of rail operations over this property, it would violate the constitutional rights of the bondholders. There are several weaknesses in these arguments. In the first place, it is far from clear that all of the liened assets will be required for Amtrak operations under the proposed contract. The contract allows considerable flexibility to the Trustees in providing substitute facilities, and in disposing of nonessential property. More important, the constitutional rights of these bondholders will not have been adversely affected unless and until their lien is not properly treated in a reorganization plan, or reorganization is so long delayed that continued losses deplete the liened assets. The latter situation has not yet occurred, [**10] and the undeniable cash benefits of the proposed contract would diminish the likelihood of such an eventuality. These objections are without merit.

For the foregoing reasons, an order is being entered granting the Trustees' application.

n1. The Trustees have submitted to the corporation an avoidable cost study which indicates that the Debtor should be reimbursed approximately $13.7 million per year over and above 'solely for the benefit of' computation. The 5% 'override would yield approximately $5 million annually. Pending resolution of these matters, either by agreement or by arbitration before the ICC, the corporation has agreed to pay the Debtor approximately $7.9 million annually over and above the 'solely for the benefit of' amount.

n2. Originally, the Trustees also sought permission to issue Trustees' certificates to finance the contract; this request has been withdrawn 'for the present time.' The cash-flow projections demonstrate that the contract, in and of itself, will not necessitate further borrowings.

[**11]