UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SUJATA NICHANI,<br>  Plaintiff<br>v.<br><br>OTIS ELEVATOR COMPANY and<br>UNITED TECHNOLOGIES CORP.<br>  Defendants | NO.: 3:02 CV 1384 (MRK)<br><br><br><br><br><br>April 22, 2006 |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION IN LIMINE**

**Preliminary Statement**

Defendants' motion to preclude testimony by Sheldon Wishnick rests on two flawed premises: (1) the notion that the Black-Scholes method of calculating value of employee stock options is unreliable and in disrepute, despite authoritative approval of its use and defendant UTC's historical and continuing endorsement and use of the method; and (2) the notion that Mr. Wishnick's expert opinions encompass or rely upon special expertise with respect to predicting the number of stock options the plaintiff may have been granted.

Mr. Wishnick's testimony and expert reports consistently have reflected his opinion based on the value of a single option on each relevant grant date. He also has extended that value based upon an assumption of a hypothetical number of options, by a simple process of multiplication. Plaintiff maintains that the appropriate number of options is a question for the jury to decide as a fact issue, based upon the evidence at trial. Further, the jury may readily derive the dollar value of an award without expert assistance, by a simple process of multiplication, although testimony and arguments based on illustrative hypothetical scenarios with evidentiary basis also is appropriate.

Damage calculations relating to the <u>number</u> of future stock options are no different in nature than calculations that assume a certain level of salary increase. The only difference is that lost salary is expressed directly in dollars, whereas the value of lost stock options must be translated from a number of options into a value in dollars.

On this score, defendants' presentation of the state of acceptance and reliability of Mr. Wishnick's valuation methodology is skewed, limited, contrary to authoritative pronouncements that approve the Black-Scholes Method and defied by UTC's own practices. By far the better and more accepted view, and the view accepted by UTC for executive and director compensation issues, is that the Black-Scholes method produces reasonable and reliable dollar values of employee stock option grants. Moreover, Mr. Wishnick is prepared to respond to criticisms and adjustments to the Black-Scholes Method suggested by the defendants' expert, so as to give the jury the option of adopting an adjusted value.

With respect to the number of options, plaintiff intends to present figures in a manner that assists the jury in calculating the dollar value of an award if they make certain alternative factual findings, such as: (1) a finding that Ms. Nichani would have received the same number of options as Mr. Russell; and (2) a finding that Ms. Nichani would have received options at the high end, the average, or the low end for UTC L3 executives. Once the jury determines the value of a single option – either by accepting the testimony of Mr. Wishnick, accepting the testimony of Mr. Erath, or rejecting both, as is the jury's province – the remaining calculation of value is, as the defendants repeatedly note, merely "number crunching." Indeed, Mr. Wishnick's Black-Scholes calculations are themselves based on methods approved in authoritative pronouncements of the SEC and the FASB and assumptions and inputs set forth in UTC's annual reports and proxy statements and used by UTC for its own Black-Scholes calculations.

For these reasons, as discussed further below, the reliability of Mr. Wishnick's methods and conclusions are not truly subject to reasonable dispute.

## Facts

A. **The Bases for Sheldon Wishnick's Expert Opinions.**

Defendant's damages expert, Sheldon Wishnick, has issued two reports and given a deposition addressing various issues relating to the plaintiff's claims for lost wages, benefits and stock options. At the final pretrial in this matter, the Court rejected defendants' motion in limine as it relates to damage components other than stock options. With regard to stock options, Mr. Wishnick's has adopted the Black-Scholes Method for valuing options that the plaintiff claims she would have received but for the defendants' unlawful conduct. In each of Mr. Wishnick's reports, he calculated, and reflected in a table in his reports, the value of a single option based upon the Black-Scholes Method using relevant option grant dates.

