options as of 2003 thus <u>exceeded a quarter of a billion dollars</u> (calculated by UTC using the Black-Scholes Method) – a sum <u>more than 200 times</u> his annual salary.

If, as UTC contends in this Court, the value of Mr. David's stock options and all other executive stock options UTC calculated using the Black-Scholes Method is "unreliable," "speculative," and "inflated," then UTC's inclusion of such obviously material misleading information in its proxy statements surely is fodder for a massive shareholder class action at the very least. In simple terms, UTC's reliance on Black-Scholes for such important purposes simply cannot be squared with their assertions in this Court.

In a very real and practical sense, the question whether Black-Scholes is a reliable methodology is not properly directed at Mr. Wishnick at all. It is UTC that has determined, in fulfillment of its obligations under the rules of the FASB and the SEC, that Black-Scholes is sufficiently "reliable" to meet its financial reporting and legal obligations to its shareholders. Mr. Wishnick simply followed UTC's lead and accepted a methodology that <u>UTC</u> selected as reliable. His assumptions regarding appropriate inputs for a Black-Scholes calculation, moreover, are derived from UTC's own assumptions as stated in its annual reports. Thus, defendants' only arguably valid commentary regarding Mr. Wishnick's methodology is that it is "numbers crunching." But it is useful "numbers crunching" that involves matters beyond the understanding of the average juror and will assist the jury as the trier of fact. As such, it comports fully with the standards of Federal Rule 702 and clearly is admissible expert testimony under the standards of <u>Daubert</u> and its progeny.

D. **Defendants' Attack on Black-Scholes as "Unreliable" is *Completely* Undone By Their Use of Black-Scholes to Compute the Dollar Value of Directors' Stock Options.**

As noted, beginning with the 2005 fiscal year, UTC no longer uses the Black-Scholes Method to value employee stock options for financial reporting purposes and has changed to a "binomial"

method of valuation.[6] UTC's use and reliance on Black-Scholes, however, continues to the present and never has been limited to technical compliance with FASB rules and SEC financial reporting requirements. Amazingly, (amazing only because of the defendants' shrill criticism of Black-Scholes before this Court) UTC has, from 2001 to and including 2006, specifically relied on the Black-Scholes Method to determine a <u>specific dollar value</u> of annual option grants to the <u>members of its board of directors</u>.

With respect to non-employee director stock option grants, UTC does not merely establish a pool defined by a number of stock options and report the value on its financial disclosures using the Black-Scholes Method. For director options, UTC goes about the process in reverse. It first sets a <u>dollar value of director compensation</u> promised to each director and then uses <u>the Black-Scholes Method</u> to determine the <u>number of options</u> required to <u>match the dollar value</u> of the promised compensation.

In 2006, for example, UTC told each of its non-employee directors that they would receive compensation of $100,000, in the form of stock options. It then determined the <u>number</u> of options that would <u>equal a value of $100,000</u> using the Black-Scholes Method. UTC's proxy materials for its April 12, 2006 shareholders' meeting thus state:

> Each nonemployee director receives annually, on the date of the annual meeting, a grant of stock options valued at $100,000. Options issued are valued at issuance using the Black-Scholes option valuation model. All director options have an exercise price equal to the closing price of Common Stock on the date of issuance, become exercisable after three years, and have a ten-year term. For 2005, each nonemployee director received options to purchase 6,000 shares at an exercise price of $50.525 per share.

UTC Proxy Statement issued March 9, 2006, for April 12, 2006 Shareholder' Meeting, p. 15 (Exhibit

---

[6] The "binomial method" is but another of the methods approved for use by the SEC and the FASB, along with the Black-Scholes Method, which continues to be an approved method. FASB 123(R), pp. 171-72, ¶¶ B59-B60; SEC Memorandum, p. 3 (Exhibit E).

L). Moreover, the very same language and methodology – identifying a dollar value of director option grants and then determining the number of options that equal the stated dollar value, using "the Black-Scholes valuation model" – <u>has appeared in every UTC proxy statement from 2001 through and including 2006</u>.

UTC thus at all relevant times has considered the Black-Scholes Method sufficiently reliable to "size" and value the option grants of those who serve UTC at the highest echelon – its board of directors. It uses the Black Scholes Method to fulfill a specific commitment to give each director a stated dollar value of options. It also elects to communicate the same dollar value and the valuation methodology to its shareholders in its proxy materials.