He also used a simple computation – the multiplication of two numbers – to extend the value of a single option to a total dollar value at an assumed number of options granted. Plaintiff does not assert that either Mr. Wishnick's assumption of the number of options granted or the multiplication of the number times the value of a single option is a matter that requires or involves "expert" opinion. Rather, Mr. Wishnick's extended calculation, or a calculation involving any other assumed number of options, merely serves to illustrate the total dollar outcome based on a given number of options. The number of stock options, if any, that Ms. Nichani would have received but for the defendants' unlawful conduct is a matter for the jury to decide as a question of fact based upon the evidence.[1]

---

[1] Even Chris Erath, defendants' damages expert, agrees that expert witnesses do not decide issues of fact, a proposition he admitted at his deposition:

Similarly, as the Court already has decided, the jury will determine, as an issue of fact, whether Ms. Nichani should have been compensated as an executive and issues of damages relating to lost salary and other benefits. Damage awards and specific calculations that may be presented or suggested to the jury based upon the evidence – such as the salary level of Brad Russell or the average salary range of L3 executives during relevant periods – will be presented for the jury's convenience and as illustrative support for damage arguments based on the evidence. Such matters, involving simple addition, subtraction and multiplication, do not require special expertise. The value of a stock option, however, is a proper subject for opinion evidence, at least to the extent that the future value of the underlying stock is a component of the equation.

Of course, there is also a value of stock options that is undisputed and similarly does not require special expertise to calculate. To the extent that the jury concludes that Ms. Nichani would have received an option (or any number of options) in 2001, for example, there is a value of that option that may be computed based simply on the mathematical difference between the option "strike price" (the price of UTC stock on the date of issue), reflected as $74.15 in Mr.

---

> Q. But you don't as an expert decide what the evidence proves or doesn't prove, do you?
>
> A. I'd agree with that.

(Exhibit B; Erath Dep., p. 129). But Mr. Erath would reject any damages calculation based upon a comparison of Ms. Nichani to Brad Russell or to any other employee, whether the subject is salary, incentive compensation, or stock option grants, id. pp. 128-29, an overly restrictive view that this Court already has properly rejected. Showing no shame in inconsistency, however, Mr. Erath was fully prepared to use the assumption that Brad Russell was "red circled," even though he had not seen any documents supporting such a conclusion other than an e-mail exchange between Ms. Nichani and Ellen McGroary, in which the latter asserted the Brad Russell was "red-circled." (Id., p. 130). This assumption contradicts the record, since the only document concerning "red circling" as it relates to Brad Russell indicates he was not red circled, and both Ellen McGroary and Steve Page testified that Nichani's position was reclassified. This is a "baseless" assumption which Defendants want the jury to hear from their "expert's" mouth, yet the same reason they challenge Wishnick's assumption concerning the number of stock options.

Wishnick's reports, and the current per share price of UTC stock, which is approximately $128 on a split-adjusted basis.

Thus, while the parties may dispute whether Ms. Nichani would have received any options in 2001, a value in the vicinity of $55 per option, derived simply by the subtracting the option strike price from the current market price of UTC stock, does not require expert testimony and is not subject to any reasonable dispute. Even Chris Erath, defendant's damages expert, does not dispute that this value, which Mr. Wishnick refers to as the "instant value," is a hard number. Thus, Mr. Erath's deposition testimony includes the following:

> Q. I guess from what you've testified to so far that if this case goes to trial you wouldn't have any quarrel with the idea of using whatever the UTC stock price is at the time of trial as a measure of the value of stock options?
>
> Q. Well, less whatever the strike price of the option was.

(Exhibit B, p. 137). In fact, Mr. Erath testified regarding a case in which he may have used a calculation, in representing a terminated employee, that adds to such value a future increase based upon a future risk-free rate of return and generally finds such a methodology acceptable. (Id., pp. 54-57, 136).[2]

The fact that Mr. Wishnick's testimony at trial will be based on the evidence at trial and that his calculations will be adjusted as of the date of his testimony is neither new nor surprising. Mr. Wishnick's methodology has been consistent in this regard. Thus, at Mr. Wishnick's deposition, he testified that he had issued two reports in this case. He was asked what the

---

[2] In this case, the evidence will show that this hard number – the "instant value" of the options that Ms. Nichani claims – is approximately three-quarters of the valuation of options based upon a Black-Scholes calculation, defeating any possible claim of "speculation" as to a corresponding portion of the option valuation. The "instant value," however, does not include the value of the options for the remaining term or expected life of the options, a value captured by the Black-Scholes calculation.

differences were between the two reports and stated:

> A.      . . . . -- *I can tell you the obvious differences*. One obvious difference is that the split between past loss and future loss is different. The one in Exhibit 5A used December 31 of 2002 and the one in Exhibit 6A uses December 31, 2003. Also the -- all the interest rates were updated to current economic conditions in the 6A report, so that changed what was in 5A. And in calculating the losses that related to stock or stock options, I used the most current value of UTC stock. There may have been other things as well but those are the major areas.