Surely, UTC is honest with its directors and shareholders when it explicitly represents that options granted to its directors have a value of $100,000. Surely, UTC has chosen an appropriate and reliable valuation method for such an important purpose. Just as surely, such a method also is sufficiently reliable to determine the dollar value of Ms. Nichani's stock option claims in this Court. UTC's proxy materials and its own practices put the lie to its arguments against Black-Scholes.

The simple point is that UTC cannot have it both ways. UTC cannot tell the world – their shareholders, their directors, their executives, the SEC, the FASB, in proxy statements, annual reports and in direct promises and representations about the value of executive and director compensation – that it can and does use the Black-Scholes Method to <u>reliably</u> determine the <u>value</u> of stock options, while at the same time telling this Court that the methodology is hopelessly speculative and <u>unreliable</u>. UTC's long-standing and continuing use of Black-Scholes to determine the dollar value of director compensation renders its current position an affront to the discernment of its audience.

Moreover, UTC's current criticism of convenience, as well as the criticisms of the

unauthoritative sources cited in their brief, also have all been heard, duly considered, and <u>rejected</u> by the authorities at the FASB and the SEC after "thousands of hours" of analysis and consultations with many leading experts in the field. FASB 123(R), pp. 171-72, ¶¶ B59-B60 (Exhibit E); SEC Memorandum, p. 3 (Exhibit F).

For these fundamental reasons, as further explained below, the defendants' motion in limine must be denied.

## Legal Discussion

### I.  The Standard for Admission of Expert Testimony.

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. Under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), district courts act "as the gatekeeper for expert testimony." <u>Raskin v. Wyatt Co.</u>, 125 F.3d 55, 66 (2d Cir.1997). For expert testimony to be admissible, "it must help the jury 'to understand the evidence or to determine a fact in issue.' " Id. at 66 n. 5 (quoting Daubert, 509 U.S. at 591).

With respect to proof of damages that depends on future events, "[r]easonable certainty of proof is all that is required," and "the amount may be determined approximately upon reasonable inferences and estimates." <u>Burr v. Lichtenheim</u>, 190 Conn. 351, 360, 460 A.2d 1290 (1983); <u>Bronson & Townsend Co. v. Battistoni</u>, 167 Conn. 321, 326-27, 355 A.2d 299 (1974); see 3 Restatement (Second), of Contract §352.[7] The use of assumptions likewise is permissible, where

---

[7] This memorandum cites federal and state authorities with respect to the Court's "gatekeeper" function interchangeably, both because the present case involves both state and

the expert's opinion is "qualified accordingly, and the jury . . . correctly instructed that it must reject the expert's opinion if it failed to find the assumed facts to be proven. West Haven Sound Development v. West Haven, 201 Conn. 305, 321, 514 A2d 734, 743 (1986).

## II. Mr. Wishnick is Qualified to Express His Opinions.

The defendants' initial premise is that Mr. Wishnick is an expert only with respect to what they refer to broadly as "actuarial calculations." Selectively citing Mr. Wishnick's deposition testimony, defendants assert that Mr. Wishnick conceded he "has no special expertise with the Black-Scholes method." Def. Memorandum at pp. 13-14.

In fact, while Mr. Wishnick did not claim "special" expertise with respect to Black-Scholes, his full testimony included a statement that the Black-Scholes Method was "on the syllabus of the [actuarial] society exams," as well as his statement that "I have read up on it." The standard under Federal Rule of Evidence 702 is not whether the expert witness is a particular specialist in the subcategory of expertise at issue, but whether he will "assist the trier of fact" because of his "knowledge, skill, experience, training, or education." Thus, Mr. Wishnick's testimony that Black-Scholes is a matter is tested by the professional society that certifies him as an actuary and the he has "read up on it" are both means of showing expertise within the meaning of Rule 702.