Wishnick Dep., pp. 34-35 (Exhibit A; emphasis added).

Thus, Mr. Wishnick made it clear that his methodology included various "obvious differences" based on updating his calculations to reflect "current" facts – such as current interest rates, the current stock price, and the date of the calculation (to adjust the split between past loss and future loss). His methodology in updating from his first to his second report relied on updating factors that are not static and change over time. Consistent with this methodology, his testimony at trial obviously will, and must, use inputs as of a date at or near the date of his testimony. The precise inputs will not be known until that time. Nevertheless, so that there is no confusion on this issue, plaintiff has attached hereto Mr. Wishnick's updated calculations reflecting inputs stock price and interest rate inputs as of April 20, 2006 and other inputs that UTC itself reflected and relied upon for its UTC's 2005 annual report, in order to illustrate once again the effect of updating the data inputs.[3] See Updated Wishnick Calculations (Exhibit N).

As with each of Mr. Wishnick's reports, the dollar values at trial will be based on the value of a single option at the relevant grant dates, extended by simple multiplication to show the aggregate value of an assumed number of options. However, plaintiff does not claim that Mr.

---

[3] Although a difference of a several weeks may not greatly affect the figures shown in Mr. Wishnick's second set of updated spreadsheets attached hereto, plaintiff anticipates that adjustments may be needed to these figures to take into account the facts as of the date of his testimony, expected to be presented in mid-May. In addition, Mr. Wishnick has shown the effect on his calculations if an exercise date of less than the full stated term of the option is assumed.

Wishnick is an "expert" with respect to predicting the number of options that Ms. Nichani would have received in the future. This is a question the plaintiff considers a fact issue for the jury, to be decided based on the evidence and simple multiplication of the value of the option times the number of options.

However, for purposes of illustration and to obviate the defendants' criticism of Mr. Wishnick regarding the number of options assumed at each grant date, plaintiff intends to adjust the method of presentation of the data to include iterations showing the total dollar value of option grants at each grant date in increments of 500 options. The trier of fact thus may consult the appropriate table to determine the approximate value of a specific number of options and may consult either a pencil and paper or a calculator to determine the precise value of a number that falls within the increments shown on the tables. This manner of presentation is illustrated in Exhibit N. Consistent with Mr. Wishnick's two reports, however, his expert opinion remains centered on the value of a single option at each relevant grant date, based on inputs updated through a date at or near the date of his testimony.

B.  **Black-Scholes is Reliable and a Generally Accepted Method of Valuation of Employee Stock Options**.

   1.  **The Flaws in the Defendants' Criticisms of Black-Scholes**.

Defendants' review of the literature regarding Black-Scholes is, not surprisingly, skewed wildly toward critical analysis. Most notably missing in the cacophony of criticism is the fact Black-Scholes remains not only the prevailing method of valuing employee stock options among large, publicly traded companies, but a method that continues to enjoy official sanction and approval and continues <u>to this date</u> to be used by UTC with respect to stock options it grants as compensation to its board of directors.

A second fundamental failure of the defendants' analysis is its focus on the highly theoretical question whether Black-Scholes perfectly models and predicts the actual value of an option. As virtually all authorities agree, in an employment context, there is a measurable cost to an employer of granting employee stock options for which it receives employee services in exchange, as part of a package of compensation that includes salary, benefits and stock options. The authorities, including critics of Black-Scholes, also generally agree that Black-Scholes provides a reliable measure of the value of the <u>real-time, present-day</u> trade made between employer and employee involving an exchange of personal services for stock options, regardless of whether they agree that Black-Scholes perfectly predicts the future value of options based upon the future market value of the underlying stock.