The plain fact is that Black-Scholes is a matter within the expertise of mathematicians and actuaries as well as economists. Indeed, leading texts that discuss Black-Scholes have been written by Phelim Boyle, a noted actuary and by Joseph Stampfi, a mathematics professor. See, Stampfli, The Mathematics of Finance: Modeling and Hedging, (Brooks Cole 2001); Boyle, Derivatives: The

---

federal claims and because the standards articulated by the Connecticut and federal courts are the same. See State v. Griffin, 273 Conn. 266, 274, 869 A.2d 640 (2005) ("In Porter we adopted the test for determining the admissibility of scientific evidence set forth in Daubert")

Tools that Changed Finance (Risk Books 2001). A further fact is that courts have accepted the Black-Scholes method of valuing options as well as other recognized methods, supported by the testimony of economists, actuaries, mathematicians and finance professors. See, e.g., Hansel v. Holyfield, 779 So.2d 939 (La. App. 4 Cir. 2000) (after admitting testimony from two experts, the court accepted the testimony of an actuary, using the a present value/discount method over the testimony of a finance professor using the Black-Scholes Method).

The Black-Scholes Method is a mathematical formula whose use fits comfortably within the area of expertise of actuaries. Moreover, in the present case, Mr. Wishnick relied on UTC's annual reports and the inputs it uses in its own valuation calculations for the variables he used in his Black-Scholes calculations. No "special" expertise beyond Mr. Wishnick's ample expertise as an actuary and the knowledge he has gained from a review of UTC's annual reports and relevant literature is required to support Mr. Wishnick's opinions in this case.

### III. Defendants' Attack on Mr. Wishnick's Testimony Assumptions Is Misplaced.

The assumptions in Mr. Wishnick's reports regarding the number of options Ms. Nichani may have received do not invalidate his testimony under Daubert or any other applicable legal principles. As Mr. Wishnick himself noted, he did not derive these figures by expert analysis; rather, he was *given* certain assumptions to use at a time when data was not available regarding actual numbers of option grants at UTC. Mr. Wishnick's "expert" opinions, however, and those he is expected to express at trial, relate to the value of a single option grant at relevant dates, rather than the total number of options Ms. Nichani might have received.

In Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1188 (2d Cir.), cert. denied, 113 S. Ct. 82 (1992), the defendant challenged expert testimony that projected a terminated employee's future earnings for a period of seventeen years and included assumptions regarding increases in

compensation based upon evidence in the trial record. The trial court rejected the employer's challenge and the Second Circuit agreed, stating that the defendant employer's "arguments are better addressed to a jury." Id. at 1188. As the Second Circuit stated:

> Under Fed.R.Evid. 703, expert testimony may be based on firsthand observation of the witness, on facts or data presented at the trial, or on facts and data presented before the trial. All of Bethlehem's arguments, however, go to the weight, not the admissibility, of the testimony. Judge Curtin did not abuse his discretion when he denied Bethlehem's motion to strike Holmes' testimony. On this record it was for the jury to determine both the length of the work period denied to Tyler and the amount he would have earned during that period. As to the salary level and the rate of increases the jury could reasonably evaluate the proper weight to give to historical rates, Tyler's own abilities, and the actual wage differences at the company between Tyler's discharge and the time of trial.

Id. at 1188-89.

In this case, the plaintiff has no intention of presenting as an "expert" opinion that 9,000 option grants or any other particular number is more credible or should be accepted based upon any scientific theory or special expertise of Mr. Wishnick. Rather, the plaintiff will leave to the jury to determine, based on the evidence, a number of option grants reasonably supported by the evidence. The defendants' motion therefore is misdirected to the extent that it challenges Mr. Wishnick's opinion testimony regarding a proper number of option grants.

The challenged assumption regarding the number of grants assumed in Mr. Wishnick's expert report is not an assumption that affects Mr. Wishnick's true "expert" opinion concerning the value of a single option. Because any assumptions concerning the number of options are applied in the damage analysis as a multiplication function *after* the Black-Scholes calculation is completed, such assumptions play no role in the Black-Scholes calculation of the value of a single option. Thus, defendants' arguments that Mr. Wishnick's testimony should be excluded because his expert opinions are infected by unfounded assumptions also is misplaced. See Def. Memorandum at 24, citing Lippe v. Bairnco Corp., 99 Fed. App'x 274, 278-79 (2d Cir. 2004).