In other words, for the purposes for which we here are concerned – to place a value on what Ms. Nichani lost as compensation for her services in the form of stock options – Black-Scholes unquestionably is a valid and reliable methodology.

2. **Black-Scholes Is a Generally Accepted and Reliable Method of Valuing Employee Stock Options.**

The Black-Scholes Method continues to enjoy the imprimatur of the Financial Accounting Standards Board (FASB), "the authoritative source of standards of financial accounting officially recognized as authoritative by the Securities and Exchange Commission and the American Institute of Certified Public Accountants." http://www.fasb.org/facts/ [4] see

---

[4] As more fully noted at the FASB web site:

Since 1973, the Financial Accounting Standards Board (FASB) has been the designated organization in the private sector for establishing standards of financial accounting and reporting. Those standards govern the preparation of financial reports. They are officially recognized as authoritative by the Securities and Exchange Commission (Financial Reporting Release No. 1, Section 101 and reaffirmed in its April 2003 Policy Statement) and the American Institute of Certified Public Accountants (Rule 203, Rules of

also, Congressional Research Service, "CRS Report for Congress, Enron: Selected Securities, Accounting, and Pension Laws possibly Implicated in its Collapse" (January 16, 2002) ("FASB standards are recognized as definitive by the SEC and therefore must be followed by companies that file financial disclosure statements with the SEC.") (Exhibit D) Thus, the FASB, the SEC and the AICPA agree that Black-Scholes is an approved and reliable methodology for valuing stock options.

The FASB Statement of Financial Accounting Standards No. 123, Revised (FAS 123 R (2004)) states, in relevant part:

> A 13. A **lattice model** (for example, a binomial model) and a **closed-form model** (for example, the Black-Scholes-Merton formula) <u>are among the valuation techniques that meet the criteria required by this Statement for estimating the fair values of employee share options and similar instruments.</u>
>
> A 14. This Statement does not specify a preference for a particular valuation technique or model in estimating the fair values of employee share options and similar instruments.

FAS 123R, Appendix A, Implementation Guidance, p. 41, ¶¶ A13-A14 (Exhibit E; emphasis in original; underscoring added)

Further reflecting the continuing authoritative impact of FAS 123R and acceptance of the Black-Scholes Method, the Securities and Exchange Commission issued a Memorandum responding to the "[n]umerous questions" that "have arisen about the availability of suitable methods for companies to use in valuing employee stock options and related compensation." SEC Office of Economic Analysis Memorandum, "Economic Perspective on Employee Option Expensing: Valuation and Implementation of FAS 123(R)," (March 18, 2005) (hereinafter the "SEC

---

Professional Conduct, as amended May 1973 and May 1979).

http://www.fasb.org/facts/ (Exhibit C)

Memorandum") (Exhibit F). The SEC Memorandum includes the following statements regarding the terms of FAS 123(R) and Black-Scholes:

> o   The models that FAS 123(R) recognizes for estimating the value of employee options are well known to practitioners and in academic research. <u>The standard expressly allows for the use of models that comply with the basic principles of modern financial economics, which include:</u>
>
> > • <u>The modified *Black-Scholes-Merton model*, which estimates the value of employee stock options using a closed-form equation.</u>

SEC Memorandum, pp. 2-3 (Exhibit F; emphasis added). The SEC's view that the Black-Scholes Method is "well known to practicioners and in academic research" is fully borne out in the relevant literature. See, e.g., Carpenter, et al., "The Exercise and valuation of stock options." *Journal of Financial Economics* 46 (1998): 127, 130 ("A number of other empirical papers use data on option grants to estimate the value of executive stock options using the Black-Scholes formula (1973), as adjusted for dividends by Merton (1973).") (Exhibit G); Bettis, et al., "Exercise Behavior, Valuation, and the Incentive Effects of Employee Stock Options." *Journal of Financial Economics* 76 (2005): 225, 447 (reporting findings consistent with earlier studies and concluding that "conditional on exercise, executives in our sample capture a large fraction (90% at the median) of the remaining Black Scholes option value") (Exhibit H).