However, as experts typically are permitted to do, Mr. Wishnick may be expected to testify in response to hypothetical scenarios regarding the number of stock options that the jury might find to be supported by the evidence. The rule consistently applied in the Second Circuit is that expert witnesses may testify as to "scenarios that ha[ve] evidentiary support in the record." In re Air Disaster at Lockerbie Scotland, 37 F.3d 804, 824, 825 (2d Cir. 1994), cert. denied, 115 S.Ct. 934 (1995); see Tyler, 958 F.2d at 1188 (Under Rule 703, experts may testify based on "facts or data presented at the trial, or on facts and data presented before the trial"). In this case, moreover, even the hypothetical scenarios that may be put to Mr. Wishnick would call merely for extension, through the use of multiplication, of the value of a single option and not a new or independent "expert" opinion.

IV. **Other Courts Have Accepted Black Scholes For Purposes Such as the Plaintiff's Damages Claim in the Present Case.**

Fundamentally, the Daubert challenge raised here is persuasively addressed by the SEC and FASB pronouncements, the use of Black-Scholes by scores of publicly traded companies, and UTC's own long-standing use and acceptance of the Black-Scholes Method. There is, however, no definitive case law, either in Connecticut case law or in the Second Circuit, regarding the use of Black-Scholes to value employee stock options in an employment case.

Yet, authority from a number of courts, including several district courts within the Second Circuit and inferential authority from the Second Circuit itself, support its use. For example, the Southern District of New York, in R.A. MacKie & Co., L.P. v. Petrocorp, Inc., 329 F. Supp.2d 477, 514 (S.D.N.Y. 2004), found that the Black-Scholes model employed by the Plaintiff, and his opinion of the warrants' value based thereon, met the test for reliability under Federal Rule of Evidence 702 and as set forth in Daubert. Another Southern District Court Judge, in Mathias v. Jacobs, 238 F.

Supp.2d 556, 575 (S.D.N.Y. 2002), applied the Black Scholes method to value the Plaintiff's stock options. And the Second Circuit Court of Appeals, in <u>Resnick v. Swartz</u>, 303 F.3d 147, 154 (2nd Cir. 2002) recognized, elementarily, that "a reasonable shareholder would understand that stock options at the time of their grant have value, notwithstanding the uncertainty, until exercise date, of the actual value the option holder will eventually realize." Finally, the respected Delaware Chancery Court, in <u>In Re Coleman Co., Inc. S'Holders Litig.</u>, describes Black Scholes as "the leading option pricing model." 750 A2d 1202, 1208 n.3 (Del. Ch. 1999).

Defendants cite two lower court cases in Connecticut that have rejected the use of Black-Scholes. <u>See</u> Defs.' Mem. at pp.27-28. They fail to point out, however, that both decisions were by the same Judge, who expressed specific reasons for rejecting Black-Scholes in the context of equitable distribution of marital assets in a divorce case. Thus, Judge Tierney's rejection of Black-Scholes in both <u>Wendt</u> and <u>Chammah</u> has more to do with the nature of marital dissolution law than any <u>Daubert</u> or <u>Porter</u> principles. In fact, Judge Tierney specifically refers to Black-Scholes as "a recognized valuation technique with well known variations," that is "held in high regard in the financial and economic community," but finds it inappropriate for valuing unvested stock options "<u>in a marital setting</u>." <u>Wendt v. Wendt</u>, 1998 Conn. Super. LEXIS 1023 at *109-110 (Super. Ct. Mar. 31, 1998) (emphasis added).

In a marital setting the Court has the duty to make an equitable distribution of marital assets and can do so by outright division of assets such as stock options, by deferred distribution of assets that may appreciate in value, or by use of a constructive trust, as well as other means. <u>Id</u>. at *114; <u>See, e.g.</u>, <u>Fisher v. Fisher</u>, 564 Pa. 586, 597-98, 769 A.2d 1165 (2001) (applying deferred distribution when "[r]egrettably, . . . the record [was] void of any testimony" supporting the "well known" models, such as "discounting to present value and the Black-Scholes model.").

Nevertheless, as the Connecticut Appellate Court noted, the method that Judge Tierney chose in fact arrived at a higher valuation of the defendant's unvested stock options than did the valuation method known as the Black-Scholes method." Thus, the Court stated: "Not surprisingly, the plaintiff does not challenge the court's choice of valuation methods. Accordingly, we do not discuss it further." Wendt v. Wendt, 59 Conn. App. 656, 663, n.4, 757 A.2d 1225, cert. denied, 255 Conn. 918, 763 A.2d 1044 (2000).