Indeed, even the authorities the defendants cite fail to support their assertion that the Black-Scholes Method produces "inflated" values for employee stock options. For example, defendants cite "a study of the actual gains of 1,445 companies during six periods between 1972 and 2002" that concluded "'the average actual gains as a percent of Black-Scholes value ranged from 95 percent to 910 percent." Def. Memorandum at 12-13, citing Reason, "The Holes in Black-Scholes: Valuing stock-option grants with Black-Scholes may cause some confusion on the income statement," CFO Magazine, last visited Mar. 30, 2006). What this article in fact establishes is that in the study sample

Page 10 of 29

the Black-Scholes Method produced at most an overvaluation of 5 percent and, in almost all cases, produced a <u>conservative</u> valuation <u>lower</u> than actual gains on employee stock options, rather than an "overstated" value. <u>Id</u>.

### 3. Defendants' Criticisms of Black-Scholes are Unconvincing and Have Been Rejected by Authoritative Sources.

A principal flaw of the defendants' arguments against the Black-Scholes Method lies in their inappropriately loose use of the term "value" in discussing what it is that Black-Scholes purports to measure. The aim of Black-Scholes, and the relevant application of Black-Scholes in this case, is not merely to measure a theoretical market "value" of the employee stock options, but to measure the value of employee stock options in an exchange of options for employee services. This, in fact, is precisely what FASB Standard 123(R) is designed to address and the reason that it approves the use of the Black-Scholes Method for valuing employee stock options. Thus, FASB Standard 123(R) states at the outset:

> This Statement establishes standards for the accounting for transactions in which an entity exchanges its equity instruments for goods or services. . . . This Statement focuses primarily on accounting for transactions in which an entity obtains employee services in share-based payment transactions.

FASB 123(R), Summary, p. i. (Exhibit E)

Thus, FASB 123(R) is focused on the issue here – the cost to the employer and the payment to the employee in an exchange of services for stock options. Similarly, the SEC Memorandum states that the "objective of the model is to estimate the cost to the company (as a payment for employee services)" of employee stock option grants. The SEC describes Black-Scholes as a method that is "well known," and "compl[ies] with the basic principles of modern financial economics." SEC Memorandum, p. 3 (Exhibit F).

In FASB 123(R), moreover, the Board addressed the criticisms of the reliability of the Black-

Scholes Method head-on, and rejected them, stating:

> B59. <u>Many respondents to the Exposure Draft . . . cited reliability concerns. Critics generally asserted that available valuation techniques, especially the Black-Scholes-Merton option-pricing formula and similar closed-form models, do not adequately take account of unique features of employee share options.</u> . . .They contended that recognizing compensation cost based on fair value estimated using currently available valuation techniques would add an unacceptable level of measurement error to financial statements and impair their reliability and comparability.
>
> B60. <u>The Board did not find those assertions persuasive.</u> During the course of its work on share-based payment, the Board and its staff devoted thousands of hours to understanding the available valuation models and how they can be applied to estimate the fair value of employee share options and similar instruments. That work encompassed discussions with many valuation experts, including those who developed some of the most widely used and familiar models. Based on that work, the Board concluded that entities can develop estimates of the fair value of equity instruments, including equity share options, awarded to employees that are sufficiently reliable for recognition in financial statements. <u>The Board therefore concluded that use of the fair-value-based method required by this Statement will improve not only the relevance and reliability, but also the credibility, of financial statements</u>. Without estimates, accrual accounting would not be possible. For example, financial statement amounts for loan loss reserves, valuation allowances for deferred tax assets, and pensions and other post retirement benefit obligations are based on estimates. For those and many other items in accounting that necessitate the use of estimates, companies are required to use appropriate measurement techniques, relevant data, and management judgment in the preparation of financial statements.

FASB 123(R), pp. 171-72, ¶¶ B59-B60 (Exhibit E).