Moreover, divorce cases are not jury cases. The fact that there is criticism of a particular methodology, or that the Court may prefer another methodology, is not a proper ground for precluding the plaintiff from presenting her evidence to the jury. As the Connecticut Supreme Court has stated:

> In Porter, we stated that testimony derived from a scientifically valid methodology is admissible "even if the judge thinks that there are better grounds for some alterative conclusion. . . ."

Hayes v. Decker, 263 Conn. 677, 686, 822 A.2d 228 (2003) (emphasis added in original; internal quotation marks omitted).

Subsequent to the Wendt decision, in Grimm v. Grimm, 82 Conn. App. 41, 844 A.2d 855, (2004) rev'd in part on other grounds, 276 Conn. 377, 886 A.2d 391 (2005), the Connecticut Appellate Court refused to open a judgment based on the assertion that the husband's employer, General Electric, had announced that it intended to use a new valuation method to value employee stock options. The Court noted that any "purportedly new valuation method would be just one of numerous methods that could be utilized in valuing the plaintiff's stock options." Grimm v. Grimm, 82 Conn. App. at 50 (emphasis added), citing Wendt v. Wendt, 59 Conn. App. 656, 663 n. 4, 757 A.2d 1225, cert. denied, 255 Conn. 918, 763 A.2d 1044 (2000).")

The notion that a Court is permitted to choose among accepted valuation methods and that

future damages need not be proven with mathematical exactitude is, of course, settled in both the Connecticut courts and the Second Circuit. Thus, the Connecticut Supreme Court has stated:

> [We] recognize that economics is an inexact science and we hesitate to adopt any particular method for computing the present value of lost compensation and future costs. Predictive techniques are constantly being refined, as are methods of correctly assessing the immediate past.

Mather v. Griffin Hospital, 207 Conn. 125, 127 (1988) (internal quotation marks and citation omitted). The Court also has recognized that damages related to future events "cannot be calculated with mathematical certainty." Message Center Management, Inc. v. Shell Oil Products Co., 85 Conn. App. 401, 421, 857 A.2d 936, 949 (Conn. App.,2004), citing 3 Restatement (Second) Contracts § 352 (1981). "Mathematical exactitude in proof often is impossible." Lawson v. Whitey's Frame Shop, 241 Conn. 678, 689-90, 697 A.2d 1137 (1997). "A damages award by a jury need not be nullified if the evidence affords a basis for a reasonable estimate by the trier of fact as to the amount due." Message Center, 85 Conn. App. at 421.

The federal rule is no different. "The computation of damages based upon fair market value is not the only method of measurement. . . . `The test of market value is at best but a convenient means of getting at the loss suffered. It may be discarded and other more accurate means resorted to if, for special reasons, it is not exact or otherwise not applicable.'" Kanematsu-Gosho Ltd. v. M/T Messiniaki Aigli,, 814 F.2d 115, 118-119 (2nd Cir. 1987), (quoting, Illinois Cent. R.R. v. Crail, 281 U.S. 57, 64-65, 50 S.Ct. 180, 74 L.Ed. 699 (1930)); see Davis v. The Gap, Inc. 246 F.3d 152, 167 (2nd Cir. 2001) ("We recognize also that finding the fair market value . . . may involve some uncertainty. But that is not sufficient reason to refuse to consider this as an eligible measure of actual damages.")

Where there are different approaches or schools of thought with respect to the calculation of

damages, each of which may meet the test of reliability, cross-examination, rather than exclusion, remains the appropriate tool. Thus, as the Second Circuit has stated, to the extent an expert is alleged to have "departed from general valuation practices or adopted procedures subject to criticism," cross-examination provides "ample opportunity to elicit these facts and argue them to the jury." Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 494 (2nd Cir. 1995) "The expert's training and background and the procedures he followed in arriving at a valuation presented the jury with the question of whether or not to accept the expert's opinion and what weight to give it." Id., citing Enercomp, Inc. v. McCorhill Pub., Inc., 873 F.2d 536, 550 (2d Cir. 1989); W.L. Hailey & Co. v. County of Niagara, 388 F.2d 746, 753 (2d Cir. 1967) ("when reviewing the sufficiency of the damages evidence, we are guided by the principle that if a plaintiff has shown it more likely than not that it has suffered damages, the amount of damages need only be proved with reasonable certainty."); Merlite Industries, Inc. v. Valassis Inserts, 12 F.3d 373 (2nd Cir. 1993) (reversing grant of summary judgment where damages were based on record facts and "the district court appears to have decided disputed issues of fact rather than to have determined whether there were genuine issues of material fact to be tried")