Thus, defendants' attack on the use of Black-Scholes defies the FASB's rejection of similar attacks and its affirmative conclusion that the use of methods such as Black-Scholes <u>improves</u> the relevance and reliability of financial statements. <u>Id</u>. The defendants arguments in this case are what the FASB identified as, in effect, a groundless wholesale attack on the use of estimates in accrual-based accounting, a methodology whose widespread use, general acceptance and reliability cannot reasonably be questioned. <u>Id</u>.

The standards applied by the FASB clearly match the relevant legal standard that damages involving future contingencies may be based upon reasonable estimates. Moreover, the FASB's

conclusion that "entities can develop estimates of the fair value of equity instruments, including equity share options, awarded to employees that are sufficiently reliable for recognition in financial statements" points to the next fundamental flaw in the defendants' arguments. FASB 123(R), pp. 171-72, ¶ B60 (Exhibit E) The entity at issue here, defendant UTC, in its efforts to comply with FASB 123(R), has in fact identified a methodology, appropriate to its own circumstances, to produce "sufficiently reliable" reliable estimates of the value of share options awarded to employees. UTC selected the Black-Scholes Method. Further, UTC continues to this date to use the Black-Scholes Method to determine the dollar value of options it grants as director compensation.

C.  **Defendants' Rejection of the Black-Scholes Method as "Unreliable" in this Case is Defied by their Use of Black-Scholes as "Reliable" for Compliance With FASB 123 (R).**

Until its most recent SEC filing, UTC used the Black-Scholes Method for the valuation of its employee stock options and disclosed the use of that method in its SEC Form 10K and 10Q filings, as well as in its proxy materials issued to shareholders. [5] There is no dispute of this fact, nor can there be any dispute as to UTC's purpose and intent in using the Black-Scholes Method. FASB Rule 123(R) requires that a publicly traded company use only "reliable" estimates of the fair value of equity instruments." Id. It permits a choice of several accepted methodologies. UTC chose Black-Scholes.

In fact, with respect to proxy materials, UTC is <u>not</u> required to disclose the valuation method it uses, or that it used any valuation method at all. Yet, UTC affirmatively chooses to disclose in its

---

[5] UTC's most recent Annual Report states:

As of January 1, 2005, the fair value of each option award is estimated on the date of grant using a binomial lattice model. Prior to January 1, 2005, the fair value of each option award was estimated on the grant date using a Black-Scholes valuation model.

UTC Form 10-K For the Fiscal Year Ended December 31, 2005, p. 39 (Exhibit I).

proxy materials that it uses the Black-Scholes method. That it now attacks the same methodology as "unreliable" in this Court reflects truly either exceptional audacity, a misconception of the standards that apply to this Court's "gatekeeper" function, or both.

Defendants' also attempt to distort the issue by comparing the value of Ms. Nichani's stock options with the value of her cash compensation, suggesting that the relationship between the two proves the unreliability of Black-Scholes derived option values. However, it is well accepted that the principal means by which executives at large companies acquire wealth from their personal services is from growth in the value of the company's stock and stock options, rather than from salary growth. As researchers at the Harvard Business School have noted:

> The [research] results show that for any given shift in firm value, changes in CEO wealth due to stock and stock option revaluations are *more than fifty times larger* than changes in wealth due to salary and bonus.

Ross, "Paid for Success: Options for Compensating CEOs", Harvard Business School, Working Knowledge (Oct. 12, 1999) (Exhibit J; emphasis added).

Defendants simply seek shock value in the fact that the value of Ms. Nichani's claims (using the assumption of 9,000 options per year) is *"approximately 100 times her annual salary while at Otis."* Def. Memorandum at 3 (emphasis and italics in original). If defendants really wanted shock value, however, they should have noted the value of the stock options granted to UTC's CEO, George David, as reflected in UTC's proxy statement for the 2003 fiscal year:

> Salary – $1,200,000
> Present Value of Option Grants – $6,757,445
> Value Realized for Options Exercised – $66,226,550
> Value of Remaining Exercisable Options – $183,317,610

http://swz.salary.com/execcomp/layouthtmls/excl_companyreport_C1000107_tcc.html (summarizing information from UTC 2003 proxy statement) (Exhibit K). The total value of Mr. David's stock