Mr. Wishnick has used two accepted methods – Black-Scholes and a discounted present value model derived from UTC's own forecasts (which are in turn based on past stock performance and management's understanding of the current business and future plans of the company). The defendants' expert, on the other hand, is of the view that no methodology to value employee stock options is sufficiently reliable to pass Daubert muster. This conclusion is as extreme as defendants' previously rejected arguments that whether Ms. Nichani should have been compensated as an executive is impermissibly speculative.

The alternative that the defendants propose – to declare ten-year options in one of the

greatest, largest, strongest and most well-established companies in the world as valueless for purposes of assessing damages in an employment context – truly would violate well-settled principles of economics, UTC's own treatment and valuation of employee stock options, and the most fundamental legal theories of future damages, uniformly articulated by the Connecticut courts and the Second Circuit. See Aboody, "Firms' Voluntary Recognition of Stock-Based Compensation" *Journal of Accounting Research.* 42(2) (2004): 123, 126 ("Because options have a time value in addition to intrinsic value (Black Scholes [1973]), stock-based compensation expense under SFAS 123 does not equal zero.") (Exhibit M)

In the Resnik case, the Second Circuit considered a securities fraud case involving proxy materials that the plaintiff alleged to be misleading because the company did not include a Black-Scholes valuation. 303 F.2d at 154. The plaintiff also claimed that the language in the proxy materials suggested the options might not have any value. Id. The Second Circuit rejected the claim that a shareholder might be easily misled to reach such a conclusion, declaring broadly that "a reasonable shareholder would understand that stock options at the time of their grant have value, notwithstanding the uncertainty, until exercise date, of the actual value the option holder will eventually realize." [8] The Massachusetts Courts also have expressly accepted the hypothesis that stock options have a value and that the value is reasonably calculable in a manner that meets the standards for admissibility in court proceedings. Massachusetts Mut. Life Ins. v Massachusetts Life

---

[8] The challenged proxy statement language was as follows:

> The actual value, if any, an executive will realize will depend on the excess of the market price over the exercise price on the date the option is actually exercised. The value actually realized by an executive or any shareholder may not be at or near the values estimated in this table.

Resnik, 303 F.3d at 150.

Ins., 356 Mass. 287, 290-91, 249 N.E.2d 586 (1969) (Noting that stock options "present an opportunity to profit from a rise in the market price of the stock without risk and are an incentive for key men to remain with the company.")

Finally, it bears repeating – perhaps one more time – that the SEC, the FASB, the AICPA and UTC have accepted, and continue to accept, the Black-Scholes Method as a reliable method to calculate the value of employee stock options.

## Conclusion

For all of the foregoing reasons, the plaintiff respectfully submits that the defendants' motion in limine must be denied.

THE PLAINTIFF,

BY _____
Jeffrey J. Tinley, Esq.
Tinley, Nastri, Renehan & Dost, LLP
60 North Main Street, 2nd Floor
Waterbury, CT 06702
203-596-9030
Federal Bar No.: CT00765

Anthony R. Minchella, Esq.
Law Offices of Anthony R. Minchella, L.L.C.
530 Middlebury Road
Suite 203-204B
Middlebury, CT 06702
203-758-1069
Federal Bar No.: CT18890

## CERTIFICATION

THIS IS TO CERTIFY that a copy of the foregoing was sent by electronic mail and by U.S. mail, postage prepaid, on this 22nd day of April 2006, to:

Albert Zakarian, Esq.
Douglas Bartinik, Esq.
Victoria Woodin Chavey, Esq.
Day, Berry & Howard, LLP
CityPlace I
Hartford CT 06103-3499

_____
Jeffrey J. Tinley